**ORIGINAL**
**FILED**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT

OCT 1 1 2007

E-Filing

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

NO. **C 07 5217**

CRB

In Re )

LAVARIUS JERMAINE McCORD, ) PETITION FOR WRIT OF HABEAS CORPUS

Petitioner, )

v. )

State of California, )
Warden of Calipatria State Prison )

(PR)

Contra Costa Superior Court No. 05-032028-3
Honorable Harlan Grossman, Judge Presiding

**PETITION FOR WRIT OF HABEAS CORPUS**
**APPENDIX**

IVY McCRAY
Attorney at Law
Cal. State Bar No. 245927

829 - 61st Street
Oakland, California 94608
Telephone: 510-653-4900

Attorney for Petitioner
Lavarius Jermaine McCord

# APPENDIX OF EXHIBITS

| NO. | ITEM | PAGE |
|-----|------|------|
| 1 | Marsden Hearing | 1 |
| 2 | Motions to Continue Trial | 1 |
| 3 | Letter to Shayla Gustafson | 3 |
| 4 | Letter from School of the Blind | 4 |
| 5 | Nancy Phinnesse's Letter to Probation Office | 6 |
| 6 | Memo to file re: Trial Strategy | 7 |
| 7 | Letter by Ed Oasa re: Juror's change in verdict | 8 |
| 8 | Petitioner's Motion in Limine No. 8 | 10 |
| 9 | BART Transfer | 20 |
| 10 | Photocopy of underwear | 22 |
| 11 | Declaration of Due Diligence | |
| 12 | Jane Doe's statements and trial testimony | iii |

1    IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2    IN AND FOR THE COUNTY OF CONTRA COSTA

3    BEFORE THE HONORABLE WILLIAM DANIEL O'MALLEY, JUDGE

4    DEPARTMENT NO. 13

FILED
Court of Appeal First Appellate District

JAN 25 2005

Diana Herbert, Clerk
By_____ Deputy Clerk

5    ---oOo---

6    PEOPLE OF THE STATE OF CALIFORNIA, )

7                    Plaintiff,    )

8    vs.                           )        No. 032028-3

9    JERMAINE LAVARIUS McCORD,      )        MARSDEN

10                   Defendant.     )        SEALED

11    _____)

12    REPORTER'S TRANSCRIPT OF PROCEEDINGS

13    JUNE 16, 2004

14    A P P E A R A N C E S :

15    FOR THE PEOPLE:        ROBERT KOCHLY

16                           District Attorney

17                           Contra Costa County

18                           Martinez, CA  94553

19                           By:  Anita Santos

20                                Deputy District Attorney

21    FOR THE DEFENDANT:     DAVID COLEMAN

22                           Public Defender

23                           Contra Costa County

24                           Martinez, CA  94553

25                           By:  Timothy Ahearn

26                                Deputy Alternate Defender

27    Reported By:  LINDA S. MacFARLANE

28    Official Court Reporter, Certificate No. 7813

6-16-04                    EXh I

2

| | |
|---|---|
| 1 | JUNE 16, 2004 | MORNING SESSION, 8:30 A.M. |

---o0o---

3

4    MS. YANCEY:  Calling lines seven and eight, Lavarius

5    McCord, A.D.O..  It says Mr. Ahearn.  He is in trial.  I

6    spoke to Mr. Bowen.  My suggestion is to put it over to the

7    afternoon and I'll try to get somebody over here on it,

8    Judge.

9        THE COURT:  We'll just confirm the trial.

10    MS. YANCEY:  Great, Judge.  And trail the other

11    matter to Monday?

12        THE COURT:  Sure.

13        *    *    *    *    *    *    *

14    MS. SANTOS:  Line seven, Jermaine McCord, docket

15    number 5-032028-3.  And it's on for readiness this morning,

16    the trial is on June 21st, Judge.  The People are ready to

17    confirm.

18    MR. AHEARN:  Your Honor, I've received some

19    outstanding discovery this morning.  And I don't believe

20    we'll be prepared to proceed next week.  My investigator is

21    out of the office, but back on Wednesday.  The way the trial

22    calendar is shaking down, probably won't be an issue.

23        THE COURT:  Is it my understanding that Mr. McCord

24    would like to make a Marsden?

25    MR. AHEARN:  I believe, he does.

26        THE COURT:  Ask that the courtroom be cleared.

27    Order that the transcript of what we're about to say be

28    sealed until further order of the Court.

3

1              All right.   Present are the Court security

2   staff, Mr. Ahearn, the court staff and myself.  Once again,

3   this is a confidential hearing.

4              Mr. McCord, what would you like to tell me?

5              THE DEFENDANT:  First of all, like to let you know

6   my name.  Lavarius Jermaine McCord, in custody at the

7   Martinez Detention Facility.

8              At this moment like to say I am getting

9   inadequate representation.  During the seven or eight months

10   that I have been represented by Mr. Ahearn nothing has been

11   accomplished.  He has failed and/or refused to communicate

12   with me, to subpoena witnesses and evidence critical to my

13   defense and deprived me of the testimony and physical

14   evidence that is critical.

15              Failed and/or refused to file motions critical

16   to my case.

17              Failed and/or refused to declare prejudice or

18   conflicted against me and due to said surrogate Prosecutor

19   against my best interest.

20              Counsel has failed and/or refused to confer

21   with me concerning the preparation of my defense.

22              All of the above is a fundamental breakdown of

23   my relationship and reaches well beyond disagreements.  I,

24   Jermaine McCord, cannot and will not cooperate with counsel

25   of record in this case.  At this time I move the Court to

26   relieve or dismiss counsel due to inadequate representation.

27              I declare that the forgoing is true and

28   correct to the best of my ability.

4

1          THE COURT:  Anything else?

2          THE DEFENDANT:  That's it.

3          THE COURT:  Mr. Ahearn, tell us about your training,

4     experience and education.

5          MR. AHEARN:  Employed by the Public Defender's

6     office in Contra Costa County for almost five years at this

7     point.  I've done numerous felony trials and getting near to

8     40 trials altogether and numerous contested juvenile

9     hearings, 602.

10          After law school, clerked for the Supreme

11     Court for a semester.  I wrote memos and briefs to the

12     justices of that Court which grant petitions.  I feel that

13     I'm well qualified to handle a case of this nature.

14          THE COURT:  What's the range of types of cases?  I

15     assume -- and what's the most serious types?

16          MR. AHEARN:  Handled from a 14601 to homicide.  I

17     have done a homicide trial.

18          THE COURT:  All right.

19          And Mr. McCord has some concerns.  You were

20     going kind of fast.  I tried to write them down.

21          THE DEFENDANT:  I'm sorry.

22          THE COURT:  You're doing fine.  Hang in there for

23     me.

24          THE DEFENDANT:  Okay.

25          THE COURT:  Regarding an allegation you may be

26     prejudiced against Mr. McCord, would you like to --

27          THE DEFENDANT:  Your Honor --

28          THE COURT:  I'm asking Mr. Ahearn to respond.

5

1        MR. AHEARN:  Your Honor, I don't feel -- I take job

2  extremely seriously and am working hard on Mr. McCord's

3  behalf.  We've done a vast amount of investigation on this

4  case.  And I don't think in anyway that I'm prejudiced

5  against Mr. McCord in anyway whatsoever.

6        THE COURT:  What's this business about witnesses?

7        MR. AHEARN:  We haven't talked about subpoena of

8  witnesses.  I've spoken to several witnesses that I'd like

9  for him to give to me, which he never gave to me.  In

10  addition, we've interviewed every witness that's been

11  disclosed to us from the District Attorney, including the

12  victim in this case.  We've had an interview, albeit by

13  phone.  And there -- I have not been notified of any

14  additional witnesses that need to be subpoenaed for the

15  trial.

16        THE COURT:  In the opening statement by Mr. McCord,

17  he says nothing's been accomplished.  Where are you on that

18  issue?

19        MR. AHEARN:  Mr. McCord -- my take on the case.  I

20  think we've done a lot and a lot has been accomplished.  As

21  I've said, there is a greater amount of investigation.

22  Ed Wassa (phonetic) is the investigator.  I've been out to

23  the crime scene, interviewed the witnesses involved.  We're

24  trying to track down a witness in particular and working

25  every day to track this one witness down, if she in fact does

26  exist.

27        I think a lot has been accomplished in this

28  case.  I filed two motions.  I filed a 995 and I also filed a

6

1    1538.5.  And quite frankly, I think Mr. McCord has a great

2    issue on appeal.  There was a search warrant issue.  There

3    was no search warrant for his blood and that was considered

4    illegal.

5                I don't mean to bore the court.  I would like

6    to make a record.  Motions were filed on Mr. McCord's behalf.

7    I have conferred with Mr. McCord about the case.

8                I know Mr. McCord wants to see me more than he

9    has.  It's a comment we hear.  I can't see him as much as I

10   would like to.  I have met with him numerous time.  There was

11   some times that I did not see him for a little while.  We

12   have conferred about his case and defense.

13         THE COURT:  You've prepared yourself both, I

14   suppose, intellectually and being prepared to advance the

15   trial at this point?

16         MR. AHEARN:  Yes, Your Honor, I do.

17         THE COURT:  Mr. McCord, any last comments?

18         THE DEFENDANT:  I would like to say, sir, that

19   Mr. Ahearn, he was assigned my case in November, 2003 I

20   believe.  He came in after Ms. Lorna Brown.  She was with me

21   through preliminary hearing.  I -- up until the first

22   continuation, sir, when I came into this courtroom, I didn't

23   speak to Mr. Ahearn -- I didn't speak to him over

24   approximately two hours, hour and a half until that time, to

25   where you pressed it on.

26                And I really didn't know a whole lot about

27   what was going on.  He said he's spoken to some people.  I

28   didn't know anything, actually know anything about it.  He

7

1   didn't have any documents for me to read. I asked for

2   preliminary hearing transcripts. It took me so long to get

3   those. It took me over four, five, six months to get those,

4   those preliminary hearing transcripts, sir.

5              THE COURT: Do you have them now?

6              THE DEFENDANT: Yes, I do.

7              I'm just not satisfied with my representation.

8   I ask the Court if they would grant me some time that I can

9   get a paid attorney, a private attorney and I can go on from

10  there.

11             THE COURT: All right.

12             Well, with the Marsden Motion, make the

13  following findings, first of all. Based on your Complaint, I

14  find as follows: Your attorney is providing adequate

15  representation. I find that you and your attorney are not so

16  embroiled in irreconcilable conflict that ineffective

17  representation is likely to result.

18             You have not met the burden that any failure

19  on the attorney's part would work to substantially impair

20  your constitutional right to assistance of counsel. At this

21  point I'm going to confirm the trial. And if you had someone

22  hired by, I suppose, tomorrow or the next day and they came

23  in, I would consider that. At this point I'll deny the

24  Marsden Motion and keep moving forward on that.

25             Invite the public back into the court.

26             THE DEFENDANT: Excuse me, Your Honor, but I didn't

27  know that that was basically how the proceeding went 'cause I

28  could have said a whole lot more, to -- you know, so you have

1    enough burden, but I thought you were going to ask me some
2    questions.
3              THE COURT:  All right.
4              Go ahead and close the door, again.  What
5    would you like to tell me?
6              THE DEFENDANT:  Okay.
7              The whole time that I've been represented by
8    Mr. Ahearn, I haven't spoken with him over five hours total.
9    I don't know what's going on at all as far as my defense.
10    He's come in -- he's came into court I believe in the last --
11    the last readiness conference hearing.  And he's even stated
12    to the Court that he's not ready.
13              He's just not ready.  And I just don't know
14    what's going on.  I don't know where my defense is going at
15    this point.  It's just been a long time.  He's been with me a
16    long time and now he's basically rushing.  And I'm not
17    comfortable with that, by him rushing because he didn't get
18    the continuation, all the months and him not coming to see
19    me, not telling me anything.  Now, he's rushing, trying to
20    get things done.
21              And he says that he's spoken to people today.
22    And I don't know that.  That's what he's saying to me now,
23    but I don't know that.  And how are we going to get together
24    and work on that type of stuff?  I haven't spoken with him
25    over an hour and a half this past two, three weeks.  And I
26    just don't think that's right, enough time with my counsel to
27    adequately prepare myself for trial.
28              THE COURT:  Mr. Ahearn, I'll ask it again.  He says

1   that you're rushing to get these things done.  Did you want

2   to comment on that?

3          MR. AHEARN:  Your Honor, there was a continuance

4   motion I made several weeks ago.  I was granted a

5   continuance.

6          Mr. McCord is right that things were a bit

7   rushed.  We were able to get everything done.  I had to step

8   up the pace.  To my satisfaction, I believe everything is

9   done.  I understand Mr. McCord's concern about the rushing.

10  I feel quite fine with the way the case is going.

11          Take issue with the assertion that we have

12  only met for five hours.  I don't have it documented.  My

13  recollection is much longer than that.

14          THE COURT:  Okay.

15          Also do you think you'll have time before the

16  trial or during the trial to tell him what's going on and

17  have you explained your defense in this case?

18          MR. AHEARN:  Your Honor, I thought I had talked to

19  him.  I had a long conversations with Mr. McCord's and he

20  expressed the same concerns.  I've told Mr. McCord the

21  defense and we've discussed the defense.  Maybe I haven't

22  done a proper job and informed him with everything, not with

23  everything.  Haven't gone over it several times.  We've

24  discussed it, the case, in quite some detail.

25          THE COURT:  You're going to have time to go over it

26  again with him?

27          MR. AHEARN:  Yes, I will definitely make a point of

28  that.

10

THE COURT:  I am going to reiterate the findings
that I just made at this point.  Once again, it seems to me
that you do have effective assistance of counsel.  And I'll
reiterate the previous findings on that issue.

Open up the court again.

THE DEFENDANT:  Like you said, Judge, if I have
counsel by Monday --

THE COURT:  I'm not making you any promises.  We're
confirming the trial now.  If counsel came in before Monday
and said they want to substitute in, I don't know what the
ruling would be or the other Judge would say.  I'm not making
any promises and don't be misled that I am.

We're back on the record and Ms. Santos is
back in the room.  It seems to me that the motion -- I mean
the trial will be confirmed for Monday morning, 8:30, in
Department 1.


(Whereupon, the proceedings were concluded)

---oOo---

11

REPORTER'S CERTIFICATE

STATE OF CALIFORNIA          )
                             )        ss.
COUNTY OF CONTRA COSTA )

         I, LINDA MacFARLANE, a Certified Shorthand Reporter
in and for the State of California, hereby certify:

         That on the 16th day of June, 2004, I fully, truly,
and correctly took down in shorthand writing all of the
proceedings had and all of the testimony given in said court
and cause;

         That I thereafter truly, fully and correctly caused
the same to be transcribed into typewriting;

         That the forgoing pages 1 through 11, inclusive, is
a full, true, and correct transcript of my shorthand notes
taken at said time and place therein named.

         DATED:  _12·22·04_____

                                    LINDA MacFARLANE, C.S.R. #7813
                                    LINDA S. MacFARLANE, CSR #7813
                                    Official Court Reporter

1 | ALTERNATE DEFENDER OFFICE
CONTRA COSTA COUNTY
2 | William W. Veale, Chief Assistant Public Defender & Counsel of Record
By: Timothy W. Ahearn, Deputy Public Defender, State Bar #202824
3 | 610 Court Street
Martinez, California 94553-1298
4 | Telephone: 925-646-1740

5 | Attorneys for Defendant

6

7

8 | SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF CONTRA COSTA

9 | THE PEOPLE OF THE STATE OF CALIFORNIA,      No. 5-032028-3

10 |                                             NOTICE OF MOTION AND MOTION
                                    v.          TO CONTINUE TRIAL

11

12 | JERMAINE LAVARIUS MCCORD                     Date:  February 4, 2004
                                                 Time:  8:30 am
13 |                                             Dept.: 13
                                    Defendant./

14

15 | TO:    ROBERT J. KOCHLY, DISTRICT ATTORNEY OF CONTRA COSTA COUNTY;
          AND TO THE CLERK OF THE ABOVE-ENTITLED COURT:

16 |        PLEASE TAKE NOTICE that on the above date or as soon thereafter as can be heard in

17 | the Courtroom of the above-entitled court, the attorney for the defendant will move the Court to

   | continue the trial scheduled in this matter.

18 |        The motion will be made on the grounds that a continuance is necessary because the

19 | defendant needs more time to prepare the case for trial.

20 |        The motion will be based on this notice of motion, on the attached declaration, on the

21 | memorandum of points and authorities served and filed herewith.

   | Dated:  February 3, 2004
22

23 |                                             Timothy W. Ahearn
                                                 Attorney for Defendant

24

1

**EXH 2**

# MEMORANDUM OF POINTS AND AUTHORITIES

## I

## PENAL CODE SECTION 1050

Penal Code section 1050 sets forth the criterion for continuing a trial, and under subsection (e) states: "Continuances shall be granted only upon a showing of good cause."

## II

### THERE IS GOOD CAUSE TO CONTINUE
### THE TRIAL IN THIS MATTER

Generally speaking a trial or hearing will not be continued unless "upon a showing of good cause" as prescribed in Section 1050(e) of the Penal Code. Good cause is not either "the convenience of the parties" nor "a stipulation of the parties" and neither is sought here. "Good cause" is what ever persuades the court that there is sufficient reason to continue the trial. This of course means that the Court must weigh and consider all the circumstances surrounding the case and then exercise its discretion. However, in exercising its discretion the Court is not without limits. See People v. Santamaria (1991) 229 Cal.App.3d 269, 280 Cal.Rptr. 43

> "[A]ll exercises of legal discretion must be grounded in reasoned judgment and guided by legal principals and policies appropriate to the particular matter at issue. (citations) A trial court abuses its discretion when it exceeds the bounds of reason, all of the circumstances before it being considered. (citations)

People v. Santanmaria, supra, at page 276-277.

In exercising its discretion to assess "good cause", this court will be guided by basic constitutional standards. There are several applicable here.

First, it is clear that the defendant is entitled to an attorney who is properly prepared to represent him at the trial on the issue concerning his competency to stand trial. One cannot be forced to give up one constitutionally protected right (such as effective assistance of counsel) in favor of another (such as the People's right to a speedy trial). (See Simons v. United States

2

1   (1968) 390 U.S. 377, 394, the Supreme Court held that a defendant did not have to give up his

2   right against self incrimination to attempt to win a fourth amendment suppression motion.) Even

3   assuming that the Court were vindicating the right to due process, or speedy trial, but were doing

4   so at the cost of the right to effective assistance of counsel, then it is clear that a constitutional

    violation would have occurred (the defendant's constitutional right to effective assistance of

5   counsel).

6        Second, the due process clause of the Fourteenth Amendment mandates the right to

7   counsel in a criminal case. (Powell v. Alabama (1932) 287 U.S. 45.) That right comprehends

8   the need for court appointed counsel for an indigent accused. (Gideon v. Wainwright (1963) 372

9   U.S. 335.) The United States Supreme Court has interpreted the right to counsel to mean, among

    other things, a guarantee to effective assistance of counsel. (Strickland v. Washington (1984)

10  466 U.S. 668.) These rights apply to defendants involved in the trial of their case.

11       Third, the right of effective assistance of counsel, as guaranteed by the Sixth Amendment

12  of the United States Constitution and Article I, section 15 of the California Constitution, entitles

13  the defendant to "a reasonably competent attorney acting as a diligent, conscientious advocate."

14  (People v. Pope (1979) 23 Cal.3d 412, 424-425) This right applies to all stages of the case. If

15  defense counsel fails to offer evidence which disputes the prosecutions case or impeaches the

    prosecution's primary witness, such failure constitutes incompetent representation, necessitating

16  reversal of the conviction. (Cf. People v. Cropper (1979) 89 Cal. App.3d 716; even the

17  hopeless case requires counsel to prepare a defense.)

18       As the Court is aware, the Supreme Court of this state has held that it is a lawyer's duty to

19  become thoroughly familiar with the factual and legal circumstances of the case prior to any trial

20  or hearing. (People v. Pope (1979) 23 Cal 3d 412, 424-425.)

21       The State Supreme Court itself refers to duties of attorney preparation as a constitutional

    obligations in a criminal case. (See People v. Pope, supra, 23 Cal.3d at page 424-425, fn. 14.)

22  Again these rights are applicable to defendant and the trial of his guilt, innocence or competency

23  to stand trial. Some time ago the State Supreme Court held that counsel for the accused "...has a

24

1  right to a reasonable opportunity to prepare for a hearing..." which "... is a fundamental as is the

2  right to counsel...". People v. Sarazzawski (1945) 27 Cal. 2d 7, 17; People v.Murphy (1963) 59

3  Cal.2d 818, 825.

4      There is work specific to the preparation of the trial of the case, which is discussed in the

   declaration set forth below. The preparation completed to date falls below the constitutionally

5  mandated duties of counsel as discussed in People v Pope, supra. A defendant in a criminal case

6  must always be given an adequate opportunity to present their claims fairly within the adversary

7  system. (Ross v. Moffitt 417 U.S. 600, 612.)

8      It appears, given the serious nature of this case that the only constitutionally acceptable

9  remedy is to continue the jury trial to a date which meets with the Court's approval as well as that

10  of the parties.

## CONCLUSION

11      It is respectfully submitted that this Court grant counsel motion to continue the trial and

12  that we select a new date agreed upon by court and counsel.

13

14  Dated: February 3, 2004                    Respectfully submitted,

15

16                                            Timothy W. Ahearn
                                              Attorney for the Defendant
17

18

19

20

21

22

23

24

4

## DECLARATION IN SUPPORT OF MOTION TO CONTINUE

I, TIMOTHY W. AHEARN, declare:

The following facts exist that make a continuance necessary in this case:

1.  I am an attorney licensed to practice law in the State of California and I am a deputy public defender assigned to the Alternate Defenders Office.

2.  I represent the defendant, Jermaine Lavarius McCord, in this matter

3.  The Jury Trial in this matter is currently set for February 9, 2004. At this time and on that date I will not be ready and properly prepared to adequately and effectively represent Mr. McCord at trial as I am constitutionally mandated to do.

4.  To be fully prepared to represent Mr. McCord in this matter, I have further investigation which needs to be completed.

5.  I have only had this case since late November of 2003, after Ms. Lorna Brown was relieved as counsel. Thus, I have only had about two months to become fully familiar with the case and investigate it.

6.  However, due to the complex and serious nature of the case I need more time for investigation so that I will be adequately prepared to effectively represent Mr. McCord.

7.  I notified Ms. Anita Santos, the deputy district attorney handling the case, of my intention of seeking this continuance.

8.  As a result, I am requesting a continuance of the Jury Trial to complete my investigation of this matter so I will be able to adequately and effectively represent Mr. McCord at his jury trial.

I declare under penalty of perjury that the above is true and correct of my own knowledge, except as to those matter which are alleged on information and belief, and to those matter I believe them to be true.

000081

1    Executed on February 3, 2004 at Martinez, California.

2                                    TIMOTHY W. AHEARN

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

6



1  | **ALTERNATE DEFENDER OFFICE**
    **CONTRA COSTA COUNTY**
2  | William W. Veale, Chief Assistant Public Defender & Counsel of Record
    By:  Timothy W. Ahearn, Deputy Public Defender, State Bar #202824
3  | 610 Court Street
    Martinez, California 94553-1298
4  | Telephone:  925-646-1740

FILED

2004 MAY -4  P 2: 15

K TOFFE, CLERK OF THE SUPERIOR COURT
COUNTY OF CONTRA COSTA, CALIF.
BY:
Deputy Clerk

5  | Attorneys for Defendant

6

7

8  | SUPERIOR COURT OF THE STATE OF CALIFORNIA
    COUNTY OF CONTRA COSTA

9  | THE PEOPLE OF THE STATE OF CALIFORNIA,          No. 5-032028-3

10 |                                                 NOTICE OF MOTION AND MOTION
                          v.                        TO CONTINUE TRIAL

11

12 |                                                 Date:  May 5, 2004
    JERMAINE LAVARIUS MCCORD                         Time:  8:30 am
13 |                                                 Dept.: 13
                                 Defendant./

14

15 | TO:  ROBERT J. KOCHLY, DISTRICT ATTORNEY OF CONTRA COSTA COUNTY;
          AND TO THE CLERK OF THE ABOVE-ENTITLED COURT:

16 |      PLEASE TAKE NOTICE that on the above date or as soon thereafter as can be heard in

17 | the Courtroom of the above-entitled court, the attorney for the defendant will move the Court to

    continue the trial scheduled in this matter.

18 |      The motion will be made on the grounds that a continuance is necessary because the

19 | defendant needs more time to prepare the case for trial.

20 |      The motion will be based on this notice of motion, on the attached declaration, on the

21 | memorandum of points and authorities served and filed herewith.

    Dated:  May 4, 2004
22

23 |                                                 Timothy W. Ahearn
                                                    Attorney for Defendant

24

1

# MEMORANDUM OF POINTS AND AUTHORITIES

## I

## PENAL CODE SECTION 1050

Penal Code section 1050 sets forth the criterion for continuing a trial, and under subsection (e) states: "Continuances shall be granted only upon a showing of good cause."

## II

## THERE IS GOOD CAUSE TO CONTINUE
## THE TRIAL IN THIS MATTER

Generally speaking a trial or hearing will not be continued unless "upon a showing of good cause" as prescribed in Section 1050(e) of the Penal Code. Good cause is not either "the convenience of the parties" nor "a stipulation of the parties" and neither is sought here. "Good cause" is what ever persuades the court that there is sufficient reason to continue the trial. This of course means that the Court must weigh and consider all the circumstances surrounding the case and then exercise its discretion. However, in exercising its discretion the Court is not without limits. See People v. Santamaria (1991) 229 Cal.App.3d 269, 280 Cal.Rptr. 43

> "[A]ll exercises of legal discretion must be grounded in reasoned judgment and guided by legal principals and policies appropriate to the particular matter at issue. (citations) A trial court abuses its discretion when it exceeds the bounds of reason. all of the circumstances before it being considered. (citations)

People v. Santanmaria, supra, at page 276-277.

In exercising its discretion to assess "good cause", this court will be guided by basic constitutional standards. There are several applicable here.

First, it is clear that the defendant is entitled to an attorney who is properly prepared to represent him at the trial on the issue concerning his competency to stand trial. One cannot be forced to give up one constitutionally protected right (such as effective assistance of counsel) in favor of another (such as the People's right to a speedy trial). (See Simons v. United States

2

1   (1968) 390 U.S. 377, 394. the Supreme Court held that a defendant did not have to give up his

2   right against self incrimination to attempt to win a fourth amendment suppression motion.) Even

3   assuming that the Court were vindicating the right to due process, or speedy trial, but were doing

4   so at the cost of the right to effective assistance of counsel, then it is clear that a constitutional

5   violation would have occurred (the defendant's constitutional right to effective assistance of

    counsel).

6   ·       Second. the due process clause of the Fourteenth Amendment mandates the right to

7   counsel in a criminal case. (Powell v. Alabama (1932) 287 U.S. 45.) That right comprehends

8   the need for court appointed counsel for an indigent accused. (Gideon v. Wainwright (1963) 372

9   U.S. 335.) The United States Supreme Court has interpreted the right to counsel to mean, among

    other things, a guarantee to effective assistance of counsel. (Strickland v. Washington (1984)

10  466 U.S. 668.) These rights apply to defendants involved in the trial of their case.

11  Third. the right of effective assistance of counsel. as guaranteed by the Sixth Amendment

12  of the United States Constitution and Article I. section 15 of the California Constitution, entitles

13  the defendant to "a reasonably competent attorney acting as a diligent, conscientious advocate."

14  (People v. Pope (1979) 23 Cal.3d 412, 424-425) This right applies to all stages of the case. If

15  defense counsel fails to offer evidence which disputes the prosecutions case or impeaches the

16  prosecution's primary witness, such failure constitutes incompetent representation, necessitating

17  reversal of the conviction . (Cf. People v. Cropper (1979) 89 Cal. App.3d 716; even the

    hopeless case requires counsel to prepare a defense.)

18  As the Court is aware. the Supreme Court of this state has held that it is a lawyer's duty to

19  become thoroughly familiar with the factual and legal circumstances of the case prior to any trial

20  or hearing. (People v. Pope (1979) 23 Cal 3d 412, 424-425.)

21  The State Supreme Court itself refers to duties of attorney preparation as a constitutional

22  obligations in a criminal case . (See People v. Pope, supra, 23 Cal.3d at page 424-425, fn. 14.)

23  Again these rights are applicable to defendant and the trial of his guilt, innocence or competency

    to stand trial. Some time ago the State Supreme Court held that counsel for the accused "...has a

24

3

1    right to a reasonable opportunity to prepare for a hearing..." which "... is a fundamental as is the

2    right to counsel..." People v. Sarazzawski (1945) 27 Cal. 2d 7, 17; People v.Murphy (1963) 59

3    Cal.2d 818, 825.

4    There is work specific to the preparation of the trial of the case, which is discussed in the

declaration set forth below. The preparation completed to date falls below the constitutionally

5    mandated duties of counsel as discussed in People v Pope, supra. A defendant in a criminal case

6    must always be given an adequate opportunity to present their claims fairly within the adversary

7    system. (Ross v. Moffitt 417 U.S. 600, 612.)

8    It appears, given the serious nature of this case that the only constitutionally acceptable

9    remedy is to continue the jury trial to a date which meets with the Court's approval as well as that

of the parties.

10    **CONCLUSION**

11    It is respectfully submitted that this Court grant counsel motion to continue the trial and

12    that we select a new date agreed upon by court and counsel.

13

14    Dated: May 4, 2004              Respectfully submitted,

15

16                                   Timothy W. Ahearn
                                     Attorney for the Defendant
17

18

19

20

21

22

23

24

                                    4

## DECLARATION IN SUPPORT OF MOTION TO CONTINUE

I, TIMOTHY W. AHEARN, declare:

The following facts exist that make a continuance necessary in this case:

1.   I am an attorney licensed to practice law in the State of California and I am a deputy public defender assigned to the Alternate Defenders Office.

2.   I represent the defendant. Jermaine Lavarius McCord, in this matter.

3.   The Jury Trial in this matter is currently set for May 10, 2004. At this time and on that date I will not be ready and properly prepared to adequately and effectively represent Mr. McCord at trial as I am constitutionally mandated to do.

4.   There are two motions which need to be heard before the matter is ready for trial.

5.   The first motion is a suppression motion (Penal Code section 1538.5). I attempted to file this motion during the week of April 19th. On April 21st, I called Superior Court Department 13 on two occasions. but no one was available to give me a date in the book. I also went to the department on April 21st, but the court was in session with no one available to get a date either. After going to the department, I was unable to wait for a recess because I was then called away to received a verdict in a jury trial. The business with the trial took the remainder of the afternoon. The following two days I was ill and then I went on vacation the following week. returning today.

6.   I also need to file a motion pursuant to Penal Code section 995. This motion should be completed and ready for filing at the time this continuance motion is heard. I was not able to timely file the 995 motion due to a murder trial which took up to better portion of my time of the past 5 weeks prior to my vacation. I had the 995 motion nearly completed by the time I attempted to file the suppression motion. but due to an illness I was not able to complete it before my vacation.

5

7. There is also additional investigation which needs to still be conducted in this matter. I would request an in camera hearing to inform the court of the investigation which needs to be completed.

8. I notified Ms. Anita Santos. the deputy district attorney handling the case, of my intention of seeking this continuance on April 26, 2004.

9. As a result, I am requesting a continuance of the Jury Trial in order for the motions to be heard, and to complete my investigation of this matter so I will be able to adequately and effectively represent Mr. McCord at his jury trial.

I declare under penalty of perjury that the above is true and correct of my own knowledge, except as to those matter which are alleged on information and belief, and to those matter I believe them to be true.

Executed on May 4. 2004 at Martinez. California.

TIMOTHY W. AHEARN

6

1  ALTERNATE DEFENDER OFFICE
   CONTRA COSTA COUNTY

2  William W. Veale, Chief Assistant Public Defender & Counsel of Record
   By: Timothy W. Ahearn, Deputy Public Defender, State Bar #202824

3  610 Court Street
   Martinez, California 94553-1298

4  Telephone: 925-646-1740

5  Attorneys for Defendant

6

7

8            SUPERIOR COURT OF THE STATE OF CALIFORNIA
                   COUNTY OF CONTRA COSTA

9  THE PEOPLE OF THE STATE OF CALIFORNIA,        No. 5-032028-3

10                                               NOTICE OF MOTION AND MOTION
                                                 TO CONTINUE TRIAL
                            v.

11

12                                               Date:  May 10, 2004
    JERMAINE LAVARIUS MCCORD                     Time:  8:30 am
13                                               Dept.: 1

14                                   Defendant./

15  TO:    ROBERT J. KOCHLY, DISTRICT ATTORNEY OF CONTRA COSTA COUNTY;
           AND TO THE CLERK OF THE ABOVE-ENTITLED COURT:

16         PLEASE TAKE NOTICE that on the above date or as soon thereafter as can be heard in

17  the Courtroom of the above-entitled court, the attorney for the defendant will move the Court to

18  continue the trial scheduled in this matter.

19         The motion will be made on the grounds that a continuance is necessary because the

20  defendant needs more time to prepare the case for trial.

21         The motion will be based on this notice of motion, on the attached declaration, on the

22  memorandum of points and authorities served and filed herewith.

23  Dated: May 7, 2004

24                                               Timothy W. Ahearn
                                                 Attorney for Defendant

                              1

# MEMORANDUM OF POINTS AND AUTHORITIES

## I

### PENAL CODE SECTION 1050

Penal Code section 1050 sets forth the criterion for continuing a trial, and under subsection (e) states: "Continuances shall be granted only upon a showing of good cause."

## II

### THERE IS GOOD CAUSE TO CONTINUE
### THE TRIAL IN THIS MATTER

Generally speaking a trial or hearing will not be continued unless "upon a showing of good cause" as prescribed in Section 1050(e) of the Penal Code. Good cause is not either "the convenience of the parties" nor "a stipulation of the parties" and neither is sought here. "Good cause" is what ever persuades the court that there is sufficient reason to continue the trial. This of course means that the Court must weigh and consider all the circumstances surrounding the case and then exercise its discretion. However, in exercising its discretion the Court is not without limits. See People v. Santamaria (1991) 229 Cal.App.3d 269, 280 Cal.Rptr. 43

> "[A]ll exercises of legal discretion must be grounded in reasoned judgment and guided by legal principals and policies appropriate to the particular matter at issue. (citations) A trial court abuses its discretion when it exceeds the bounds of reason, all of the circumstances before it being considered. (citations)

People v. Santanmaria, supra, at page 276-277.

In exercising its discretion to assess "good cause", this court will be guided by basic constitutional standards. There are several applicable here.

First, it is clear that the defendant is entitled to an attorney who is properly prepared to represent him at the trial on the issue concerning his competency to stand trial. One cannot be forced to give up one constitutionally protected right (such as effective assistance of counsel) in favor of another (such as the People's right to a speedy trial). (See Simons v. United States

2

(1968) 390 U.S. 377, 394, the Supreme Court held that a defendant did not have to give up his right against self incrimination to attempt to win a fourth amendment suppression motion.) Even assuming that the Court were vindicating the right to due process, or speedy trial, but were doing so at the cost of the right to effective assistance of counsel, then it is clear that a constitutional violation would have occurred (the defendant's constitutional right to effective assistance of counsel).

Second, the due process clause of the Fourteenth Amendment mandates the right to counsel in a criminal case. (Powell v. Alabama (1932) 287 U.S. 45.) That right comprehends the need for court appointed counsel for an indigent accused. (Gideon v. Wainwright (1963) 372 U.S. 335.) The United States Supreme Court has interpreted the right to counsel to mean, among other things, a guarantee to effective assistance of counsel. (Strickland v. Washington (1984) 466 U.S. 668.) These rights apply to defendants involved in the trial of their case.

Third, the right of effective assistance of counsel, as guaranteed by the Sixth Amendment of the United States Constitution and Article I, section 15 of the California Constitution, entitles the defendant to "a reasonably competent attorney acting as a diligent, conscientious advocate." (People v. Pope (1979) 23 Cal.3d 412, 424-425) This right applies to all stages of the case. If defense counsel fails to offer evidence which disputes the prosecutions case or impeaches the prosecution's primary witness, such failure constitutes incompetent representation, necessitating reversal of the conviction . (Cf. People v. Cropper (1979) 89 Cal. App.3d 716; even the hopeless case requires counsel to prepare a defense.)

As the Court is aware, the Supreme Court of this state has held that it is a lawyer's duty to become thoroughly familiar with the factual and legal circumstances of the case prior to any trial or hearing. (People v. Pope (1979) 23 Cal 3d 412, 424-425.)

The State Supreme Court itself refers to duties of attorney preparation as a constitutional obligations in a criminal case . (See People v. Pope, supra, 23 Cal.3d at page 424-425, fn. 14.) Again these rights are applicable to defendant and the trial of his guilt, innocence or competency to stand trial. Some time ago the State Supreme Court held that counsel for the accused "...has a

3

right to a reasonable opportunity to prepare for a hearing..." which "... is a fundamental as is the right to counsel..." People v. Sarazzawski (1945) 27 Cal. 2d 7, 17;  People v.Murphy (1963) 59 Cal.2d 818, 825.

There is work specific to the preparation of the trial of the case, which is discussed in the declaration set forth below.  The preparation completed to date falls below the constitutionally mandated duties of counsel as discussed in People v Pope, supra.  A defendant in a criminal case must always be given an adequate opportunity to present their claims fairly within the adversary system. (Ross v. Moffitt 417 U.S. 600, 612.)

It appears, given the serious nature of this case that the only constitutionally acceptable remedy is to continue the jury trial to a date which meets with the Court's approval as well as that of the parties.

## CONCLUSION

It is respectfully submitted that this Court grant counsel motion to continue the trial and that we select a new date agreed upon by court and counsel.

Dated:  May 7, 2004                Respectfully submitted,

Timothy W. Ahearn
Attorney for the Defendant

4

## DECLARATION IN SUPPORT OF MOTION TO CONTINUE

I, TIMOTHY W. AHEARN, declare:

The following facts exist that make a continuance necessary in this case:

1.    I am an attorney licensed to practice law in the State of California and I am a deputy public defender assigned to the Alternate Defenders Office.

2.    I represent the defendant, Jermaine Lavarius McCord, in this matter.

3.    The Jury Trial in this matter is currently set for May 10, 2004. I will not be ready and properly prepared to adequately and effectively represent Mr. McCord at trial as I am constitutionally mandated to do.

4.    This is the second motion I have made in connection with this upcoming trial setting. The first motion to continue was denied at the readiness conference on May 5, 2004 by the Honorable Dan O'Malley in Department 13.

5.    I renew the same reasons for the continuance stated before the Judge Dan O'Malley on May 5, 2004, and wish to expand and clarify the reasons I am not ready for trial.

6.    On May 5th, I informed Judge Dan O'Malley that I have not fully completed my investigation. However, I did not make clear at the readiness conference why the investigation was not competed in a timely fashion.

7.    I acknowledge that I lack the experienced some of my colleagues have in handling forcible rape cases. This is my first forcible rape case. I did not begin a formal investigation until sometime in early January, after having taken a while to digest the discovery in this case.

8.    I acknowledge that the investigation should have begun sooner. My office was assigned to represent Mr. McCord after the Preliminary Examination and accepted him as a client on October 20, 2003. I was assigned the case shortly thereafter.

5

9. I further believe that due to my inexperience I failed to adequately supervise the investigation which needed and still needs to be done, after an investigator had been hired. ( ... ... )

10. I requested a continuance of the first jury trial setting at the readiness conference on February 3, 2004. That motion was granted, over objection, so I could complete my investigation. I had requested at that time a date in June when I believed I would be ready. Instead, the May 10th date was set.

11. My office was short two attorneys in the month of March and I was in a murder trial which was I was involved with almost exclusively for five weeks, both in trial and in preparation for the trial.

12. I believe that my inexperience played a role in not having the investigation done in a timely manner during this period. I believed wrongly that I could get all my work done in this matter in that timeframe. Unfortunately, I did not and was not able to complete my investigation.

13. I strongly feel that I have not completely digested this case, especially since I have not completed my investigation. I do not believe that I will be able to adequately prepare in limine motions, conduct voir dire, give an opening statement, conduct cross-examination, discuss jury instructions, or deliver a closing argument.

14. Investigation needs to be done in order to determine who the a cab driver was who allegedly drove Mr. McCord and the victim to 23rd Street and San Pablo Avenue, before the alleged kidnap and rape. I raised this issue at the motion to continue heard on May 5, 2004, in Dept. 13.

15. The discovery I have received indicates that Jaspal Heir Singh was the cab driver. A witness, Amanda Harris, has identified Mr. Singh through a photograph, as the driver of the cab she saw Mr. McCord and the victim get into right before the rape. Mr. Singh was uncooperative with the police.

6

000097

16.  We have contacted Mr. Singh and he has denied that he was the cab driver. We have unfortunately been able to contact Ms. Harris, though we have tried on several occasions to do so, and verify that it was Mr. Singh she identified as the driver.

17.  In addition, we have not been provided with the pictures which Ms. Harris was shown of Mr. Singh by the police. A request for all photos was made by previous counsel.

18.  Our investigation has further revealed that the police may have photographed and/or videotaped the cab drivers who frequent the Del Norte BART station. It is unclear whether any these drivers where interviewed. Discovery of this nature has not been provided to the defense.

19.  It is unclear from the reports and our investigation how Ms. Harris was able to identify Mr. Singh as the driver. Her statement to the police is fairly vague regarding where and how she saw the cab driver and how she knew it was him. It appears that she only saw the cab driving away and never saw the driver outside the car. It was only after investigation, that I determined that the vantage point from which she made the observation is also fairly unclear.

20.  An interview with Ms. Harris is therefore a necessity. The cab driver is a percipient witness who may have pertinent information about material events leading up to the alleged kidnap and rape. If Mr. Singh in not the cab driver, then a critical and key material witness has not been located and interviewed, thereby necessitating a continuance.

21.  Obviously, due to the nature of the case and his probable role, Mr. Singh perhaps does not want to be involved in any manner and is not being entirely honest with us. However, the defense should be allowed more time to verify his involvement, if any. At this time Mr. Singh is not under subpoena by the defense.

00 A 0 4 8

22.   Another witness who needs to be interviewed is Shayla Gustafson. The alleged victim had a phone conversation with Ms. Gustafson after the cab ride, but before the rape. Ms. Gustafson made a very brief statement to the police which provides little detail of the conversation she had with the victim right before the rape.

23.   Ms. Gustafson appears to live in Southern California. A data base search a Shayla Gustafson has revealed no such person in Southern California.

24.   Furthermore, as I mentioned in my previous continuance motion, for there are two motions which need to be heard before the matter is ready for trial. Due to my poor scheduling and time management, I was not able to file these motions in a timely fashion. However, it appears that the district attorney is willing to have these motions heard in the trial department. If that is no longer the case, the defense would request a brief continuance so that these motions can be heard before trial.

25.   Finally, I would like to stress to the court my general lack of preparedness for this trial. Due to the factors explained above, I do not believe that I am as fully familiar with the case as I should be to competently represent Mr. McCord, especially in a case in which he faces life imprisonment. At the most basic level, I simply need more time to prepare the case for myself.

26.   The fault lies with no one else but myself. It is due to my inexperience and my own poor time management.

27.   I know that the district attorney's office will be opposing this motion and they have previously asserted their right to a speedy trial. I apologize to the district attorney's office and the court for not being prepared. However, I am requesting this court not to harm my client for my own lack of preparation and permit him to have competent representation.

28.   As one last point, it should be noted that I have not personally discussed this case with Deputy District Attorney Dara Cashman, the head of the sexual assault unit,

8

in attempt to resolve this case prior to trial. I am informed and believe, that the previous attorney was unable to receive an offer from Ms. Cashman other then plead as charged.

29.  I am requesting is a two or three month continuance at which time, I believe that I will be prepared to represent Mr. McCord. I believe that my investigation will have been completed, my motions heard, and I will have a general level of preparedness which I do not have as of today.

I declare under penalty of perjury that the above is true and correct of my own knowledge, except as to those matter which are alleged on information and belief, and to those matter I believe them to be true.

Executed on May 7, 2004 at Martinez, California.

_____
TIMOTHY W. AHEARN

9

**Ivy McCray**
*Attorney at Law*

*P.O. Box 11186*
*Berkeley, CA 94712*
*510-653-4900*

*829 –61ST Street*
*Oakland, California 94608*
*1cal.law@sbcglobal.net*

June 16, 2007

Ms. Shayla Gustafson
906 S. Cardiff
Anaheim, CA 92806

     Re: Witness Statement

Dear Ms.Gustafson:

I am writing to you regarding information you stated to the police in 2003 regarding an incident that happened with your friend Amanda McClure. I am reviewing the file for a legal document that I will be submitting to the court in July. I am trying to make sure all the facts are correct.

Officer Tom Sharp from the Contra Costa Community contacted you in January 2003 and you stated to him that you spoke with Ms. McClure at 9:00 p.m. as she was on a bus going to the BART from her school, and then again sometime after midnight as she walking toward her home.

Please let me know if this is correct. There is some indication that you spoke with the young man that was with Ms. McClure. Please let me know if this is correct. Any additional information will be helpful. You may call me at 510-653-4900 at anytime. If I am not here, please leave a message and a telephone number for me to reach you. ***Your conversation with me will be held absolutely confidential.***

Very truly yours,

Ivy McCray

**EXH 3**



**CALIFORNIA
DEPARTMENT OF
EDUCATION**

1430 N STREET
SACRAMENTO, CA
95814-5901

**JACK O'CONNELL**
State Superintendent of
Public Instruction
PHONE: (916) 319-0800

June 7, 2007

Ivy McCray
Attorney at Law
829 61st Street
Oakland, CA 94608

RE:    *Request for records of visit by Amanda McClure*

Dear Ms. McCray:

I have discussed your request with my clients. They decline to provide you written answers to your questions. There are no records, but staff remember Amanda attending some after school activity at California School for the Blind during the winter of the 2002-2003 school year. She left campus via paratransit, even though she was offered the option of staying in one of the campus apartments. A California School for the Blind staff member waited with Amanda until the paratransit arrived at the school. California School for the Blind has no additional information that would allow it to provide more precise information.

Thank you for your attention to the foregoing.

Sincerely,

Gregory J. Rousseve, Deputy General Counsel
Legal and Audits

cc:    Stuart Wittenstein, Superintendent
California School for the Blind

EXH 4

# Living Skills Center for the Visually Impaired

2430 Road 20, #B12, San Pablo, CA 94806
(510) 234-4984  Fax (510) 234-4986  Email: patty@livingskillscenter.org
www.livingskillscenter.org

## MEMORANDUM

August 24, 2004

To:    James Edwards, Probation Officer
From:  Nancy Phinnessee, Instructor, Living Skills Center for the Visually Impaired

In accordance with your request for a victim impact statement, the following expresses my experience with Amanda during her recovery from this traumatic incident.

I have thought of Amanda's kidnapping and rape as the proverbial pebble thrown into a placid pool of water. Before I address Amanda's situation, I'd like you to understand how this event affected everyone around her. Amanda was living at the Living Skills Center for the Visually Impaired (LSC) when the assault happened. While the Board of Directors and staff were deeply concerned with Amanda's physical and mental health, there were also very legitimate concerns about how this event would impact the program. Parents, professionals and visually impaired consumers may constitute a group relatively large in number, but incredibly fast at communicating.

When it became widely known that the victim was blind, the "blind vine", as it has been affectionately coined. Even after the true facts became widely known, namely that against LSC policy the student was out alone after dark and that the crime began nowhere near LSC, some parents still refused to consider the program for their son or daughter. In the short run we lost prospective students. In the long run there is no way to know how this event will factor into the decisions of prospective students and their families.

Amanda's rape certainly had a direct affect on every student in the program at the time. With Amanda's permission, albeit without her presence, we met with all the students less than twenty-four hours after the assault. Amanda's therapist, a woman who numbered several of our students as clients, facilitated the meeting. Without going into detail I told them what had happened to Amanda. For several women this triggered painful personal memories. One young woman was so overcome she had to leave. Fortunately, Amanda's therapist had forewarned us of this possibility, and our director followed this young who left and stayed with her for quite awhile. Subsequently this young woman had to resume seeing her therapist and begin a regime of drugs to control acting out behavior she attributed to Amanda's rape. She came very close to losing her placement at LSC. AT the meeting that night with the students, some of the women talked of their own experiences. There were others who spoke later to staff. Who knows if there were others who felt they couldn't talk to anyone. We serve a very vulnerable population and unfortunately many of our students have a history of abuse.



**EXH 5**

This incident not only affected the entire staff, but everyone who is a champion for this unique program. Our director spent a lot of time explaining the situation to parents, the Board of Directors, Department of Rehabilitation counselors, public school teachers of the visually impaired, The Braille transcribing group, former consumers, LSC foundation members, the Director of Blind Services at the Department of Rehabilitation...

This crime even impacted the state budget. Amanda was granted an unprecedented seven month extension of her stay at LSC. Amanda's program fees were paid by the State Department of Rehabilitation. As a taxpayer, I give a resounding endorsement to this decision.

Because I had been Amanda's case manager all of a month before the incident (during which she went home for a two week Christmas vacation), I was the one called the night Amanda was assaulted. I'll never forget arriving on campus, driving around barriers set up years ago when gun violence resulted in death. As instructed by the police, I drove down the forbidden road and parked next to a police vehicle in front of a maintenance building. Just behind this building was the pre-school co-op my adult children attended when they were small. Standing in the door of the building was a SP police officer. He explained he was waiting for the college district police since the assault took place at Contra Costa College. Just inside the door were two maintenance workers. One turned out to be the person who found Amanda. Amanda was seated alone at the far end of a very long conference table, located in an alcove wing of an already cavernous building. She was at least 75 feet from this group of people. Opposite the door I entered, perhaps 10 feet beyond where Amanda was sitting was another door that had been propped open. After Amanda continued to shake when I reassured her she was safe, I realized she was cold. I closed the door that led to the playground I supervised doing my parent hours all those years ago. Amanda was very forthcoming with the events that night; however, she waited for questions to be asked. That trait is probably just a part of Amanda's nature, but it is also something that is exhibited by many kids who grew up in institutions. Amanda spent 12 years at a residential school for the blind. She would elaborate some, but mainly gave brief answers to questions. Amanda and I waited for someone to get there for over 2 hours. During that time I realized no one had talked to Amanda to get a description of the guy. They probably figured she was blind with no way of helping. It turns out Amanda knew he had an unusual hairstyle, half twists and half natural Afro. She gave a pretty accurate description of his height and build and knew he was wearing jeans and a jacket. He was traveling on foot and I guess we will never know if he could have been spotted that night if trained patrol officers and transit operators had been given just that minimal information in a more timely manner. It was not only our students at LSC who were fearful on campus, but many of the mainstream women at the college. Amanda had just registered at the college when the rape happened. For that semester the college provided Amanda with an escort to and from her classroom to her drop off/pick up point.

### ALTERNATE DEFENDER OFFICE
*County of Contra Costa*
*Martinez, California*

Date:  6/22/04

To:  File/Jermain McCord

From:  Tim Ahearn (TA)

Subject:  Witnesses/Trial strategy

I spoke to Jermaine this morning about Neshell Smallwood. I had attempted to contact Ms. Smallwood yesterday by calling the last known number and then physically going to her Vallejo address. The address was from a letter she wrote to Lorna Brown, Mr. McCord's attorney, about the night of January 15th and 16th, 2003, the night of the incident. She basically claims to have seen Jermaine sometime in the early morning hours after looking for him at BART and at this home. (See letter in file.) Ms. Smallwood was no longer at the address on the letter, but I learned through a DMV search of her new whereabouts. Before going to try and see her I went to talk to Jermaine about her.

Jermaine was adamant that I not see her or get her involved. I explained that she might be able to talk about his demeanor and whether he was bruised or injured. He again declined, even after I made sure he understood that he was facing life and we needed all the evidence we could.

We talked again later in the day. I again reiterated that I wanted to speak to her and he again said she was not involved. I then said she might be able to tell us about McCord's sexual conduct – rough, well endowed etc. I told him his case was interesting on the issue of consent. There was a case to be made that she went willingly and consented. The problem is the SART exam and the vics injuries. He again did not want to get her involved.

I then asked him about the names of girlfriends again. Previously, right before the last trial setting, either May 6 or 7, that we needed to explain these injuries. He had been claiming the encounter was consensual. I asked for the names of girlfriends I could talk to about his sex life. If he liked rough sex, largeness, anything. He said he would give me the names. I asked on several different occasions to ask him for names. He said he wanted to call first. I said it would be easier for me or Ed Oasa to do it on the outside. He again said he would give me the names. I never got any names from him.

Today, I again told him of the importance of the vics injuries and how we needed to explain them  I asked about Dorothy Mills. He said she was underaged. I said that's only stat rape, not forcible with kidnap and life. He did not want me talking to Mills.

**EXH 6**

As we were leaving, he said that he would think about our conversation and get back to me tomorrow.

Also, Jermaine agreed to a polygraph. It was authorized by Bill Veale to get one done since Jermaine was so adamant that it was consent and he was not helping with the investigation. I explained to him that it could not be used in court since it was inadmissible. However, we could show it to the DA and perhaps get an offer. DA has been unwilling to give offers. Spoke to Jon Yamaguchi today, temp head of SAU with Cashman out, he will not give number. Same with Paul Sequeira.

It should be noted that yesterday I spoke to Jermaine about the possibility of saying that a Rape occurred but there was absolutely no kidnap. He was adamant against that it was consensual. I informed him again that he was facing over 50 years to life if found guilty. We have previous talked about his maximum sentence on many previous visits. If we beat the the kidnap, the they could ony full-term conseq the forcible counts, giving him a chance to get out. He did not want to go that route and said it was consensual.

(A) 6/22/04

# ED OASA INVESTIGATIONS

Lic. PI 20088

484 Lake Park Ave., No. 370
Oakland, CA 94610

Voice: (510) 482-9159
Fax: (510) 336-1177

September 6, 2004

Timothy Ahearn
Attorney at Law
Office of the Alternate Defender
610 Court Street
Martinez, CA 94553

RE:    **PEOPLE v. JERMAINE MCCORD**
**Contra Costa County Superior Court Case No. 5-032028-3**

## REPORT OF INVESTIGATION

### SHEILA HARDIN
c/o CA Department of Motor Vehicles
303 Hegenberger Road
Oakland, CA
(510) 563-8900

Sheila Hardin was interviewed via telephone on August 9, 2004. Hardin affirmed that she was a juror in the trial in the instant case. This investigator told her he worked for defense counsel and advised her of her right to deny us an interview. Hardin agreed to speak with us.

We attempted to reach Hardin in person at her workplace, the hearings office of the State of California Department of Motor Vehicles in Oakland. The receptionist allowed us to leave Hardin a written message. Hardin called us a couple of days later after she contacted the trial judge to ask "if it was OK to talk to [this investigator]." The judge, she said, advised her that "it was OK."

Hardin affirmed that she was a dissenting juror who "didn't give up [and] stayed with the process." She said it was clear in the early stages of deliberations that there was a single dissenting vote, which was hers. Hardin recalled that the process began with jurors speaking individually about the evidence. No formal votes were taken because "everyone knew by the way each one talked about the evidence" that the vote was eleven to one.

Hardin said the deliberations became increasingly "heated." She did not give examples of how heated the process got but concurred with our suggestion that her colleagues were "exasperated"

**EXH 7**

Peo. v. Jermaine McCord                                                    2
Interview: Sheila Hardin
09/06/04

about her dissent. Hardin stated unequivocally that she was not threatened in any way during the
process. No juror raised the idea of reporting her to the judge. Hardin asserted that at no time
did she refuse to deliberate. She did not call the atmosphere unprofessional, "just heated." She
said she cried "a few times." At one point, she told her fellow jurors, "If you think I'm doing
anything improper, then tell the judge."

We read Hardin the foreperson's letter to the judge, dated July 14, 2004 at 10:20 a.m. Hardin
was not aware of this letter. When asked to comment on its content, Hardin answered, "Well,
you see how people felt," in reference to how heated and exasperated others on the panel were.
Hardin maintained that during deliberations, she did not speak about "evidence not submitted"
[per juror letter].

On the day of the verdict, Hardin recalled, the foreperson reported to the judge that the jury was
"deadlocked." The judge polled each juror about whether he/she wanted more judicial input and
assistance. Ten jurors said that "there was nothing the judge could do." Two jurors, including
Hardin, asked for a re-reading of instructions.

Hardin said that a juror, whose first name was "Paul (lnu)," asked for a read back of all
instructions. Hardin asked for a re-reading of instructions regarding the Defendant's videotaped
interview with law enforcement and the concept of reasonable doubt.

Back in the jury room after instructions were reviewed, Hardin changed her mind and expressed
a vote for guilt. She told us why in the following words, "It came to me, that Counselor Ahearn
presented no evidence that it was consensual. He said it was, but there was no evidence."

Hardin elaborated on her dissenting position she held earlier. She said she doubted the notion of
guilt because of (1) the victim's inconsistent statements and (2) Counsel's cross-examination of
the "portly" police officer, who "covered his face during cross." Hardin assessed at the time that
the police officer seemed confused and not confident of his own investigation.

When asked about other aspects of her experience as a juror, Hardin said that she and her
colleagues did not discuss the trial or the case outside deliberations. She did not notice cliques of
jurors or individual jurors having private conversations. No juror, she said, injected arguments
based on personal knowledge and experience.

Hardin agreed to us phoning her back if we had more questions. Please advise as to further
investigation regarding this juror.

Edmund K. Oasa

1  ALTERNATE DEFENDER OFFICE
   CONTRA COSTA COUNTY
2  William W. Veale, Chief Assistant Public Defender & Counsel of Record
   By: Timothy W. Ahearn, Deputy Public Defender, State Bar #202824
3  610 Court Street
   Martinez, California 94553-1298
4  Telephone: 925-646-1740

5  Attorneys for Defendant

6

7            SUPERIOR COURT OF THE STATE OF CALIFORNIA
                     COUNTY OF CONTRA COSTA

8  THE PEOPLE OF THE STATE OF CALIFORNIA,        No. 032028-3

9                     v.                          DEFENSE IN LIMINE MOTION
                                                  NUMBER 8
10

11 JERMAINE LAVARIUS MCCORD                       MOTION TO EXCLUDE
                                                  TESTIMONY OF S.A.R.T.
   _____/     NURSE

12

13         Per defendant Jermaine Lavarius McCord request, the court has ordered a 402 hearing to

14 determine the admissibility of the prosecution's proposed expert testimony of, Louise Jones,

15 R.N., concerning the sexual assault examination of Ms. Amanda McClure undertaken after the

16 alleged rape and forcible sexual penetration. The defense challenges the expertise of Nurse Jones,

17 as well as the admissibility of any opinions they may proffer whether Nurse Jones' "findings" are

18 consistent with Ms. McClure's allegations of rape and forcible sexual penetration.

19         The challenge here is addressed to the admissibility of the examination that Nurse Jones

20 conducted on the grounds that the statutory regime for S.A.R.T. programs does not permit a

21 trained nurse to conduct an examination for evidence of sexual assault except in consultation

22 with a physician or surgeon. In the regard, Penal Code[1] section 13823.5, a county with a

23

24 [1] All further statutory references are to the Penal Code.

                                    1

EXH 8

1   population over 100,000 shall arrange "that professional personnel trained in the examination of

2   victims of sexual assault...shall be present or on call" at county hospitals in compliance with the

3   guidelines set forth in sections 13823.5, 13823.9(b), and 13823.11. Section 13823.5(e) defines a

4   " qualified health care professional," for the purposes of the Chapter to include:

5           "As used in this chapter, "qualified health care professional" means
            a physician and surgeon currently licensed..., or a nurse currently
6           licensed...and working in consultation with a *physician and
            surgeon* who conducts examinations or provides treatment as
7           described in Section 13823.9 in a general acute care hospital or in a
            physician and surgeon's office.

8
9   (Emphasis added.) By its express terms, this section therefore requires that an examination by a

    nurse must be in consultation with a physician.

10
11          We have found no case law construing section 13823.5(e). However, that subsection's

12  meaning is brought into clearer focus by section 13823,13, which states that the Office of

    Criminal Justice Planning shall also develop a training course for "qualified health care
13
14  professionals."  Subsection c of section 13823.13 provides as follows:

15          "As used in this section, "qualified health care professional" means a
            physician and surgeon currently licensed..., or a nurse currently
16          licensed...who works in consultation with a physician and surgeon or who
            conducts examinations described in Section 13823.9 in a general acute
17          care hospital or in the office of a physician and surgeon.

18  (Emphasis added.) Significantly, this subsection (dealing with those who shall be trained to

19  conduct examinations pursuant to section 13823.9, defines "qualified health care professional"

20  more broadly than section 13823.5(e), to include any nurse who conducts sexual assault

21  examinations "in a general acute care hospital or in the office of a physician and surgeon.  Thus,

22  in order to be a "qualified health care professional" under section 13823.13, a nurse need only

    work "in consultation with a physician and surgeon."
23
24

                                            2

1    Clearly, the legislature's selection choice of language in the two subsections was

2  intentional, i.e., the class of nurses who may be trained to conduct examinations under section

3  13823.9 is broader then the class of nurses who may actually conduct such examines, the latter

4  being limited by consultation with a physician who examines and treats sexual assault victims.

5  The purposefulness of this distinction is further evidenced by the facts that (1) section

6  13823.13(c)'s definition of "qualified health care professional" was limited to "this section,"

7  while section 13823.5(e) definition apples more broadly to "the chapter" and (2) section

8  13823.5(e) requires "consultation with a physician and surgeon who conducts examinations or

9  provides treatment," while section 13823.13(c)'s language applies more broadly to a nurse "who

10  works in consultation with a physician or surgeon [without limitation] or who conducts [sexual

11  assault] examinations...." Consequently, the legislature's intent was clear: nurses who work in

12  consultation with a physician may be trained to conduct sexual assault examinations under

13  section 13823.9, but they nay not actually conduct such examinations except in consultation with

14  a physician and surgeon who conducts such examinations or provides such treatment.

15    In this case, the physical examination was conducted by Louise Jones, apparently a nurse

16  who has received formal S.A.R.T. training consistent with section 13823.13(c). However, it

17  appears that the examination in the case was apparently **NOT** conducted in consultation with a

18  physician. Accordingly, the examination did not comply with section 13823.9 and should not be

19  admitted into evidence.

20  Dated: June 28, 2004

21                                    Respectfully submitted,

22

23                                    Timothy W. Ahearn
                                     Attorney for Defendant

24

3



EXH 9



EXH 10

EXHIBIT

DECLARATION OF DUE DILIGENCE IVY McCRAY

I, Ivy McCray, declare as follows:

1. I am an attorney at law, with a business address at 829 - 61st Street, Oakland, California. I was retained to write a petition of habeas corpus for the federal court on March 27, 2007.

2. I did not receive appellate files until April 17, 2007, and transcripts from petitioner until May 1, 2007. In May, I obtained trial counsel's files. The file is substantial.

3. It took a considerable amount of time to read and absorb the case and the documents. There are well over 2,000 pages to the file.

4. There were several detrimental actions taken in petitioner's case and research consumed enormous time to determine any colorable issues to raise.

5. After research, I believe certain claims must be raised in the state courts prior filing them in the federal courts.

6. I have worked as steadfastly as possible for the undertaking, and able to present the bare bones of petitioner's contention in this brief.

7. Petitioner should not be penalized for the delivery of the brief on this case, and that the court accept that the trial had enormous issues that conflicted and had to be researched o petitioner's case. Petitioner is now serving a life sentence.

8. I believe that I worked diligently as possible in presenting this brief to the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed at Oakland, California, on July 11, 2007.

Ivy McCray, Declarant



1

# JANE DOE

# STATEMENT TO

# POLICE

# JANUARY 16, 2003

EXH 12

CONTRA COSTA COMMUNITY COLLEGE DISTRICT    Case: 03-0008-C
**POLICE DEPARTMENT**
<u>Report Narrative</u>    Date: <u>01/16/2003</u>

<u>INVESTIGATION:</u> (cont.)    Page # 6 of 9

I interviewed the victim in the Emergency Room OB/GYN Room at County Hospital.
Nancy PHINNESSEE and Ofc. Milano were present. SART Nurse Louise JONES
arrived and witnessed approx. one half of the interview. The victim's demeanor was
visibly shaken, relatively calm and cooperative. I saw scrapes on both of the victim's
knees. Both knees had the appearance of fresh abrasions beginning the healing process.
There were additional abrasions that were not as severe as the two already described.

The victim told me the following in summary:

     The victim left her school in Fremont at approx. 2100 hrs. The victim took a
     direct BART train from Fremont to Del Norte BART in El Cerrito. The victim
     got off the train unassisted and made her way to the Station Agent. The Station
     Agent (unidentified at time of initial report) assisted the victim hailing a taxi cab.
     There was a Yellow Cab waiting at the curb. The Station Agent told the victim it
     was a Yellow Cab. The Station Agent assisted the victim into the cab. The
     victim was seated behind the driver. The driver's side of the car was curbside.
     The victim told the driver her address and the driver told her it would be a $10.00
     trip. The victim paid the $10.00.

     A male subject got into the back seat of the cab from the rear passenger door. The
     male said "I just wanna go with my girlfriend; I wanna make sure she gets home."
     The victim did not know this person. The victim told the driver she did not know
     this person and felt uncomfortable with him in the car. The victim wanted the
     male subject out of the car. The driver told the male to leave. The male said
     "no." The victim thought the male subject gave the driver money. She thought it
     was ten dollars.

     The cab left the BART station with the victim and the suspect in the back seat.
     The male subject rested his let hand on her right leg for the most of the ride. The
     suspect said "Alright baby I'll take you home." The victim told the suspect to
     leave her alone. The cab stopped at 23rd Street and San Pablo Ave and let the
     victim and suspect out. The cab driver stated he would not go to the apartments
     unless the victim paid an additional $10.00.

     The suspect told the cab driver he wanted his money back. The victim did not
     recall any additional conversation about the suspect wanting his money. The
     driver refused to give him back any money. The cab drove away. The victim did
     not know the cab driver. She could recall specific odors or characteristics
     regarding the driver with one exception. She thought he may be Filipino. This
     was based on his speech.

     The suspect held on to the victim and directed her to walk with him forcibly to the
     college. The suspect and the victim went along Castro Road and recalled walking



CONTRA COSTA COMMUNITY COLLEGE DISTRICT          Case: 03-0008-C
POLICE DEPARTMENT
Report Narrative                                                    Date: 01/16/2003

INVESTIGATION: (cont.)                                              Page #7 of 9

on some gravel and walked through an opening in a fence. The suspect stopped
the victim at some bleachers. The victim felt the bleachers. The suspect pushed
her down from behind. The victim was screaming for the suspect to stop. The
suspect hit the victim on her back with his fists. The suspect told the victim to get
up. She was being pushed around and the suspect was slamming her head into a
cement wall. The victim made it back up on her feet and the suspect kept telling
the victim to stop screaming and to be quiet. The suspect was still behind the
victim. He grabbed by her neck and covered her mouth with the other hand to
prevent her from screaming. The suspect was saying "shut up bitch!"

The suspect put the victim to the ground on her back. He was kneeling over her
telling her to "pull up your shirt." The victim told the suspect "no" The suspect
said; "if you don't do it I'll kill you!" The suspect pulled her shirt up. He pulled
her bra up exposing her breast. The suspect did not fondle, kiss or touch her
breast. The suspect pulled the victim's shirt down and ordered her to pull down
her pants. The suspect pulled down her pants and panties as a unit. The victim's
pants and panties were pulled down to her ankles.

The victim was crying and telling the suspect to stop. The suspect was telling her
to "shut the fuck up!" The victim said "he raped me!" "He did twice!" The
victim was having trouble providing detail. The victim was showing fear of the
event she was describing. The victim calmed down and was able to respond to
questions.

The suspect held her down with his hands on her shoulders and "put his penis in
my vagina". The suspect's penis was not erect. "It was soft" "He pushed it in
really hard!" I clarified "really hard." The victim was referring to the suspect
thrusting and pushing against and inside her. "He kept going for 20 to 30
minutes." The suspect paused during this time and started again. This was the
second time the victim was referring to.

The suspect got up and said his name was Reese from Pinole. The suspect asked
the victim her name. She told him her name was Lauren and she was 30. The
suspect left the area to the victim's right and she went to the left. The victim was
contacted by a custodian and she made the report to the police.

I concluded this initial interview with the victim so the victim could be examined
by the doctor and SART Nurse

## PHYSICAL CONDITION:

The victim had a complaint of pain from her head, shoulders, back, pelvic region and
knees. There were abrasions on both knees. There were no other outward signs of injury

Det. T. C. Sharp #104

Case 3:07-cv-05217-CRB     Document 5     Filed 10/25/2007     Page 52 of 101

CONTRA COSTA COMMUNITY COLLEGE DISTRICT          Case: 03-0008-C
POLICE DEPARTMENT
Report Narrative _____          Date: 01/16/2003

PHYSICAL CONDITION: (cont.)                              Page #8 of 9

or trauma. The victim was frightened and emotionally distraught.

See SART exam report for additional information.

## VEHICLES:

Not Applicable

## PROPERTY:

See Face Sheet

## EVIDENCE:

See attached Property/Evidence Property Report

I opened Evidence Item #2 at 1645 hrs. I removed the bag containing the victim's panties and hung them on sterile swabs for air drying. The panties were left secured inside the evidence room for drying. These panties were very blood soaked and placed damp in the evidence bag by the ER staff. The bag and panties will be re-sealed in a new paper evidence bag when dry. The panties will now be evidence item #3

## OPINIONS & CONCLUSIONS:

The case is active and under investigation.

Det. T. C. Sharp #104   

# JANE DOE

# STATEMENT TO

# POLICE

# JANUARY 22, 2007

1   Date of Interview: 1/22/2003

2   Subject:          Amanda

3   Interviewer:      Not Identified

4   Case:             People v. Jermaine McCord, Docket# 2-278131-8

5   Transcriber:      Gwen Watson

6

7   Interviewer:      (Unintelligible), all your answers verbally,

8   Amanda:           um, um, (yes).

9   Interviewer:      Ok. Uh, it is January 22nd, it's about 2:45 in the afternoon, and I'm here with Amanda. And

10                    there is nobody else present, and we're gonna, uh, what happened last Thursday morning

11                    over at Contra Costa College. Ok, Amanda, uh, one of the reasons why I'm going to be

12                    interviewing you is because now its time that, uh, it's a little bit of time after the incident, so

13                    you know, you shouldn't have that initial trauma of when it all happened, so maybe you can

14                    think more clearly.

15  Amanda:           um,um. (yes).

16  Interviewer:      And uh, the other reason is, is that I've come up with .. I'm coming up with some problems

17                    and I don't know if its because of assumptions that I've made when I'm talking to you...or, um,

18                    I just may not have some facts straight. The other thing that I want you to know is that

19                    whatever you tell me...

20  Amanda:           um,um (yes).

21  Interviewer:      Um, is, it's only , this whole thing is to just help you. So don't think that there's anything that

22                    you can't tell me, or that you shouldn't tell me, you should pretty much tell me absolutely

23                    everything.

24  Amanda:           Ok.

25  Interviewer:      Ok? And, uh, the other thing that I don't think I told you the other night, which I should've is

                      that I don't want you to blame yourself, that you feel like whatever you did is, is the reason

-1-

1   why this happened, ok? Somebody else did this to you and they shouldn't of, no matter what

2   the circumstances were, there was, there is no reason in the world for them to do this to you,

3   that you would deserve this, ok?

4   Amanda:    um,um (yes).

5   Interviewer:    So, I don't want you to blame yourself in anyway.

6   Amanda:    I'm ready.

7   Interviewer:    So, why don't we just, let's just kind of start back at the beginning. From uh....

8   Amanda:    Ok.

9   Interviewer:    When you left the school in Fremont.

10  Amanda:    Ok.

11  Interviewer:    Just kind of go in, uh, just in your own pace and tell what happened.

12  Amanda:    Ok, I, uh, I, ok, I get on the bus, uh, in Fremont to go to the Bart station .And, I get on Bart,

13  everything's fine. The ride is very smooth. And, as people were coming on the train, I asked

14  them if they were going to El Cerrito, or Del Norte, and there was one passenger that says that

15  he was going to El Cerrito and Del Norte, so I said, uh, since you're going there could you

16  please uh, tell me when we get there and could you please direct me off the train, so I could

17  you know, I said I could get lost. And then he said he would. So, we didn't talk the whole trip,

18  we were just riding, and then when we got to the stop, he helped me off the train. And then,

19  um, he took me.... Oh yeah, then we got, I got out the gate with the ticket, and then he took

20  me to the 72 bus stop, so I could catch the bus. And so, the driver, and so he left me there;

21  and the driver came along and says: oh we're going to the college. And then I asked her ,are

22  you guys going to 23 rd. and San Pablo? And she said: no, we're going to the college. And

23  then, she all like; I know another driver,  that she could come and get you.  And so,  um, the

24  other bus driver came , came around to the bus pool. the bus stop. I asked her are you going

25  to go to 23 rd. and San Pablo? And she said no, I'm going to the college. And, then she's all;

    what are you doing up, what are doing up here this time of night? And then I told her that I

just came from Fremont. And she goes: oh, ok, well we don't go there, I'm sorry. So then, the

passenger came back and he took me to one of the cabs and, uh, what the cab was yellow,

and he..they put me inside the cab, and then the, uh, individual got in and he's all: I wanna

go take, he said I wanna go with you, I wanna take my girlfriend home. And I told the cab

driver that I did not know him. And he's not my girlfriend. I don't feel comfortable with him

riding with me. So, the cab driver didn't say anything. So, you know, I told the cab driver to let

me off at 23rd, and San Pablo. So, he did. And so, I got out of the cab, I didn't think the other

guy was going to get out of the cab with me. So, I got out, and as I'm walking, he comes right

up, well actually I was on the phone, I mean checking my messages. He's all: let me see your

phone. Let me call, Let me ask your friend if she can come get you. Then he grabs the phone

from me. Then I walk away, I'm all: ok. that's it. So I walked away. Then he comes up behind

me and he grabs me. Then we're walking ten minutes. And we're coming to some bleachers,

and then he goes: sit down. He goes: sit down bitch, and then he goes: sit down before I

knock you out. And then, and then I fell to the floor. And he... and when I did that, he fell too,

so I hit him, and I kicked him in the stomach because I wanted to defend myself. Because he

was.. because he grabbed me. And I screamed: let me go right now, and then he covered my

mouth and told me: to shut the "f" up. He goes: shut the fuck up; shut up. And so, he not

only covered my mouth, he also choked me. He yeah.. and then he goes: if you don't... he go:

everyone can here you; you scream so loud that everyone can here you. And then he says:

why isn't cool to hit? He's all: you skinned up my knee. And I'm all: you skinned up mine too.

And he's all: , he lifted me, he's all: get the "f" up, get the fuck off me, I don't even know you.

And, and, I'm: I don't even know you either, so why are you doing this? And he didn't say

anything, well, I didn't say that but, I thought that in my mind. And, he's all: pull up your shirt

right now, he's all: if you do what I ask you to do, I'll leave you alone, but if you don't, I'm

gonna fucking kill you. So lift up your shirt, *now*. So I, I, was forced, I mean , I felt like, you

know, I, I felt like if I didn't do it, he was really gonna kill me. So, I had no choice but to pull up

-3-

1    my shirt. So, you know, and then he got me on the ground and then he laid me on the ground

2    and then he pulled down my pants. He stuck his thing into me. I start, I mean, I sort of cried,

3    I'm like... and then he's all: shut the fuck up. Just shut up. And I'm like: well could you

4    please stop? He go: no, I'll stop... wait until I'm finished. And then, so, I mean, he kept on and

5    he go:.. ,and then stopped. And then what he did was (unintelligible), so you need help , and I

6    said yeah, uh, I thought I was, I could have sworn that I thought it was somebody different

7    until I felt the, the guy's sweatshirt. (Unintelligible), then I said I need someone to, uh call the

8    police. And he's all: why, what happened? I was raped. And he's like, uh, oh my god. And

9    then, like, he was like pretending to call the police or something. And he took me to the

10   bleachers and he was pretending to call the police. And then he's all: oh you're in trouble

11   now; I'm going to do it again. (Unintelligible), which means he's gonna rape me again. He

12   goes: ok, that's it, you're in trouble now. You, you, tried to get me in trouble. You know, I'm

13   gonna do it again with you. So he takes me to the bleachers, one of the benches, and he laid

14   me down; pulls down my pants; he took off my shoe and my sock, and then he did it again.

15   He raped me again. And then, I'm like: can I go home? He's all: wait, and wait until I'm

16   finished. And then I said: I'm gonna get pregnant. And he's all: alright, I'll take care of the

17   baby. And then he stopped. And then I pulled up my pants and stuff. And so he's all: you're

18   gonna... he tried to uh, give me directions. You know, you're gonna go straight, you're gonna

19   go, you're gonna...you're just gonna keep going straight. And he's all: (before he left), I wasn't

20   raping you. He go: I'm cool with these people, I wasn't raping you, ok? He's all: I'm watching

21   you. And he's all: I, I didn't rape you. So, he said: hold on. Let me go get my stuff real quick.

22   So, he left. So, I was walking around...: for five minutes, I'm like: oh where am I going? I don't

23   know where I'm going. And I go: oh, everyone's gonna find me I'm blind. So, the custodian

24   found me. He goes: what are you doing up so late? He goes: what are you doing on this

25   campus so late at night? And I asked him to give me a ride to the police station so I could file

     a police report on this guy. And he says: what happened? I'm like: well ,uh, I told him all that

| | |
|---|---|
| 1 | | happened. And then, I guess when he went to the police station, it was closed. So, he took |
| 2 | | me to the office. And I asked him could I call my house, and he said no, um, we're gonna call |
| 3 | | the police first because this is important. So, um, he called the police and I got, then I talked |
| 4 | | to them, and I told them the whole details that happened. And then, after that, um, one of the |
| 5 | | custodians was like: when are the police gonna come out? I'm like: I don't know, like I hope |
| 6 | | they come soon. And then, and then like, so, I had called one of my friends, and then I told |
| 7 | | them what happened. So they called my teacher, that's how she found out, and she called |
| 8 | | the police department. And then I talked to her on the phone , so um, that's when you guys |
| 9 | | came along and I went to the doctors and stuff. |

| | | |
|---|---|---|
| 10 | Interviewer: | Ok. Let's kind of... let's work backwards from the custodian's office.   When you called...when |
| 11 | | you talked to Nancy on the phone... |
| 12 | Amanda: | Um,um. |
| 13 | Interviewer: | Do you tell her that, that, uh, she was going to be mad at you? |
| 14 | Amanda: | Yeah. |
| 15 | Interviewer: | Why did you say that? |
| 16 | Amanda: | Because I thought that , I thought that it was my fault at first. And then she told me: well this |
| 17 | | is not your fault, honey. I mean what ever happened, it's not your fault. It's the person, the |
| 18 | | person responsible, it's their fault, it's not yours. |
| 19 | Interviewer: | Ok. Now we're going to jump back to the beginning. Now, you said that you talked to this |
| 20 | | individual on the Bart train, this male passenger; there was no conversation on the train at |
| 21 | | all? |
| 22 | Amanda: | Un,un. (no). |
| 23 | Interviewer: | He didn't, uh, did you tell him your name? |
| 24 | Amanda: | No. |
| 25 | Interviewer: | Ok. He didn't say his? |
| | Amanda: | Un, un. (no). |

1  Interviewer:    Ok, when you, uh, so he assisted you off the train at Del Norte.

2  Amanda:    Un,un. (no).

3  Interviewer:    And took you down to the turnstiles?

4  Amanda:    Um,um (yes)

5  Interviewer:    When you were going through the turnstiles, do you recall, if you... did you have your cane

6         extended, or was that... did you still have it folded up.

7  Amanda:    It was extended.

8  Interviewer:    So...

9  Amanda:    Yeah, it was extended.

10  Interviewer:    Ok. And in your jacket pocket, I found a..., the bus transfer from Del Norte.

11  Amanda:    Um,hum (yes)

12  Interviewer:    And, did you.... and that male passenger, was he the one that got that for you?

13  Amanda:    Yes.

14  Interviewer:    Ok. And you used... you told me yesterday you used an exact fare Bart ticket?

15  Amanda:    Um hum (yes).

16  Interviewer:    Ok. So, when you left the turnstiles of the Bart station, and uh, you were by this other

17         passenger, he took you over to the bus stop?

18  Amanda:    Yes.

19  Interviewer:    And what bus stop was that again?

20  Amanda:    The 72 bus stop.

21  Interviewer:    The 72?

22  Amanda:    Um, hum (yes).

23  Interviewer:    Ok. Did you actually get on the 72 bus?

24  Amanda:    Well, I did , yes.

25  Interviewer:    And then did you give him the transfer then?

| | | |
|---|---|---|
| 1 | Amanda: | Ummm.. no, not yet, because they said that they were not going to 23rd. and San Pablo. So, |
| 2 | | the passenger came back and took me off the bus. |
| 3 | Interviewer: | Do you know where he went after you got on the bus? Or, was , was.. |
| 4 | Amanda: | I knew he was around the Bart station. That's all I know. |
| 5 | Interviewer: | Ok. So you're not sure where he was or what he was doing when you were talking to the |
| 6 | | driver. |
| 7 | Amanda: | Un,Un, (no). |
| 8 | Interviewer: | Ok. Was the driver male or female? |
| 9 | Amanda: | It was a female. |
| 10 | Interviewer: | And that was on the 72 bus? |
| 11 | Amanda: | Yes. |
| 12 | Interviewer: | She just said she was just gonna go to the station there, at Contra Costa College? |
| 13 | Amanda: | Yes. |
| 14 | Interviewer: | Ok, so you still had your transfer then. |
| 15 | Amanda: | Yes. |
| 16 | Interviewer: | And then you, this passenger came back and he got on the bus and helped you off? |
| 17 | Amanda: | Um,um (yes). |
| 18 | Interviewer: | And, then, was there another bus already there, or did you wait for another bus to come? |
| 19 | Amanda: | There was another one already there. |
| 20 | Interviewer: | Do you know what number that one was? |
| 21 | Amanda: | No. |
| 22 | Interviewer: | And, she said she was not... and that was another female driver? |
| 23 | Amanda: | Um,um (yes). |
| 24 | Interviewer: | And she said she was going to the college but she wasn't going to go to 23rd. |
| 25 | Amanda: | Um,hum (yes). |
| | Interviewer: | And.... And all this time this male passenger is still with you. |

-7-

| 1 | Amanda: | Yes. |
|---|---------|------|
| 2 | Interviewer: | Ok, and then he, did you,.. when you got on the second.. did you get on the second bus? |
| 3 | Amanda: | No. |
| 4 | Interviewer: | Ok. Who ended up taking your tran..., your bus transfer? |
| 5 | Amanda: | I got on the second bus, they took it; and they said oh, yeah they took the transfer. |
| 6 | Interviewer: | Was that on the second bus? |
| 7 | Amanda: | Yes. |
| 8 | Interviewer: | Ok, did you.. did uh, did you ride the bus at all? |
| 9 | Amanda: | No. |
| 10 | Interviewer: | Ok, so you didn't, you didn't even ride the bus? |
| 11 | Amanda: | un,un (no). |
| 12 | Interviewer: | So then you went.. you ended up going to, um, you got off the bus with this male passenger? |
| 13 | Amanda: | Um,hum (yes). |
| 14 | Interviewer: | And went over to a cab stand? |
| 15 | Amanda: | Yes. |
| 16 | Interviewer: | Ok, then he.. did he talk to the cab driver at all? |
| 17 | Amanda: | No. |
| 18 | Interviewer: | Ok, did, um, did you get into the cab before this, this guy left? Or did he just leave you at the |
| 19 | | cab? |
| 20 | Amanda: | He helped me into the cab. (unintelligible). |
| 21 | Interviewer: | Ok, he helped you into the cab. And then, and then he left? |
| 22 | Amanda: | um,hum (yes). |
| 23 | Interviewer: | From, then talking with him and all, do you know if he was white or black? |
| 24 | Amanda: | He was white. |
| 25 | Interviewer: | White? Anything about him that you might remember? You know... |
|  | Amanda: | um? |

| | | |
|---|---|---|
| 1 | Interviewer: | Possibly cologne? |
| 2 | Amanda: | No, I can't. |
| 3 | Interviewer: | Anything in his voice? Was he, you know, was he high voice, deep voice? |
| 4 | Amanda: | Deep voice. |
| 5 | Interviewer: | Was he soft spoken, or? |
| 6 | Amanda: | Yes. |
| 7 | Interviewer: | And, and he never, never ... once he said : oh my name , my name so and so, or whatever? |
| 8 | Amanda: | No. |
| 9 | Interviewer: | Ok. But he did... did you have any conversation with him at all like ... give you some idea |
| 10 | | that... did you think that maybe he was a regular passenger on Bart? |
| 11 | Amanda: | He seems like he takes it all the time. |
| 12 | Interviewer: | So he rides Bart all the time? |
| 13 | Amanda: | Yes. |
| 14 | Interviewer: | And, did he ever say where he lived? |
| 15 | Amanda: | He said that he lived in Richmond. |
| 16 | Interviewer: | Ok. Um, so, now you're in the cab, and, this man's gone, and, and now you're talking to the |
| 17 | | cab driver. |
| 18 | Amanda: | Yeah. |
| 19 | Interviewer: | Ok. uh, at any time, are you on the, about, I guess it was about 12:15 when you made a |
| 20 | | phone call to your friend down south? |
| 21 | Amanda: | Yeah. |
| 22 | Interviewer: | Ok, was that while you were in the cab? |
| 23 | Amanda: | When I left the cab. |
| 24 | Interviewer: | When you left the cab. So, that was after the cab ride? |
| 25 | Amanda: | Yeah. |

| | | |
|---|---|---|
| 1 | Interviewer: | Ok, we'll get back to that in a minute.  Now, ok, you're in the cab,  did the driver just come out |
| 2 | | and say that's going to be ten dollars?  Or, did he start out with five dollars and then go to ten, |
| 3 | | or? |
| 4 | Amanda: | Um, he said it was going to be ten dollars. |
| 5 | Interviewer: | Ok.  So, he just came right out and said ten dollars is a flat rate. |
| 6 | Amanda: | Um, um (yes). |
| 7 | Interviewer: | And, as you told me before, he never called anything in. |
| 8 | Amanda: | Un, Un (no). |
| 9 | Interviewer: | On his radio, you never heard anything like that? |
| 10 | Amanda: | No. |
| 11 | Interviewer: | And, you didn't hear like his meter going...or... |
| 12 | Amanda: | No. |
| 13 | Interviewer: | Could you hear, did he have a radio in the car that you could, uh, you know, like a two way |
| 14 | | radio that you could hear .... |
| 15 | Amanda: | Yeah. |
| 16 | Interviewer: | ....people taking in the background? |
| 17 | Amanda: | Yeah. |
| 18 | Interviewer: | So he did have a radio? |
| 19 | Amanda: | Um, hum (yes). |
| 20 | Interviewer: | Ok.  Did he ever talk on that radio at all? |
| 21 | Amanda: | No. |
| 22 | Interviewer: | Ok.  When, uh, and so now, this other guy gets in the car with you. |
| 23 | Amanda: | Uh, yes. |
| 24 | Interviewer: | Ok.  And he, uh, he pretty much tells the cab driver  that you're his girlfriend? |
| 25 | Amanda: | Yes. |
| | Interviewer: | Is that kind of right off the bat that he says that? |

| | | |
|---|---|---|
| 1 | Amanda: | Yeah, he's all.. actually. He's all: hey where you at? Where you going? And uh, he.... the cab |
| 2 | | driver, I don't remember what he said. And then I remember, I remember the guy say: I'm |
| 3 | | gonna come with you to take, I want to come with you 'cause I wanna take my girlfriend home. |
| 4 | | He said that a little after. |
| 5 | Interviewer: | Ok, so then he was... was he directing that to the cab driver? |
| 6 | Amanda: | Yes. |
| 7 | Interviewer: | Ok, was he in the car at that time when he said that? |
| 8 | Amanda: | He was getting in. |
| 9 | Interviewer: | Ok. And you told the cab driver that you didn't feel comfortable with him in the car? |
| 10 | Amanda: | Um, hum (yes). |
| 11 | Interviewer: | Did you, were you kind of quiet about saying that, or, did the, do you think the cab driver |
| 12 | | heard you? |
| 13 | Amanda: | I don't think so. |
| 14 | Interviewer: | And were you kind of quiet and maybe uh, I don't want to use the word meek, but, you know, |
| 15 | | real soft when you were speaking? |
| 16 | Amanda: | Yeah. |
| 17 | Interviewer: | So it's possible the cab driver never heard you then. |
| 18 | Amanda: | Yeah. |
| 19 | Interviewer: | Ok. do you think, uh, the guy in the car heard you? |
| 20 | Amanda: | Yes. |
| 21 | Interviewer: | Ok. Um, so you ended up getting out at 23rd. and San Pablo? |
| 22 | Amanda: | Yes. |
| 23 | Interviewer: | Does that , um, how certain are you of that? |
| 24 | Amanda: | Very. |
| 25 | Interviewer: | Ok. So you said you walked about ten minutes. |
| | Amanda: | Yeah. |

| | | |
|---|---|---|
| 1 | Interviewer: | Ok. From where 23rd. and San Pablo is and to where you ended up, if you would  walked |
| 2 | | quickly, you could probably make it in ten minutes. But there's the... there two routes you |
| 3 | | could take, and I'm not sure which side of the street. or anything  you got off on... er, got  out |
| 4 | | on,  when you got on 23rd. and San Pablo, but did you feel like you were walking in front of |
| 5 | | where you live? |
| 6 | Amanda: | Yes. |
| 7 | Interviewer: | So you walked, did you walk past? |
| 8 | Amanda: | Yes. And then he said, the guy said that  we're coming to a Burger King, do you know where |
| 9 | | that is?  I said no, and he just kept walking.   We were walking  quickly. |
| 10 | Interviewer: | Burger King? |
| 11 | Amanda: | Yeah, he said (Unintelligible) Burger King. |
| 12 | Interviewer: | You're sure it was a Burger King? |
| 13 | Amanda: | Yeah. |
| 14 | Interviewer: | Ok, he didn't say a thing about McDonalds? |
| 15 | Amanda: | No. |
| 16 | Interviewer: | Jack in the Box? |
| 17 | Amanda: | Un, Un (no). |
| 18 | Interviewer: | Der Weinersnitzel? |
| 19 | Amanda: | Un, un. (No). |
| 20 | Interviewer: | Ok, Ok, he said Burger King. |
| 21 | Amanda: | Um,um (yes). |
| 22 | Interviewer: | Ok. Did he say anything about a gas station? |
| 23 | Amanda: | No. |
| 24 | Interviewer: | Ok. And , initially you said at the hospital, you were talking about Goball 7. |
| 25 | Amanda: | Yeah... |
| | Interviewer: | Are you certain of that, or is that kind of a... |

| | | |
|---|---|---|
| 1 | Amanda: | It's a guess. |
| 2 | Interviewer: | 'Cause Goball 7 is uh, uh, actually down in El Portal and (unintelligible), which is down at the |
| 3 | | end of route 20. It's almost a good block ,or so, past the gas station. So that would be |
| 4 | | walking away from the college instead of to it. |
| 5 | Amanda: | Um, ok. |
| 6 | Interviewer: | But you don't recall a gas station, at all? |
| 7 | Amanda: | No I don't. |
| 8 | Interviewer: | Recall any, uh, any fencing? If, well, let me take that back. When you were walking towards |
| 9 | | the college, were, did you notice... where there any cars out on the road? |
| 10 | Amanda: | Yeah. |
| 11 | Interviewer: | Do you remember if they were to your left or to your right? |
| 12 | Amanda: | To my right. |
| 13 | Interviewer: | Ok. |
| 14 | Amanda: | I don't, I mean the rest of the time we were walking, I don't , I, I really don't recall the rest. I |
| 15 | | wasn't paying attention. The only time, I mean, I was talking with my friend on the phone, so, |
| 16 | | and I wasn't really paying attention... and I was telling her that this guy's getting me |
| 17 | | (unintelligible), and he, he grabbed the phone from me, and he's all: let me see , you know, let |
| 18 | | me see if she can meet you, and he just grabbed the phone out my hand. |
| 19 | Interviewer: | Ok. And you, so when you got out the cab, you're walking, you're actually walking on your own |
| 20 | | .... |
| 21 | Amanda: | Yeah... |
| 22 | Interviewer: | ...out of the cab, and you're walking towards your house. |
| 23 | Amanda: | Um, hum (yes). |
| 24 | Interviewer: | ...and you're taking on the phone, was that to Cheryl? |
| 25 | Amanda: | Yes. |
| | Interviewer: | Ok, and that was the last phone call you made on that cell phone, right? |

-13-

| | | |
|---|---|---|
| 1 | Amanda: | Yes. |
| 2 | Interviewer: | And you're...., and, so then he took it out of you hand. Now, did he say anything to Cheryl at |
| 3 | | all? |
| 4 | Amanda: | No. She, he hung it up. I guess. She hung up. |
| 5 | Interviewer: | Ok. Did you..... Have you talked to Cheryl since? |
| 6 | Amanda: | Yes. |
| 7 | Interviewer: | Um, when, um, you said you walked on gravel... |
| 8 | Amanda: | Um, hum (yes). |
| 9 | Interviewer: | Was it near, was that near the bleachers? |
| 10 | Amanda: | Yes. |
| 11 | Interviewer: | Ok. The gravel was near the bleachers. |
| 12 | Amanda: | Yeah. |
| 13 | Interviewer: | And, uh, ok. Um, I'm going to ask you some more personal questions. I noticed that, uh, on |
| 14 | | the (unintelligible), exam , that, uh, you said that he also, besides his penis, he also put, uh, a |
| 15 | | finger in you. |
| 16 | Amanda: | Yeah, he did. |
| 17 | Interviewer: | Ok, did he do that the first time? |
| 18 | Amanda: | Yes. |
| 19 | Interviewer: | Um, did he do it also the second time? |
| 20 | Amanda: | No. |
| 21 | Interviewer: | Ok. And was he doing that at the same time he was , uh, putting his penis in? |
| 22 | Amanda: | Yes. |
| 23 | Interviewer: | Ok, and, what about..., the (unintelligible), exam shows you had some injuries. |
| 24 | Amanda: | Yes. |
| 25 | Interviewer: | Did, uh, this, uh, you told me you had a lot of pain when he was trying to put his penis in you |
| | | and that, that, hard pushing and all was hurting you. |

| | | |
|---|---|---|
| 1 | Amanda: | Yeah, yeah. |
| 2 | Interviewer: | And did his finger end up hurting you also? |
| 3 | Amanda: | Yes. |
| 4 | Interviewer: | Could you, could you tell the difference between the two? |
| 5 | Amanda: | Yes. |
| 6 | Interviewer: | And, and, how was that? |
| 7 | Amanda: | Well, his finger didn't go all the way, and it was his penis that I thought hurt me the most. |
| 8 | Interviewer: | Ok. Now, and uh, (unintelligible), we'll go back to that night in the hospital , you were telling |
| 9 | | me, he never, uh, he never really kiss you, or licked you, or anything? |
| 10 | Amanda: | Un, um, (no). |
| 11 | Interviewer: | And, he never forced you to kiss or lick him? |
| 12 | Amanda: | Un, um (no). |
| 13 | Interviewer: | And he never tried to put his penis in your mouth? |
| 14 | Amanda: | No. |
| 15 | Interviewer: | He didn't put it anywhere else on you? |
| 16 | Amanda: | No. |
| 17 | Interviewer: | Except for in your vagina? |
| 18 | Amanda: | Um, hum (yes). |
| 19 | Interviewer: | That was it? |
| 20 | Amanda: | Yes. |
| 21 | Interviewer: | Well, um,... |
| 22 | Amanda: | Wait, wait, wait, I take this back, he did put his mouth on my breast, on one of them. |
| 23 | Interviewer: | Ok, and do you recall which one of them? |
| 24 | Amanda: | This one. |
| 25 | Interviewer: | Your, your right breast? |
| | Amanda: | Yes. |

| | | |
|---|---|---|
| 1 | Interviewer: | Ok. Um, While you're at the um, at the bleachers there and the first time you were actually |
| 2 | | laying on the ground, and the second time he had you up on the middle of the bleachers? |
| 3 | Amanda: | Um,hum, (yes). |
| 4 | Interviewer: | Ok. And the ground you were on was actually like concrete ? |
| 5 | Amanda: | Yes. |
| 6 | Interviewer: | Was it..., did you just feel it under your shoes, or did you actually feel it with your hand? |
| 7 | Amanda: | I felt it with my hand. |
| 8 | Interviewer: | Ok, so that felt like , did it, did it feel like cement, or asphalt? |
| 9 | Amanda: | Asphalt. |
| 10 | Interviewer: | Asphalt. Ok, it's a little rougher than cement? |
| 11 | Amanda: | Yes. |
| 12 | Interviewer: | Ok. Um, and you, you said you stepped on gravel, you walked on gravel before you got to the |
| 13 | | bleachers? |
| 14 | Amanda: | Um,um (yes). |
| 15 | Interviewer: | Do you know how much gravel you waked on? |
| 16 | Amanda: | It was a little bit. |
| 17 | Interviewer: | Say about how many steps? |
| 18 | Amanda: | Two. |
| 19 | Interviewer: | Just two steps? Were you just walking through a little patch of it? |
| 20 | Amanda: | Yes. |
| 21 | Interviewer: | Ok. Did you recall walking in, say, any slippery mud? |
| 22 | Amanda: | No. |
| 23 | Interviewer: | Ok, you're pretty much on a hard surface with the exception of the gravel the whole time? |
| 24 | Amanda: | Yes. |
| 25 | Interviewer: | Ok. Do you know if you ever walked across any grass? |
| | Amanda: | No. |

| | | |
|---|---|---|
| 1 | Interviewer: | Ok. When uh, at the, uh, after he raped you the second time, now, you told me before that |
| 2 | | he was asking your name? |
| 3 | Amanda: | Yeah. |
| 4 | Interviewer: | Ok, and you, you gave him a false name? |
| 5 | Amanda: | Yes. |
| 6 | Interviewer: | What, what name was it? |
| 7 | Amanda: | I told him that my name was Laura. |
| 8 | Interviewer: | Ok, and he uh, told you his name was... |
| 9 | Amanda: | (Unintelligible) |
| 10 | Interviewer: | From Pinole? |
| 11 | Amanda: | Um, hum (yes). |
| 12 | Interviewer: | Did he say anything else about maybe what he did? Uh, did he say anything else about Pinole |
| 13 | | or anything else about him? |
| 14 | Amanda: | No. |
| 15 | Interviewer: | Ok. Ok. Let me just.. see if I got pretty much everything here. Um, so, pretty much we're |
| 16 | | looking for the bus driver of, uh, the 72 and another bus driver that the first bus driver might |
| 17 | | know, right? |
| 18 | Amanda: | Yeah, she may recognize you, too, because I heard him talking to the bus driver : hey where |
| 19 | | are you at? |
| 20 | Interviewer: | Uh, is that the passenger, or? |
| 21 | Amanda: | The, the, other individual, the other guy. |
| 22 | Interviewer: | Ok. The bad guy. |
| 23 | Amanda: | Yeah. |
| 24 | Interviewer: | Ok, so the bad guy, the bus driver may know, the second bus driver may know him? |
| 25 | Amanda: | Um, hum (yes). |

-17-

| | | |
|---|---|---|
| 1 | Interviewer: | Ok. Were the bus driver, is, is, the cab, where the cab pick-up, is that close to where the |
| 2 | | buses are? |
| 3 | Amanda: | Yeah. |
| 4 | Interviewer: | Were both of the buses still there when the cab was there? |
| 5 | Amanda: | They left. |
| 6 | Interviewer: | They left before you did? |
| 7 | Amanda: | Um, hum (yes). |
| 8 | Interviewer: | Ok. and there's a possibility the second bus hadn't left yet, and they may have seen you with |
| 9 | | this guy? |
| 10 | Amanda: | Yes. |
| 11 | Interviewer: | Ok. Do you know if this other guy may have seen this guy? |
| 12 | Amanda: | I don't know. |
| 13 | Interviewer: | Ok. Ok. Is there anything that uh, you can think of, that I may have not asked you or ? |
| 14 | Amanda: | No. |
| 15 | Interviewer: | Ok. So, and on, uh, how come you ended up on Bart anyway? Don't you normally have a |
| 16 | | different transportation? |
| 17 | Amanda: | Um, Para-Transit didn't show up. I took Bart. |
| 18 | Interviewer: | Ok. Ok, so, and you were, uh, A.C. Transit to Bart? |
| 19 | Amanda: | Um,hum (yes). |
| 20 | Interviewer: | And then, you were gonna take A.C. Transit, and you ended up taking a cab after Bart. |
| 21 | Amanda: | Um,hum (yes). |
| 22 | Interviewer: | Ok. Ok, have you talked to, uh, besides Nancy and Cheryl, have you talked to anybody else |
| 23 | | about this, other than you know, anybody from the police department, doctors, or ? |
| 24 | Amanda: | I talked with someone from ... uh, I (unintelligible) called the 800 number on the rape crisis, |
| 25 | | and I talked to somebody about that. |
| | Interviewer: | Ok. But you didn't talk to, uh, anybody that, uh, anybody else? |

-18-

| | | |
|---|---|---|
| 1 | Amanda: | Um, um (no). |
| 2 | Interviewer: | Just to let them know what happened, or, anything like that? |
| 3 | Amanda: | Um, um (no). |
| 4 | Interviewer: | Ok. Ok, well I, I've, I think I have all the questions that, uh, so that I can stop bothering you |
| 5 | | with those. |
| 6 | Amanda: | Um, hum. |
| 7 | Interviewer: | Are you feeling better at all? Physically? |
| 8 | Amanda: | Um, yeah. |
| 9 | Interviewer: | Ok. Have you, uh, do you have another appointment set up at rape crisis? |
| 10 | Amanda: | I think so, (unintelligible). |
| 11 | Interviewer: | Ok. Uh, if you happened to talk to Cheryl, let her know that I'd like to talk to her . I left a |
| 12 | | message on her home number. I just want.. maybe she 's got an idea of, she may have heard |
| 13 | | something and might not really realize what she heard type thing. |
| 14 | Amanda: | Um, hum. (yes). |
| 15 | Interviewer: | So, um, and if you know, you end up thinking about , uh, anyone's , you know, if something |
| 16 | | pops in your head, like: yeah, I did remember the guy did say his name... because sometimes |
| 17 | | that may have just pop in your head, you're not , you know you don't really pay attention |
| 18 | | sometimes ... people say my name is so and so, and it doesn't click. |
| 19 | Amanda: | I did tell my boyfriend about this. |
| 20 | Interviewer: | Ok. He lives, uh, he lives in San Jose? |
| 21 | Amanda: | Um, hum (yes). |
| 22 | Interviewer: | You haven't, when was the last time you saw him or you were with him? |
| 23 | Amanda: | Um, last month. |
| 24 | Interviewer: | Last month? |
| 25 | Amanda: | Um, hum (yes). |
| | Interviewer: | Ok. Ok, I think that's, I think that's about it. So, we'll complete this. It's 2:25 . |

-19-

1    Amanda:          2:25?

2    Interviewer:          Yeah.  Oh, I'm  sorry, 3:25.  (laughter) .Thought I went back in time for a minute.  Yeah, it's

3          3:25 , and that will complete this tape.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# JANE DOE

# TESTIMONY AT TRIAL

# JUNE 30, 2004

1          Ms. Santos.

2                    DIRECT EXAMINATION

3          BY MS. SANTOS:   Q.   * Jane Doe -- is it okay if

4    I call you * Jane Doe?

5          A.   Yes.

6          Q.   * Jane Doe, how old are you?

7          A.   I am 22.

8          Q.   What is your date of birth?

9          A.   3-21-82.

10         Q.   March 21, 1982?

11         A.   Yes.

12         Q.   * Jane Doe, are you married?

13         A.   No.

14         Q.   Have you ever been married?

15         A.   No.

16         Q.   * Jane Doe -- are you blind, * Jane Doe?

17         A.   Yes.

18         Q.   How long have you been blind?

19         A.   Since birth.

20         Q.   * Jane Doe, as a child or -- and as growing up,

21   did you attend a school called California School for the

22   Blind in Fremont?

23         A.   Yes.

24         Q.   Did you, during the school year, live at that

25   school?

26         A.   Yes.

27         Q.   When you went to school, were you living with

28   your grandmother?

1       A.    Yes.

2       Q.    * Jane Doe, in January of 2003, January 15th,

3   did you -- were you at the California School for the Blind in

4   Fremont during that date?

5       A.    Yes.

6       Q.    At some point did you leave the school for the

7   blind?

8       A.    Yes, I did.

9       Q.    Do you remember, what time in the day was it --

10  morning, afternoon, or evening -- that you left the school?

11      A.    It was in the evening.

12      Q.    Okay. And how were you planning to leave the

13  school and go home?

14      A.    I was planning to take Para Transit back.

15      Q.    What is Para Transit, * Jane Doe?

16      A.    It is this -- it is for -- they use it for the

17  visually impaired people, and they also use it for disabled

18  people that can't like use BART or bus.

19      Q.    All right. Have you traveled on Para Transit

20  before?

21      A.    Yes, I have.

22      Q.    That is your normal way of getting around?

23      A.    No. I usually take the bus.

24      Q.    Okay. And, * Jane Doe, in January of 2003, were

25  you living in the city of San Pablo, ma'am?

26      A.    Yes.

27      Q.    Did you have an apartment?

28      A.    Yes.

1          .Q.   Did you have an adult roommate?

2          A.    No..

3          Q.    Okay.  Were you living on your own, meaning as

4    with a young adult living in your place?

5          A.    Yes.

6          Q.    Did you know a lady by the name of Nancy

7    Phinnesse?

8          A.    Yes.

9          Q.    Who is she?

10         A.    She is my teacher at the Living Skill Center.

11         Q.    What kind of teacher is she to you?

12         A.    She is a financial teacher.

13         Q.    Does Nancy help you learn how to live on your

14   own?

15         A.    Yes, she does.

16         Q.    Okay.  In January of 2002, was Nancy your

17   teacher then?

18         A.    No.

19               THE COURT:   You asked 2002.

20               MS. SANTOS:   I am sorry.  I misspoke.  I meant

21   January 2003.

22               THE WITNESS:  Yes, she was.

23               MS. SANTOS:  Q.  Okay.  * Jane Doe, I would like

24   to move back to January 15th of 2003.  When you wanted to

25   leave the school for the blind in Fremont, did you, in fact,

26   call for Para Transit?

27         A.    Yes, I did.  But they never showed up, so I

28   decided to take the bus and BART back.

1          Q.    Where were you taking or trying to get to?

2          A.    Well, I took the bus to -- I took the bus from

3    the Fremont school for the blind.    I took it to the BART

4    station at Fremont.

5          Q.    Okay.

6          A.    And then I was taking BART back to Del Norte,

7    El Cerrito Del Norte.

8          Q.    All right.    * Jane Doe, when you were traveling

9    that day, did you have anything with you to assist you,

10   meaning anything to assist you with seeing or trying to find

11   your way?

12         A.    I had my white cane with me.

13         Q.    What do you call that cane?

14         A.    We just call it our white cane.

15         Q.    Do you have a white cane with you today?

16         A.    Yes.

17         Q.    Can you please hold it up?

18         A.    Yes.

19         Q.    Is that similar to the white cane you had in

20   January of 2003?

21         A.    Yes.

22               THE COURT:    For the record, the witness held up

23   a sectioned cane, which has a white handle and red tip, and

24   it looks like it folds into maybe five approximately 12-inch

25   segments.

26               MS. SANTOS:    Q.    * Jane Doe, the cane that you

27   had in January of 2003, was it similar to the one you have

28   today?

82

1          A.    Yes.

2          Q.    Is it the same cane?

3          A.    No.  This is a new cane, but it was similar to

4     this one.

5          Q.    Did it fold up like you just held up?

6          A.    Yes.

7          Q.    And did you say something?

8          A.    No.

9          Q.    Okay.  And, * Jane Doe, did you, in fact, get on

10    a bus in Fremont and take it to the BART station?

11         A.    Yes.

12         Q.    Who was traveling with you that evening?

13         A.    I was traveling by myself.

14         Q.    Okay.  Do you know approximately what time it

15    was you left to go on the bus to go to BART?

16         A.    Yes.  I left at 10:00 p.m.

17         Q.    That was time you left the school for the blind?

18         A.    Yes.

19         Q.    And did you, in fact, get to the Fremont BART

20    station?

21         A.    Yes, I did.

22         Q.    Okay.  Did you get on a Fremont BART train?

23         A.    Yes.

24         Q.    All right.  Where did you take that BART train

25    to?

26         A.    Del Norte.

27         Q.    All right.  That is the El Cerrito Del Norte

28    Bart Station?

1      A.    Yes.

2      Q.    When you got on the BART train, did you hear any

3  other passengers on the train?

4      A.    Yes, I did.

5      Q.    Did you talk to any other passengers on the BART

6  train?

7      A.    Yes, I did.  I talked to one.  I think it was

8  like the third stop to Del Norte before that.

9      Q.    The third stop before you get to Del Norte

10  station --

11      A.    Yes.

12      Q.    -- you spoke to another passenger?

13      A.    Yes.

14      Q.    Did you know who that passenger was?

15      A.    No.  I just asked them, Are you going to

16  Del Norte?

17      Q.    You say "them."  Do you mean other passengers?

18      A.    No.  I just said that one person.

19      Q.    All right.  And was that one person responding

20  to you?

21      A.    Yes.

22      Q.    Was it a male or female?

23      A.    It was a male.

24      Q.    All right.  Did that male person ride with you

25  to the Del Norte Bart Station?

26      A.    Yes.

27      Q.    Did the two of you talk along the way to

28  Del Norte?

1    A.    No.  No.  The only thing I asked him was if --

2    are you going to Del Norte?  And he said, "yeah."  Then I

3    said, When you get there, could you let me know because I am

4    going there also?  But the rest of the way we didn't talk

5    until we got to Del Norte.

6        Q.    So when you got to Del Norte BART station, did

7    you speak with him any more?

8        A.    Yes.  I asked him to take me to the 72.

9        Q.    What did you mean by the "72"?

10       A.    72 bus stop.

11       Q.    All right.  Did he agree?

12       A.    Yes.

13       Q.    When you were on the BART train, before you got

14   off at the Del Norte BART Station, did you hear other

15   passengers other than the male passenger getting on and off

16   the train?

17       A.    Yes.

18       Q.    All right.  Did you talk to any other

19   passengers?

20       A.    No, I didn't.

21       Q.    Okay.  So when you got off the Del Norte Bart

22   Station, what happened after you got off the train?

23       A.    Well, the guy walked me -- the person that got

24   off the BART train with me, he walked me to the 72 bus stop.

25   He said -- then I was waiting there at the bus pole, and then

26   he said, Do you want to transfer?  And I said, "yes."  So he

27   went and he got me one, and so I was waiting at the 72 bus

28   stop.

1                    And then the bus driver came along.  And she
2    asked me -- the first bus driver came along and asked me
3    if -- she asked me where did I want to go.  And I said, Do
4    you guys go to -- by the college, and she said, No, we don't
5    go there.  And then -- then I said, Do you guys go to 23rd?
6    And she said, They don't go by there.  Then she said -- she
7    said that there was another bus going there to -- there was
8    another 72 coming.  So she said, Hold on, let me -- this bus
9    driver is coming around.  So I waited.
10             Q.   Okay.  Let me stop you right there.  And I am
11   going to ask you some questions about the first bus driver.
12             Did you know who that was?  Did you recognize
13   her voice?
14             A.   No, I didn't recognize really.  She sounded like
15   she was black, but I don't know who she was.
16             Q.   Okay.  By her voice she sounded like she was
17   black?
18             A.   Yes.
19             Q.   And -- all right.  Did you actually step onto
20   that first bus and start to board it, or did you talk to her
21   from the curb?
22             A.   I talked to her from the curb.
23             Q.   All right.  Did you -- she -- at some point
24   after she said she wasn't going where you wanted to go, move
25   her bus?
26             A.   Yes.
27             Q.   Did you hear the bus pull off?
28             A.   Yes.

1        Q.    Was there a second bus that -- or a second bus

2    driver that you had contact with?

3        A.    Yes.

4        Q.    Can you tell me what happened?

5        A.    Well, she asked me where I was going.  And I

6    said, I am going to 23rd and San Pablo.  And then she asked,

7    Where is that at?  And I said, By the college.  And she said,

8    Well, we don't stop by there.  She said, What are you doing

9    out so late at night?

10        Q.    Okay.  Let me ask you about that.  Did you

11    recognize that bus driver's voice?

12        A.    Yes.  She sounded black.

13        Q.    She also sounded black?

14        A.    Yes.

15        Q.    Did you recognize her to be someone you knew?

16        A.    No.

17        Q.    Okay.  Then the second bus, did you actually

18    start to get on that bus?

19        A.    Yes, I did.

20        Q.    So when you spoke to the second bus driver, was

21    it on the bus that you spoke to her?

22        A.    Yes, it was.  It was on the bus.

23        Q.    All right.  * Jane Doe, when you were on the

24    second bus, could you hear any other people on the bus as

25    well?

26        A.    No.

27        Q.    Okay.  What about the first bus?  Could you hear

28    anybody else on that bus?

1        A.    No.

2        Q.    Did you address anybody else?  Did you speak to

3    anybody else on either of the two buses?

4        A.    Well, on the second bus I heard a guy say to the

5    bus driver -- I heard him say, Where are you at?

6        Q.    Now, did you know who that guy was?

7        A.    No, I didn't know.

8        Q.    Okay.  Did you ever address him or speak to him?

9        A.    Yeah.  He -- actually, he helped -- that same

10   guy that said to the bus driver, Where are you at? he

11   actually -- because he said something, he said, Do you need

12   help?  And I said, yeah.  Could you take me to the cab?  So I

13   just decided to take a cab.

14       Q.    All right.  The male that asked you if you

15   needed help was the same man that said, Where are you at?

16       A.    Yes.

17       Q.    Was this the same male that had originally

18   helped you off the BART train, as far as you could tell?

19       A.    No.  That was a different one.

20       Q.    All right.  So you were talking to the second

21   bus driver and you were asking to go to 23rd and San Pablo.

22             What happened after that?

23       A.    She -- okay.  After I talked to the bus driver,

24   well, the guy was there, and he took me to the cab.

25       Q.    Where was the cab?

26       A.    It was at the BART Station.  It was Yellow Cab.

27       Q.    How do you know it was a Yellow Cab?

28       A.    Because the guy told me.

1       Q.    What guy?

2       A.    The one that said, Where are you at?

3       Q.    Okay.  So the guy that said, Where are you at?

4   that helped you to the cab told you it was a Yellow Cab?

5       A.    Yes.

6       Q.    And do you -- * Jane Doe, can you say how far

7   you had to walk from the second bus to the cab?

8       A.    It was about -- I don't remember how far.

9       Q.    Did it take you five or ten minutes or seconds,

10  a few minutes?

11      A.    Few minutes.

12      Q.    Okay.  Did you walk far enough to have left the

13  BART Station, or was it within the same BART Station?

14      A.    It was in the BART Station.

15      Q.    Did you speak with this man that was helping you

16  now between when you left the bus and got to the cab?

17      A.    Well, I did.  I was about to call Yellow Cab.

18  And then he said, No, it is here in the BART Station.

19      Q.    All right.  How was it that you were going to

20  call for a Yellow Cab?

21      A.    I was going to use my cell phone.

22      Q.    Where was your cell phone?

23      A.    In my jacket pocket.

24      Q.    Do you remember what you were wearing that

25  night, * Jane Doe?

26      A.    I was -- no, I don't remember.

27      Q.    Okay.  So when you walked -- when you were

28  walking over to the cab with this second man, that is now

1    helping you, were you holding onto him using your sight cane

2    or how were you walking?

3         A.   I was holding onto his arm.

4         Q.   Where was your sight cane?

5         A.   I had it in my other hand.

6         Q.   Was it folded up or extended?

7         A.   Extended.

8         Q.   You said you held onto the second man's arm?

9         A.   Yes.

10        Q.   Did you -- the two of you walked together to the

11   cab?

12        A.   Yes.

13        Q.   When you got to the cab, tell me what happened?

14        A.   When I got to the cab, I asked the cab driver to

15   let me off at 23rd and San Pablo because I didn't want --

16   well, actually, this is what went on.  We got to the cab,

17   right?

18        Q.   Yes.

19        A.   And then the guy -- this is the same man, the

20   second man that helped me.  He asked me, he said, Do you want

21   me to go with you?  I didn't say it loud enough.  I said

22   "no."  But I said it.  I probably said it too soft that he

23   couldn't hear me.

24        Q.   Why do you think he couldn't hear you?

25        A.   Because I -- I don't -- I don't speak up.  I am

26   a very soft-spoken person.

27        Q.   Okay.  So when you said, "no," what happened

28   after that?

1      A.   He -- the guy didn't get it through his head, so

2   he came with me.  He got in the cab, and he was --

3      Q.   What happened when you got inside the cab?

4      A.   The cab driver told me how much the amount was.

5      Q.   What did the cab driver say?

6      A.   That it was $10.

7      Q.   Did you ask him how much?  Or did you -- did he

8   volunteer that, or how did the exchange of money go?

9      A.   He just told me how much it was.

10      Q.   Where was it that you told him you wanted to go?

11      A.   I told him I wanted to go to 23rd and San Pablo.

12      Q.   And was the man that got into the cab with you

13   saying anything?

14      A.   Yeah.  He said to the cab driver, he said, I

15   want to go with you guys.  He said; I want you to take my

16   girlfriend home.

17      Q.   Had you ever met this young man before that

18   night?

19      A.   No.

20      Q.   Did you say anything in response to that comment

21   by him?

22      A.   No, I didn't, because I was really afraid.

23      Q.   Why were you afraid, * Jane Doe?

24      A.   Because he was drunk.  And the reason I could

25   tell was because I could smell it.  And I was afraid if I

26   said anything, that he might get violent.

27      Q.   Okay.  And did you say anything else to the cab

28   driver during when you were sitting in the cab?

1    A.    No, I didn't.

2    Q.    And did the cab take off?

3    A.    Yes.

4    Q.    And as far as you know, the only three people in

5    the cab were you and this male and the cab driver?

6    A.    Yes.

7    Q.    Did you hear anybody else in the cab?

8    A.    No.

9    Q.    Did you hear anybody else get in the cab?

10    A.    No.

11    Q.    Did you talk with the cab driver at all?

12    A.    No, I didn't.

13    Q.    When the cab driver told you how much the ride

14    would be, did he tell you that would be the flat fee or

15    anything about that?

16    A.    He said it would just be the flat fee.

17    Q.    Did you hear any type of old-fashioned meters

18    that cab used to have that you could hear them?

19    A.    Yes.

20    Q.    Did you hear that?

21    A.    Yes.

22    Q.    All right.  Did you hear any type of radio,

23    two-way radio or walkie talkies that cab drivers sometimes

24    have?

25    A.    Yes, I did hear that.

26    Q.    Did the cab take off?

27    A.    Yes.

28    Q.    And how long did you ride in the cab?

92

```
 1          A.    For about 10 to 15 minutes.

 2          Q.    And did -- was there any conversation during

 3    that ride?

 4          A.    No.

 5          Q.    Did the male that gets in with you say anything

 6    to you?

 7          A.    No.  He just -- no, he didn't.

 8          Q.    Did you say anything to him?

 9          A.    No.

10          Q.    Did he do anything?

11          A.    Yes.  He put his hand on my leg.

12          Q.    Where on your leg?

13          A.    On my thigh.

14          Q.    What did you do when he did that?

15          A.    I moved my -- I moved away from him.

16          Q.    Did he stop putting his hand on your thigh?

17          A.    Yes.

18          Q.    Now, after the ride -- well, let me ask you

19    this:  Have you ever ridden in a car from the El Cerrito

20    Del Norte BART Station to 23rd and San Pablo before that

21    night?

22          A.    No.

23          Q.    Do you know -- okay.  Had you ever taken BART to

24    El Cerrito Del Norte and taken a bus home from that location

25    before that night?

26          A.    No, I have not.

27          Q.    No.  Okay.

28          A.    Well, hold on.  Yeah, I have.  But I took it
```

1    with other friends though.

2         Q.   Okay.  I am trying to figure out if you had any

3    way of knowing how long that ride should have been from that

4    location to 23rd and San Pablo in terms of time.

5              Did you have any way of knowing that?

6         A.   No, I didn't.

7         Q.   So when the cab stopped, tell me what happened.

8         A.   I got out of the cab, and then I was walking --

9    well, I got out of the cab, and then I was walking for a bit.

10   I was walking.

11        Q.   Yes.

12        A.   And then the guy comes, and he -- he grabs me

13   from behind like he was getting ready to attack.

14        Q.   Let me stop you before we get there, did -- when

15   you got out of the cab, did you get out by yourself?

16        A.   Yes, I did.

17        Q.   Did you pay the cab driver?

18        A.   Actually, the guy did it, and -- yeah, the guy

19   did it.

20        Q.   The guy that got in the cab paid for the cab

21   ride?

22        A.   Yes.

23        Q.   Did he pay with your money or his money?

24        A.   His.

25        Q.   Okay.  When was it that he paid the cab, if you

26   know?

27        A.   When we got out.

28        Q.   You got out of the cab.  Did the guy get out

94

1    right behind you, or were you out for a while?

2        A.    I was out for a while.

3        Q.    Did you hear him get out of the cab?

4        A.    Yes.

5        Q.    How long was it that you were out of the cab

6    before he got out, approximately?

7        A.    Like two minutes.

8        Q.    And during that two minutes, what were you

9    doing?

10       A.    I was walking for a bit.

11       Q.    So you didn't wait there at the cab for him?

12       A.    No.

13       Q.    Were you familiar with -- where you were when

14   you got out of the cab?

15       A.    No.

16       Q.    Did you recognize anything at all?

17       A.    Huh-uh.

18       Q.    "Yes" or "no"?

19       A.    No.  No.

20       Q.    Okay.  Were you using your sight cane?

21       A.    Yes.

22       Q.    Okay.  And so after the guy got out of the cab,

23   what happened?  How did he approach you?

24       A.    He grabbed me from behind.  While I was walking,

25   and -- he ran and grabbed me from behind.

26       Q.    Okay.  What part of your body did he grab,

27   * Jane Doe?

28       A.    He grabbed like -- he grabbed me by my

1    shoulders.

2            Q.    By your shoulders?

3            A.    Yes.

4            Q.    When he grabbed you, could you tell if it was

5    one hand or two?

6            A.    I could tell it was one hand.

7            Q.    Okay.  Did he put the hand around you or grabbed

8    you in a holding fashion?

9            A.    He put his hand around me.

10           Q.    Was that around your shoulder?

11           A.    Well, he put his hand under my shoulder like.

12           Q.    Okay.  * Jane Doe, could you move back?  I am

13    going to stand up next to you.  If you scoot your chair back

14    a little bit, you can stand up.

15                 If you could show me on me -- I am here to your

16    left -- how his arm was around you?

17           Q.    Okay.  You put your right hand around my waist

18    area and your left hand is on my left shoulder?

19           A.    Yes.

20           Q.    That is how he grabbed you?

21           A.    Yes.

22           Q.    Was it the same hand that you just demonstrated?

23           A.    Yes.

24           Q.    Was his body -- go ahead and sit back down.  You

25    can scoot up.  Thank you.

26                 What did you do, * Jane Doe, when he grabbed you

27    like that?

28           A.    I asked him to let me go.

96

1          Q.    And right before he grabbed you, what were you

2     doing?

3          A.    I was on the phone.  I was on the phone with my

4     friend Shayla.  I called my friend Shayla to tell her that I

5     was not home yet because she had called me to see if I had

6     made it home.

7          Q.    Shayla is a friend of yours.  Is she an adult?

8          A.    Yes.

9          Q.    Where does Shayla live, what city?

10         A.    She lives in Anaheim.

11         Q.    Do you know the prefix of Shayla's phone number

12    in Anaheim, first three numbers, Area Code?

13         A.    Yes.  714.

14         Q.    All right.  And so were you speaking with

15    Shayla?

16         A.    Yes.

17         Q.    Okay.  And --

18         THE COURT:  I apologize, but could we have a

19    spelling?

20         THE WITNESS:  S-h-a-y-l-a.

21         THE COURT:  Thank you.

22         MS. SANTOS:  Q.  * Jane Doe, how long was it

23    that you had been speaking with Shayla?

24         A.    For about five minutes.

25         Q.    All right.  When was it that you first began

26    speaking with her?

27         A.    When I -- when I got out of the cab, so as I was

28    walking.

1    Q.   Okay.  What did you do when this man grabbed you

2  the way you demonstrated for us, when you were on the phone?

3    A.   Well, actually, this is before he grabbed me.

4  He took my phone from me.

5    Q.   Okay.  How did that happen?

6    A.   Well, I was talking with my friend Shayla.  And

7  then he said, Let me see your phone.  Let me ask your friend

8  if she can meet you.  And then I said "no."  I said -- I said

9  "no."  So he grabbed the phone from me.  And I tried to reach

10  for it, and he pulled back.  And so after that, then I

11  said -- I started walking.  I said -- before I did that, I

12  said, Okay.  That is it, fine.  So I started walking.  And

13  then I -- he hung up the phone because I could hear the

14  clicking sound because I used to have a flip phone.

15    Q.   Was the phone in your hand when he grabbed it

16  from you?

17    A.   Yes.

18    Q.   Were you able to get it back from him?

19    A.   No.

20    Q.   So after he took the phone from you, how long

21  after that was it that he grabbed you?

22    A.   About two seconds.

23    Q.   All right.  And did he hold you in the position

24  that you showed me just now?

25    A.   Yes.

26    Q.   Tell me what happened.

27    A.   Then I said -- well, we were walking to like a

28  bench.  And then I said, Let me go right now.  I screamed.

98

1    And I said, Let me go right now.

2        Q.    What happened?

3        A.    And then he said -- then he told me to -- he

4    said, Sit down before I knock you out.  And so I kept

5    screaming.  I said, Let me go right now.  Then he covered my

6    mouth.

7        Q.    What did he cover your mouth with?

8        A.    His hand.

9        Q.    Did you sit down after he said that?

10       A.    No, I did not.

11       Q.    Okay.  When he covered your mouth, what did you

12   do?

13       A.    Well, when I -- well, this was -- well, I

14   stopped screaming.  Well, I kept screaming for a while, and

15   he -- then he strangled me.

16       Q.    He put his hands around your neck?

17       A.    Yes.  He choked me to death.

18       Q.    Okay.  Were you still walking when he was doing

19   this, or were you still --

20       A.    I was still -- well, this is before, you know,

21   after he grabbed me.  And I screamed, Let me go.  We were on

22   the -- I fell on the floor with him, and then I was laying

23   down on my back.  And then he put my head on the ground.  He

24   banged it against the ground.

25       Q.    Okay.  Before you fell on the ground, did you

26   walk anywhere?

27       A.    No.

28       Q.    Okay.  So you fell on the ground and you said

99

1    you banged your head?

2         A.    Yeah, he did.

3         Q.    Were you on the sidewalk or street?  Did you

4    know?

5         A.    We were on the sidewalk.

6         Q.    Okay.  Did you hear anybody else around you?

7         A.    No.

8         Q.    Did you hear any cars passing by?

9         A.    No.

10        Q.    So after you fell to the ground and banged your

11   head, what happened, * Jane Doe?

12        A.    Then I kicked.  I -- I kicked him in the

13   stomach.

14        Q.    Okay.  Did you actually make contact with his

15   body?  Did your foot touch him when you kicked him?

16        A.    Yes.  Then I -- yes, then he hit me.

17        Q.    Where did he hit you?

18        A.    He hit me on my shoulder.

19        Q.    Could you tell if it was fist or open hand or

20   what?

21        A.    It was an open hand.

22        Q.    Were you still on the ground then?

23        A.    Yes.

24        Q.    Did the two of you ever walk anywhere?

25        A.    Yes, we did.  Well, okay.  Well, as he was

26   grabbing me, he did -- we walked.  It was like he dragged me

27   to the college.  Yeah, he dragged me to the college.  It was

28   about a ten minute walk, I believe.

1    Q.    This is when he had his arm around you?

2    A.    Yes.

3    Q.    Did you tell him stop?

4    A.    Yes, I did.

5    Q.    What did he say when you told him to stop?

6    A.    He told me to shut up.

7    Q.    Did he say anything else?

8    A.    Yeah.  He told me to shut the F up.

9    Q.    When you were walking to the college, did you

10   know where you were going?

11   A.    No, I didn't know at the time.

12   Q.    Did he ever take his arm away from your body the

13   way you showed me during the walk?

14   A.    No, he didn't.

15   Q.    The walk to the college, was this before you

16   fell to the ground or after?

17   A.    It was after.

18   Q.    Okay.  * Jane Doe, I don't want to get ahead of

19   myself.  I am going to go back to when you fell on the

20   ground.

21         You said he hit you on your shoulder.  Did

22   anything else happen before you got off the ground?

23   A.    Then he -- I skinned up my knees pretty badly.

24   Q.    Was that when you fell to the ground?

25   A.    Yes.

26   Q.    And was this before you walked to the college?

27   A.    This was after.

28   Q.    Okay.  I am sorry if I am confusing things here.

101

1   So the walk to the college, * Jane Doe, do you remember the

2   surface beneath your feet that changed?

3           A.   Yes.  I felt some gravel.

4           Q.   All right.  And during -- any time during this

5   walk to the college, did you hear any cars going by you?

6           A.   Yes.

7           Q.   Do you know which side of you he was on?

8           A.   No.

9           Q.   Was it more than one car that you heard?

10          A.   Yes.

11          Q.   Did you hear any people that you passed on the

12  road?

13          A.   No.

14          Q.   And when he was walking and dragging you to the

15  college, were you screaming still?

16          A.   Yes.

17          Q.   Did he threaten to hurt you in any way?

18          A.   Yes, he did.

19          Q.   What did he say?

20          A.   He said -- well, he wanted me to lift up my

21  shirt.  And he said that if I didn't do it, he said he would

22  kill me.

23          Q.   Was this before you got to the college or after

24  you got to the college?

25          A.   After.

26          Q.   You said you felt some gravel under your feet.

27  Did you feel any mud or dirt or anything like that when you

28  were with him, going to the college?

1      A.    No.

2      Q.    All right.  Was there a point in time when the

3   two of you stopped walking?

4      A.    Yeah.  When we got to the benches.

5      Q.    All right.  How did you know they were benches

6   there?

7      A.    Because I could feel the wood.

8      Q.    You could feel the wood?

9      A.    Yes.

10      Q.    All right.  Did both of you go through any type

11   of fencing?

12      A.    Yeah, it was some kind of wall.  I don't

13   remember.

14      Q.    What kind of what?

15      A.    A wall.

16      Q.    Did you go through it, over it, around it, or

17   what?

18      A.    We went around it.

19      Q.    Was this before you got to the college or when

20   in time?

21      A.    It was after.

22      Q.    Okay.  * Jane Doe, did you ever agree to walk

23   with this man to the college?

24      A.    No.

25      Q.    So when you got to the wood bleachers, you said

26   you felt the wood.  Tell me what happened when you got there.

27      A.    I still kept on screaming.  And then I said to

28   him, Let me go right now.  And then he told me to shut up.

1    He told me to shut the F up.  Then the -- he told me to sit

2    down before I knock you out.  But I did do it, so instead of

3    doing that -- well, he was still holding onto me, so I fell

4    on the ground.

5         Q.   How was it that you fell?  What made you fall?

6         A.   Because -- well, he was holding onto me right

7    tight, and I tried to slip away from him.

8         Q.   Okay.  When you fell to the ground, did he fall

9    to the ground with you?

10        A.   Yes.

11        Q.   Did he fall on you or next to you or what?

12        A.   Next to me.

13        Q.   What happened when you fell to the ground?

14        A.   Then that is when I kicked him and -- in the

15   stomach, and that is when he hit me on the shoulder.

16        Q.   After he hit you on the shoulder, what happened?

17        A.   Then he said -- he told me, he said that I

18   skinned up his knees.

19        Q.   What did you say in response?

20        A.   I said to him, Well, you skinned up mine also.

21        Q.   What happened after that?

22        A.   Then he told me to get up, but he called me.  He

23   said, Get up right now.

24        Q.   He called you what?

25        A.   He called me the B word.

26        Q.   Do you mean bitch?

27        A.   Yes.  He said, Get up, bitch, right now, so I --

28        Q.   Did you?