1     A.   Yes, I did.

2     Q.   Were you still afraid, * Jane Doe?

3     A.   Yes.

4     Q.   What happened after you got up?

5     A.   Then he just -- he asked me -- he said, Well,

6   why isn't it cool to hit.

7     Q.   Why isn't it cool to hit?

8     A.   Yes.

9     Q.   What did you say, anything?

10    A.   I didn't say anything to that. I didn't know

11  what he meant by that.

12    Q.   What happened after that?

13    A.   Then -- and then he lifted me up because we were

14  by the wall. He lifted me up. He said, I will leave you

15  alone if you do what I ask you to do.

16    Q.   How did you know you were by the wall?

17    A.   Because I felt it.

18    Q.   And did he say anything else after he said, I

19  will leave you alone if you do what I ask?

20    A.   Yes. He said, Lift up your shirt before I

21  fucking kill you.

22    Q.   Did you?

23    A.   Yes.

24    Q.   What happened after that?

25    A.   Then he was -- then after he did that, he laid

26  me on the ground.

27    Q.   What happened after he laid you on the ground?

28    A.   Then after that he pulled my pants and my

1    underwear down.

2            Q.    What happened after that?

3            A.    Then that is when he raped me the first time.

4            Q.    Did you -- were you laying on the ground?

5            A.    Yes.

6            Q.    And was he laying on top of you?

7            A.    Yes.

8            Q.    That first time you said he raped you, did he

9    put his penis in your vagina, * Jane Doe?

10           A.    Well, actually, he stuck his finger in there,

11   and then he put his penis.

12           Q.    All right.   * Jane Doe, did you actually feel

13   his finger in your vagina?

14           A.    Yes.

15           Q.    Could you distinguish that from his penis?

16           A.    Yes.

17           Q.    How long was it that he had his penis in your

18   vagina?

19           A.    It was for about five minutes.

20           Q.    Did he say anything while he was doing that?

21           A.    Yeah.  I told him, Will you please stop.  Then

22   he told me to -- again told me to shut the F up.  Then he

23   said, Shut up.  Then I said, Will you please stop.  He said,

24   When I am finished.

25           Q.    Was there a time when did he stop, * Jane Doe?

26           A.    Yes, he did stop.

27           Q.    Do you know what "ejaculation" means?

28           A.    Yes.  When he pulled the thing out, yeah.

1   Q.   When you say "the thing," what do you mean?

2   A.   When he pulled his penis out.

3   Q.   Do you know what semen is, * Jane Doe?

4   A.   No, I don't.

5   Q.   Okay.

6   A.   Wait.  Yeah, I do.  I just --

7   Q.   All right.  Do you know if any semen came out of

8   his penis or not?

9   A.   No, I don't know.

10   Q.   * Jane Doe, did it hurt when he had his finger

11   or penis in your vagina?

12   A.   No.  But actually it felt kind of uncomfortable.

13   It did hurt a little bit, but most of the time it felt really

14   uncomfortable.

15   Q.   After he took his penis out, * Jane Doe, what

16   happened?

17   A.   Then I asked him if he could show me which way

18   to go.  So he was trying to direct me and in the right

19   direction, but I was getting lost.

20   Q.   Okay.  How was he trying to direct you?  Was he

21   telling you which way to go or guiding you with his -- go

22   ahead.

23   A.   He was telling me which way to go, you -- he

24   said, You go straight and you will find your way home.

25   Q.   Did he leave you after that first time?

26   A.   Yeah.

27   Q.   Tell me what happened.

28   A.   Then -- then somebody came around and said, Do

107

1    you need help?  And I said, "yeah."

2         Q.   How long was it after he left that somebody came
3    and said, Do you need help?

4         A.   I don't recall.

5         Q.   Okay.  This guy that raped you, * Jane Doe, did
6    he ever say his name or give you a name?

7         A.   Yes.  He said his name is Riece.  Well, I asked
8    him at the second time what his name was because I kept -- I
9    called him "sir" the first time.

10        Q.   What did you mean by the first time and second
11   time?

12        A.   Well, before I -- well, before he raped me the
13   second time, I called him.  I just kept calling him "sir."

14        Q.   What you just described to me, where his penis
15   and finger was in your vagina, was that the first or second
16   time?

17        A.   First.

18        Q.   Tell me about the second time.  Tell me what
19   happened before.  Well, first tell me between the first time
20   and second time.

21        A.   First time after he raped me, he left.

22        Q.   Uh-huh.

23        A.   And then somebody came around and said, Do you
24   need help?  And I said "yes."  Then could I go to the police
25   station.  I need to make a police report.

26        Q.   What happened?

27        A.   Then I told the guy that I got raped.  And I
28   guess I -- and then he pretended to call the police on the

1   cell phone.  Because I could tell because of the clicking

2   sound.

3          Q.   So you heard the clicking sound.  And what else

4   did you hear?

5          A.   Then I could hear him talking on the phone.

6          Q.   What did you hear him saying?

7          A.   That this person has been raped, could you come

8   and get me a police over here.

9          Q.   What happened after that?

10         A.   Then I felt his sweatshirt, and then I knew it

11   was the same guy.

12         Q.   How did you feel his sweatshirt?

13         A.   With my hands.

14         Q.   So when this person was on the phone pretending

15   to call the police, * Jane Doe, were you standing up?

16         A.   Yes.

17         Q.   Had you put your clothing back on?

18         A.   Yes.

19         Q.   And when you felt his sweatshirt, tell me what

20   happened after that.

21         A.   Then he -- after he got off the phone, he said

22   to me -- he said, Okay.  You are in trouble.  Now I am going

23   to do it again.  What he meant by that, he said he was going

24   to rape me again.

25         Q.   That is when you realized it was the same

26   person?

27         A.   Yes.

28         Q.   And after he said, I am going to do it again,

109

1   what happened?

2           A.   Then he took me to the bleachers.

3           Q.   How far away were the bleachers?

4           A.   They were about -- well, I don't recall how far

5   they were.

6           Q.   Do you recall about how long it took you to get

7   there?

8           A.   About a few minutes.

9           Q.   Did you walk to the bleachers?

10          A.   Yes, we did.

11          Q.   Did he have his arm or hand on you in any way

12   when you went to the bleachers?

13          A.   Well, I held onto his arm.

14          Q.   Did he say anything to you to get you to go to

15   the bleachers?

16          A.   Actually, he did drag me across the bleachers

17   because he -- he pulled my hand around his arm, and then

18   he -- he said, "okay." He said, Okay. You are in trouble

19   now. Then he said, I am going to rape you again.

20          Q.   Are those the words he used?

21          A.   He didn't use the word "rape." He just said I

22   was in trouble and he was going to do it again.

23          Q.   What happened when you got to the bleachers?

24          A.   He laid me -- well, he laid me down, and then he

25   unbuttoned my pants and pulled them down.

26          Q.   When -- this time when he laid you down, were

27   you on the ground again?

28          A.   No.  I was on one of the bleachers.

1         Q.   Okay.  Did he take your pants off?

2         A.   He didn't -- yes, he did take them down, but he

3   didn't take them off this time.  He just pulled them down to

4   my ankles.

5         Q.   All right.  What about your underwear?

6         A.   He pulled that down to my ankles only and took

7   my right shoe and sock off.

8         Q.   Do you remember specifically which shoe and sock

9   that he took off?

10        A.   Yes.

11        Q.   Did he put his penis in your vagina again?

12        A.   Yes, he did.

13        Q.   How long was his penis in your vagina the second

14   time?

15        A.   It was about two minutes.

16        Q.   Did he say anything else to you while he was

17   doing that?

18        A.   No.  But I said something.

19        Q.   What did you say?

20        A.   I said, I am going to get pregnant.

21        Q.   What was his response, if any?

22        A.   He said, Okay.  I will take care of the baby.

23        Q.   Did he say anything else?

24        A.   No.

25        Q.   * Jane Doe, did he at some point stop or take

26   his penis out of your vagina?

27        A.   Yes, he did.

28        Q.   What happened after that?

1    A.   Then he said, I wasn't raping you.

2    Q.   That is the word he used?

3    A.   Yes.

4    Q.   Did he say anything else?

5    A.   Well he said -- well, he said, I wasn't raping

6    you.   Then he said, I am watching you.

7    Q.   Did he stay there after making those comments?

8    A.   He did say -- then he said, I will be right

9    back.   I got to go get my stuff real quick.   Then he left.

10   He didn't come back.

11   Q.   Did he ever come back?

12   A.   No.

13   Q.   Did he ever give you your phone back?

14   A.   No, he didn't.   He kept it.

15   Q.   Did he take anything else from you?

16   A.   He took my white cane from me.

17   Q.   Did he ever give that back to you?

18   A.   No.

19   Q.   * Jane Doe, what did you do after he left after

20   the second incident?

21   A.   When -- then I was walking around for a little,

22   say five minutes or so.   I don't recall.   I was walking

23   around.

24   Q.   Okay.   Did you have any idea where you were?

25   A.   No.

26   Q.   Okay.

27   A.   No, I didn't.

28   Q.   Then what happened after you were walking

1   around?

2          A.    And then a custodian found me.

3          Q.    Did you ask the custodian for help?

4          A.    Yes.

5          Q.    * Jane Doe, during either of these two

6   incidents, did you ever hit your head on anything?

7          A.    Yes.  Well, when we were at the wall, he -- the

8   guy hit -- he banged my head up against the wall.

9          Q.    Were you standing up when that happened?

10         A.    Yes.

11         Q.    Tell me what happened.  How did you bang your

12  head on the wall?

13         A.    Well, because I was -- well, this is when he was

14  getting ready to tell me to lift my shirt up, and I -- that

15  is when he did it.

16         Q.    After this second time that he raped you, * Jane

17  Doe, did you put your underwear and pants back on and your

18  shoes?

19         A.    Yes.

20         Q.    That is what you had on when the custodian found

21  you?

22         A.    Yes.

23         Q.    Where did you go, if anywhere, with the

24  custodian?

25         A.    Well, we went in his truck to the police

26  station, yes.

27         Q.    But it was closed?

28         A.    So I went back with him to his office --

113

Q. Okay.

A. -- in the college.

Q. Did you tell him that you had been raped?

A. Yes, I did.

Q. Did the police come and meet you at the -- his office and take a report from you?

A. Yes, they did.

Q. After you talked to the police at the custodian's office, did you go to the hospital?

A. Yes.

Q. How did you get to the hospital?

A. I rode in the police car.

Q. So the officer took you?

A. Yes.

Q. Do you remember if the officer was male or female?

A. It was male.

Q. Do you remember the officer's name?

A. No, I don't.

Q. Was there anybody else with you when you went to the hospital?

A. Nancy. She accompanied me, but she followed in her own car.

Q. Okay. Did Nancy -- how did you meet up with Nancy?

A. Well, I called my friend -- well, I called one of my friends at the center where I am, and then she called the night person. And the night person called Nancy. And

1   then Nancy called the police department, and she found me.

2          Q.   Okay.  Now, you say, Center where I am.  What do

3   you mean by that?

4          A.   Skill center.

5          Q.   That is the center where Nancy is a teacher at?

6          A.   Yes.

7          Q.   Is that called the Living Skill Center?

8          A.   Yes.

9          Q.   And when was it that you called the center?

10         A.   When I got to the office.

11         Q.   With the custodian?

12         A.   Yes.

13         Q.   Now, were you at the hospital for a long time,

14  * Jane Doe?

15         A.   Yes.

16         Q.   And do you remember talking to a couple of

17  nurses actually at the hospital?

18         A.   Yes.

19         Q.   Did one of those nurses examine you.

20         A.   Yes.

21         Q.   Did one of those nurses take samples from you

22  and give you a female vaginal exam?

23         A.   Yes.

24         Q.   Did the nurse and police officers take pictures

25  of you?

26         A.   Yes.

27         Q.   The clothes that you had on at the hospital,

28  were those the same clothes that you had on when you were

1   raped by this man?

2        A.   Yes.

3        Q.   You said Nancy followed in her own car to the

4   hospital?

5        A.   Yes.

6        Q.   Was she there during the examination?

7        A.   She was there for part of it, but then at the

8   last part she had to go call the director.

9        Q.   So she was there for part of the exam?

10        A.   Yes.

11        Q.   Was she there when you first got to the

12   hospital?

13        A.   Yes.

14        Q.   And, * Jane Doe; I am going to ask you a couple

15   of things about your phone.

16        Do you remember your cell phone number at the

17   time?

18        A.   Yes.

19        Q.   First of all, is that your -- still your cell

20   phone number?

21        A.   No.

22        Q.   Did you have it turned off or disconnected

23   sometime after this incident?

24        A.   Yes.

25        Q.   What was the phone number at the time, * Jane

26   Doe?

27        A.   It was (408) 836-5771.

28        Q.   Okay.   That is the phone that you had that night

1    that this man took from you?

2            A.    Yes.

3            Q.    Was that your personal phone, * Jane Doe?

4            A.    Yes.

5            Q.    Do you know how much it was worth, roughly?

6            A.    Well, I got the phone for $125.

7            Q.    $125?

8            A.    Yes.  Well, that was for the deposit and the

9    phone.

10           Q.    And the phone, okay.  Who was the carrier of

11   that phone?

12           A.    Sprint.

13           Q.    * Jane Doe, before this man took you up to the

14   college, were you speaking to your friend Shayla?

15           A.    Yes.

16           Q.    Had you spoken to any other friend in the

17   Southern California area that night?

18           A.    No.

19           Q.    So she was the only one from that Southern

20   California area?

21           A.    Yes.

22           Q.    Okay.  And you said you never got the phone

23   back, right?

24           A.    Right.

25           Q.    You have never seen it since then to this day?

26           A.    No.

27           Q.    Okay.

28           A.    Well, actually, I did get a replacement.

1      Q.    That is the replacement, but that particular

2   phone?

3      A.    No, I did not get that phone back.

4      Q.    When you got the replacement, did you get a

5   different phone number?

6      A.    Yes.

7      Q.    * Jane Doe, did you ever agree to go with this

8   man that -- after you got out of the cab?

9      A.    No.

10     Q.    Did you ever go with him willingly?

11     A.    No.

12     Q.    Did you ever agree to have any type of sexual

13   activity with him?

14     A.    No.

15     Q.    And this man that took you out to the baseball

16   field that day, you never dated him or had any sexual

17   relationship with him, did you?

18     A.    No.

19          MR. AHEARN:  Objection.  Move to strike.  Facts

20   not in evidence, baseball field.

21          THE COURT:  Overruled.

22          MS. SANTOS:  I will retract "the baseball

23   field."

24     Q.    The area that you were taken to, did you ever

25   date or have any relationship with that man?

26     A.    No.

27     Q.    * Jane Doe, before you were raped that morning,

28   had you ever had sex before?

1          A.   No.

2               MS. SANTOS:   I don't have anything else at this

3     time, Judge.

4               Thank you, * Jane Doe.

5               THE COURT:   All right.   Ladies and gentlemen,

6     excuse me, but before any cross-examination I want to talk to

7     the attorneys very briefly.

8               You can stand and stretch and talk amongst

9     yourselves.

10              * Jane Doe, if you need any water or anything,

11    we can get you some water.

12              May I talk to the attorneys?

13              (Sidebar conference.)

14              THE COURT:   I apologize for the delay.   We are

15    going to go til about 4:30 today.   We can break at 4:30.   If

16    we don't get through the cross-examination of the witness --

17    and we may not depending on what works best for the witness,

18    if we have to interrupt the cross-examination, we will start

19    at 9:00 a.m. tomorrow morning.   If that is an inconvenient

20    time for the witness, I would permit that we could start with

21    another witness, and that -- go that way.   All right.

22                        **CROSS-EXAMINATION**

23              BY MR. AHEARN:   Q.   Good afternoon, * Jane Doe.

24         A.   Good afternoon.

25         Q.   Let me know at any time if you cannot hear my

26    questions or you don't understand.   I will speak up.   Okay?

27         A.   Okay.

28         Q.   * Jane Doe, on January 15th of last year, 2003,

119

1    it sounds like you were down at Fremont, at the California

2    School for the Blind?

3              A.    I went to school there.

4              Q.    Were you visiting?

5              A.    Yes.

6              Q.    At that point you got on a bus because the Para

7    Transit didn't pick you up?

8              A.    Yes.

9              Q.    Have you done that trip before down to the

10   California School for the Blind from San Pablo?

11             A.    Yes.

12             Q.    You had done that before?

13             A.    Yes.

14             Q.    And you had taken Para Transit?

15             A.    Yes.

16             Q.    Had you ridden BART before?

17             A.    Yes.

18             Q.    Had you ridden BART before to the Del Norte

19   station BART?

20             A.    Yes.

21             Q.    And "before," I mean before January 15th of last

22   year.

23             A.    I did, but I rode with some friends.

24             Q.    Okay.  Now, I believe your testimony here today

25   was you left the school at 10:00 p.m.; is that correct?

26             A.    Yes.

27             Q.    Now, do you recall how long that train ride took

28   on BART?

1         A.   It was about an hour.

2         Q.   Okay.  * Jane Doe, I believe you have given

3 testimony about -- do you remember talking about -- to some

4 other officers about this incident?

5         A.   Yes.

6         Q.   Do you remember talking to Detective Sharp?

7         A.   Yes.

8         Q.   On the 15th of January?

9         A.   Yes.

10        Q.   In the morning?

11        A.   Yes, I do.

12        Q.   Do you recall telling Detective Sharp at that

13 time that you left Fremont on BART at 9:00 o'clock?

14        A.   No, I don't recall.

15        Q.   Do you recall talking to Detective Sharp on the

16 22nd or -- yes, 22nd of January of last year?

17        A.   Yes.

18        Q.   And you talked to him -- did you talk to him at

19 the police station?

20        A.   No.  He came to my apartment.

21        Q.   Do you recall telling him at that time on

22 January 22nd that you got onto BART at 9:00 o'clock?

23        A.   No, I don't.

24        Q.   Is it possible that on both occasions you said

25 9:00 o'clock?

26        A.   Yes.

27        Q.   But you don't recall saying 9:00 o'clock, as you

28 sit here today?

1      MS. SANTOS:  Asked and answered.

2      THE COURT:  Overruled.

3      You don't remember saying 9:00 o'clock on either

4  of those interviews?

5      THE WITNESS:  Wait.  No, I don't.

6      MR. AHEARN:  Q.  * Jane Doe, it sounds to me

7  like your testimony here today is that you got on the BART

8  train in Fremont; is that correct?

9      A.   Yes.

10     Q.   And while you were on the BART train, you asked

11  a passenger to help you and let you know when it was

12  Del Norte BART or something similar; is that correct?

13     A.   Yes.

14     Q.   That passenger let you know when it was

15  Del Norte BART; is that correct?

16     A.   Yes.

17     Q.   And that passenger -- I believe your testimony

18  today is that he helped you off the BART train; is that

19  correct?

20     A.   Yes.

21     Q.   And that passenger helped you to the 72 bus; is

22  that correct?

23     A.   Correct.

24     Q.   How did you know to take the 72 bus?

25     A.   Because one of the teachers at the Living Skill

26  Center told me that I could take the bus, that she takes that

27  bus.

28     Q.   When did this person tell you that?

1        A.   Before this happened.

2        Q.   That same day, couple of days before or --

3        A.   A week before.

4        Q.   Had you ridden that bus before?

5        A.   Yes.

6        Q.   You had ridden that bus from the Del Norte

7  El Cerrito BART to your Living Skill Center on Road 20?

8        A.   Yes.  Once, I did.

9        Q.   Okay.  It sounds like you did that with some

10  friends; is that correct?

11        A.   Yes.

12        Q.   And your testimony here today is that the same

13  passenger from the BART train helped you to the 72 bus; is

14  that correct?

15        A.   Yes.

16        Q.   Now, again I will refer you -- do you remember

17  talking to Detective Sharp on the 16th of January of last

18  year?

19        A.   Yes.

20        Q.   I believe you talked to him while you were in

21  the hospital still?

22        A.   Yes, I did.

23        Q.   Do you recall telling Detective Sharp at that

24  time that a station agent helped you to a cab?

25        A.   I did tell him that.  Yes, I did tell him that.

26  But it was actually the guy that raped me, helped me to the

27  cab.

28        Q.   What was that?  I am sorry.

1          A.   The guy that raped me, that was the one, he

2    helped me to the cab.  I didn't think he would get in the cab

3    with me.

4          Q.   But you told Detective Sharp on the 16th of

5    January that it was a station agent; is that right?

6          MS. SANTOS:  I object as confusing.  "It was a

7    station agent," is he referring to the rape or cab?

8          THE COURT:  I don't want speaking objections.

9    But the question was -- it relates back to what, if anything,

10   * Jane Doe told Detective Sharp while being interviewed on

11   January 16, 2003, while she was in the hospital.

12          At that time, do you remember * Jane Doe telling

13   Detective Sharp that you were walked to the cab by a BART

14   Station agent?

15          THE WITNESS:  I don't recall.

16          THE COURT:  Let's proceed.

17          MR. AHEARN:  Q.  Do you recall telling Detective

18   Sharp on January 16th, that same day, that you got off the

19   train unassisted?

20          A.   What do you mean?

21          Q.   I am asking you about a conversation you had

22   with Detective Sharp on January 16th, okay?

23          A.   Okay.

24          Q.   Do you recall that conversation?

25          A.   Yeah.

26          Q.   What I am asking, if you recall telling

27   Detective Sharp that when you got off the BART train at the

28   Del Norte BART that you got off the train unassisted?

124

1    A.   No.  I -- no.  I don't remember telling him

2    that.  I remember telling him that somebody helped me off the

3    BART.

4         Q.   Do you remember telling him that you made your

5    way to the station agent after you got off the BART train?

6         A.   No, I don't.

7         Q.   But your testimony today is that a passenger at

8    the Del Norte train helped you to the bus?

9         A.   Yes.

10        Q.   Now, I believe your testimony was that that

11   passenger helped you get a transfer; is that correct?

12        A.   Yes.

13        Q.   When that passenger helped you get the transfer,

14   did he leave you?

15        A.   Yes.

16        Q.   And you never heard from that passenger again;

17   is that correct?

18        A.   Yes.

19        Q.   Were you able to --

20             THE COURT:  Could I ask for clarification?

21             The passenger asked if * Jane Doe needed a

22   transfer, the individual left * Jane Doe to get the transfer.

23             Did the individual ever come back and give you a

24   transfer?

25             THE WITNESS:  Yes, he did.

26             THE COURT:  Okay.

27             MR. AHEARN:  Q.  After he gave you the transfer,

28   you didn't hear from him again that night; is that correct?

1      A.   Yes.

2      Q.   I can't remember if I asked.   It sounds like you

3  can discern the race of a person when you are talking to

4  them.

5      A.   Yes.

6      Q.   Could you tell what race that person was, the

7  person that helped you to the 72 bus?

8      A.   Yes.  He was Caucasian.

9      Q.   Now, it sounds like the 72 bus driver told you

10  that they are -- they were not going to 23rd and San Pablo;

11  is that correct?

12      A.   Yes.

13      Q.   And you went to another bus; is that correct?

14      A.   Yes.

15      Q.   All right.   How did you get to the other bus?

16      A.   Well, actually, the first bus left, and then

17  there was another bus coming in.

18      Q.   So you stood in the same place?

19      A.   Yes.

20      Q.   Okay.   And then you almost got on that bus, that

21  second bus; is that correct?

22      A.   Yes.

23      Q.   And then I believe you testified that you heard

24  someone say, Where are you at?   Is that correct?

25      A.   Yes.

26      Q.   And that is the person who helped you over to

27  the cab area; is that correct?

28      A.   Yes.

1          Q.   At least that is your testimony.

2          Do you recall giving that testimony?  Is that

3     correct?

4          A.   Yes.

5          Q.   Now, do you recall telling Detective Sharp on

6     January 16th -- we have already asked about the station

7     agent.  You don't remember that.  But you do --

8          MS. SANTOS:  I object to the commentary before

9     the question.

10          THE COURT:  I don't want speaking objections.

11     Let's try to avoid the editorializing.  Try to ask a

12     question.

13          MR. AHEARN:  I was trying, Your Honor.

14          THE COURT:  Well --

15          MR. AHEARN:  I am trying.

16          THE COURT:  I don't know why you need to

17     reference back to a question and earlier testimony.

18          MR. AHEARN:  Fine.

19          Q.   Do you recall telling Detective Sharp on

20     January 16th that this station agent left after he left you

21     to the cab?

22          A.   No.

23          Q.   Do you recall your conversation with Detective

24     Sharp on January 22nd still?

25          A.   Yes.

26          Q.   Do you recall telling Detective Sharp that a

27     passenger helped you to the cab?  Do you recall telling him

28     that on January 22nd?

1      A.   Yes.

2      Q.   January 22nd interview?

3      A.   Yes.

4      Q.   Do you recall telling Detective Sharp on that

5 date after the passenger helped you to the cab, he left?

6      A.   No.

7      Q.   I believe your testimony here today is that when

8 you went from the bus station to the cab, you were holding

9 the man's arm; is that correct?

10      A.   Yes.

11      Q.   I believe your testimony is that you -- as you

12 were walking over, he asked you do you want to go with -- do

13 you want me to go with you?

14      A.   Correct.

15      Q.   Now, when you got to the cab, did you tell the

16 cab driver where you wanted to go?

17      A.   Yes.

18      Q.   Where did you tell him you wanted to go?

19      A.   I told him I wanted to go to -- I told him to

20 drop me off at 23rd and San Pablo.

21      Q.   Had you been dropped off at 23rd and San Pablo

22 before?

23      A.   Yes.

24      Q.   Do you know your way back to the Living Skill

25 Center from 23rd and San Pablo?

26           MS. SANTOS:   Your Honor, relevance.

27           THE COURT:   I don't know.

28           At that time of night, were you planning to go

# JANE DOE

# TESTIMONY AT TRIAL

# JULY 6, 2004

295

1              And, * Jane Doe, could I have you remain
2    standing and raise your right hand.
3                      * JANE DOE,
4              recalled as a witness on behalf of the
5              People, having been first duly sworn, was
6              examined and testified as follows:
7              THE COURT:  For the record, this is * Jane Doe,
8    (spelling given), but in court records she is being
9    identified as Jane Doe.
10             We interrupted the cross-examination of the
11   witness on, I believe, Wednesday afternoon, June 30th, with
12   the understanding that the witness would return this
13   afternoon.
14             Mr. Ahearn, you may resume your
15   cross-examination of * Jane Doe.
16             MR. AHEARN:  Thank you.
17             CROSS-EXAMINATION (Continued)
18             BY MR. AHEARN:  Q.  * Jane Doe, please let me
19   know if you can't hear me or if you don't understand the
20   question.
21        A.   Okay.
22        Q.   Now, * Jane Doe, I have a few questions for you.
23   Before your testimony last Wednesday, did you recount the
24   events of January 16th and January 15th, 2003, to anyone
25   else?
26             MS. SANTOS:  I object as to vague, "recount the
27   events."
28             THE COURT:  Do you mean did she discuss this

1  since she was last on the stand?

2            MR. AHEARN:  No.  Prior to your testimony on

3  January -- last week, did you discuss the events?

4       A.   Yes.

5       Q.   Did you discuss the events with a few police

6  officers?

7       A.   Yes.

8       Q.   And did you also discuss the events with maybe a

9  rape crisis counselor?

10      A.   Yes.

11      Q.   All right.  Did you discuss the events with the

12  counselor on several occasions, or --

13      A.   Yeah.

14      Q.   Okay.  Now, prior to coming to court last

15  Wednesday, did you discuss your testimony with either

16  Ms. Santos or anyone from the District Attorney's Office?

17      A.   Yes.

18      Q.   Now, how did you discuss your testimony?  Did

19  you listen to a statement that you gave?  Did you talk to her

20  about it?  How did that happen?

21      A.   I talked to her about it.

22      Q.   Did you ever listen to a recorded statement that

23  you gave?

24      A.   I did, yes.

25      Q.   And where did you listen to that recorded

26  statement?

27      A.   I listened to it in her office, Anita Santos'

28  office.

1      Q.   All right. Now, was this the recorded statement

2   you made with Detective Sharp on January 22nd of last year?

3      A.   Yes, it was.

4      Q.   How many times did you listen to that statement?

5      A.   I listened to it once. That was with Anita

6   Santos.

7      Q.   Did you listen to it any other time without

8   Ms. Santos?

9      A.   No.

10      Q.   Before you listened to the statement with

11   Ms. Santos, did you discuss the events of January 15th and

12   January 16th with her?

13      A.   No, I don't recall.

14      Q.   After you listened to the recording?

15      A.   Uh-huh.

16      Q.   When did you listen to the recording with

17   Ms. Santos?

18      A.   It was about two weeks ago.

19      Q.   After you listened to that recording with

20   Ms. Santos, did you discuss the events of January 15th,

21   January 16, 2003?

22      A.   Little bit.

23      Q.   A little bit?

24      A.   Yes.

25      Q.   You discussed it with Ms. Santos?

26      A.   Yes.

27      Q.   I know that you can't see, but were you able to

28   understand or hear if Ms. Santos was taking notes?

1      A.   Not that I recall, no.

2      Q.   All right.  Prior to -- after that -- after you

3   spoke to Ms. Santos -- well, let me re-ask that question.

4           How many times after listening to the

5   tape-recording did you speak to Ms. Santos about the case and

6   events of January 15th and January 16th?

7      A.   I don't recall.

8      Q.   Did she ever read to you or did anyone ever read

9   to you from a police report written by Detective Sharp on

10   January 16th of 2002 -- 2003, excuse me.

11      A.   No.  No.  I just listened to the recorded

12   statement.

13      Q.   So no other statements were read back to you or

14   any other manner?

15      A.   No.

16      Q.   All right.  Now, you recall giving a statement

17   on January 16th of 2003 to an officer, I think, at the

18   college; is that correct?

19           Now, when you gave that statement to the

20   officer, you were trying to be truthful; is that correct?

21      A.   Yes.

22      Q.   Now, later on that day, I think you testified

23   about a statement you gave to Detective Sharp on January 16,

24   2003.

25           Do you recall that statement you gave to him?

26      A.   Yeah, I remember that one.

27      Q.   Okay.  And you were trying to be honest and

28   truthful when you gave that statement; is that correct?

299

1          A.    Yes.

2          Q.    You were trying to be accurate in what you were

3    telling the officer; is that correct?

4          A.    Yes.

5          Q.    Do you recall talking to a nurse on

6    January 16th?

7          A.    Yes.

8          Q.    And you told the nurse about some of the events

9    that happened to you earlier that morning and late night; is

10   that correct?

11         A.    Yes.

12         Q.    And you also tried to be honest and truthful

13   when you were talking to her as well; is that correct?

14         A.    Correct.

15         Q.    And I will ask you the same questions for the

16   statement you gave to the detective on January 22, 2003, you

17   were trying to be honest and truthful when you gave those

18   statements as well, correct?

19         A.    Correct.

20         Q.    Now, * Jane Doe, I am going to direct your

21   attention -- I am going to do something different.  I am

22   going to direct your attention to the events right before you

23   got in the cab.  Okay?

24         A.    Okay.

25         Q.    I believe -- you recall your testimony, you

26   testified last Wednesday that you were walked over to a cab;

27   is that correct?

28         A.    Correct.

1         Q.   At some point during that walk, the individual

2 who -- you were guided by his arm?

3         A.   Yes.

4         Q.   He stuck his arm out and you held onto his

5 elbow; is that a fair statement?

6         A.   Yes, correct.

7         Q.   Now, I believe your testimony was that when you

8 went to the cab, you asked the cab driver to drop you off at

9 23rd and San Pablo; is that correct?

10         A.   Correct.

11         Q.   Now, if I might direct you to your -- refresh

12 your recollection with a statement that you made to Detective

13 Sharp on January 16, 2003.

14         MS. SANTOS:   I have to object.   There has been

15 no question where she failed to recollect.

16         THE COURT:   All right.   I don't know that it is

17 actually a failure of recollection.   But, Mr. Ahearn, if you

18 are aware of some discrepancy between testimony given in

19 court and statements from * Jane Doe on June 1st you may

20 inquire about it of the witness.

21         MR. AHEARN:   Thank you.

22         Q.   Do you recall telling Detective Sharp on

23 January 16th that you told the driver your address on Road

24 20?

25         A.   No, I don't recall.

26         Q.   If I read you part of his statement, would that

27 help you recollect your -- refresh your recollection?   Would

28 that help you remember?

1          A.     Yes, that would be fine.

2          Q.     All right.  With the permission of the Court --

3                 THE COURT: _ That is fine.

4                 Ladies and gentlemen, normally the procedure

5    would be to show the witness the document and have the

6    witness read the document to them self, but I will permit

7    Mr. Ahearn to read the statement or excerpt of the document

8    to the witness.

9                 MR. AHEARN:  Q.  It says here --

10                MS. SANTOS:  May I ask counsel what he is

11   referring to for the record?

12                MR. AHEARN:  Sure.  I am referring to a report

13   written by Detective Sharp on January 16, 2003, page 6 of 9,

14   first paragraph with summary of what was told to Detective

15   Sharp.

16                MS. SANTOS:  Your Honor, I have an objection.  I

17   don't know how you want me to address it.  We have the

18   recorded statement.  I have no objection to the recorded

19   statement.  I don't know how to address the objection.

20                THE COURT:  Well, ladies and gentlemen, again I

21   am assuming there was a recorded statement because the

22   attorneys have made reference to it.  They have copies of

23   that tape-recorded statement.  They may have listened to the

24   tape-recorded statement.  I have not.

25                I am not aware -- I have not reviewed any of the

26   police reports in the case authored by any of the officers.

27   If, in fact, there is something that is written in Detective

28   Sharp's report that whether it be a summary or whether it be

1  reported to be verbatim, I am going to permit that it may be

2  read subject to further examination or further questioning.

3         This particular statement apparently was done on

4  June 1st. Tape recorded statement was January 22nd, and we

5  will proceed.

6         MR. AHEARN:  So it is okay if I read.

7         THE COURT:  You may.

8         MR. AHEARN:  Q.  It says here the victim told

9  the driver her address.

10         Do you recall now telling Detective Sharp you

11  gave the cab driver your address?

12         A.   No, no, I did not give the cab driver my

13  address.

14         Q.   Do you recall telling that to Detective Sharp on

15  January 16th?

16         A.   No, I do not.

17         Q.   Now, I believe your testimony last Wednesday was

18  when you got to the cab, the person walking with you said, Do

19  you want me to go with you?

20         A.   Correct.

21         Q.   And I believe your response was something you

22  did not speak up loud enough, correct?

23         A.   Correct.

24         Q.   And your testimony last Wednesday, you did not

25  testify that -- well, strike that.  I believe after that you

26  got in the cab; is that correct?

27         A.   Correct.

28         Q.   All right.  And the individual got in with you;

1  is that correct?

2       A.   Correct.

3       Q.   I believe your testimony was that you never told

4  the driver that you wanted Mr. McCord out of the cab, is that

5  correct, or the individual; is that correct?

6            MS. SANTOS:   I object to the form of the

7  questions and confusion and restating testimony.

8            THE COURT:   All right.   I don't know why we

9  are -- in every one of your questions you are referring to

10  the testimony last week as a reference to every question.   I

11  realize it is cross-examination, you know.   But basically I

12  think the question asked is, Did you at -- in any way

13  communicate to the cab driver that you were concerned that

14  there was somebody else in the cab with you?

15           THE WITNESS:   No, I didn't say -- no, I did not

16  tell the cab driver anything.

17           THE COURT:   All right.   Mr. Ahearn.

18           MR. AHEARN:   Q.   Okay.   Do you recall telling

19  Officer Milano, the first officer you spoke to on

20  January 16th, that you wanted the cab driver -- that you

21  wanted the man out of your cab?

22       A.   Yes.

23       Q.   Do you recall telling him that?

24       A.   Correct.

25       Q.   But that is not what happened, that is what I

26  understand you never told the man, you never told the cab

27  driver for the man to get out?

28       A.   No.

304

1          Q.   Do you recall telling Detective Sharp on
2     January 16th that the driver actually told the male to leave
3     the car?  Do you recall telling Detective Sharp?
4          A.   I don't recall.
5          Q.   * Jane Doe, I believe you gave the cab driver
6     $10 after you got in the cab; is that correct?
7          A.   Correct.
8          Q.   Do you recall a phone conversation you had on
9     June 16th, about two weeks ago, with a man identified himself
10    as Ed Owasa, defense investigator?
11         A.   I don't recall.
12         Q.   You don't recall that conversation?
13         A.   No.
14         Q.   Do you recall a conversation that was set up
15    with Ms. Phinnesse with a man who asked you about the case?
16         A.   Oh, yeah.  Okay.  Yes, I remember.  Now I
17    remember.
18         Q.   That was somewhere -- June 16th, does that sound
19    about right?
20         A.   Correct.
21         Q.   Do you recall telling Mr. Owasa during that
22    phone conversation that the man paid the fare?
23         A.   Yes.
24         Q.   But your testimony here today is that you paid
25    the fare, correct?
26         A.   No, that is not correct.
27         Q.   Who paid the fare?
28         A.   The individual paid it.

1      Q.  Do you recall your statement to Detective Sharp

2  on January 16, 2003, where you told the detective that you

3  paid the $10 fare?

4      A.  No, I don't recall.  That is not correct.

5      Q.  But when you gave that statement to Detective

6  Sharp, you were trying to be accurate and truthful, correct?

7      A.  Correct.

8      MS. SANTOS:  I object as --

9      THE COURT:  When you say gave the statement on

10  January 16th --

11      MR. AHEARN:  That is correct.

12      THE COURT:  That is how you understood the

13  question?

14      THE WITNESS:  Correct.

15      THE COURT:  Let's proceed.

16      MR. AHEARN:  Q.  Now, * Jane Doe, during the cab

17  ride with this individual, I believe your testimony was that

18  a hand was placed on your leg; is that correct?

19      A.  Correct.

20      Q.  That was moved off rather quickly when you asked

21  for it to be moved off; is that correct?

22      A.  Correct.

23      Q.  Besides that there was no other conversation?

24      A.  Right, that is correct.

25      Q.  Do you recall telling Detective Sharp on

26  January 16th that the person in the car said, All right,

27  baby.  I will take you home?

28      A.  No, I don't recall that.

1    Q.    By me saying those words, does that refresh your
2    recollection at all?
3    A.    Yes.
4    Q.    Okay.  Do you recall saying that to Detective
5    Sharp, that the individual said, All right, baby.  I will
6    take you home to Detective Sharp on January 16th?
7    A.    No, that is not correct.
8    Q.    All right.  Now, you state that you got out at
9    23rd and San Pablo, correct?
10    A.    That is correct.
11    Q.    How did you know you got out at 23rd and
12    San Pablo?
13    A.    Because there is like a bus pole there.
14    Q.    Okay.  Bus pole on San Pablo?
15    A.    Yes, on 23rd and San Pablo.
16    Q.    How did you know it was the bus pole at 23rd and
17    San Pablo?
18    A.    Because it is skinny.
19    Q.    What do you mean skinny, something you remember
20    that pole from feeling it before or --
21    A.    Because I remember feeling it before.
22    Q.    All right.  Now, I believe when you got out of
23    the cab, you made a phone call to your friend Shayla
24    Gustaufson; is that correct?
25    A.    Correct.
26    Q.    And you were walking for a while after you got
27    out of the cab; is that correct?
28    A.    Correct.

1      Q.  And maybe you were talking two minutes with

2  Ms. Gustaufson; is that correct?

3      MS. SANTOS:  Excuse me.  Misstates her

4  testimony.

5      THE COURT:  All right.  Ladies and gentlemen,

6  again what the attorneys say in their questioning is not the

7  evidence.  You may, okay, consider the questions as it helps

8  you to understand the answer.  And if, in fact, * Jane Doe

9  gave different testimony or other testimony last Wednesday,

10  or you recall her testimony being something different it is

11  your recollection that controls and not what is incorporated

12  into the question.

13      Let's proceed.

14      MR. AHEARN:  Q.  Do you recall how long you

15  spoke to Ms. Gustaufson on the phone?

16      A.  Yes.

17      Q.  How long?

18      A.  Two minutes.

19      Q.  And the phone call ended when the telephone was

20  taken from your hand, correct?

21      A.  Correct.

22      Q.  You heard the phone shut off; is that correct?

23      A.  Correct.

24      Q.  Then I believe you were grabbed behind on your

25  shoulders; is that correct?

26      A.  Correct.

27      Q.  I believe your testimony was that you were

28  walking to a bench, correct?

1    A.   Correct.

2    Q.   And the individual was with you, correct?

3    A.   Correct.

4    Q.   And I believe you said, Let me go right now?

5    A.   Correct.

6    Q.   And then I believe you began screaming; is that

7    correct?

8    A.   Correct.

9    Q.   This all happened, sounds like a short time

10   after the phone was taken from you; is that correct?

11   A.   Correct.

12   Q.   And I believe that you testified -- and I

13   believe you fell on the sidewalk at that point after the

14   struggle; is that correct?

15   A.   Correct.

16   Q.   And your head hit the ground?

17   A.   Yes.

18   Q.   Then I believe you said you were dragged to the

19   college?

20   A.   Correct.  It was -- I was dragged to the

21   college.  I mean after I made the phone call, well, yeah.  It

22   was before I made the -- it was while I -- well, it was after

23   I made the phone call.  I was dragged to the college.

24   Q.   After you fell to the ground with the

25   individual?

26   A.   Yeah, that was at the bench at the college, the

27   bleachers.

28   Q.   So after you made the phone call, within a

1  couple of minutes, did you fall to the ground on the

2  sidewalk?

3        A.   Yes.

4        Q.   Okay.  And then you were dragged, picked up and

5  dragged down the sidewalk a little bit more; is that correct?

6        A.   Yes.

7        Q.   And then you were taken to some bleachers?

8        A.   Yes.  Actually --

9        Q.   Do you recall something different?

10       A.   Yeah.  I was -- okay.  After I made the phone

11  call, I was -- after the phone was taken from me, I was

12  dragged to the college.  And after I -- well, I did scream

13  when he was dragging me, but this was after we got to the

14  bleachers after -- in the college, that is when I fell to the

15  ground, when I hit my head.

16       Q.   Okay.  So you did not fall to the ground and hit

17  your head until you got to the bleachers; is that correct?

18       A.   Correct.

19       Q.   When you say "dragged," were you being dragged

20  in the way you showed us the other day in court with

21  Ms. Santos, with one hand around your stomach and one hand on

22  the shoulder?

23       A.   Correct.

24       Q.   And I think you were -- it took about ten

25  minutes after the phone call ended until you got to the

26  bleachers; is that correct?

27       A.   Correct.

28       Q.   So you were being dragged for ten minutes?

1      A.    Correct.

2      Q.    And you felt the sidewalk underneath your feet?

3      A.    Correct.

4      Q.    And I believe as you were getting dragged, you

5  were screaming; is that correct?

6      A.    Correct.

7      Q.    And as you were getting dragged, you were

8  telling this individual that -- let you go, correct?

9      A.    Correct.

10     Q.    Do you recall you listened to the recorded

11  statement that you made on January 22nd?  Do you recall

12  telling the officer that -- and even then he grabs the phone

13  from me.  I am okay.  Go on.  That is it.  So I walk away,

14  and then he comes up behind me and grabbed me, and we are

15  talking ten minutes and coming down some bleachers.

16        Do you recall saying that?

17     A.    Yes.

18     Q.    Do you recall not saying at that point that you

19  were -- on January 22nd, that you were being dragged for ten

20  minutes?

21        MS. SANTOS:  Argumentative.

22        THE COURT:  Overruled.

23        MR. AHEARN:  Q.  Do you remember whether or not

24  on the 22nd the tape-recorded conversation you described

25  being dragged?

26     A.    Yes.

27     Q.    You recall telling the officer on January 22nd

28  that you were dragged?

1        A.    Yes.

2        Q.    And you recall that even after listening to that

3   tape-recorded statement?

4        A.    Yes.

5        Q.    Do you recall at what point during the

6   conversation that you told the officer on January 22nd of

7   2003 when you were being dragged?

8        A.    I don't recall.

9              Excuse me.

10             THE COURT:  Do you need a tissue?

11             THE WITNESS:  Yes.  Okay.

12             MR. AHEARN:  Q.  Okay.  * Jane Doe, do you

13   recall telling Mr. Owasa on the 16th of January of this

14   year --

15             THE COURT:  1st of June.

16             MR. AHEARN:  1st of June of this year.

17        Q.    That the only words spoken during the walk after

18   the phone and to the bleachers was your question of where are

19   we going and the man telling you, I am just taking you to the

20   bus stop?  Do you recall that?

21        A.    I do recall that.  This is before I started

22   screaming.

23        Q.    So you started screaming only after you got to

24   the bleachers?

25             MS. SANTOS:  Misstates her testimony,

26   argumentative.

27             THE COURT:  All right.  It is cross-examination.

28   You may answer the question.  I believe it was a question

312

1    phrased as a question.  And if you disagree with the

2    characterization, you may indicate that.

3          Do you want the question repeated?

4          THE WITNESS:  No.  Correct.  I did ask him where

5    we were going.  And, yeah, he did say we are going to the bus

6    stop.  He did not say which one.

7          MR. AHEARN:  Q.  Okay.  And it sounds like you

8    did not begin screaming until you hit the bleachers; is that

9    correct?

10          A.    Correct.

11          Q.    So you did not -- you weren't screaming as you

12   went down the sidewalk?

13          A.    No.  Actually, I did scream.  No, I did not

14   start screaming when we were going on the sidewalk.  I did

15   that when we got to the bleachers.

16          Q.    Thank you.  Do you recall whether or not you

17   were checking your messages right before you called Shayla

18   Gustaufson?

19          A.    Yes.

20          Q.    Were you?

21          A.    Yes.

22          Q.    How were you checking your messages on your

23   phone?

24          A.    Well, I -- I -- there is a button I would press,

25   and it would go right to my messages.

26          Q.    All right.  That would dial the number of -- you

27   have a phone, I would imagine?

28          A.    Yes.

1    Q.   And the number on your phone is (408) 836-5771,

2    at least on January 16th and January 15th of last year?

3         A.   Correct.

4         Q.   And your testimony is that you made them

5    right -- you checked your messages right after you got out of

6    the cab?

7         A.   Correct.   That is when I was walking.   I checked

8    my messages.

9         Q.   Did you get through with hearing your messages?

10        A.   Yes.

11        Q.   Now, Ms. Gustaufson --

12             THE COURT:   Ms. Gustaufson?

13             MR. AHEARN:   Excuse me.

14        Q.   * Jane Doe, when you got to the bleachers, that

15   is when you were knocked down; is that correct?

16        A.   Correct.

17        Q.   That is when you hit your head on the cement or

18   something; is that correct?

19        A.   Yes.

20        Q.   You had not hit your head on the cement prior to

21   that; is that correct?

22        A.   Correct.

23        Q.   And it is at the bleachers, at that same

24   location that your pants were taken down; is that correct?

25        A.   Correct.

26        Q.   That is where the -- your first sexual encounter

27   occurred; is that correct?

28        A.   Actually, by some -- actually, when he took down

314

1   my pants, it was like some wooden wall, like a wooden fence.

2          Q.   It was not a cement or concrete wall or fence?

3          A.   Well, oh, yeah, it was.   It was a brick wall

4   that he did that.

5          Q.   And I believe you used the word -- I might be

6   wrong.   Correct me if I am wrong.

7          A.   Correct.

8          Q.   That your head was slammed; is that correct?

9          A.   Correct.

10         Q.   And that is when you began screaming; is that

11  correct?

12         A.   Correct.

13         Q.   I believe you said you were choked?

14         A.   Yes.

15         Q.   And you were choked, I imagine, by having some

16  hands around the front of your throat; is that correct?

17         A.   Correct.

18         Q.   And, * Jane Doe, I am sorry, I might be asking

19  sensitive questions.   So please let me know if you would like

20  a break or something?

21         A.   Okay.

22         Q.   All right.   * Jane Doe, you said that you felt a

23  finger inside your vagina; is that correct?

24         A.   Correct.

25         Q.   Than you said you felt a penis in your vagina;

26  is that correct?

27         A.   Yes.

28         Q.   Were you able to tell if the penis was erect?

315

1      A.   Yes.

2      Q.   What was it?

3      A.   It was erect.

4      Q.   And do you know what I mean by the word "erect"?

5      A.   Yes.  Hard.

6      Q.   Okay.  Do you recall telling Detective Sharp on

7   January 16th, that the suspect's penis was not erect, it was

8   soft?

9      A.   No, I don't recall.

10      Q.   Okay.  Do you recall telling the nurse Ms. Jones

11   that the finger and penis went in at the same time?

12      A.   Correct.  Yeah, it did.  It did go in at the

13   same time, his finger and his penis.

14      Q.   So you recall your testimony earlier where you

15   said the finger went in and then the penis?

16      A.   Actually -- actually, first it was the finger

17   and then it was the penis.

18      Q.   So it was not at the same time?

19      A.   No.

20      Q.   I believe you also testified that prior to that

21   that your pants and your panties were taken down to your

22   ankles?

23      A.   Yes, correct.

24      Q.   Your right shoe and sock was taken off; is that

25   correct?

26      A.   Correct.

27      Q.   So, * Jane Doe, if I understand you correctly,

28   prior to going to the bleachers you did not scream; is that

1    correct?

2         A.    Correct.

3         Q.    You did not -- you were not forcibly taken down

4    to the sidewalk; is that correct?

5         A.    Can you repeat it again?  Sorry.

6         Q.    That is all right.

7         MR. AHEARN:  I have nothing further, Your Honor.

8         THE COURT:  All right.  The question was

9    withdrawn.

10        Any redirect, Ms. Santos?

11        MS. SANTOS:  Yes.

12              REDIRECT EXAMINATION

13    BY MS. SANTOS:  Q.  * Jane Doe --

14        A.    Yes.

15        Q.    -- were you able to tell by the voice of the man

16    that assaulted you what his race was?

17        A.    Yes.

18        Q.    What was that?

19        A.    Black.

20        Q.    What about the cab driver, were you able to tell

21    his ethnicity or about -- anything about where he might be?

22        A.    He seemed like he might be from India.

23        Q.    * Jane Doe, when you got in the cab, did you

24    tell -- did you try to tell the cab driver in any way that

25    you did not know the man that was with you and you did not

26    want him to go with you?

27        A.    No.  I did not say anything because I was

28    afraid.

317

1       Q.  All right.  Did you tell the driver -- or did

2  you say whether or not what the driver heard is different,

3  but did you say that you did not want him to go with you?

4       A.  Yes.

5       Q.  All right.  What is it, if you remember, that

6  you said?

7       A.  I -- just when he said, I want to go with you,

8  to take my girlfriend home, I told the cab driver I wasn't

9  his girlfriend.

10      Q.  And did the cab driver respond to your comment

11  in any way?

12      A.  No.

13      Q.  And you said that when he said, I want to go

14  with her, to take my girlfriend home, who was saying that?

15      A.  The guy that sexually assaulted me.

16      Q.  All right.  When you got into the cab, why

17  didn't you ask the cab driver to take you directly to your

18  apartment?

19      A.  Because I did not want the individual to know

20  where I lived.

21      Q.  * Jane Doe, the friend Shayla that lives in

22  Anaheim, can you tell me Shayla's number if you remember it,

23  number she had in January of '03?

24      A.  I don't remember her number.

25      Q.  All right.  Do you remember the Area Code was

26  (714); is that correct?

27      A.  Correct, yes.

28      Q.  * Jane Doe, when this male was dragging you to

1  the college, did he cover your mouth in any way?

2       A.  Yes.

3       Q.  Tell us what he did?

4       A.  Well, when I was screaming, that is when he

5  covered my mouth.

6       Q.  Okay.  When you were screaming, at what point in

7  time was it before you got to the college or at the college?

8       A.  At the college.

9       Q.  Okay.  Did he cover your mouth on your way to

10  the college at all?

11       A.  No.

12       Q.  All right.  Did he ever -- you know, * Jane Doe

13  when you spoke to Officer Milano and Detective Sharp that

14  very first morning, right --

15       A.  Correct.

16       Q.  All right.  -- do you remember telling Officer

17  Milano that the suspect and this was out, after you got out

18  of the cab, suspect grabbed you by the car and then grabbed

19  and lead you to the ball field area of the Contra Costa

20  College, do you recall telling the first officer that?

21       A.  I don't recall.

22       Q.  Okay.  Detective Sharp, right before or during

23  your sexual assault examination, do you recall telling him

24  that the male directed you to walk with him forcibly to the

25  college?  Do you remember telling him that?

26       A.  Yes.

27       Q.  * Jane Doe, do you consider -- you say he

28  forcibly directed me to walk with him.  Is that the same as

1    drag is dragging?  Is that the same thing?

2         A.   Yes.

3         Q.   All right.  And then I think the second time you

4    talked to Sergeant Sharp was January 22nd of last year.

5              Do you remember that?  That was the recorded

6    interview?

7         A.   Right.

8         Q.   It was only one time that you know that he

9    recorded your interview, right?

10        A.   Right.

11        Q.   Do you remember telling Detective Sharp on that

12   particular interview that the man grabbed you from behind and

13   forced you to walk about ten minutes?  Do you remember

14   telling him that?

15        A.   Yes.

16        Q.   And then you said that he grabbed from behind

17   and forced you to walk.  Do you equate that to be he dragged

18   you?

19        A.   Correct.

20        Q.   Okay.  Thank you.

21             * Jane Doe, did the police ever give you your

22   cane back to you that night that was taken away from you?

23        A.   Yes.

24        Q.   All right.  Was -- the cane that they gave back

25   to you, was that the same one that the male had taken from

26   you?

27        A.   Yes.  It was the same exact one.

28        Q.   Another cane, not the one you have today, but

1   the same one you had that day?

2        A.   Yes.

3        Q.   It looked like the one you have today?

4        A.   Yes.

5        Q.   Thank you.

6             Now, * Jane Doe, when you came to my office and

7   you and I spoke, I offered to read the police reports to you,

8   didn't I?

9        A.   Yes.

10        Q.   And you did not want me to, correct?

11        A.   Correct.

12        Q.   And when you listened to the one statement that

13   was recorded, did you stop and before that recording was done

14   and say you heard enough?

15        A.   Yes.

16        Q.   Okay.  Did you knock on the wall and ask me to

17   come back in while you were listening to that tape?

18        A.   Yes.

19        Q.   Did I sit in with you while you were listening

20   to that tape?

21        A.   No.

22        Q.   * Jane Doe, when was it that this male

23   threatened to kill you?

24        A.   When my -- after my head was slammed and he

25   choked me.

26        Q.   Was that before the first time he raped you or

27   the second time?

28        A.   Before the first time he raped me.

1    Q.   And, * Jane Doe, if I could ask you why you were

2    out at the school for the blind so late that night?

3         A.   Because I had a senior meeting.

4         Q.   Had a what?

5         A.   Senior meeting.

6         Q.   What is that?

7         A.   It is like where they plan our senior trips to

8    go to Disneyland.

9         Q.   When you say senior meeting, did you mean senior

10   as in your status at the school?

11        A.   Yes.

12        Q.   All right.   That meeting, did that meeting run

13   late?

14        A.   Yes.

15        Q.   Okay.   And, * Jane Doe, during your physical

16   examination at the hospital, did they take a sample of your

17   blood?

18        A.   Yes.

19        Q.   Did you cooperate and give the nurse a sample of

20   your blood?

21        A.   Yes.

22        Q.   Okay.   And, * Jane Doe, I hate to ask you, but

23   the time of this rape you weren't on your period, were you?

24        A.   No.

25        Q.   Are you sure?

26        A.   Yes.   Very sure.

27             MS. SANTOS:   Thank you.   Nothing further.

28             THE COURT:   Mr. Ahearn.

1    MR. AHEARN:  I have nothing further, Your Honor.

2    THE COURT:  Is the witness excused or subject to

3  recall?

4    MS. SANTOS: · Subject to recall.

5    THE COURT:  * Jane Doe, you are free to leave.

6  Technically you are subject to recall.  If we need to call

7  you back, I am certain that Ms. Santos will be in contact

8  with you.

9    THE WITNESS:  Thank you.

10    THE COURT:  Before I have you leave, I think it

11  is in the afternoon.  I will take the afternoon recess.  And

12  let the jury leave before you leave the courtroom.

13    (Witness excused.)

14    THE COURT:  Ladies and gentlemen, we will be in

15  recess until ten after 3:00.

16    Please remember the Court's admonition not to

17  discuss the case or form or express an opinion on the case,

18  and don't let anybody discuss the case with you.

19    Please be outside ten after 3:00 by the court

20  clock.  Please leave your pads with the covers down on your

21  chairs.  Thank you.

22    (Recess taken.)

23    THE COURT:  We are on the record outside the

24  presence of the jury in People versus Jermaine Lavarius

25  McCord.  Ms. Jones is in the courtroom.  Mr. Ahearn asked to

26  put something on the record before we resume the direct

27  examination of Ms. Jones.

28    MR. AHEARN:  I think it is both counsel would

# ED OASA INVESTIGATIONS

*Lic. PI 20088*

484 Lake Park Ave., No. 370
Oakland, CA 94610

Voice: (510) 482-9159
Fax: (510) 336-1177

June 16, 2004

Timothy Ahearn
Attorney at Law
Office of the Alternate Defender
610 Court Street
Martinez, CA 94553

## RE:   PEOPLE v. JERMAINE MCCORD
### Contra Costa County Superior Court Case No. 5-032028-3

## REPORT OF INVESTIGATION

## AMANDA MCCLURE
c/o Living Skills Program
2430 Road 20
San Pablo, CA
(510) 234-4984 (off)
(408) 603-5372

Amanda McClure, the complaining witness in this case, was interviewed via telephone on June 16, 2004. We contacted McClure through her living skills teacher, Nancy Phinnessee. McClure agreed to speak with us. This investigator told McClure and Phinnessee that he worked for defense counsel in the instant case.

McClure affirmed that at a late hour on January 15, 2003, she rode a BART train from the Fremont BART station to the El Cerrito Del Norte station. She left the latter station through the exit gates and with the assistance of another passenger obtained a machine-generated bus transfer to catch an AC Transit bus home. McClure said she did not know very well the immediate area surrounding the BART station and usually had a BART employee guide her to the bus stop. This time [for reasons undetermined], she said, she managed to get the assistance of a BART rider when she got off the train at Del Norte. The rider was a man and, from what she could tell by the man's speech and accent, white.

McClure asked the man to assist her to AC Transit's 72 bus. She said the 72 stop is the first bus stop a person comes across as he/she leaves the BART station to catch an AC Transit bus. [AC Transit buses wait for passengers in a special, designated lane that extends along the west side of

Peo. v. Jermaine McCord                                                                    2
Interview: Amanda McClure
06/16/04

the Del Norte station.] McClure approached the 72 already waiting there and spoke with the woman bus driver.

McClure recalled that the driver addressed her first, asking McClure about her destination. She told the driver she wanted to go "near the [Contra Costa Community] College" or "23rd." The driver told McClure that she went to neither location at that hour and that McClure should wait for the next 72 bus, which was scheduled to travel where McClure wanted to go. The driver then asked McClure, "What are you doing out so late?" McClure told her that she had been in Fremont earlier in the evening.

When asked about the man who had assisted her, McClure said that the man had left while she and the driver spoke. She recalled him saying goodbye at some point during this conversation.

McClure recalled that the bus driver also asked her if she [McClure] wanted to wait for the next 72 bus or take a taxicab. It was at this point, McClure recalled, that a second man, who she said turned out to be her assailant, approached the bus and stood to her left.

McClure heard the man say, "Where you at?" She then heard the driver reply, "Over here." McClure said she did not know what to make of this exchange. "It didn't make sense," she remarked to us. McClure then resumed the conversation with the bus driver and told her she decided to take a cab home.

At this point, the second man offered to help her to a cab and grabbed McClure's arm to begin the walk to the cab station. McClure said she did not know this man. She stopped and told him, "No, I usually hold on to someone's arm" when she was guided by someone. The man, McClure recounted, released his hold on her arm and "let" her hold on to his.

McClure did not remember the direction the man and her walked in to get to a cab. She did not recall if she did an about-face or proceeded at an angle relative to the location of her conversation with the bus driver.

McClure, who stated her height to be 4'11", could tell that the man was much taller than her. She determined this because it seemed that she had to reach up to hold on to his arm.

McClure distinctly remembered that she and the man walked into the BART station to reach a cab. During this walk, the man asked her, "Do you want me to ride with you?" McClure replied in the negative. When asked for his reaction to her response, she told us that she did not say "no" loud enough and suspected that he did not hear her. McClure conjectured that the man was drunk because she smelled alcohol on this breath.

McClure recalled the man say, "There's a yellow cab," just before they reached it. She was certain the driver was inside the cab when the man spoke to the driver. It seemed to

McClure that the man guiding her bent over a bit to speak to the driver through a window. She recalled the man's first words to the driver were something like, "I want to go with you to take my girlfriend home," to which McClure said aloud that she wasn't his girlfriend. She was not sure if the cab driver heard her. She heard the cab driver say with a male's voice, "OK," in reference to the man's request to take his girlfriend home.

McClure and the man got into the cab's back seat through the passenger side. She entered first and sat behind the driver. She said she determined via touch that the cab's interior was equipped with a plexiglass divider. The man was also in the rear passenger seat. McClure said she could not tell how far away he sat from her.

McClure said she told the cab driver a second time that she was not the man's girlfriend and that "I didn't know him that well." When the driver asked for her destination, McClure told him to let her off "at 23rd." She did not give the driver a cross street or address because she did not want the man to know where she lived. Instead, she told him to drop her off on 23rd Street "near a bus stop." When we asked McClure how the driver knew where the bus stop was, she re-iterated that she just told the driver, "23rd."

While waiting for the cab to leave, McClure heard the driver mentioned "ten dollars." She did not know who he was talking to, but she did hear the sound of money exchanging hands. After this apparent exchange, the man told McClure that (1) he paid her fare and (2) she "hurt [his] feelings" when she told the driver that she was not his girlfriend.

The cab ride, McClure guessed, lasted ten or fifteen minutes. McClure reported that she and the man said nothing to each other. Midway through the ride, the man put his hand on her leg, which she moved to avoid being touched there. She stated, "He moved his hand away." McClure said that at this juncture of the incident, she was more nervous than scared. Despite this feeling, she appended, she was still expecting to make it home.

When the cab stopped, the man the driver that "he wanted to go home." The driver, McClure recalled, replied that it would cost the man another twenty dollars. The man retorted, "I want my money back." Because of the man's tone of voice, McClure sensed that he was about to "be violent."

By this time, McClure continued, she just wanted to get out of the car. If the driver and man talked some more, she did not hear their words and "was not paying attention." McClure stated that she became more concerned about "getting away."

McClure got out of the cab via the driver's side and walked around the rear of the car to get to the street curb. She said she did not know where she was but "thought" she was on 23rd Street near Road 20. She stood there for a few seconds before she felt the man "grab" her around her shoulders. The two then began walking.

4

Peo. v. Jermaine McCord
Interview: Amanda McClure
06/16/04

McClure said the man held her tightly during a walk that was mostly on asphalt [or concrete] and lasted ten minutes [before the alleged assault happened]. During this period, McClure asked the man, "Where are we going?" The man told her, "I'm just taking you to the bus stop." McClure stated that these were the only words spoken between them during this walk.

McClure confirmed that she spoke with her friend, Shayla [Gustafson], via cell phone at some point during the occurrences described above. When first asked about Gustafson, McClure said that Gustafson called her to check on her because McClure had not arrived home yet. McClure reported that Gustafson sometimes checked on her well-being at night.

When asked again about Gustafson's call, McClure changed her account with, "I think I called her." [She sounded flustered when trying to answer our queries about the phone conversation in question.] McClure answered, "I don't remember" or "I don't recall," to our questions about when the call was made and how long the call lasted.

At one point, when asked about the length of the call, McClure quickly answered, "12:21 [a.m.]." We re-stated the question to her, which resulted in a lack of recall. McClure did not remember if the conversation occurred while in the cab or on the walk after the cab ride.

McClure was asked about the topic of conversation. She said she told Gustafson that she "was in trouble." McClure remained vague, uttering, "I don't recall," to our questions about the conversation. She issued her lack of recall again when we mentioned that the call, according to phone records, lasted ten minutes. McClure did say that the man grabbed the phone away from her, which ended the conversation with Gustafson.

McClure did not remember how she made the call. When asked whether her hands were free to dial a phone number, let alone talk on the phone, McClure said she did not remember when she was able to make this call or whether there were moments when the man was not holding her shoulders or arms at some point during the walk.

McClure confirmed she had a boyfriend when the incident at issue happened. He is still her boyfriend, she added. She answered firmly, "No," when we asked her if she and her boyfriend were "sexually active" [this investigator's words] in January 2003.

McClure has been subpoenaed by the prosecution for Jermaine McCord's trial.

Please advise as to further investigation regarding this witness.

Edmund K. Oasa

# ARGUMENT

## INTRODUCTION

Without doubt, the Bill of Rights exists to ensure that a citizen cannot be punished unless he or she has had a fair trial. Although the parameters of fairness are, of course, subject to case-by-case adjudication, it is manifest that a criminal defendant is entitled to certain basic protections in every case. Unfortunately, those protections were not afforded in the instant case.

As this brief will demonstrate, a series of fundamental constitutional errors occurred at appellant's trial: the court failed to instruct on an affirmative defense to the charge of rape; the court failed to instruct regarding essential elements of the One Strike allegations that resulted in appellant s life sentence; the evidence is insufficient to support either the sexual penetration conviction or the finding under the One Strike sentencing allegation; and the 25-years-to-life sentence under the One Strike sentencing scheme violated constitutional prohibitions against cruel and unusual punishment. Given the number and significance of these errors, it is impossible to conclude that appellant received a fair trial. Thus, appellant is confident that this court will vindicate his rights under the Constitution by granting him a new trial or reducing his sentence.

26

EXH. 13

## I.  APPELLANT WAS DENIED DUE PROCESS UNDER THE FEDERAL CONSTITUTION WHEN THE TRIAL COURT FAILED TO GIVE HIS REQUESTED JURY INSTRUCTION PURSUANT TO CALJIC NO. 10.65 CONCERNING HIS DEFENSE OF REASONABLE GOOD FAITH BELIEF IN CONSENT

The jury instructions in this case gave the jury an all-or-nothing choice between convicting appellant of forcible rape and forcible sexual penetration or accepting his defense of actual consent. That was unfair because in this case Jane Doe s actions at the BART station and in the taxi cab and after she and appellant got out of the cab were such that appellant could have reasonably and mistakenly believed Jane was consenting to having sex with him when she traveled in the taxicab with him, when she got out of the cab and went with him and had intercourse with him on the college grounds.

The court should have given the jury this middle ground. The jury should have been instructed with CALJIC No. 10.65, as appellant requested, providing the option of finding that, although Jane did not consent to sex with appellant, her conduct nonetheless was equivocal enough to lead appellant to reasonably and in good faith believe she had consented.

There was ample evidence in support of the defense of mistake of fact regarding Jane s consent to sexual intercourse. Thus the trial court committed reversible error when it failed to give CALJIC No. 10.65, as appellant requested.

## A.  Procedural Context And Cognizability On Appeal

It is well established that a criminal defendant is entitled to adequate instructions on the defense theory of the case. (*Conde v. Henry* (9th Cir. 2000) 198 F.3d 734, 739.) Due process requires that

EXH. 13

the jury must be instructed on the defendant's theory of the case. (*People v. Modesto* (1963) 59 Cal.2d 722, 730.) Here, the primary defense to the charged sex offenses was consent. Appellant s counsel argued to the jury that Jane was lying or was at least not a good historian about the incident, and that the sexual encounter was consensual. (See RT 856-880.)

The trial court instructed the jury on the definition of actual consent as a defense to the rape charge, using CALJIC No. 1.23.1 (CT 394, RT 782), but failed to instruct the jury on reasonable belief in consent, also known as a mistake-of-fact, or the *Mayberry* defense, even though appellant requested that the court give CALJIC No. 10.65.[4] (CT 294, 302.) In refusing to give the instruction, the court said: [I]t seems to me that there was not substantial evidence of the equivocal conduct that would have led a defendant to reasonably and

---

[4]

The wording of the CALJIC No. 10.65 requested was set forth in a jury instruction form as follows: In the crime of unlawful forcible rape oral copulation by force and threats forcible sodomy penetration of the genital or anal opening by a foreign object, substance, instrument or device by force, violence fear or threats to retaliate, criminal intent must exist at the time of the commission of the __(crime charged)__. [¶] There is no criminal intent if the defendant had a reasonable and good faith belief that the other persona voluntarily consented to engage in sexual intercourse oral copulation sodomy or penetration of the genital anal opening by a foreign object, substance, instrument, or device. Therefore, a reasonable and good faith belief that there was voluntary consent is a defense to such a charge, unless the defendant thereafter became aware or reasonably should have been aware that the other person no longer consented to the sexual activity. [¶] However, a belief that is based upon ambiguous conduct by an alleged victim that is the product of conduct by the defendant that amounts to force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person of the alleged victim or another is not a reasonable good faith belief. [¶] If after a consideration of all the evidence you have a reasonable doubt that the defendant had criminal intent at the time of the accused sexual activity, you must find him/her guilty of the crime. (CT 302.) The jury instruction form would obviously have had to be changed by the court to specify the particular offense involved in this case, had the court not refused to give the instruction.

28

in good faith believe consent existed where it did not.   (RT 910-911.)

In contrast, the jury *was* instructed, as to kidnapping, on both actual consent (CT 350; RT 787-788; CALJIC No. 9.56), and reasonable, good faith belief in consent. (CT 351; RT 788; CALJIC No. 9.58).  Because the requested instruction was not given, trial counsel was not able to argue that appellant thought Jane was consenting and had a reasonable belief that her actions or lack of action indicated she was consenting to his advances and to having sexual relations with him.

In *Mayberry*, as here, the defendant *requested* the instruction on reasonable belief in consent. (*People v. Mayberry, supra*, 15 Cal.3d at p. 153.)  Later cases established that a trial court also has a *sua sponte* duty to give such an instruction whenever there is substantial evidence supporting the defense and the defense is not inconsistent with the defendant's theory of the case. (*People v. Castillo* (1987) 193 Cal.App.3d 119, 125-126; *People v. Burnham* (1986) 176 Cal.App.3d 1134, 1139-1149; *People v. Rivera* (1984) 157 Cal.App.3d 736, 739, 740-744; *People v. Hampton* (1981) 118 Cal.App.3d 324, 328-330.)

**B.       There Was Substantial Evidence to Support the**
**          *Mayberry* Instruction**

If the defense requests an instruction on a particular defense or a lesser included offense, an instruction must be given so long as there is substantial evidence in support of the defense or lesser included crime. (*People v. Wickersham* (1982) 32 Cal.3d 307, 324, overruled on another point in *People v. Barton* (1995) 12 Cal.4th 186, 200.)  Importantly, doubt as to the sufficiency of the evidence must be resolved in favor of the defendant. (*People v. Flannel* (1979) 25

29

Cal.3d 668, 684-685.) Moreover, even if the evidence in support of
the instruction is "incredible," the reviewing court must proceed on
the hypothesis that it is entirely true. *(People v. Burnham* (1986) 176
Cal.App.3d 1134, 1143, relying on *People v. Modesto* (1963) 59
Cal.2d 722, 729.)

Here, the jury was instructed pursuant to CALJIC No.
1.23.1 on actual consent as a defense to rape. (CT 394, RT 782.) A
natural corollary of the theory of actual consent is a defendant's
reasonable and good faith belief in consent. (See *People v. Giardino*
(2000) 82 Cal.App.4th 454, 471 [ A defendant s honestly and
reasonably held but erroneous belief that the victim actually
consented to sexual intercourse is a defense to a charge of forcible
rape. ], citing *People v. Williams* (1992) 4 Cal.4th 354, 360-361;
*People v. Mayberry, supra,* 15 Cal.3d at p. 155.)

Thus, a trial court is obliged sua sponte to instruct on this
alternative theory if the theory is supported by substantial evidence
that the defendant actually believed the sex act was consensual and
the alleged victim engaged in conduct that was sufficiently equivocal
in regard to consent that the defendant reasonably believed there was
consent. *(People v. Mayberry, supra,* 15 Cal.3d at pp. 153-158;
accord *People v. Williams* (1992) 4 Cal.4th 354, 361, 364.)

In *People v. Williams, supra,* 4 Cal.4th 354, the California
Supreme Court held the *Mayberry* instruction need not be given
where the defense and prosecution accounts of the incident are
wholly divergent, resulting in no middle ground from which [the
defendant] could argue he reasonably misinterpreted the [complaining
witness s] conduct. *(Id.* at p. 362.)

In *Williams*, the defendant testified the alleged victim
initiated sexual conduct, fondled him to overcome his impotence,

30

and inserted his penis inside herself.  (*People v. Williams, supra,* 4 Cal.4th at p. 362.) The alleged victim, on the other hand, testified that the sex occurred only after the defendant blocked her, punched her, pushed her onto a bed, and warned her  he did not like to hurt people.  (*Ibid.*) The Supreme Court found the defendant s version of the events, if believed by the jury, supported only actual consent. (*Ibid.*) That is, if the woman acted as the defendant described, there could be no mistake about the fact she actually wanted to engage in sexual conduct.

While rejecting the *Mayberry* instruction in that particular case, the *Williams* court held, for the guidance of lower courts in the future, that the instruction must be given where there is substantial evidence of the alleged victim s  equivocal conduct  constituting a possible middle ground, and even though such equivocal conduct follows the defendant s exercise or threat of force, violence or fear. (*People v. Williams, supra,* 4 Cal.4th at p. 362.) *This case is such a middle-ground case.*

The record demonstrates that Jane Doe s conduct was equivocal about whether she wished to have sex with appellant.  To begin with, she took appellant s arm and allowed him to lead her to the taxicab at the BART Station.  When they arrived at the cab, appellant asked if Jane wanted him to come with her.  Though she testified she said no in response, she admitted that it was probably not loud enough for appellant to hear.  After appellant entered the cab with Jane, he told the driver he wanted to take his girlfriend home, referring to Jane.  Jane testified ambiguously that she both said nothing in response to this to either appellant or the cab driver and that she told the driver she was not appellant s girlfriend.  (RT 85-90, 317.)  She did not tell the cab driver that she did not know the man

31

with her or that she did not want him to go with her. After she and
appellant got into the cab, Jane told the taxi driver that she wanted to
go to 23rd and San Pablo. She did not tell him to take her directly to
her apartment, which could have been interpreted as wanting to stay
with appellant. (RT 316-317.)

During the ride in the taxi Jane made no protest to the cab
driver about appellant s presence. She did not communicate in any
way that she was concerned with appellant being in the taxi. She
testified that during the 10-15 minute taxi ride she and appellant rode
in silence, except that when appellant put his hand on her thigh, she
asked that he move his hand, which appellant did. Jane had a cell
phone, but did not use it in the taxi. (RT 90-92, 303, 305.) During
her first interview after the incident, Jane told Detective Sharp that
during the cab ride appellant had said to her, All right, baby. I ll
take you home. (RT 525.) She did tell Sharp she objected to this.

When Jane exited the taxicab at 23rd and San Pablo she let
appellant pay the $10 cab fare with his own money. (RT 93.) She
herself began walking and talking on the telephone to her friend in
Anaheim. She talked for about 10 minutes. (RT 93-94, 486.) She
did not call 911 nor is there evidence that she expressed any
reservations about her situation to her friend in Anaheim.

At some point appellant walked up to Jane and asked to see
her cell phone so he could talk to her friend and ask if she could meet
Jane. When Jane refused this request, appellant took the phone.
Jane s response was to make the ambiguous statement, Okay. That s
it. Fine. Then she simply walked away from appellant. (RT 96-97.)
At that point appellant took hold of her from behind and made her
walk with him for about 10 minutes. During the walk, the only thing
Jane said was to ask appellant where they were going. She did not

32

scream nor try to signal the cars she heard traveling along the street where they walked. (RT 101, 311-312.)

It was only on the Contra Costa College Campus field by the bleachers that Jane demanded that appellant let her go and started screaming and struggling with appellant. In the struggle she and appellant fell to the ground. Jane testified that appellant banged her head against a wall, though no injuries were noted to her head. (RT 100-103, 112, 312, 342-343.) He told her to get up and she did. He said he would leave her alone if she did what he asked her to do, which was to have sex with him. He proceeded to have intercourse with Jane, during which she asked him to please stop. (RT 103-106.)

After the first intercourse and after Jane had gotten dressed, appellant came back and said he was going to do it again. He put Jane's arm around his, similar to how he had done it back at the BART Station, and lead her to some bleachers, where he again had intercourse with Jane. Jane did not protest. She did tell appellant that she was afraid she would have a baby, to which appellant replied that he would take care of any baby. Jane asked appellant his name (he said it was "Riece") and she told him hers was "Lauren." (RT 107-111, 574.)

Jane Doe's behavior during these events can fairly be categorized as "equivocal." At first, she appeared to voluntarily accompany appellant in the cab to a location in San Pablo. She gave no noticeable protest to appellant coming with her or toward his initial verbal advances. Her actions in the cab were uncertain. She did not call the police or seek help from her friend either during the cab ride or after she got out of the cab. She acted ambiguously, by her behavior giving conflicting suggestions as to whether she wished to have sex with appellant. Even after appellant took hold of her and

33

walked with her toward the college, Jane s actions were less than certain about whether she was consenting to be with appellant. However, in the field at the college campus Jane became less equivocal. The jury clearly did not believe that Jane consented to have sex with appellant. Nevertheless, because of what preceded the actions on the field appellant could reasonably have believed that Jane had consented. On these facts, jurors could certainly find that there was equivocal conduct which supported the defense of a reasonable good faith belief that consent had been given.

*People v. Anderson* (1983) 144 Cal.App.3d 55 supports this conclusion. In that case the defendant picked up two girls hitchhiking. One got in the back seat with the defendant s four-year-old son, while the other took the front seat. The defendant started forcibly fondling the girl next to him and ordered her to orally copulate him. The girl in the back seat moved to the front at the behest of the other so that defendant would stop his use of force. The defendant said he had a gun. As he drove, he ordered them to disrobe and out of fear, they did. Eventually, he pulled into a parking lot and engaged in several sex acts with the two girls, including intercourse with each of them. When he dropped the girls off, he warned them that if they spoke to the police, he would come and kill them. (*Id.*, at pp. 58-59.) By its verdict, the jury obviously rejected the defendant s defense of actual consent. The trial court had refused to give the *Mayberry* instruction. (*Id.*, at p. 60.) The appellate court concluded that there was substantial enough evidence to have required the giving of the *Mayberry* instruction. There was evidence that the young women appeared to willingly remain in appellant's presence and consent to the sex acts. The one girl moved from the rear seat, a place of safety, to the front, and she was seated by the door to the

34

vehicle and did not attempt to escape, though the vehicle was traveling on city streets, in moderate traffic, and stopped at a number of traffic lights. (*Id.*, at pp. 61-62.) The court held the failure to give the *Mayberry* instruction was prejudicial error. While the jury decided the issue of actual consent adversely to appellant, that determination does not necessarily decide the issue of whether appellant reasonably believed the victims consented. The two defenses are separate. (*Id.*, at p. 63, citing *People v. Mayberry, supra*, 15 Cal.3d 143, 157-158.)

The court in *Anderson* also pointed out that it was not necessary for a defendant to have testified relative to the consent issue. Since a defendant's state of mind is most often shown through circumstantial evidence rather than his direct testimony, a defendant can establish sufficient circumstantial evidence other than by his testimony to require an instruction of his reasonable good faith belief on the question of consent. (*Ibid.*; *People v. DeLeon* (1992) 10 Cal.App.4th 815, 824.) Evidence of equivocal conduct on the part of a victim can come solely from the defendant's mouth, solely from the victim's mouth, or from a third party. (*People v. May* (1989) 213 Cal.App.3d 118, 125.) In the instant case, appellant did not testify, but the direct and cross-examination of Jane Doe as well as other circumstantial evidence was sufficient to establish appellant's state of mind of a reasonable good faith belief.

*People v. May, supra,* 213 Cal.App.3d 118 also supports the conclusion that the jurors could have found the equivocal conduct to support the defense of a reasonable good faith belief that consent had been given. There, a woman went to the defendant's home after meeting him in a bar. When the defendant told her to disrobe, the woman grabbed a steak knife and told him "no." When the defendant

35

disarmed her and slapped her, the woman went to the bedroom and took off her clothes. When the couple got on the bed, the woman tried to roll off. Oral copulation was then performed. On these facts, the Court of Appeal found there was ample evidence of equivocal conduct by the woman. (*Id.*, at pp. 125-126.)

Here, a similar situation is presented. Like the woman in *May*, Jane Doe gave indications she willingly traveled with appellant. However, after the taxi ride and particularly at the college campus, she signaled that she did not want to have sex (i.e. she started screaming that appellant should let her go and she struggled with appellant). However, like the woman in *May*, she arguably put aside her initial reluctance and voluntarily submitted to having intercourse. And after the initial sexual contact, during the second intercourse she did not resist or protest. Though this pattern of Jane Doe s conduct was not sufficient to convince the jury that there had been consent, it was certainly "equivocal" enough to require the court to instruct with CALJIC No. 10.65. (*People v. May, supra,* 213 Cal.App.3d at pp. 125-126.)

It was for the jury to decide whether or not Jane Doe s equivocal conduct was the product of the physical force or violence or of fear, such that the mistake-of-fact defense should be disallowed, or whether it warranted acquittal on the rape count. (See *People v. Williams, supra,* 4 Cal.4th at p. 364; see also CALJIC No. 10.65.) The jury is permitted to credit some portions of a witness s testimony, and not credit others. (*People v. Williams, supra,* 4 Cal.4th at p. 364.) The jury could believe Jane - - that all her actions were the result of force and violence and fear engendered by appellant- - or could believe the circumstantial evidence of her vague, ambiguous or equivocal behavior - - that she in the taxi and walked willingly with

36

appellant and at that he could reasonably have believed they engaged in sexual relations that were not forced.

Thus, the jury could find appellant assaulted Jane Doe, but still find he reasonably and mistakenly believed she had consented to the sexual intercourse and sexual penetration. The requested CALJIC No. 10.65 would have provided an opportunity for the jurors to make that finding. As it was, under the instructions given the only option the jury had to acquit was to find actual consent. The court therefore erred in failing to instruct the jury on reasonable mistaken belief in consent.

## C.  Prejudice

The trial court's failure to give the mistake-of-fact defense instruction of CALJIC No. 10.65 requires per se reversal. The controlling rule is that the omission to instruct on an affirmative defense constitutes reversible error unless "the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions." [Citation.]  (*People v. Stewart* (1976) 16 Cal.3d 133, 141; accord, *People v. Lee* (1987) 43 Cal.3d 666, 675, fn. 1.)[5]

In the instant case, the jury was not given any instruction on the subject of reasonable good faith belief in consent. Thus, reversal is compelled. (*People v. May, supra,* 213 Cal.App.3d 118, 128; [a]lthough the jury resolved the issue of <u>actual</u> consent against May, that determination says nothing about how they would have resolved

---

[5] At least two Court of Appeal opinions have said that the failure to instruct on a defense does not require reversal per se. (*People v. Gonzales* (1999) 74 Cal.App.4th 382, 391; *People v. Elize* (1999) 71 Cal.App.4th 605, 616.) However, these cases cannot be followed since this court is required to adhere to the rule stated by the state Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

the issue of <u>reasonable belief</u> in consent, since they were never asked to consider it. [Citations.], emphasis in original.)

Importantly, the instructional error impacts on both counts of rape and on the forcible sexual penetration count. Thus, these three counts must be reversed. (*May, supra,* 213 Cal.App.3d at pp. 128-129; failure to instruct on the defense of reasonable good faith belief required reversal of oral copulation conviction and conviction for assault with intent to commit rape.)

Aside from California law, per se reversal is required under the due process clause of the federal Constitution. In *United States v. Escobar De Bright* (9th Cir. 1984) 742 F.2d 1196, the defendant was charged with the conspiracy to sell drugs. Although there was substantial evidence that the defendant had conspired with a government agent, the trial court refused to instruct the jury on the defendant's theory that a conspiracy conviction cannot be found where the only co-conspirator is a government agent. After finding that the instruction should have been given, the Court of Appeals held that the error was reversible per se:

> "The right to have the jury instructed as to the defendant's theory of the case is one of those rights so basic to a fair trial that failure to instruct where there is evidence to support the instruction can never be considered harmless error. Jurors are required to apply the law as it is explained to them in the instructions they are given by the trial judge. They are not free to conjure up the law for themselves. Thus, a failure to instruct the jury regarding the defendant's theory of the case precludes the jury from considering the defendant's defense to the charges against him. Permitting a defendant to offer a defense is of little value if the jury is not informed that the defense, if it is believed or if it helps create a reasonable doubt in the jury's mind, will entitle the defendant to a judgment of acquittal." (*Escobar De Bright, supra,* 742 F.2d at pp. 1201-1202.)

38

Notably, the analysis in *Escobar De Bright* is entirely consistent with that which has been subsequently posited by the United States Supreme Court. In this regard, the court has indicated that per se reversal is required when an error vitiates <u>all</u> the jury's findings. (*Sullivan v. Louisiana, supra*, 508 U.S. 275, 281, emphasis in original.) Or, stated otherwise, per se reversal is compelled when the consequences of an error "are necessarily unquantifiable . . . ." (*Id.*, at p. 282; accord, *Neder v. United States* (1999) 527 U.S. 1 [144 L.E.2d 35, 48].) Since it is impossible to know whether a jury would have accepted a defense which it never had occasion to consider, the conclusion is inescapable that the effect of the instructional omission is "necessarily unquantifiable." (See *Conde v. Henry, supra*, 198 F.3d 734, 740-741; structural error found where the defense was precluded from presenting its "theory of the case;" *United States v. Sarno* (9th Cir. 1995) 73 F.3d 1470, 1485; "failure to instruct a jury upon a legally and factually cognizable defense is not subject to harmless error analysis. [Citations.]")

Assuming arguendo that this court should find that error occurred solely under state law and is not entitled to per se reversal, the question is whether there is a reasonable probability that an acquittal would have been returned absent the error. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) Under *Watson*, a reasonable probability does not mean more likely than not, but merely <u>a reasonable chance</u>, more than an <u>abstract possibility</u>. [Citations.] (*College Hospital, Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715, emphasis in original; see also *People v. Blakely* (2000) 23 Cal.4th 82, 93.) Thus, prejudice must be found under *Watson* whenever the defendant can undermine confidence in the result achieved at trial. (*College Hospital, Inc. v. Superior Court, supra*, 8 Cal.4th 704,

715.)

It is manifest that prejudice must be found in this case. The
case was factually fairly simple, with the actual presentation of
evidence lasting four days (including two half days). (RT 217-226,
231-234.) Yet the jury deliberated for a total of approximately
thirteen hours over four days. (CT 234-243.) Given this objective
indication that the case was close, reversal is mandated. (*People v.
Cardenas, supra,* 31 Cal.3d 897, 907; six hours of deliberations is
evidence of a close case.)

Another indication of the close nature of the case were the
jury s requests for readbacks of testimony. On the first day of
deliberations the jury requested that it be allowed to receive Jane
Doe s January 22, 2003, interview with Detective Sharp, as well as
receive copies of the transcript of the interview. The jury also asked
to examine all other evidence. (CT 468.) On the third day of
deliberations the jury requested a readback of all of Jane Doe s
testimony. (CT 473.) Crucially, later the same day the jury requested
a readback of part of the cross examination of the SART nurse,
Louise Jones,  starting with the cross-examination by the Defense
Attorney of Louise Jones regarding whether or not the injuries
sustained on [Jane Doe s] genitalia could have been caused by
normal  sex, to the end of her testimony.  (CT 476.) This request
indicates that the jury was closely considering whether or not the
sexual relations between appellant and Jane Doe had been
consensual. Even if a jury eventually convicts the defendant, its
requests for additional instructions or the readback of testimony may
establish that the case was a close one. (*People v. Pearch* (1991) 229
Cal.App.3d 1282, 1295; "[j]uror questions and requests to have
testimony reread are indications the deliberations were close.

40

[Citations.]"; *People v. Williams* (1971) 22 Cal.App.3d 34, 38-40; request for readback of critical testimony.)

Moreover, the jurors in this case reported on the fourth day that they were deadlocked, also indicating a close case. The court inquired whether they had reached verdicts on any of the counts, and the presiding juror wrote that they had, but only on one count. (CT 478.) The court decided to have the jurors put the written verdict form that related to the count they had decided into a sealed envelope for the court's safekeeping. (RT 925-926.) Since the two rape and the sexual penetration charges were all interconnected, it is unlikely that before it reported it was deadlocked the jury had decided any of those counts.[6] It was only after the court interviewed the jury and found out from the jurors that several believed additional instruction would be helpful and then reread certain of the instructions and ordered them back into the jury room for further deliberations that the jury resolved its deadlock and returned verdicts on all counts. Requests for additional instruction is another indication of a close case and points to prejudice in the failure to give the requested instruction. (*People v. Filson* (1994) 22 Cal.App.4th 1841, 1852.)

The jury was obviously troubled by the case. This court is required to take heed. (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279; harmless error analysis requires an appellate court to look at the impact of an error on the jury.)

The jury had trouble with coming to a verdict even in the

---

[6]
Since the jury had sent a specific note about the count five robbery, asking whether if they found appellant not guilty on robbery they had to make a decision as to both of the lesser counts (CT 474), and since the jury ultimately found appellant not guilty of robbery, but guilty of both lesser crimes (CT 503-505), it is likely that the verdict they reached before they reported they were deadlocked was on count five.

41

face of a very sympathetic young blind victim. But the ambiguous conduct of Jane Doe made it entirely reasonable for appellant to have believed that she wished to have sex with him. Thus, there is certainly a substantial possibility that the jury would have accepted the defense of reasonable good faith belief in consent had an appropriate instruction been given. (*College Hospital, Inc. v. Superior Court, supra,* 8 Cal.4th 704, 715.)

As has been shown above, the trial court prejudicially erred by failing to instruct the jury on the defense theory of reasonably good faith belief in Jane Doe's consent, which was supported by substantial evidence. Such being the case, the judgment on counts one, two and three must be reversed.

**II.     SINCE THE COURT FAILED TO INSTRUCT THE JURY REGARDING ESSENTIAL ELEMENTS RELATING TO THE APPLICABILITY OF SECTION 667.61, APPELLANT'S ONE STRIKE LIFE SENTENCE MUST BE STRICKEN**

**A.     Facts/Introduction**

Appellant was sentenced to an indeterminate term of 25 years to life for the count one conviction of forcible rape (section 261, subdivision (a)(2)) of Jane Doe under the so-called "One Strike Law." (CT 566-567; *People* v. *Rayford* (1994) 9 Cal.4th 1, 8 [section 667.61 is commonly known as the "One Strike" law].) Appellant contends that the 25-years-to-life sentence imposed must be stricken, because the jury was inadequately instructed regarding crucial elements of this penalty statute, thereby abridging his right to trial by jury. (See, *Apprendi* v. *New Jersey* (2000) 530 U.S. 466.)

The One Strike law imposes life imprisonment upon conviction for certain sex crimes committed under specified

42

conditions, even if the offender has no prior convictions. Section 667.61, subdivision (a) provides that a person convicted of particular offenses detailed in subdivision (c), including forcible rape and forcible sexual penetration, under at least one circumstance detailed in subdivision (d) is to be imprisoned for life and not be eligible for parole for 25 years, with good time credits of no more than 15 percent. (Section 667.61, subdivisions (a), (c) and (j).) Among the circumstances detailed in subdivision (d) are that the defendant kidnapped the victim of the present offense and the movement of the victim substantially increased the risk of harm to the victim over and above that level of risk necessarily inherent in the underlying offense in subdivision (c). (Section 667.61, subdivision (d).)

The One Strike law requires that for its penalty provisions to apply, the existence of any fact required under subdivision (d) or (e) shall be alleged in the accusatory pleading and either admitted by the defendant in open court or found to be true by the trier of fact. (Section 667.61, subdivision (i).) In the instant case the information alleged pursuant to subdivisions (a) and (d) of Penal Code section 667.61, that in the commission of each and/or all of the above offenses the Defendant, Jermaine Lavarius McCord, kidnapped Jane Doe and the movement of Jane Doe substantially increased the risk of harm to Jane Doe, over and above the level of risk necessarily inherent in each and/or all of the above offenses. [7] (CT 72.)

The jury was instructed regarding its obligation to make a finding relative to the section 667.61 allegation as follows:

---

[7]

This allegation, though worded to apply to all five counts, clearly was not applicable to the count four kidnaping and the count five robbery, since they are not sex offenses enumerated in section 667.61, subdivision (b). However, this error was rectified by not submitting to the jury the applicability of 667.61 to these counts. (CT 368, 491-505.)

43

It is further alleged that at the time of the
commission of the crimes charged in Counts One
Two and Three, that the defendant committed a
kidnapping that substantially increased the risk of
harm to the victim.

If you find defendant guilty of the crimes
charged in Counts One, Two and Three, you must
determine whether or not the truth of this
allegation has been proved. The People have the
burden of proving the truth of this allegation.

If you have a reasonable doubt that it is true,
you must find it to be not true. Include a special
finding of that question, using a form that will be
supplied to you. (CT 368; RT 800.)

Appellant contends that this inadequate instruction
particularly its first paragraph omitted key elements of the One
Strike sentencing scheme. Section 667.61, subdivision (d)(2) requires
that a kidnapping be of the victim of the present offense. It further
requires that the movement of the victim be what substantially
increases the risk of harm to the victim. Further, the rather vague
term risk of harm to the victim is qualified as being that which is
over and above that level of risk necessarily inherent in the
underlying offenses, which in this case were the two rape counts and
the charge alleging digital penetration.

Thus, the instruction regarding section 667.61 given in this
case did not specify that the jury should examine what had been
specifically alleged in the information, nor did it lay out all of the
considerations that the jury had to decide. The instruction did not
specify that it had to be the actual movement of Jane Doe that

44

substantially increased the risk of harm to her. And it did not specify that the definition of the risk of harm was not just any risk, but that risk of harm which was over and above the normal risk which is necessarily inherent in the offenses of rape and/or sexual penetration without the movement.

A proper instruction on the One Strike allegation would have included the following italicized wording which should have been added by the court to the first paragraph of the above instruction that was actually read to the jury:

> It is further alleged that at the time of the commission of the crimes charged in Counts One, Two and Three, that the defendant committed a kidnapping [*of Jane Doe and that the movement of Jane Doe by defendant*] substantially increased the risk of harm to [*Jane Doe over and above that level of risk necessarily inherent in the underlying offense of rape charged in Counts One and Three and/or the underlying offense of forcible sexual penetration charged in Count Two.*]

**B.      The Court Had The Sua Sponte Obligation To Instruct the Jury on the One Strike (Section 667.61) Principles of Law**

"Even in the absence of a request, a trial court must instruct on general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case. [Citation.]" (*People* v. *Mayfield* (1997) 14 Cal.4th 668, 773.) More specifically, there is a *sua sponte* duty to instruct on the elements of the One Strike circumstances. (*People v. Jones* (58 Cal.App.4th 693, 709; *People v. Estrada* (1997)

45

57 Cal.App.4th 1270, 1275.)

A defendant has a constitutional right to have the jury determine every material issue presented by the evidence, and a denial of that right constitutes a miscarriage of justice regardless of the strength of the prosecution's case. (*People* v. *Reynolds* (1988) 205 Cal.App.3d 776, 779 (citations omitted.).) The trial court must ensure that the instructions adequately state the law and adequately assist the jury in resolving the issues addressed by the instructions. (*People* v. *Kay* (1984) 153 Cal.App.3d 888, 898.) This is true regardless of whether the instruction pertains to a crime, a defense, an enhancement, or a "penalty provision." In this regard, the United States Supreme Court has written:

> The question whether Apprendi had a constitutional right to have a jury find such [racial] bias [which will increase his sentence for the crime charged] on the basis of proof beyond a reasonable doubt is starkly presented. [¶¶] Our answer to that question was foreshadowed by our opinion in *Jones* v. *United States*, 526 U.S. 227 (1999), construing a federal statute. We there noted that "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Id.*, at 243, n. 6. The Fourteenth Amendment commands the same answer in this case involving a state statute...
> Merely using the label "sentence enhancement" to describe the latter surely does not provide a principled basis for treating them differently. [¶¶] At stake in this case are constitutional protections of surpassing importance: the proscription of any deprivation of liberty without "due process of law," Amdt. 14, and the guarantee that "[i]n all criminal prosecutions, the accused shall enjoy the right to a

46

speedy and public trial, by an impartial jury,"
Amdt. 6.[fn. omitted] Taken together, these rights
indisputably entitle a criminal defendant to "a jury
determination that [he] is guilty of every element
of the crime with which he is charged, beyond a
reasonable doubt." *United States v. Gaudin*, 515
U.S. 506, 510 (1995); see also *Sullivan v.
Louisiana*, 508 U.S. 275, 278 (1993); (*In re
Winship* (1970) 397 U.S. 358, 364 ("[T]he Due
Process Clause protects the accused against
conviction except upon proof beyond a reasonable
doubt of every fact necessary to constitute the
crime with which he is charged."). (*Apprendi v.
New Jersey, supra,* 530 U.S. at pp. 475-477.). . .

If a defendant faces punishment beyond that
provided by statute when an offense is committed
under certain circumstances but not others, it is
obvious that both the loss of liberty and the stigma
attaching to the offense are heightened; it
necessarily follows that the defendant should not--
at the moment the State is put to proof of those
circumstances--be deprived of protections that
have, until that point, unquestionably attached.
(*Apprendi* v. *New Jersey, supra,* 540 U.S. at pp. 483-484.)

Under the unequivocal language of *Apprendi*, a jury
instruction was required in appellant's trial on not just whether or not
at the time of the commission of the sex crimes charged he committed
a kidnapping that substantially increased the risk of harm to a victim,
but also whether or not the kidnapping resulted in movement to Jane
Doe and the movement itself caused a substantial increase in the risk
of harm to her over and above the risk of harm that would otherwise
necessarily have been suffered by her in a rape or sexual penetration
that would have occurred without the movement. Since the
legislature has defined the penalty by resort to these specific factors,
under the *Apprendi* analysis, these issues must be submitted to the
jury. The instruction actually given failed to do this and therefore

47

was erroneous.

## C. Reversal Of Appellant's Conviction Is Required Because The Prosecution Cannot Prove Beyond A Reasonable Doubt That The Error Did Not Contribute To the Result Obtained

[E]xcept for sentence enhancement provisions that are based on a defendant's prior conviction, the federal Constitution requires a jury to find, beyond a reasonable doubt, the existence of every element of a sentence enhancement that increases the penalty for a crime beyond the "prescribed statutory maximum" punishment for that crime. (*Apprendi v. New Jersey, supra*, 530 U.S. at p. 490.) Therefore, a trial court's failure to instruct the jury on an element of a sentence enhancement provision (other than one based on a prior conviction), is federal constitutional error if the provision "increases the penalty for [the underlying] crime beyond the prescribed statutory maximum." (*Ibid.*) Such error is reversible under *Chapman* v. *California* (1967) 386 U.S. 18, 24, unless it can be shown "beyond a reasonable doubt" that the error did not contribute to the jury's verdict. (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 326.) The burden is on the beneficiary of the error "either to prove that there was no injury or to suffer a reversal of his erroneously obtained judgement." (*Chapman v. California* (1967) 386 U.S. 18, 23-24.)

"The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279, emphasis in the original.) "The *Chapman* test is whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' "To say

48

that an error did not contribute to the verdict is ... to find that error unimportant in relation to everything else the jury considered on the issue in question...." (*Yates v. Evatt* (1991) 500 U.S. 391, 402-403; accord, *Sullivan v. Louisiana, supra,* 508 U.S. 275, 279.)

In the present case, the prosecution is unable to meet the *Chapman* burden. The question of whether Jane Doe was in fact kidnapped and the extent of any movement were key issues that were contested in the trial. In her recorded interview with the investigating detective, Jane did not talk about being held or forced or dragged or kidnapped, a fact emphasized by appellant's trial counsel in his argument to the jury. (Exhibit E1; RT 866.) At other times Jane characterized the amount of force that allegedly was used by appellant variously as being grabbed or held or directed. In her direct testimony she at first indicated that as soon as appellant contacted her after she had alighted from the taxicab at 23rd and San Pablo, and before they walked anywhere, she screamed and he covered her mouth and they fell to the gourd where he banged her head against the ground. (RT 98.) In her cross-examination, however, she changed her story and admitted that it was only after they had arrived at the college campus that she and appellant fell to the ground and she hit her head and that it was only then that she started screaming. (RT 309-314.) Defense counsel argued that partly because of her contradictory statements and partly because of her motivation to make up a story in order not to get in trouble with her Living Skills program, Jane Doe was possibly lying and was at least an unreliable and not credible witness. (RT 858-860.)

The testimony was that the incident occurred late at night. Jane Doe testified that when she and appellant were walking toward the college campus she did not hear any other pedestrians and heard

49

only a few automobiles. (RT 99.) There was no evidence about the lighting conditions at the intersection of 23rd and San Pablo, where Jane and appellant got out of the taxi. There was evidence that the athletic field where the custodian found Jane later in the night was fairly dark, but also that every other light was still on at the field. There were lights on in some of the adjoining parking lots and street lights along El Portal Drive next to the athletic field. (RT 73-76.) Whether it was darker in the athletic field than on the street where the pair got out of the taxicab was not clear. There was no testimony from the investigating officer comparing these locations.

A correctly-given jury instruction would have focused the jury on the critical issue of the alleged movement of Jane Doe and whether any such movement by appellant substantially increased the risk to her over and above what it would have been had she been raped right after she got out of the taxi.  [T]he risk of harm element focuses on the movement of the victim during the kidnapping, and the resulting risk of harm. The jury is to consider such factors as the decreased likelihood of detection, the danger inherent in a victim's foreseeable attempts to escape, and the attacker's enhanced opportunity to commit additional crimes. (See, e.g., *People v. Lara* [(1974)] 12 Cal.3d [903,] 908 & fn. 4 [examples of such risk of harm 'include not only desperate attempts by the victim to extricate himself but also unforeseen intervention by third parties']; *In re Earley* [(1975)] 14 Cal.3d [122,] 132 [ asportation gave rise to dangers, not inherent in robbery, that an auto accident might occur or that the victim might attempt to escape from the moving car or be pushed therefrom by [defendant] ); cf. *People v. Caudillo* (1978) 21 Cal.3d 562, 574 ... [aggravated kidnapping includes review of such factors as 'the defendant's motivation to escape detection' and 'the possible

enhancement of danger to the victim resulting from the movement.'].)  (*People v. Rayford* (1994) 9 Cal.4th 1, 13-14.) (*People v. Jones, supra,* 58 Cal.App.4th at p. 713.)

The risk of harm accompanying the crime of rape is high in itself.  To prove the One Strike elements of kidnapping and movement and the required substantial increase in that risk, the risk of harm must therefore be very high indeed.  In most cases to establish such an increase in risk the prosecution must prove that the perpetrator removed the victim to a secluded secondary location where privacy affords the perpetrator great control and the victim very little.  (*People v. Rayford* (1994) 9 Cal.4th 1, 24, Mosk, J., dissenting.)  The jury should have been focused by the jury instructions on whether the movement involved in any kidnapping that occurred substantially raised the risk of harm over and above that which would have been inherent in a rape at the original location.

The jury obviously struggled with its decision about the kidnapping and the sexual crimes, reporting on the fourth day of deliberations before the court re-instructed them that they were hopelessly deadlocked on all except one count.  (RT 478; See fn. 6 *infra* for an analysis showing that the deadlock was on the kidnapping and sex crimes counts.)  A properly instructed jury would have been able to determine that there was significant risk of harm in any rape or sexual penetration in the first instance and that, though appellant should be fund guilty of the sex crimes, the actual movement of Jane Doe in any kidnapping did not substantially increase the necessarily inherent risk of harm in rape and sexual penetration.  But because of the faulty instruction on the One Strike charge, the jury was denied the opportunity to make that determination.

The jury should have been given the chance to decide

whether any movement of Jane Doe by appellant substantially increased the risk of harm to her over and above the level of risk necessarily inherent in the underlying offenses of rape or sexual penetration. The error was not harmless beyond a reasonable doubt. It cannot be demonstrated beyond a reasonable doubt that an acquittal or at least a hung jury would not have resulted if the jury had been fully instructed with all the elements of the statute that the prosecution had to prove. That is, it cannot be shown that a properly instructed jury would not have come to a different conclusion about appellant's culpability under the One Strike law. (*Chapman v. California, supra*, 386 U.S. at p. 24.)

### III.    THE ONE STRIKE SENTENCING FINDINGS UNDER PENAL CODE SECTION 667.61 SHOULD BE STRICKEN, SINCE THERE WAS INSUFFICIENT EVIDENCE THAT ANY MOVEMENT FROM THE KIDNAPPING SUBSTANTIALLY INCREASED THE RISK OF HARM TO JANE DOE

The determination by the jury that the One Strike sentencing provision of section 667.61 was true in relation to the rape and sexual penetration charges rest on insufficient evidence. The statute at issue, section 667.61, subdivision (d)(2), reads in pertinent part as follows: "The defendant kidnapped the victim of the present offense and the movement of the victim substantially increased the risk of harm to the victim over and above that level of risk necessarily inherent in the underlying offense ...." The plain wording of this sentencing scheme required the jury to find two elements: (1) a kidnapping; and (2) movement of the victim that results in a substantial increase in the risk of harm over and above that which is necessarily inherent in the crimes of rape and sexual penetration.

52

To determine a claim of insufficient evidence, an appellate court must ascertain whether, on the entire record, there is substantial evidence from which a reasonable trier of fact could have found the elements of the crimes charged beyond a reasonable doubt. (*People v. Miranda* (1987) 44 Cal.3d 57, 86; *People v. Johnson* (1980) 26 Cal.3d 557, 576-578.) In making this determination, the reviewing court "'must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [citations]" (*People v. Johnson, supra*, 26 Cal.3d at p. 576.) The task is twofold: first, to resolve the issue in the light of the whole record; second, to judge whether the evidence of each of the essential elements of the charged offense is substantial. (*Id.*, at p. 577.)

Evidence is substantial if it is "of ponderable legal significance...reasonable in nature, credible of solid value. [citations]" (*Id.*, at 576.) The evidence must consist of more than a mere possibility that something happened to be considered substantial. (*People v. Houts* (1978) 86 Cal.App.3d 1012, 1019.)

[K]idnapping within the meaning of section 667.61, subdivision (d)(2) requires movement of the victim that is more than incidental to the underlying sex offense. (*People v. Diaz* (2000) 78 Cal.App.4th 243, 246.) However, the California Supreme Court has observed that there is no minimum distance a defendant must move a victim. The Court has held that the question of whether the movement was incidental to the commission of the underlying crime is to be considered in the whole context of the environment in which the movement occurred. (*People v. Rayford, supra*, 9 Cal.4th at p. 12.)

In the instant case, the evidence shows that appellant rode

with Jane Doe in the taxicab to 23rd and San Pablo. He paid for the
cab as Jane left it and began walking home and talking on her cell
phone. Appellant then came up to her as she walked and talked. He
engaged her in conversation about her phone. He took the phone
from her and she acquiesced. He took hold of her and apparently
made her walk with him. They walked approximately 10 minutes to
an athletic field on the edge of the college campus. There was some
vehicle traffic along the way, but Jane did not notice any pedestrian
traffic. If the jury thought that the kidnapping began on the street
near 23rd and San Pablo, given that environment and the place where
appellant ended up with Jane, there does not appear to be sufficient
evidence that the movement of Jane itself substantially increased the
risk of harm to her.

    Regarding the element of a risk of harm beyond that
inherent in the underlying sexual offenses: The risk of harm test is
satisfied when the victim is forced to travel a substantial distance
under threat of imminent injury by a deadly weapon. [Citation.] (*In
re Earley, supra,* 14 Cal.3d at p. 131, fn. omitted.) In the present case
there was no threat by a weapon. After riding in the taxi with Jane,
appellant approached her after they got out of the taxi and inquired
about her conversation with her friend in Anaheim. He took the
phone from her hand. He placed one hand around her middle and the
other hand on her shoulder and moved with her about 10 minutes
toward the college campus. (RT 309.) Jane did not verbally protest
as they walked. She asked where they were going and appellant
replied that he was taking her to a bus stop. (RT 311.) There was
never any evidence presented of a verbal threat or threat with a
weapon during the movement from the initial location to the college
athletic field. (Cf., *People v. Jones, supra,* 58 Cal.App.4th at p. 718;

sufficient evidence of one strike circumstance where defendant used gun to kidnap and then do sex crimes to victim.)

There was not substantial evidence in the instant case about the different lighting in the location where appellant first took hold of Jane Doe at the intersection of 23rd and San Pablo and the location of the purported sexual assaults. The athletic field at the community college had approximately half its lights on at that time of night and parking lots and streets in the areas apparently were lighted. The lighting question affects the sufficiency of evidence of increased risk of harm as well. This is not like the case of *People v. Diaz, supra,* 78 Cal.App.4th at p. 249, where the court found substantial evidence of increased risk of harm where the victim was accosted at night at a well-lighted intersection and then forcibly taken to an area that was completely dark. In *Diaz,* the court opined that [c]learly, the risk to the victim in the dark and isolated location of the attack increased significantly as compared to the lighted sidewalk near the bus stop where the incident began. (*Ibid.*)

Even though it is not clear that this is what occurred in the present case, it should be noted that acts of removing a victim from public view do not in themselves substantially increase risk of harm to the victim, though such acts are a circumstance to be considered in determining whether the risk of harm substantially increased. (*In re Earley, supra,* 14 Cal.3d at 133.)

In the instant case, the evidence of the essential elements of the One Strike allegations were not of solid enough value to support the jury finding that the movement of Jane Doe in any kidnapping substantially increased the risk of harm to her over and above the level of risk necessarily inherent in the underlying crimes of rape and sexual penetration. Accordingly, the jury finding of the truth of these allegations must be stricken.

IV. **APPELLANT'S 25-YEARS-TO-LIFE SENTENCE UNDER THE ONE STRIKE SENTENCING SCHEME VIOLATES FEDERAL AND STATE CONSTITUTIONAL PROHIBITIONS AGAINST CRUEL AND/OR UNUSUAL PUNISHMENT AND SHOULD THEREFORE BE REDUCED**

I. **The Applicable Standards**

### 1. Federal Standard

The Eighth Amendment to the United States Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted." A punishment is excessive in violation of the Eighth Amendment if it is "grossly out of proportion to the severity of the crime." (*Gregg v. Georgia* (1976) 428 U.S. 153, 173.)

The cruel and unusual punishment clause of the Eighth Amendment prohibits the imposition of a penalty that is disproportionate to the defendant's personal responsibility and moral guilt. (*Enmund v. Florida* (1982) 458 U.S. 782, 801.) In *Solem v. Helm* (1983) 463 U.S. 277, the United States Supreme Court found the imposition of a life sentence without the possibility of parole for a seventh nonviolent felony to be unconstitutional under the Eighth Amendment. A majority of the Supreme Court held: [A] court's proportionality analysis under the Eighth Amendment should be guided by objective criteria, including (i) the gravity of the offenses and the harshness of the penalty; (ii) the sentence imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for the commission of the same crime in other jurisdictions. (*Id.*, 463 U.S. at p. 292.)

A few years later, the Supreme Court decided *Harmelin v. Michigan* (1991) 501 U.S. 957 and upheld the imposition of a life sentence without possibility of parole for a defendant who possessed over one and a half pounds of cocaine. Harmelin produced five

separate opinions. While seven justices supported a proportionality review under the Eighth Amendment, only four favored application of all three factors cited in *Solem*. In *Harmelin*, Justice Scalia, joined by Chief Justice Rehnquist, concluded *Solem* was wrongly decided and that the Eighth Amendment contained no proportionality guarantee. *(Harmelin v. Michigan, supra,* 501 U.S. at p. 1001.) Justice Kennedy, joined by Justices Souter and O'Connor, found that the Eighth amendment encompasses a narrow proportionality principle *(Id.,* 501 at p. 997) and does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are grossly disproportionate to the crime. *(Id.,* 501 U.S. at p. 1001.)

Utilizing this restrictive analysis, Justices Souter, O Connor and Kennedy determined that Harmelin s sentence was not grossly disproportionate to his crime. *(Id.,* 501 U.S. at 1004-1005.) Noting that the defendant possessed a large quantity of cocaine with a potential yield of between 32,500 and 65,000 doses, and the [p]ossession, use and distribution of illegal drugs represent one of the greatest problems affecting the health and welfare of our population, these justices also concluded that petitioner s crime threatened to cause grave harm to society. *(Id.,* 501 U.S. at p. 1002.)

The United States Supreme Court again used the "grossly disproportionate test" in deciding whether a forfeiture was an excessive fine under the Eighth Amendment. In *United States v. Bajakajian* (1998) 524 U.S. 321, customs inspectors found that Bajakajian was preparing to board an international flight without reporting, as required by federal law, that he was transporting more than $10,000. In fact, Bajakajian attempted to leave the country with $357,144, which the government sought to seize as an instrumentality of the crime. *(Id.,* 524 U.S. at pp. 324-325.)

To analyze the situation in *Bajakajian*, the Supreme Court

looked to its past interpretations of the Eighth Amendment, relying on the precedents set forth in *Solem v. Helm, supra,* 463 U.S. 277, and *Rummel v. Estelle* (1980) 445 U.S. 263, 271. The Court held that a forfeiture is unconstitutional if it is grossly disproportionate to the gravity of the defendant's offense. (*United States v. Bajakajian, supra,* 524 U.S. 321.) Applying this test, the *Bajakajian* court found that the forfeiture of $357,144 was grossly disproportionate to petitioner's crime of failing to report currency. (Id., 524 U.S. at pp. 339-340.)

Thus, in determining whether a defendant's sentence is cruel and unusual under the Eighth Amendment, one must only consider the first factor enumerated in *Solem* and again in *Bajakajian* the gravity of the offense and the harshness of the penalty. Nonetheless, comparative analyses of sentences may be considered "to validate an initial judgment that a sentence is grossly disproportionate to the crime." (*Harmelin v. Michigan, supra,* 501 U.S. at p. 1005.)

### 2. California Standard

The Eighth Amendment's ban on cruel and unusual punishment is made obligatory on the states through the Fourteenth Amendment. (*Robinson v. California* (1962) 370 U.S. 660.) Article I, section 17 of the California Constitution separately and independently sets out a prohibition similar to the Eighth Amendment. (*People v. Dillon* (1983) 34 Cal.3d 441, 478.)

Analysis of whether a sentence imposes cruel or unusual punishment begins with a recognition that "in our tripartite system of government it is the function of the legislative branch to define crimes and prescribe punishments, and that such questions are in the first instance for the judgment of the Legislature alone." (*In re Lynch* (1972) 8 Cal.3d 410, 414; citations omitted.) Although the Legislature is accorded "the broadest discretion possible in enacting

penal statutes and in specifying punishment for crime, . . . the final judgment as to whether the punishment it decrees exceeds constitutional limits is a judicial function." (*People v. Anderson* (1972) 6 Cal.3d 628, 640.)

A punishment may violate Article I, section 17 of the Constitution not only if it is inflicted by a cruel or unusual method, but also if it is grossly disproportionate to the offense for which it is imposed. (*People v. Dillon, supra,* 34 Cal.3d at p. 478.) A sentence may be deemed to be grossly disproportionate in two ways: the sentence in the abstract may constitute cruel or unusual punishment or the sentence as applied to a particular defendant might be cruel or unusual. Even if the imposition of the sentence might not be cruel or unusual in every case in which it is imposed, imposition of that sentence might be cruel or unusual as applied a particular defendant. (*People v. Superior Court (Beasley)* (1984) 159 Cal.App.3d 131, 134-135.) As explained below, the application of section 667.61 in the present case constitutes cruel and/or unusual punishment.

**B.      Appellant's Sentence Constitutes Cruel And/Or Unusual Punishment**

In the present case appellant received a total sentence of 26-years-to-life imprisonment. Twenty five years of this draconian sentence resulted from the application of section 667.61, the One Strike law. At sentencing, appellant moved to modify the verdict on the basis that the sentence mandated by section 667.61 violated the state and federal prohibitions against cruel and unusual punishment. (CT 527-533; RT 993ff.) As set forth below, appellant asserts that section 667.61 is unconstitutional on its face and as applied to him in this case.

# 1. Section 667.61 Is Facially Unconstitutional

Section 667.61, subdivision (a) provides for a mandatory consecutive term of 25-years-to-life whenever a defendant is convicted of a serious sexual offense enumerated in subdivision (c) and the prosecution establishes one or more of the circumstances set forth in subdivision (d). For purposes of section 667.61, appellant was found guilty of section 261, subdivision (a)(2) and section 289, subdivision (a)--both of which are listed in section 667.61, subdivision (c)--and the prosecution established the enhancing circumstances of aggravated kidnaping (section 667.61, subdivision (d)(2)). Given the interplay of the underlying convictions and the One Strike penalty findings, appellant received a 25-years-to-life term pursuant to subdivision (a) of section 667.61. Added on to this sentence was the enhancement pursuant to section 667.9, subdivision (a), because of the victim being blind.

By mandating a term of 25-years-to-life whenever a defendant commits an enumerated offense and meets the enhancing criteria, section 667.61 constitutes cruel and/or unusual punishment on its face. The statute is constitutionally defective because it does not recognize significant gradations of culpability depending on the severity of the current offense and it fails to take mitigating factors into consideration. (*In re Grant* (1976) 18 Cal.3d 1, 11-13; *In re Foss* (1974) 10 Cal.3d 910, 923.)

In addressing the question of whether the application of section 667.61 amounted to cruel and unusual punishment in the case before it, the Second District Court of Appeal (Division Seven) in *People v. Estrada* (1997) 57 Cal.App.4th 1270 found only two states which provided comparable sentences for aggravated rape: Louisiana (LWOP) and Washington (minimum 20 years). (*Id.* at p. 1282; see also the Sixth District case of *People v. Alvarado* (2001) 87

Cal.App.4th 178, 200; appellant acknowledges these contrary authorities.)

Even if there are several other states with measures as draconian as California's section 667.61, it would not save the California statute. [I]f the challenged penalty is found to exceed the punishments decreed for the offense in a significant number of those jurisdictions, the disparity is a further measure of its excessiveness. (*In re Lynch, supra*, 8 Cal.3d at p. 427.)

Appellant would be in a position to challenge the constitutionality of the statutory scheme even if the particular unfairness described may not have occurred in his case. (*In re Grant, supra*, 18 Cal.3d at pp. 11-12, 18; *In re Lynch, supra*, 8 Cal.3d at p. 439; see *United States v. Cheely* (9th Cir. 1994) 36 F.3d 1439, 1444 & fn. 11.)

Thus, section 667.61 is unconstitutional on its face.

## 2. Section 667.61 Is Unconstitutionally Applied in this Case

Appellant's probation report indicates that he was just short of 20 years old at the time of the crimes for which he was found guilty in this case. His prior criminal record consisted of only minor misdemeanor conduct, with one conviction for receiving stolen property (section 496d-- receiving a stolen vehicle). (CT 535-555.)

Appellant was abandoned by both his parents at an early age and was mainly raised by his grandmother in Mississippi, until his mother came back into his life and then moved with him to California. He then bounced back and forth between his mother and father, spending some longer time with his father, who is an air traffic controller, staying with him for a time when he was transferred to Texas. (CT 543-548.) As trial counsel noted from this background, we can only suspect what kind of psychological trauma this [history]

61

inflicted on him.  (CT 530.)

Despite the troubled upbringing, appellant was an honest and hardworking person, according to his mother.  At the time of the incident he was working as a stock clerk for Nike Town in San Francisco.  He had previously worked for UPS as a package handler.  While in jail, appellant earned his high school equivalency degree and began college correspondence courses, with an eye to obtaining a bachelor's degree.  He was not married, but had a daughter with his girlfriend.  (CT 530, 542-545.)

Appellant's trial counsel noted that appellant's mother loves and cares for him deeply, having attended almost every day of his trial.  His step father, a pastor at a local church, wrote a letter in his support to the probation officer, detailing appellant's positive qualities, but also his need for help.  (CT 526, 530, 558.)  At his sentencing hearing, his step father spoke eloquently on appellant's behalf with the conviction that appellant, with the network of support he has, was a changed young man.  Also speaking for appellant was a chaplain from the San Francisco Sheriff's Department who attested to the resources that he would help apply to assisting appellant's way back into society.  (RT 989-992.)

Appellant wrote a letter to the court before his sentencing in which he basically asked for the court's mercy, saying he had matured during his time in custody and no longer did the same thing that criminals do.  He acknowledged making a lot of mistakes in his life and being very terrified by his trial.  He said that he had evaluated his former lifestyle and used the time in jail to better himself.  He expressed that his incarceration had actually helped him in his life.  (CT 523-525.)  The court acknowledged the letter and said it expressed appropriate sentiments and that appellant demonstrated that he knows the wrongfulness of his acts.  (RT 992.)

The crimes for which appellant was sentenced in this case, while serious and reprehensible, do not warrant the punishment of the 25-years-to-life One Strike law sentence. An individual who commits a cold-blooded premeditated murder is subject to a 25-years-to-life sentence (section 190, subdivision (a)), while a defendant who commits a second degree murder in California receives a sentence of 15-years-to-life (section 190, subdivision (a)), much less than the sentence imposed upon appellant for his present offenses. By starker contrast, a defendant who is found to have engaged in continuous repetitive sexual molestation of a child he resides with is exposed to a maximum determinate sentence of only 16 years in California, pursuant to section 288.5.

While the two counts of rape and the sexual penetration of Jane Doe after kidnapping her should they survive this appeal certainly deserve significant punishment, no principled analysis can view appellant as a greater danger and menace to society than a murderer or a molesting pedophile. His culpability is more in line with a forcible rape offender, who is subject to an eight year aggravated term of imprisonment (Section 264, subdivision (a)), which together with the enhancement because of the victim in this case being blind (Section 667.9, subdivision (a)) would be a 9 year sentence, plus whatever other determinate terms that might be required to punish him for the other offenses he was convicted of. As stated in *Dillon,* a comparison of the challenged penalty with those proscribed in the same jurisdiction for more-serious crimes . . . is particularly striking when a more serious crime is punished less severely than the offense in question . . . (*People v. Dillon, supra,* 34 Cal.3d at p. 487, fn. 38.)

## C.    Appellant s Sentence Should Be Reduced

The 26-years-to-life sentence imposed in this case is grossly disproportionate to appellant s crimes and personal circumstances and therefore constitutes unconstitutional cruel and/or unusual punishment. Therefore, appellant s sentence should be reduced by this Court to a determinate term calculated to impose reasonable punishment that takes into account appellant s conduct and individuality and that complies with federal and state constitutional provisions prohibiting cruel and unusual punishment.

**V.    APPELLANT'S CONVICTION FOR FORCIBLE SEXUAL PENETRATION MUST BE REVERSED, SINCE THERE WAS INSUFFICIENT EVIDENCE OF DIGITAL PENETRATION OR THE REQUISITE SPECIFIC INTENT**

Appellant was convicted of one count of forcible sexual penetration. But in actuality, there was insufficient evidence to sustain this allegation.

Section 289, subdivision (a)(1) prohibits any act of sexual penetration when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person... Subdivision (k)(1) describes sexual penetration as "the act of causing the penetration, however slight, of the genital or anal opening of any person or causing another person to so penetrate the defendant's or another person's genital or anal opening for the purpose of sexual arousal, gratification, or abuse by any foreign object, substance, instrument, or device, or by any unknown object." Foreign object, substance, instrument, or device shall include any part of the body, except a sexual organ. (Section 289, subdivision (k)(2).) Penetration, however slight, does not require proof of vaginal penetration. It includes contact with the victim's hymen, clitoris, and other genitalia inside the exterior of the labia majora. (*People v. Quintana* (2001) 89 Cal.App.4th 1362, 1372.)

Thus, as part of the jury instructions given to the jury regarding the crime of forcible sexual penetration, the jury was correctly told, pursuant to CALJIC No. 10. that "In order to prove this crime, each of the following elements must be proved: [¶] One, a person committed an act of sexual penetration upon another person. [¶] Two, the sexual penetration was against the will of the alleged victim. [¶] Three, the sexual penetration was accomplished by...the

use of force, violence, duress, menace or fear of immediate and unlawful bodily injury on the alleged victim or any other person ...threatening to retaliate in the future against the alleged victim or any other person, and there was a reasonable possibility that the perpetrator would execute the threat.  [¶] And four, the penetration was done with the purpose and specific intent to cause sexual arousal, gratification or abuse.   (RT 794-795.)

When Jane testified she said that during the first rape incident her assailant stuck his finger into her vagina and then put his penis in for about 5 minutes.  She said it did not hurt when he did this, but it felt uncomfortable. (RT 105-106, 315.)

The SART Nurse testified in this case that when she examined Jane Doe, Jane told her that her assailant had penetrated her vagina with his finger two times and that both times he was putting his finger in at the same time as his penis. (RT 332-333.)  When Detective Sharp interviewed her the same night as the incident he had asked her whether of not her assailant s penis was erect or soft when he inserted it into her.  She specifically told the detective that it was soft.  (RT 531.) But she said that the assailant had kept pushing against her and inside her really hard, though there was no clarification about whether his penis remained soft during this entire time of pushing.  (RT 582-583.) In Detective Sharp s audio taped interview of Jane about a week after the incident, he asked whether her assailant had, besides his penis, also put a finger in her.  She said that he had, but only the first time, not the second time.  And she said that he was doing it at the same time as he was putting his penis in her. (Exhibit E1, p. 14.)

As is apparent by the above evidence, there is nothing that indicated that appellant, in putting his finger into Jane Doe s vagina, had the purpose and specific intent of causing sexual arousal,

gratification or abuse. It is clear that appellant was using his finger to guide his soft penis into Jane Doe s vagina, but the intent in so doing was not to abuse Jane or for his own arousal or gratification. The sexual penetration was thus incidental to the rape and was not a separate crime.

The prosecutor confused the issued when she argued the following to the jury: [There s two theories for the digital asexual penetration. [¶] At one point she said he stuck it in twice. At one point, it s once. All 12 have to decide is [sic.] at least there was one, one where he inserted his finger into her vagina. You have to agree, all 12 of you, even if his hand stuck his finger to guide his penis. [¶] What s not required for rape is his penis didn t have to be erect. His penis did not have to go all the way in. The fact that he stuck his finger is a separate crime. [¶] All you have to decide is and agree, all 12 of you is that he did it at least once. You don t have to agree that it was the first time or the second time, only that he did it once. He s only charged with one count. (RT 887-888.)

One problem with this formulation is that it left out the requirement that the digital penetration had to have been with the purpose or specific intent of abuse, arousal or gratification. This was precisely the area in which the evidence was insufficient.

Because on the record in this case there is no substantial evidence from which a reasonable trier of fact could have found the elements of digital penetration beyond a reasonable doubt, appellant s conviction for this crime must be reversed. (*People v. Johnson, supra,* 26 Cal.3d at pp. 576-578.)

## VI.    WHEN VIEWED CUMULATIVELY, THE
##          NUMEROUS ERRORS REQUIRE REVERSAL

As has been established above, a series of errors occurred at
appellant's trial. Appellant's requested instruction on the defense of a
reasonable good faith belief in Jane Doe's consent was denied by the
court. The jury was misinstructed regarding the essential elements on
the One Strike law that resulted in his 25 years to life sentence. The
evidence was insufficient concerning the One Strike allegation and
the digital penetration charge. In addition, the indeterminate 25-
years-to-life sentence under the One Strike law violates constitutional
prohibitions against cruel and unusual punishment. Given the sheer
number of errors, a finding of cumulative and reversible prejudice is
required. (*People v. Hill* (1998) 17 Cal.4th 800, 844; a number of
errors, though independently harmless, will require reversal when the
totality of the record shows that the defendant was denied a fair trial.)

In seeking reversal, appellant must once again emphasize
that this was a close case. Appellant offered the substantial factual
defense that Jane Doe consented to have sex with him. As a result,
the jury evidenced its discomfiture by asking questions, seeking
further instruction, and by deliberating for thirteen hours. Given these
objective indications that the case was a close one, reversal is
mandated. (*People v. Holt* (1984) 37 Cal.3d 436, 458-459; the
"cumulative effect" of evidentiary errors and prosecutorial
misconduct compelled reversal.)

## CONCLUSION

For the reasons set forth in the arguments above, appellant Lavarius Jermaine McCord respectfully requests that the judgment of conviction be reversed with directions to dismiss the sexual penetration charge and the One Strike sentencing allegation. Assuming there is no reversal, appellant's sentence should be reduced as set forth herein.

Date: August 28, 2005

Respectfully submitted,

_____

H. STANLEY DEWEY
Attorney for Appellant

By Appointment of the Court
of Appeal Under the First
District Appellate Project's
Independent Case System