# EXHIBIT A

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT, DIVISION FIVE

**THE PEOPLE OF THE STATE OF CALIFORNIA,**

               Plaintiff and Respondent,         **A108457**

v.

**LAVARIUS JERMAINE McCORD,**

               Defendant and Appellant.

---

### APPELLANT'S OPENING BRIEF

Appeal from the Judgment of the Superior Court of California
County of Contra Costa, Case Number 032028-3

## HONORABLE HARLAN G. GROSSMAN, JUDGE

---

*1/33 BS*

DOCKETED
SAN FRANCISCO

AUG 3 0 2005

By   P. MONTOYA
No. *SF2005 0A 0092*

*1/27/05*

H. STANLEY DEWEY
Attorney at Law
State Bar Number 107619

3150 Hilltop Mall Road
Richmond, California 94806
Telephone: (510) 970-7616

Attorney for Appellant
LAVARIUS JERMAINE McCORD

By Appointment of the Court of
Appeal Under the First
District Appellate Project's
Independent Case System

# TOPICAL INDEX

| | **Page** |
|---|---|
| TABLE OF AUTHORITIES | ii |
| STATEMENT OF THE CASE | 1 |
| STATEMENT OF FACTS | * |
| ARGUMENT | |
| INTRODUCTION | 26 |

**I.   APPELLANT WAS DENIED DUE PROCESS UNDER THE FEDERAL CONSTITUTION WHEN THE TRIAL COURT FAILED TO GIVE HIS REQUESTED JURY INSTRUCTION PURSUANT TO CALJIC NO. 10.65 CONCERNING HIS DEFENSE OF REASONABLE GOOD FAITH BELIEF IN CONSENT**     27

    **A.  Procedural Context and Cognizability on Appeal**

    **B.  There Was Substantial Evidence to Support the *Mayberry* Instruction**

    **C.  Prejudice**

**II.   SINCE THE COURT FAILED TO INSTRUCT THE JURY REGARDING ESSENTIAL ELEMENTS RELATING TO THE APPLICABILITY OF SECTION 667.61, APPELLANT'S "ONE STRIKE" LIFE SENTENCE MUST BE STRICKEN**     42

    **A.  Facts/Introduction**

    **B.  The Court Had the Sua Sponte Obligation to Instruct The Jury on the One Strike Principles of Law**

    **C.  Reversal Is Required Because The Prosecution Cannot Prove Beyond a Reasonable Doubt that the Error Did Not Contribute to the Result Obtained**

III.    THE ONE STRIKE SENTENCING FINDINGS UNDER
        PENAL CODE SECTION 667.61 SHOULD BE
        STRICKEN, SINCE THERE WAS INSUFFICIENT
        EVIDENCE THAT ANY MOVEMENT FROM THE
        KIDNAPPING SUBSTANTIALLY INCREASED THE
        RISK OF HARM TO JANE DOE                                    52

IV.     APPELLANT'S 25-YEARS-TO-LIFE SENTENCE
        UNDER THE "ONE STRIKE" SENTENCING SCHEME
        VIOLATES FEDERAL AND STATE CONSTITUTIONAL
        PROHIBITS AGAINST CRUEL AND/OR UNUSUAL
        PUNISHMENT AND THEREFORE SHOULD BE
        REDUCED                                                    56

        A.  The Applicable Standards

            1.  The Federal Standard

            2.  California Standard

        B.  Appellant's Sentence Constitutes Cruel and/or
            Unusual Punishment

            1.  Section 667.61 is Facially Unconstitutional

            2.  Section 667.61 is Unconstitutionally Applied

        C  Appellant's Sentence Should be Reduced

V.      APPELLANT'S CONVICTION FOR FORCIBLE
        SEXUAL PENETRATION MUST BE REVERSED, SINCE
        THERE WAS INSUFFICIENT EVIDENCE OF DIGITAL
        PENETRATION OR THE REQUISITE SPECIFIC
        INTENT                                                     65

VI.     WHEN VIEWED CUMULATIVELY, THE NUMEROUS
        ERRORS REQUIRE REVERSAL                                    68

CONCLUSION                                                         69

CERTIFICATION OF LENGTH                                            70

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Apprendi v. New Jersey*
(2000) 530 U.S. 466 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 47, 48

*Chapman v. California*
(1967) 386 U.S. 18 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 52

*Conde v. Henry*
(9th Cir. 2000) 198 F.3d 734 . . . . . . . . . . . . . . . . . . . . . . . . . 27, 39

*Enmund v. Florida*
(1982) 458 U.S. 782 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Gregg v. Georgia*
(1976) 428 U.S. 153 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Harmelin v. Michigan*
(1991) 501 U.S. 957 . . . . . . . . . . . . . . . . . . . . . . . . . . . 56, 57, 58

*In re Winship*
(1970) 397 U.S. 358 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Neder v. United State*
(1999) 527 U.S. 1 [144 L.E.2d 35] . . . . . . . . . . . . . . . . . . . . . . . 39

*Robinson v. California*
(1962) 370 U.S. 660 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Rummel v. Estelle*
(1980) 445 U.S. 263 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Solem v. Helm, supra,*
(1983) 463 U.S. 277 . . . . . . . . . . . . . . . . . . . . . . . . . . . 56, 57, 58

*Sullivan v. Louisiana*
(1993) 508 U.S. 275 . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 41, 47-49

*United States v. Bajakajian*
(1998) 524 U.S. 321 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57, 58

*United States v. Cheely*
(9th Cir. 1994) 36 F.3d 1439 . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*United States v. Escobar De Bright*
(9th Cir. 1984) 742 F.2d 1196 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 39

*United States v. Gaudin*
(1995) 515 U.S. 506 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*United States v. Sarno*
(9th Cir. 1995) 73 F.3d 1470 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Yates v. Evatt*
(1991) 500 U.S. 391 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

## STATE CASES

*Auto Equity Sales, Inc. v. Superior Court*
(1962) 57 Cal.2d 450 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*College Hospital, Inc. v. Superior Court*
(1994) 8 Cal.4th 704 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 42

*In re Earley, supra,*
(1975) 14 Cal.3d 122, 131 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54, 55

*In re Foss*
(1974) 10 Cal.3d 910 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*In re Grant*
(1976) 18 Cal.3d 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60, 61

*In re Lynch*
(1972) 8 Cal.3d 410 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58, 61

*People v. Alvarado*
(2001) 87 Cal.App.4th 178 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*People v. Anderson*
(1972) 6 Cal.3d 628 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*People v. Anderson*
(1983) 144 Cal.App.3d 55 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*People v. Barton*
(1995) 12 Cal.4th 186 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*People v. Blakely*
(2000) 23 Cal.4th 82 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*People v. Burnham*
   (1986) 176 Cal.App.3d 1134 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*People v. Burnham*
   (1986) 176, Cal.App.3d 1134 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*People v. Castillo*
   (1987) 193 Cal.App.3d 119 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*People v. Caudillo*
   (1978) 21 Cal.3d 562 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*People v. DeLeon*
   (1992) 10 Cal.App.4th 815 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*People v. Diaz*
   (2000) 78 Cal.App.4th 243 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53, 55

*People v. Dillon*
   (1983) 34 Cal.3d 441 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58, 59, 63

*People v. Elize*
   (1999) 71 Cal.App.4th 605 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*People v. Estrada*
   (1997) 57 Cal.App.4th 1270 . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 60

*People v. Filson*
   (1994) 22 Cal.App.4th 1841 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*People v. Flannel*
   (1979) 25 Cal.3d 668 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*People v. Giardino*
   (2000) 82 Cal.App.4th 454 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*People v. Gonzale*
   (1999) 74 Cal.App.4th 382 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*People v. Hampton*
   (1981) 118 Cal.App.3d 324 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*People v. Hill*
   (1998) 17 Cal.4th 800 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*People v. Holt*
   (1984) 37 Cal.3d 436 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*People v. Houts*
(1978) 86 Cal.App.3d 1012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*People v. Johnson*
(1980) 26 Cal.3d 557 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53, 67

*People v. Kay*
(1984) 153 Cal.App.3d 888 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*People v. Lee*
(1987) 43 Cal.3d 666 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*People v. May*
(1989) 213 Cal.App.3d 118 . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36, 38

*People v. Mayberry*
(1975) 15 Cal.3d 143 . . . . . . . . . . . . . . . . . . . 28, 29, 30, 31, 34, 35

*People v. Mayfield*
(1997) 14 Cal.4th 668 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*People v. Miranda*
(1987) 44 Cal.3d 57 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*People v. Modesto*
(1963) 59 Cal.2d 722 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 30

*People v. Pearch*
(1991) 229 Cal.App.3d 1282 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*People v. Quintana*
(2001) 89 Cal.App.4th 1362 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*People v. Rayford*
(1994) 9 Cal.4th 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 51, 53

*People v. Reynolds*
(1988) 205 Cal.App.3d 776 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*People v. Rivera*
(1984) 157, Cal.App.3d 736 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*People v. Sengpadychith*
(2001) 26 Cal.4th 316 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*People v. Stewar*
(1976) 16 Cal.3d 133 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*People v. Superior Court (Beasley)*
(1984) 159 Cal.App.3d 131 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*People v. Watson*
(1956) 46 Cal.2d 818 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*People v. Wickersham*
(1982) 32 Cal.3d 307 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*People v. Williams*
(1971) 22 Cal.App.3d 34 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*People v. Williams*
(1992) 4 Cal.4th 354 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31, 36

## STATE STATUTES

Penal Code:

Section 264, subdivision (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

Section 289, subdivision (a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Section 289, subdivision (k)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Section 667.61 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 44, 45, 60, 61

Section 667.9, subdivision (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

Section 1237 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

## MISCELLANEOUS

CALJIC No. 10.30 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

CALJIC No. 10.65 . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28, 36, 37

CALJIC No. 1.23.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 30

CALJIC No. 9.56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

CALJIC No. 9.58 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

A108457

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT, DIVISION FIVE

---

**THE PEOPLE OF THE STATE OF CALIFORNIA,**

Plaintiff and Respondent,

v.

**LAVARIUS JERMAINE McCORD,**

Defendant and Appellant.

---

## APPELLANT'S OPENING BRIEF

## STATEMENT OF THE CASE

On October 17, 2003, the Contra Costa County District Attorney filed a five-count information charging appellant with two counts of forcible rape (Penal Code[1] section 261, subdivision (a)(2)), one count of forcible sexual penetration (section 289, subdivision (a)(1)), one count of kidnapping (section 207, subdivision (a)), and one count of second degree robbery (sections 211 and 212.5, subdivision (c)), all alleged to have been committed against a victim designated as "Jane Doe." An enhancement was also alleged as to

---

[1]

All subsequent references to statutes are to the Penal Code, unless otherwise noted.

1

each count: that the victim was blind and appellant knew or should have known of this disability. (section 667.9, subsection (a).) Finally, it was charged in a sentence-fixing allegation pursuant to section 667.61, subdivisions (a) and (d) that in each of the alleged counts appellant had kidnapped Jane Doe and that moving her substantially increased the risk of harm to her over and above the risk inherent in the particular crimes charged. (CT 70-72.)

Appellant moved pursuant to section 1538.5 to suppress his arrest as having been made without a warrant and without probable cause and to suppress the saliva and blood samples seized from him. (CT 103-107, 116-117, 169-173.) Appellant also moved under section 995 to dismiss counts four and the section 667.61 "One Strike" penalty fixing allegation, claiming that the evidence at the preliminary hearing was not sufficient to hold him to answer for kidnapping or to support the finding that any movements of Jane Doe substantially increased her risk of harm. (CT 108-115.) The court denied both motions. (CT 174-174; RT 6/3/04 139-144.)

Appellant waived his right to testify (RT 737-738), and the defense rested without presenting any witnesses. (RT 763.)

The jury deliberated for a total of approximately thirteen and a half hours over four days. (CT 234-243.) At 9:48 a.m. on the last day of deliberations the jury sent a "Jury Request During Deliberations" signed by the presiding juror: "We have been unable to come to a [sic] unanimous decision on all counts. Please advise as to what are [sic] the next step should be and any information you need from us." The court sent in a note asking if the jury had returned verdicts to any of the charged offenses, and the jury replied that they had done so only on one count. (CT 478.)

At 10:20 a.m. the presiding juror sent a note to the court

2

expressing the concern that one juror "is not following (or is unable to follow) your instructions." The presiding juror detailed some of what she saw as the problem with the other juror. (CT 466.) During the court's consultation with counsel the court indicated it might reread some of the instructions to the jury. Appellant's trial attorney objected to highlighting certain instructions and thus giving the wrong impression that some instructions are more important that others. Counsel requested that the court re-instruct the jury completely and ask them to follow the law that was given. (RT 921-925.) After consultation with both counsel, the court asked each of the jurors whether there was anything that the court could do to assist the jury in continuing deliberations toward verdicts in the case. (RT 921-928.) Thereafter, the court re-read its initial instructions, but did not include instructions having to do with individual crimes or general and specific intent. (RT 932-943.)The court then instructed the jury to go back to the jury deliberation room, to consider the instructions given, and to let the court know if further clarification or other instructions would be helpful. (RT 943-944.) The jury returned to the jury room shortly after 11:31 a.m. At 11:45 a.m. the jury notified the bailiff that it had reached a verdict. (CT 240-243; RT 942-944, 948.)

The jury found appellant guilty of forcible rape in counts one and three and forcible sexual penetration in count two. The jury found true as to each of these three counts that Jane Doe was blind at the time of the rapes and forcible sexual penetration and that appellant knew or should have known of this disability. Further, the jury found true the allegation pursuant to section 667.61 as to each of these counts that appellant kidnaped Jane Doe and the movement of her substantially increased the risk of harm to her over and above the

3

level of risk inherent in the particular offenses in each count. (CT 243-244; RT 950-962.) In addition, the jury returned a verdict of guilty on the kidnap charge of count four and found true the allegation that Jane Doe was blind at the time of the kidnaping and that appellant knew or should have known of this disability. (CT 243-244; RT 962-965.) As to the robbery charge of count five, the jury found appellant not guilty, but did find him guilty of both petty theft (section 484/488) and of grand theft person (section 487, subdivision (c)). (CT 243-244; RT 965-966.)

The court imposed a total prison sentence of 26 years to life, calculated as follows: for the count one rape, the court imposed 25 years to life, pursuant to the One Strike sexual offense sentencing requirements of section 667.61, subdivisions (a) and (d)(2); for the section 669, subsection (a) (blind victim) enhancement on this count the court imposed a one year consecutive sentence. For the count two sexual penetration and the count three rape convictions the court imposed the mid-term of six years each, to run concurrent to the sentence in count one. Sentence on the count four kidnaping conviction was stayed pursuant to section 654. As to the count five grand theft offense, the court imposed two years and ran it concurrently to the count one sentence. The court set aside the verdict regarding the lesser-included petty theft conviction of count five. As to the 667.9, subsection (a) blind victim enhancements for counts two through four, the court stayed these pursuant to section 654. (CT 566-567; RT 996-1001.)

The court also imposed a restitution fine of $5,200 ($200 per year for the 26 years to life imposed) pursuant to section 1202.4. A $5,200 parole revocation fine pursuant to section 1202.45 was stayed pending appellant's release from prison and any revocation of

parole.  Appellant was afforded 670 days total credits, calculated by giving 583 actual days credit, but only 15% or 87 days local conduct credit.  (CT 565, 567; RT 1002.)  Appellant was informed that he would have to register as a sex offender, as required by section 290.  In addition, the court ordered actual restitution to the victim of the offense in the amount of $60 and retained jurisdiction to order further restitution for counseling services given to the victim up to the date of sentencing.  (CT 567; RT 1002, 1005.)

Appellant filed a timely notice of appeal on November 10, 2004.  (CT 568-569.)  This appeal is from a final judgment following trial and is authorized by Penal Code section 1237.

## STATEMENT OF FACTS

### The Prosecution's Case

Jane Doe is a single African American woman who has been blind since birth and who was 21 years old at the time of these events. (RT 78; See also CT 155, Sexual Assault Examination Form OCJP 923, admitted into evidence as Exhibit 24A.) She lived alone in an apartment in San Pablo, part of a group of apartments leased by the Living Skill Center, a program for blind and visually impaired students between 18 and 25 years old which teaches skills to live in the community. (RT 78-79, 133-134.) While she was growing up, Jane attended the California School for the Blind in Fremont and lived there during the school year. (RT 78.)

In the evening of January 15, 2003, Jane was in Fremont at the School for the Blind for a meeting. (RT 78, 321.) The meeting ran late. She called for a ParaTransit bus to take her home to San Pablo, but it never showed up. Therefore, at 10:00 p.m. she took a bus from the School for the Blind to the Fremont BART station, boarded the BART train and got off at the Del Norte Station in El Cerrito. (RT 79-81.)

At the Del Norte station, according to Jane, she asked a white male BART passenger to take her to the number 72 bus stop. At the stop a female bus driver, who sounded Black to Jane, told her that the bus she was driving did not go by Contra Costa College, where Jane had told her she wanted to go. That first bus pulled away and another came. Jane got on that bus and talked to the woman driver, who also sounded Black. That driver also said her bus did not stop by the college. At that point, a male who sounded Black to Jane, came up to her and asked if she needed help. This was a different person than the man who helped her get from BART to the busses.

Jane told the man that yes, he could help her, and asked if he would take her to a taxi. As she walked the few minutes to the taxi stand at the BART station, Jane held onto the man's arm. With her other hand she held her extended folding sight cane. The man told her that there was a Yellow Cab at the stop. When the two arrived at the taxi, the man asked her, "Do you want me to come with you?" She responded, "no," but probably did not say it loud enough for him to hear her, since she tends not to speak up. This man got in the cab with her. (RT 80, 85-90, 125, 316.)

Inside the cab, she told the driver she wanted to go to 23rd Street and San Pablo Avenue. She did not tell the driver to take her to her apartment, because she did not want the man who walked with her to know where she lived. The driver, who sounded like he was from India, told her the fare would be $10. The man who had brought her to the cab and had also gotten inside told the driver, "I want to take my girlfriend home." (RT 90, 316-317.) Jane told the driver that she was not the man's girlfriend, but she did not say more because she was afraid that the man would become violent. She had the impression that the man was drunk, since she smelled alcohol on his breath. She did not communicate to the cab driver in any way that she was concerned that there was someone in the cab with her. In fact, she did not say anything else to the cab driver. During the drive, the male who had gotten in with her put his hand on her thigh, but he moved it off quickly when she asked him to, and she moved away from him. There was no other conversation. (RT 90-92, 303, 305.)

The ride in the taxi lasted 10 to 15 minutes. When the cab stopped, Jane got out. She knew the location was 23rd and San Pablo Avenue, because she felt a skinny bus pole there that she had touched before. The man in the cab paid the cab driver with his own money,

7

and Jane heard him get out about two minutes after she did. She did not wait at the cab with him, but started walking. (RT 92-94, 306.)

As she walked, she used her flip cell phone to check her phone messages and then to telephone her friend Shayla in Anaheim (in area code 714) to tell her she was not home yet, since Shayla had called earlier to see if she had made it there. Jane spoke to her for about 5 minutes while she walked. As she walked and as she talked to Shayla, the man who had been in the cab with her came up to her and said he wanted to see her phone and wanted to ask her friend if she could meet Jane. Jane told him no. He then grabbed the phone from her; she reached for it, but he pulled it back. She said, "Okay. That's it. Fine." Then she walked away. She heard the phone being clicked shut. (RT 96-97, 313.)

Several seconds later the man grabbed her from behind, putting his right arm around her waist and his left hand on her shoulder. She asked him to let her go. He forced her to walk along the sidewalk. The man held her like this as they walked for about 10 minutes. She did not hear anyone else, though she heard some cars. She asked the man where they were going, and he said he was just taking her to the bus stop. She never agreed to walk with this man. (RT 95, 99, 101-102, 309, 311, 319.)

As they walked, Jane felt the surface change from sidewalk to gravel. They stopped walking at some wooden bleachers on the Contra Costa Community College campus. She started screaming and demanded, "Let me go right now." The man told her to "shut the F... up" and to sit down before he knocked her out. Jane tried to slip away from him, but as she did she fell to the ground, and he fell to the ground next to her. She then kicked him in the stomach. He hit her on the shoulder. She skinned her knees in the fall. He told her he had

also skinned his knees. (RT 100, 102-103, 312.)

      The man ordered her, "Get up, bitch, right now." Jane was afraid. She got up. They were next to a wall, which Jane could feel. The man banged her head against the wall. The man said he would leave her alone if she did what he asked her to do. He said, "lift up your shirt before I fucking kill you." He then laid her on the ground and pulled her pants and underwear down. He lay on top of her, stuck his finger in her vagina and then inserted his penis. She asked him to please stop. He told her again to shut up and that he would stop when he was finished. This lasted for about five minutes. It felt very uncomfortable, but hurt only a little bit. Jane does not know if the man ejaculated. (RT 103-106, 112.)

      After he stopped, Jane asked the man to show her which way to go. He told her that she should go straight and she would find her way home. Then he pretended to leave. She stood up and put her clothes back on. Moments later he came back, acting as though he were someone else and asked, "do you need help?" She said she had been raped and wanted to go to the police station to make a report. The man pretended to call the police on Jane's cell phone, which he still had. She heard the clicking sound of her phone and heard him supposedly talking on it, saying someone had been raped and asking the police to come. About this time, she felt his sweatshirt and realized it was the same man who had just raped her. (RT 106-108.)

      After he stopped talking on the phone, the man said, "you are in trouble. Now I am going to do it again." He pulled Jane's hand around his arm and walked her a few minutes away to some bleachers. There he laid her on one of the bleachers, unbuttoned her trousers and pulled them and her underwear down to her ankles. He removed her right shoe and sock. He again inserted his penis in her

vagina, this time for about two minutes.  Jane exclaimed, "I am going to get pregnant."  The man's response was, "I will take care of the baby."  After he took his penis from her vagina, he said, "I wasn't raping you."  When she asked him his name, the man said it was Riece.  He stated that he was watching her.  He told her he was going to get his stuff and would come right back, but he did not return.  He had taken Jane's cell phone and her white folding cane and never gave them back to her.  (RT 107-111.)  Before these events, Jane had never had sex with anyone.  (RT 118.)

After the second assault Jane put her clothes and shoes back on and wandered around for about five minutes with no idea where she was.  It was between 1:00 and 2:00 a.m. on January 16th, that Will Robertson, a custodian at the college, found her feeling her way along a fence of an fairly dark athletic field.  She was obviously frightened, and she asked Robertson for help.  She told him she had been raped, though she did not complain to him about being injured. He took her to the custodians' office and called the police.  The police came, took a report from Jane and then took Jane to the hospital.  (RT 49-52, 73-74, 111-113.)

Jane recounted that she was at the hospital for a long time. She arrived wearing the clothes she had been wearing when she was raped.  She was interviewed and examined by a nurse, who also performed a vaginal examination and took photographs.  Jane telephoned her friend and teacher at the Living Skills center, Nancy Phinnesse, who stayed with her as a support person the whole time she was at the hospital.  (RT 114-115, 298.)

Contra Costa Community College Detective Thomas Sharp interviewed Jane Doe at the County Hospital in the morning of January 16, 2003.  That interview was not recorded, but he made an

audiotape of his next interview with her, on January 22, 2003. He spoke to her one other time, by telephone, later on January 22, 2003. (RT 435, 440.)

There were some inconsistencies in the January 16th interview from Jane's testimony. Jane had told Sharp that she had gotten off the BART train at the Del Norte station and made her way down to the station agent. She had said it was the station agent who had assisted her with hailing a cab and helped her get into the cab. She had said she thought the cab driver sounded Filipino. She had told Sharp she had given the driver her address and he had informed her that the fare would be $10. She had claimed to have paid the $10 to the driver herself. (RT 523-524, 526.)

Jane told Sharp that it was at that point that a male got into the back of the cab with her. She announced to the cab driver that she did not know this person and that she felt uncomfortable and wanted the male out of the cab. The cab driver told the male to leave, but he refused to do so. Jane reported to Sharp that during the cab drive the male said, "All right, baby. I'll take you home." At 23rd and San Pablo the cab stopped. She told Sharp that the driver would not drive to her apartment from that location unless she paid him an additional $10. She and the male both got out of the cab at 23rd and San Pablo. (RT 524-526.)

During her initial interview with Sharp, Jane did not tell him that she had checked her messages on her cell phone after she got out of the cab, nor that she been talking to a friend on her cell phone, nor that the phone had been taken from her hand. (RT 530-531.) She also did not tell him that she had been afraid during the cab ride. (RT 572.)

Jane did tell Sharp during the initial interview that the male

held onto her and forcibly directed her to walk to the college. She
indicated they had walked on Castro Road and had came to some
gravel and an opening in a fence. As they walked, she felt some
bleachers, and at that point she started screaming for the man to stop.
She told Sharp she was pushed around and that the man slammed her
head into a cement wall. (RT 528-529.) She said he held her down
with his hands on her shoulder and he put his penis in her vagina.
The penis was soft, though he pushed hard with his penis and kept at
it for 20 or 30 minutes. (RT 531, 583.) She did not report that the
man kissed or touched her breasts. (RT 554.)

During the first interview, Jane told Sharp that after the
assault the man told her his name was Riece from Pinole and that he
had asked Jane her name. She told the man her name was Lauren and
that she was age 30. She told Sharp that the man had said, "If you
don't do it, I will kill you." She also recounted that the man had
grabbed her by the neck and covered her mouth with his other hand to
prevent her from screaming and had said, "Shut up, bitch." However,
nothing was said about any threats the man made to her as he left,
such as that he was watching her. (RT 573-574, 585.)

The tape recording of the second interview that Detective
Sharp conducted with Jane--on January 22, 2003--also had some
differences from Jane's testimony and from her first interview with
Sharp.[2] Jane told Sharp in the second interview that the white male
BART passenger who helped her off the BART train and guided her
to the #72 bus was also the person who took her from the bus to the

---

[2]

    The audiotape was admitted into evidence as Exhibit E, and the 20-
page transcript of the tape was marked as Exhibit E1. The jurors were
admonished that the tape recording was the evidence and that, though they
each were given a copy of the transcript, the transcript was not evidence.
(RT 540.)

taxi cab and helped her into the taxi. (Exhibit E1, pp 2-3, 6-8.) She said that once she was in the cab the driver told her the fare was going to be $10. (Exhibit E1, p. 10.) Then a man–other than the white BART passenger--got into the taxicab, asking where the cab was going. Jane informed Sharp she did not remember what the driver said in response. But as this man was getting into the cab, he told the driver he wanted to come along because he wanted to take his girlfriend home. Jane recounted to Sharp how she then had told the cab driver that she did not feel comfortable with the man in the cab, though she was quiet about saying it and does not think the driver heard her. (Exhibit E1, pp 10-11.) She said that when she got out of the cab she started walking on her own toward her house as she was talking to her friend Shayla on the cell phone. Jane indicated that while she was at the second bus she heard the guy who eventually raped her talking to the second bus driver. She told Sharp that second bus driver might be able to identify the man. (Exhibit E1, p. 17.)

During the recorded interview, Jane told Sharp that when the man put his penis in her vagina the first time, he was at the same time putting a finger in her. Both the penis and the finger hurt her. His finger did not go all the way in, and it was his penis that was hurting her the most. The man did not put his finger in her the second time he had intercourse with her. She also said that the man put his mouth on her right breast. (Exhibit E1, pp 14-15.)

Louise Jones was the Sexual Assault Response Team (SART) nurse for Contra Costa County who examined Jane at the county hospital. She had been a registered nurse for 31 years. However, she does not have a Bachelor's degree. She is not able to give a diagnosis; to do so would be an illegal practice of medicine. She is not nationally certified as a SART nurse, but the one-week

13

course she took to become a SART nurse qualified her to be a SART nurse for Contra Costa County. She had performed approximately 66 sexual assault examinations on her own, and she had observed approximately 100. When a person is over age 14, Jones does the examine on her own, but if the alleged victim is under 14 a pediatrician performs the examination with her. As part of her examinations she makes observations and documents what she finds. She sometimes takes photographs, and she records what the person tells her. She uses a standardized Department of Justice Form OCJP 923. Before this trial Jones had never been qualified in court as an expert. However, the trial court permitted her to testify as an expert in the field of conducting sexual assault examinations and the procedures that are followed in conducting such examinations. (RT 232-237, 336-337.)

Jane had arrived at the Emergency Room where the sexual assault examination took place at 5:30 a.m on January 16, 2003. She had a support person with her throughout the exam. Nurse Jones noted that Jane had a scratch on her neck and that both her knees were scraped. Her hair was messed up. Jones diagramed these injuries on the OCJP 923 form and took photos of them. Jane's general demeanor was calm and cooperative during the two-and-a-half hour intrusive procedures of the examination. (RT 240-243, 273 341, 366.)

As part of her examination, Jones used a speculum to open up Jane's vaginal opening. During this internal examination, Jane cried and expressed that she was in a lot of pain, so Jones was not able to fully open the speculum as far as she normally would during an examination. Jones observed abrasions on the right side of Jane's vaginal wall and a laceration to the labia minora. There was redness

14

and soreness on the outer portions of Jane's vaginal. On one of the photographs she took with a colposcope, a device that magnifies the view, she also identified red dots called petechia, which are small capillaries which have broken under the skin. She also observed two blood clots, near the clitoral hood and on the Labia minora. There was no evidence that Jane was menstruating, and Jane had said she had not been. Photographs that Jones took during the procedure were entered into evidence. (RT 247, 249-253, 264-270, 346, 353, 356.)

As part of the standard collection of evidence process, Jones collected four swabs from matter inside Jane's vagina. She prepared two wet slides from these swabs. (RT 252-260.) Jones submitted the swabs and slides she prepared to the crime lab. Examining the slides under a microscope herself, Jones was unable to observe any sperm. However, Jones has never seen sperm in her wet slide examinations, because she is not skilled in this area and the microscope is difficult for her to focus. She often fails to see sperm that are later observed by personnel in the crime lab. (RT 277, 353, 364-365.)

As part of the sexual assault examination, Jones asked Jane a series of questions relating to things that may have affected the exam. In response to the questions, Jane said she did not have any medical conditions or preexisting injuries. She denied she had had intercourse in the previous five days or that she had used alcohol or drugs prior to or after the assault. She had not bathed or showered before the examination. Jane described having been sexually assaulted. She said she had lain on cement and that her assailant had hit her head on a wall. She reported he had held her shoulder down to the ground with one hand. She indicated he had twice penetrated her vagina with his finger, inserting his finger at the same time as his penis. (RT 329-334.) She said that the man who had assaulted her

15

had choked or strangled her.  She reported that the abrasions on her knees were from the assault.  (RT 362-363.)

Jones testified that a woman can have vaginal bleeding when she has sexual intercourse for the first time, because the woman's hymen could be broken by the intercourse.  Jones also indicated that vaginal injury could occur in normal intercourse between two consenting adults.  (RT 352-353.)

Nancy Phinnesse, Jane Doe's teacher and case manager at the Living Skill Center was called to the Contra Costa College campus in the early morning hours of January 16, 2003 to be with Jane.  When she arrived, Jane appeared traumatized.  She was very quiet and almost in shock.  She wanted to talk a lot about what had occurred, so Phinnesse just let her talk.  Phinnesse was present when the police interviewed Jane, and she drove Jane to the County Hospital in Martinez, with the police following in their own vehicle.  (RT 133-136, 144.)  She was present during the entire sexual assault examination.  (RT 137-141.)

Phinnesse noted that it is against policy at the Living Skill Center for students to travel independently after dark.  Students are told that if they have to travel after dark, they should go in groups.  As with all students, Jane was told these rules, and she signed a paper acknowledging them.  Before this incident, Jane followed the rules fairly well.  After the incident, Jane was concerned that Phinnesse would be mad at her for traveling alone at night.  Jane blamed herself for being raped because she was out alone after dark.  Phinnesse assured her that she was not angry with her.  Jane was usually a very mild, calm, soft-spoken person; she was also very naive and sheltered.  Phinnesse noticed that after the assault Jane seemed depressed and unable to focus on her learning.  (RT 145, 148-150.)

16

Police processed the crime scene at Contra Costa College where Jane was found after the assault. Many photographs were taken of the area. One officer took photographs of and collected a white sight cane which was on the ground in an alleyway between a baseball backstop and a cement bathroom building at the college athletic fields. (RT 156-172.)

Dechanti Williams was on the BART train on the night of January 15, 2003, and observed a blind woman whom she did not know exit at the Del Norte Station as she did. Williams saw the blind woman being directed to a bus by a white male in the BART station. (RT 180, 196.) Williams herself went to board a bus, and as she did so a young man, whom she later identified as appellant, tried to pick her up. He was flirtatious with her, asking her name and how old she was. Williams told him he was too young for her. After she got on the bus, appellant continued to act young and foolish, tapping on the window urging her to get off the bus. He also got on the bus and tried to get Williams to come off the bus with him. He retreated off the bus when he finally understood that Williams was not going to exit the bus. (RT 181-185.)

At about the same time, the blind woman Williams had seen moments before was standing at the door of the bus talking to the driver. Appellant stood next to the blind woman and listened to her conversation with the driver, who was telling the woman it would be best if she took a taxi, since she would have a long walk from where the bus could drop her. Williams heard appellant offer to take the blind woman to the cab. Williams saw appellant guiding the woman by the elbow toward the taxi area. The blind woman did not resist. Williams did not see the pair reach the cab area, because the bus pulled out of the station. (RT 181, 185-186, 199.)

17

Williams saw both newspaper and televison reports about the rape of a blind girl, and the descriptions sounded to her like the blind woman whom Williams had seen at the BART station. Williams worked at J. C. Penny's at Hilltop Mall. A few days after the incident she saw appellant walk by the store as she was walking out, and she recognized him as the young man she had seen there that night. She contacted the police, and she gave the following description of appellant to Detective Sharp: a Black male, 6 feet tall, slender, with a light mustache and wearing a blue velour sweat suit. (RT 187-188, 590.) Sharp prepared a composite drawing from her description. He later showed her several photographic line ups that did not include appellant's picture, and she was unable to identify anyone from these. But Sharp later showed her a photo lineup that included appellant's photograph, and Williams picked out his photo as the man she had seen on the night of January 15, 2003. (RT 188-194, 447, 455-462.)

Araminta Harris was an AC Transit bus driver on the 376 line on the night of January 15, 2003. A blind woman using a cane came up to her bus and asked if she was driving to the college. Harris told the woman that the bus went there, but not to 23rd Street, where Harris knew a lot of blind people went because they had some kind of school there. The blind woman was insistent that she wanted to go to 23rd Street and said she would catch a cab. She initially pulled out her cell phone to call a cab, but Harris told her there was a taxi stand just around the corner on the other side of the BART station. (RT 380-389.)

As Harris was talking with the blind woman, a man whom Harris later identified as appellant came up to her bus and asked what time it was leaving. Harris had seen appellant before when he had ridden on her bus. She had seen him flirting and bouncing around the

18

area before he approached her bus that night. After Harris told the blind woman about the taxicab area, she saw appellant take the woman's right arm with his left--like a gentleman--and walk the woman around the side of the BART station toward the taxi area. Harris lost sight of them after about 20-30 feet. She did not hear any conversation between the two. (RT 387-391.)

Moments later, Harris saw a taxicab pull away from the BART station with the blind woman in it. In addition to the driver there was someone else in the taxi with the woman. She later identified a photo of the driver, Jaspal Singh Heir, but she could not tell who the other person in the taxi was. Harris did not drive away in her bus immediately after the taxi left, since she was waiting for appellant because he had expressed interest in catching her bus. After a few moments, she pulled her bus forward to look for appellant through an opening in the BART station toward the taxi stand. But she did not see him, so she drove her bus out of the station to begin her route. (RT 391-397.)

The next day Harris read an article in the newspaper about the blind woman. She called a detective's telephone number mentioned in the article and gave him a description of appellant: dark brown skin, age 20-25. She particularly mentioned his newly done, distinctive twisted hair style that made him look like Buckwheat. Later, the detective showed her several photographic line ups on several occasions, but she did not see appellant among those photographs. (RT 398-403.)

However, on February 21, 2003 at about 8:00 p.m., Harris drove her bus into the Del Norte BART Station to begin the route 376 run, and she saw appellant sitting in the station undoing his Buckwheat style hair. She immediately went to the BART station

agent booth and asked the agent to call the police. Several BART police came and detained appellant. Harris viewed appellant and confirmed that it was the man she had seen that night with the blind woman. A few days later she picked out a photograph of appellant from another photo line up, even though appellant did not have his Buckwheat hairstyle in the picture. (RT 404-410, 412.)

Detective Sharpe confirmed that he had shown a number of photographic line ups to Dechanti Williams and Araminta Harris before appellant was arrested, and they did not pick anyone out of those line ups. However, they both selected appellant out of the photo line up that he prepared after appellant was arrested. (RT 455-462.)

Sharp visited the 23rd and San Pablo area and found that Jane's residence was a short distance away on another road that joined San Pablo Avenue. (RT 526.)

When appellant was arrested he did not have Jane Doe's cell phone. (RT 556-557.) After he had talked to Jane, Detective Sharp obtained the records of calls to and from her cell phone from the phone company. (RT 485-486.) Among the seven calls that were made on the phone on January 16, 2003 was one to area code 714, made at 12:15 a.m. and lasting 10 minutes. (RT 486.) The remaining six calls were made after 1:30 a.m. Two of those calls were to (510) 451-6265, one at 8:18 a.m. and the other at 4:50 p.m. (RT 487.) Sharp subpoenaed records for that number and found that the subscriber was named Samantha Robinson. He later called the number and spoke to a woman who identified herself as Samantha Robinson. Jane's cell phone was never recovered. (RT 490, 492-493.)

Detective Sharp interviewed appellant in custody in the

20

early morning hours of February 22, 2003 after his arrest at the Del Norte BART station. Sharp advised appellant of his Constitutional rights, and appellant signed a waiver.[3] Appellant told Sharp that his date of birth was January 22, 1983, that he was 6 feet, 3 inches tall and that he weighed 173 pounds. (RT 462-464, 599-602, 608.)

Appellant told Sharp that he did not ride the bus very often, but used to take the AC transit route number 376 toward Pinole when he worked at UPS. (Exhibit 44a, p. 6.) He acknowledged seeing the AC Transit driver, Ms. Harris, the night he was arrested, and said he had ridden her bus before. (Exhibit 44a, p. 8.)

Sharp mentioned to appellant that several bus drivers had identified appellant as the person who had taken a blind girl to a cab on January 16, 2003, and gotten into the cab with her. Appellant denied taking a cab ride with a girl from the Del Norte Station. He said that what Sharp was saying had nothing to do with him; he agreed that he had ridden a bus and that he sometimes "hits" on girls. However, appellant denied helping a blind girl to a taxi cab or being involved with the events Sharp described. (Exhibit 44a, pp 7-13.) When Sharp said the man police were looking for had taken the blind girl to the college onto the football field and raped her twice and then took the girl's cell phone and left her there at 2:00 a.m. to fend for herself, appellant said, "That's really not me." He also characterized Sharp's description of events as "Sad." He said that there are a lot of people around who are tall and look like him. He said that he had girlfriends, and said, "I don't have to rape a female..." (Exhibit 44a, pp 15-16.)

---

[3]

The videotape of the interrogation of appellant by Detective Sharp was admitted into evidence as Exhibit 44. A transcript was provided to each of the jurors and was labeled Exhibit 44a. There are no page numbers on this transcript, but appellant will cite to it as if it were paginated.

Sharp took photographs of appellant and of appellant's hands to record the way he looked when he was arrested. The photographs of appellant's hands focused on the fingernails in order to show that they were sharp. (RT 465-466.) The detective also took four swabs from inside appellant's mouth for DNA testing, which he packaged and sent to the crime lab. (RT 468-469.) A sample of appellant's blood was also drawn while he was in custody. (RT 288-289.)

Because there was not enough evidence to charge appellant with a crime after he was initially arrested, he was released four days later. DNA evidence had not been processed by that time. (RT 469-470.)

David Stockwell, from the Contra Costa County Sheriff's Department Crime Lab, was qualified as an expert in the field of DNA testing and analysis. He is also an expert in the use of population frequencies relating to DNA testing and analysis. He explained the DNA testing concepts and the procedures used by his lab. (RT 613-674, 665.) Stockwell is a deputy sheriff and carries a badge. He has only a Bachelor of Science degree. He has done no research in the area of DNA. His entire professional career since 1982 has been working for law enforcement. (RT 715-717.)

Stockwell explained that using a microscope he examined a vaginal smear slide from Jane Doe that had been prepared by the SART nurse. On it he saw spermatozoa as well as typical vaginal cells. After he reported finding the sperm, he was assigned to conduct a DNA analysis of samples collected in this case. (RT 687-690.)

Stockwell first examined the reference sample from the vaginal swabs taken from Jane by the SART nurse. He used half of

22

the swab tip and extracted the DNA content from it. He separated out the sperm from the non-sperm material in the sample and then extracted sperm for the DNA content. (RT 691, 694-696.) Next, he extracted, isolated and concentrated the DNA from the swab taken from appellant's mouth. Only part of the samples were used in these testing processes, so the procedure could be replicated, if necessary. (RT 697-698.) He used the PCR process for analyzing the DNA. (RT 636ff.)

The Crime Lab's tests showed that a single male was responsible for the sperm that were found on the vaginal swab from Jane Doe. The DNA profile from those sperm matched appellant's DNA. Stockwell matched all 13 of the loci and the gender points between the sperm fraction from the vaginal swab and the reference profile taken from the oral swab from appellant. Using FBI databases about the genotype frequency for each genetic marker, Stockwell estimated that the profile he observed would be randomly observed in one in 59 quintillion African-Americans, one in 3.4 septillion Caucasians, and one in 11 septillion Hispanics. (RT 703-704, 715.)

Stockwell acknowledged that he was not present when any swab samples were taken from appellant's mouth, and that he was relying on the forms that accompanied the swabs, which indicated that the swabs had been taken from appellant. He also noted that if there was any contamination in the various swab samples taken, it could be greatly amplified in the PCR procedure. This could affect the results the of DNA tests. (RT 718-720.)

Detective Sharp rearrested appellant on March 4, 2003, based on the evidence he received from the crime lab. (RT 470-471.)

23

**The Defense Case**

Appellant rested his case without presenting any witnesses. In arguing to the jury, defense counsel indicated that there was no rape or digital penetration, since the sexual encounter was consensual. Counsel agreed that appellant was seen with Jane Doe at the Del Norte BART station, that they went for a cab ride together, and that they wound up at the Contra Costa Community College. There they engaged in consensual sexual intercourse. What occurred between the cab ride and the time the college custodian found Jane was what was at issue and was highly debatable in the case. (RT 856.)

Counsel argued that Jane was not a reliable or credible witness and pointed out her conflicting and contradictory statements, both in her testimony and in previous statements. (RT 858ff.) She had a reason to prevaricate in that she was afraid of getting kicked out of the Living Skills program for being out alone at night in violation of the rules. (RT 859.) Certainly, she was not a good historian about what happened. (RT 860.)

Counsel pointed out that the bus driver, Araminta Harris, had testified that appellant had taken Jane to the cab from her bus like a gentleman. Counsel emphasized that Jane got in the cab, and so did appellant, and the cab drove away. There was no struggle. Jane had a cell phone, but did not use it in the cab. (RT 862.)

Among many points of contradiction in her testimony, counsel emphasized that Jane had testified that when she got out of the cab at 23rd and San Pablo she was afraid, but that she never used her cell phone to call for help from 911 or from her Living Skills program or from nearby friends. She said she checked her messages after she got out of the taxi, but the phone records indicate that she

24

did not check them at that time, but had done so earlier in the
evening. She had testified that she talked to her friend in Anaheim
for about two minutes, but the phone records indicated that she had
stayed on the line to that number for ten minutes, not an action that
indicated that she was scared. Also, Jane did not tell Detective Sharp
in her two statements to him that she was scared when she got out of
the cab; this was first put forward only in her testimony. (RT 863-
864.)

   Counsel noted that in her taped statement to Detective Sharp
on January 22, 2003, Jane did not talk about being forced or dragged
or kidnaped. (RT 866.) He argued that the SART nurse had testified
that a woman could have the kind of injuries she documented to
Jane's genitalia during consensual sexual relations. (RT 872.) He
pointed out that besides the scrapes to Jane's knees, and a slight
scratch on her neck, the photographs of Jane did not show bruising or
other trauma that one might expect in a forcible sexual encounter.
There was no expert testimony that showed that the slight injuries
Jane experienced were consistent with women who are raped. (RT
871-875.)

   Counsel reminded the jury that Jane had testified that
appellant's penis was soft. The evidence thus indicated he may have
used his finger to help himself enter Jane's vagina and remain inside,
but there was no evidence that he specifically intended abuse, arousal
or gratification by his use of his finger. (RT 874-875.) The evidence
did not show beyond a reasonable doubt that there was a kidnap.
Furthermore, the sexual encounter was consensual. (RT 879-880.)

# **ARGUMENT**

## **INTRODUCTION**

Without doubt, the Bill of Rights exists to ensure that a citizen cannot be punished unless he or she has had a fair trial. Although the parameters of fairness are, of course, subject to case-by-case adjudication, it is manifest that a criminal defendant is entitled to certain basic protections in every case. Unfortunately, those protections were not afforded in the instant case.

As this brief will demonstrate, a series of fundamental constitutional errors occurred at appellant's trial: the court failed to instruct on an affirmative defense to the charge of rape; the court failed to instruct regarding essential elements of the One Strike allegations that resulted in appellant's life sentence; the evidence is insufficient to support either the sexual penetration conviction or the finding under the One Strike sentencing allegation; and the 25-years-to-life sentence under the One Strike sentencing scheme violated constitutional prohibitions against cruel and unusual punishment. Given the number and significance of these errors, it is impossible to conclude that appellant received a fair trial. Thus, appellant is confident that this court will vindicate his rights under the Constitution by granting him a new trial or reducing his sentence.

26

I.       **APPELLANT WAS DENIED DUE PROCESS UNDER THE FEDERAL CONSTITUTION WHEN THE TRIAL COURT FAILED TO GIVE HIS REQUESTED JURY INSTRUCTION PURSUANT TO CALJIC NO. 10.65 CONCERNING HIS DEFENSE OF REASONABLE GOOD FAITH BELIEF IN CONSENT**

The jury instructions in this case gave the jury an all-or-nothing choice between convicting appellant of forcible rape and forcible sexual penetration or accepting his defense of actual consent. That was unfair because in this case Jane Doe's actions at the BART station and in the taxi cab and after she and appellant got out of the cab were such that appellant could have reasonably and mistakenly believed Jane was consenting to having sex with him when she traveled in the taxicab with him, when she got out of the cab and went with him and had intercourse with him on the college grounds.

The court should have given the jury this middle ground. The jury should have been instructed with CALJIC No. 10.65, as appellant requested, providing the option of finding that, although Jane did not consent to sex with appellant, her conduct nonetheless was equivocal enough to lead appellant to reasonably and in good faith believe she had consented.

There was ample evidence in support of the defense of mistake of fact regarding Jane's consent to sexual intercourse. Thus the trial court committed reversible error when it failed to give CALJIC No. 10.65, as appellant requested.

A.       **Procedural Context And Cognizability On Appeal**

"It is well established that a criminal defendant is entitled to adequate instructions on the defense theory of the case." (*Conde v. Henry* (9th Cir. 2000) 198 F.3d 734, 739.) Due process requires that

27

the jury must be instructed on the defendant's theory of the case. (*People v. Modesto* (1963) 59 Cal.2d 722, 730.) Here, the primary defense to the charged sex offenses was consent. Appellant's counsel argued to the jury that Jane was lying or was at least "not a good historian" about the incident, and that the sexual encounter was consensual. (See RT 856-880.)

The trial court instructed the jury on the definition of actual consent as a defense to the rape charge, using CALJIC No. 1.23.1 (CT 394, RT 782), but failed to instruct the jury on reasonable belief in consent, also known as a mistake-of-fact, or the *Mayberry* defense, even though appellant requested that the court give CALJIC No. 10.65.[4] (CT 294, 302.) In refusing to give the instruction, the court said: "[I]t seems to me that there was not substantial evidence of the equivocal conduct that would have led a defendant to reasonably and

---

[4] The wording of the CALJIC No. 10.65 requested was set forth in a jury instruction form as follows: "In the crime of unlawful forcible rape oral copulation by force and threats forcible sodomy penetration of the genital or anal opening by a foreign object, substance, instrument or device by force, violence fear or threats to retaliate, criminal intent must exist at the time of the commission of the __(crime charged)___. [¶] There is no criminal intent if the defendant had a reasonable and good faith belief that the other persona voluntarily consented to engage in sexual intercourse oral copulation sodomy or penetration of the genital anal opening by a foreign object, substance, instrument, or device. Therefore, a reasonable and good faith belief that there was voluntary consent is a defense to such a charge, unless the defendant thereafter became aware or reasonably should have been aware that the other person no longer consented to the sexual activity. [¶] However, a belief that is based upon ambiguous conduct by an alleged victim that is the product of conduct by the defendant that amounts to force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person of the alleged victim or another is not a reasonable good faith belief. [¶] If after a consideration of all the evidence you have a reasonable doubt that the defendant had criminal intent at the time of the accused sexual activity, you must find him/her guilty of the crime." (CT 302.) The jury instruction form would obviously have had to be changed by the court to specify the particular offense involved in this case, had the court not refused to give the instruction.

28

in good faith believe consent existed where it did not." (RT 910-911.)

In contrast, the jury *was* instructed, as to kidnapping, on both actual consent (CT 350; RT 787-788; CALJIC No. 9.56), and reasonable, good faith belief in consent. (CT 351; RT 788; CALJIC No. 9.58). Because the requested instruction was not given, trial counsel was not able to argue that appellant thought Jane was consenting and had a reasonable belief that her actions or lack of action indicated she was consenting to his advances and to having sexual relations with him.

In *Mayberry*, as here, the defendant *requested* the instruction on reasonable belief in consent. (*People v. Mayberry, supra,* 15 Cal.3d at p. 153.) Later cases established that a trial court also has a *sua sponte* duty to give such an instruction whenever there is substantial evidence supporting the defense and the defense is not inconsistent with the defendant's theory of the case. (*People v. Castillo* (1987) 193 Cal.App.3d 119, 125-126; *People v. Burnham* (1986) 176 Cal.App.3d 1134, 1139-1149; *People v. Rivera* (1984) 157 Cal.App.3d 736, 739, 740-744; *People v. Hampton* (1981) 118 Cal.App.3d 324, 328-330.)

**B.      There Was Substantial Evidence to Support the *Mayberry* Instruction**

If the defense requests an instruction on a particular defense or a lesser included offense, an instruction must be given so long as there is substantial evidence in support of the defense or lesser included crime. (*People v. Wickersham* (1982) 32 Cal.3d 307, 324, overruled on another point in *People v. Barton* (1995) 12 Cal.4th 186, 200.) Importantly, doubt as to the sufficiency of the evidence must be resolved in favor of the defendant. (*People v. Flannel* (1979) 25

Cal.3d 668, 684-685.)  Moreover, even if the evidence in support of the instruction is "incredible," the reviewing court must proceed on the hypothesis that it is entirely true. *(People v. Burnham* (1986) 176 Cal.App.3d 1134, 1143, relying on *People v. Modesto* (1963) 59 Cal.2d 722, 729.)

Here, the jury was instructed pursuant to CALJIC No. 1.23.1 on actual consent as a defense to rape. (CT 394, RT 782.)  A natural corollary of the theory of actual consent is a defendant's reasonable and good faith belief in consent. (See *People v. Giardino* (2000) 82 Cal.App.4th 454, 471 ["A defendant's honestly and reasonably held but erroneous belief that the victim actually consented to sexual intercourse is a defense to a charge of forcible rape."], citing *People v. Williams* (1992) 4 Cal.4th 354, 360-361; *People v. Mayberry, supra,* 15 Cal.3d at p. 155.)

Thus, a trial court is obliged sua sponte to instruct on this alternative theory if the theory is supported by substantial evidence that the defendant actually believed the sex act was consensual and the alleged victim engaged in conduct that was sufficiently equivocal in regard to consent that the defendant reasonably believed there was consent. *(People* v. *Mayberry, supra,* 15 Cal.3d at pp. 153-158; accord *People* v. *Williams* (1992) 4 Cal.4th 354, 361, 364.)

In *People v. Williams, supra,* 4 Cal.4th 354, the California Supreme Court held the *Mayberry* instruction need not be given where the defense and prosecution accounts of the incident are "wholly divergent," resulting in "no middle ground from which [the defendant] could argue he reasonably misinterpreted the [complaining witness's] conduct." (*Id.* at p. 362.)

In *Williams,* the defendant testified the alleged victim "initiated sexual conduct, fondled him to overcome his impotence,

30

and inserted his penis inside herself." (*People v. Williams, supra,* 4 Cal.4th at p. 362.) The alleged victim, on the other hand, testified that the sex occurred only after the defendant blocked her, punched her, pushed her onto a bed, and warned her "he did not like to hurt people." (*Ibid.*) The Supreme Court found the defendant's version of the events, if believed by the jury, supported only actual consent. (*Ibid.*) That is, if the woman acted as the defendant described, there could be no mistake about the fact she actually wanted to engage in sexual conduct.

While rejecting the *Mayberry* instruction in that particular case, the *Williams* court held, for the guidance of lower courts in the future, that the instruction must be given where there is substantial evidence of the alleged victim's "equivocal conduct" constituting a possible middle ground, and even though such equivocal conduct follows the defendant's exercise or threat of force, violence or fear. (*People v. Williams, supra,* 4 Cal.4th at p. 362.) *This case is such a middle-ground case.*

The record demonstrates that Jane Doe's conduct was equivocal about whether she wished to have sex with appellant. To begin with, she took appellant's arm and allowed him to lead her to the taxicab at the BART Station. When they arrived at the cab, appellant asked if Jane wanted him to come with her. Though she testified she said no in response, she admitted that it was probably not loud enough for appellant to hear. After appellant entered the cab with Jane, he told the driver he wanted to take his girlfriend home, referring to Jane. Jane testified ambiguously that she both said nothing in response to this to either appellant or the cab driver and that she told the driver she was not appellant's girlfriend. (RT 85-90, 317.) She did not tell the cab driver that she did not know the man

31

with her or that she did not want him to go with her. After she and appellant got into the cab, Jane told the taxi driver that she wanted to go to 23rd and San Pablo. She did not tell him to take her directly to her apartment, which could have been interpreted as wanting to stay with appellant. (RT 316-317.)

During the ride in the taxi Jane made no protest to the cab driver about appellant's presence. She did not communicate in any way that she was concerned with appellant being in the taxi. She testified that during the 10-15 minute taxi ride she and appellant rode in silence, except that when appellant put his hand on her thigh, she asked that he move his hand, which appellant did. Jane had a cell phone, but did not use it in the taxi. (RT 90-92, 303, 305.) During her first interview after the incident, Jane told Detective Sharp that during the cab ride appellant had said to her, "All right, baby. I'll take you home." (RT 525.) She did tell Sharp she objected to this.

When Jane exited the taxicab at 23rd and San Pablo she let appellant pay the $10 cab fare with his own money. (RT 93.) She herself began walking and talking on the telephone to her friend in Anaheim. She talked for about 10 minutes. (RT 93-94, 486.) She did not call 911 nor is there evidence that she expressed any reservations about her situation to her friend in Anaheim.

At some point appellant walked up to Jane and asked to see her cell phone so he could talk to her friend and ask if she could meet Jane. When Jane refused this request, appellant took the phone. Jane's response was to make the ambiguous statement, "Okay. That's it. Fine." Then she simply walked away from appellant. (RT 96-97.) At that point appellant took hold of her from behind and made her walk with him for about 10 minutes. During the walk, the only thing Jane said was to ask appellant where they were going. She did not

scream nor try to signal the cars she heard traveling along the street where they walked. (RT 101, 311-312.)

It was only on the Contra Costa College Campus field by the bleachers that Jane demanded that appellant let her go and started screaming and struggling with appellant. In the struggle she and appellant fell to the ground. Jane testified that appellant banged her head against a wall, though no injuries were noted to her head. (RT 100-103, 112, 312, 342-343.) He told her to get up and she did. He said he would leave her alone if she did what he asked her to do, which was to have sex with him. He proceeded to have intercourse with Jane, during which she asked him to please stop. (RT 103-106.)

After the first intercourse and after Jane had gotten dressed, appellant came back and said he was going to do it again. He put Jane's arm around his, similar to how he had done it back at the BART Station, and lead her to some bleachers, where he again had intercourse with Jane. Jane did not protest. She did tell appellant that she was afraid she would have a baby, to which appellant replied that he would take care of any baby. Jane asked appellant his name (he said it was "Riece") and she told him hers was "Lauren." (RT 107-111, 574.)

Jane Doe's behavior during these events can fairly be categorized as "equivocal." At first, she appeared to voluntarily accompany appellant in the cab to a location in San Pablo. She gave no noticeable protest to appellant coming with her or toward his initial verbal advances. Her actions in the cab were uncertain. She did not call the police or seek help from her friend either during the cab ride or after she got out of the cab. She acted ambiguously, by her behavior giving conflicting suggestions as to whether she wished to have sex with appellant. Even after appellant took hold of her and

33

walked with her toward the college, Jane's actions were less than certain about whether she was consenting to be with appellant. However, in the field at the college campus Jane became less equivocal. The jury clearly did not believe that Jane consented to have sex with appellant. Nevertheless, because of what preceded the actions on the field appellant could reasonably have believed that Jane had consented. On these facts, jurors could certainly find that there was "equivocal" conduct which supported the defense of a reasonable good faith belief that consent had been given.

*People v. Anderson* (1983) 144 Cal.App.3d 55 supports this conclusion. In that case the defendant picked up two girls hitchhiking. One got in the back seat with the defendant's four-year-old son, while the other took the front seat. The defendant started forcibly fondling the girl next to him and ordered her to orally copulate him. The girl in the back seat moved to the front at the behest of the other so that defendant would stop his use of force. The defendant said he had a gun. As he drove, he ordered them to disrobe and out of fear, they did. Eventually, he pulled into a parking lot and engaged in several sex acts with the two girls, including intercourse with each of them. When he dropped the girls off, he warned them that if they spoke to the police, he would come and kill them. (*Id.,* at pp. 58-59.) By its verdict, the jury obviously rejected the defendant's defense of actual consent. The trial court had refused to give the *Mayberry* instruction. (*Id.,* at p. 60.) The appellate court concluded that there was substantial enough evidence to have required the giving of the *Mayberry* instruction. There was evidence that the young women appeared to willingly remain in appellant's presence and consent to the sex acts. The one girl moved from the rear seat, a place of safety, to the front, and she was seated by the door to the

vehicle and did not attempt to escape, though the vehicle was traveling on city streets, in moderate traffic, and stopped at a number of traffic lights. (*Id.*, at pp. 61-62.) The court held the failure to give the *Mayberry* instruction was prejudicial error. "While the jury decided the issue of actual consent adversely to appellant, that determination does not necessarily decide the issue of whether appellant reasonably believed the victims consented. The two defenses are separate." (*Id.*, at p. 63, citing *People v. Mayberry, supra,* 15 Cal.3d 143, 157-158.)

The court in *Anderson* also pointed out that it was not necessary for a defendant to have testified relative to the consent issue. Since a defendant's state of mind is most often shown through circumstantial evidence rather than his direct testimony, a defendant can establish sufficient circumstantial evidence other than by his testimony to require an instruction of his reasonable good faith belief on the question of consent. (*Ibid.*; *People v. DeLeon* (1992) 10 Cal.App.4th 815, 824.) Evidence of equivocal conduct on the part of a victim can come solely from the defendant's mouth, solely from the victim's mouth, or from a third party. (*People v. May* (1989) 213 Cal.App.3d 118, 125.) In the instant case, appellant did not testify, but the direct and cross-examination of Jane Doe as well as other circumstantial evidence was sufficient to establish appellant's state of mind of a reasonable good faith belief.

*People v. May, supra,* 213 Cal.App.3d 118 also supports the conclusion that the jurors could have found the "equivocal" conduct to support the defense of a reasonable good faith belief that consent had been given. There, a woman went to the defendant's home after meeting him in a bar. When the defendant told her to disrobe, the woman grabbed a steak knife and told him "no." When the defendant

35

disarmed her and slapped her, the woman went to the bedroom and took off her clothes. When the couple got on the bed, the woman tried to roll off. Oral copulation was then performed. On these facts, the Court of Appeal found there was ample evidence of equivocal conduct by the woman. (*Id.*, at pp. 125-126.)

Here, a similar situation is presented. Like the woman in *May*, Jane Doe gave indications she willingly traveled with appellant. However, after the taxi ride and particularly at the college campus, she signaled that she did not want to have sex (i.e. she started screaming that appellant should let her go and she struggled with appellant). However, like the woman in *May*, she arguably put aside her initial reluctance and voluntarily submitted to having intercourse. And after the initial sexual contact, during the second intercourse she did not resist or protest. Though this pattern of Jane Doe's conduct was not sufficient to convince the jury that there had been consent, it was certainly "equivocal" enough to require the court to instruct with CALJIC No. 10.65. (*People v. May, supra*, 213 Cal.App.3d at pp. 125-126.)

It was for the jury to decide whether or not Jane Doe's equivocal conduct was "the product of" the physical force or violence or of fear, such that the mistake-of-fact defense should be disallowed, or whether it warranted acquittal on the rape count. (See *People v. Williams, supra,* 4 Cal.4th at p. 364; see also CALJIC No. 10.65.) The jury is "permitted to credit some portions of a witness's testimony, and not credit others." (*People v. Williams, supra,* 4 Cal.4th at p. 364.) The jury could believe Jane - - that all her actions were the result of force and violence and fear engendered by appellant- - or could believe the circumstantial evidence of her vague, ambiguous or equivocal behavior - - that she in the taxi and walked willingly with

36

appellant and at that he could reasonably have believed they engaged in sexual relations that were not forced.

Thus, the jury could find appellant assaulted Jane Doe, but still find he reasonably and mistakenly believed she had consented to the sexual intercourse and sexual penetration. The requested CALJIC No. 10.65 would have provided an opportunity for the jurors to make that finding.   As it was, under the instructions given the only option the jury had to acquit was to find actual consent.  The court therefore erred in failing to instruct the jury on reasonable mistaken belief in consent.

**C.        Prejudice**

The trial court's failure to give the mistake-of-fact defense instruction of CALJIC No. 10.65 requires per se reversal. The controlling rule is that the omission to instruct on an affirmative defense constitutes reversible error unless "'the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions.' [Citation.]" (*People v. Stewart*(1976) 16 Cal.3d 133, 141; accord, *People v. Lee* (1987) 43 Cal.3d 666, 675, fn. 1.)[5]

In the instant case, the jury was not given any instruction on the subject of reasonable good faith belief in consent.  Thus, reversal is compelled. (*People v. May, supra*, 213 Cal.App.3d 118, 128; "[a]lthough the jury resolved the issue of <u>actual</u> consent against May, that determination says nothing about how they would have resolved

---

[5]

At least two Court of Appeal opinions have said that the failure to instruct on a defense does not require reversal per se. (*People v. Gonzales*(1999) 74 Cal.App.4th 382, 391; *People v. Elize* (1999) 71 Cal.App.4th 605, 616.) However, these cases cannot be followed since this court is required to adhere to the rule stated by the state Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

the issue of <u>reasonable belief</u> in consent, since they were never asked to consider it. [Citations.]," emphasis in original.)

Importantly, the instructional error impacts on both counts of rape and on the forcible sexual penetration count. Thus, these three counts must be reversed. (*May, supra*, 213 Cal.App.3d at pp. 128-129; failure to instruct on the defense of reasonable good faith belief required reversal of oral copulation conviction and conviction for assault with intent to commit rape.)

Aside from California law, per se reversal is required under the due process clause of the federal Constitution. In *United States v. Escobar De Bright* (9th Cir. 1984) 742 F.2d 1196, the defendant was charged with the conspiracy to sell drugs. Although there was substantial evidence that the defendant had conspired with a government agent, the trial court refused to instruct the jury on the defendant's theory that a conspiracy conviction cannot be found where the only co-conspirator is a government agent. After finding that the instruction should have been given, the Court of Appeals held that the error was reversible per se:

> "The right to have the jury instructed as to the defendant's theory of the case is one of those rights 'so basic to a fair trial' that failure to instruct where there is evidence to support the instruction can never be considered harmless error. Jurors are required to apply the law as it is explained to them in the instructions they are given by the trial judge. They are not free to conjure up the law for themselves. Thus, a failure to instruct the jury regarding the defendant's theory of the case precludes the jury from considering the defendant's defense to the charges against him. Permitting a defendant to offer a defense is of little value if the jury is not informed that the defense, if it is believed or if it helps create a reasonable doubt in the jury's mind, will entitle the defendant to a judgment of acquittal." (*Escobar De Bright, supra*, 742 F.2d at pp. 1201-1202.)

38

Notably, the analysis in *Escobar De Bright* is entirely consistent with that which has been subsequently posited by the United States Supreme Court. In this regard, the court has indicated that per se reversal is required when an error "vitiates all the jury's findings." (*Sullivan v. Louisiana, supra,* 508 U.S. 275, 281, emphasis in original.) Or, stated otherwise, per se reversal is compelled when the consequences of an error "are necessarily unquantifiable . . . ." (*Id.,* at p. 282; accord, *Neder v. United States*(1999) 527 U.S. 1 [144 L.E.2d 35, 48].) Since it is impossible to know whether a jury would have accepted a defense which it never had occasion to consider, the conclusion is inescapable that the effect of the instructional omission is "necessarily unquantifiable." (See *Conde v. Henry, supra,* 198 F.3d 734, 740-741; structural error found where the defense was precluded from presenting its "theory of the case;" *United States v. Sarno* (9th Cir. 1995) 73 F.3d 1470, 1485; "failure to instruct a jury upon a legally and factually cognizable defense is not subject to harmless error analysis. [Citations.]")

Assuming arguendo that this court should find that error occurred solely under state law and is not entitled to per se reversal, the question is whether there is a reasonable probability that an acquittal would have been returned absent the error. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) Under *Watson*, a reasonable probability "does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility. [Citations.]" (*College Hospital, Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715, emphasis in original; see also *People v. Blakely* (2000) 23 Cal.4th 82, 93.) Thus, prejudice must be found under *Watson* whenever the defendant can "'undermine confidence'" in the result achieved at trial. (*College Hospital, Inc. v. Superior Court, supra,* 8 Cal.4th 704,

715.)

It is manifest that prejudice must be found in this case. The case was factually fairly simple, with the actual presentation of evidence lasting four days (including two half days). (RT 217-226, 231-234.) Yet the jury deliberated for a total of approximately thirteen hours over four days. (CT 234-243.) Given this objective indication that the case was close, reversal is mandated. (*People v. Cardenas, supra*, 31 Cal.3d 897, 907; six hours of deliberations is evidence of a close case.)

Another indication of the close nature of the case were the jury's requests for readbacks of testimony. On the first day of deliberations the jury requested that it be allowed to receive Jane Doe's January 22, 2003, interview with Detective Sharp, as well as receive copies of the transcript of the interview. The jury also asked to examine all other evidence. (CT 468.) On the third day of deliberations the jury requested a readback of all of Jane Doe's testimony. (CT 473.) Crucially, later the same day the jury requested a readback of part of the cross examination of the SART nurse, Louise Jones, "starting with the cross-examination by the Defense Attorney of Louise Jones regarding whether or not the injuries sustained on [Jane Doe's] genitalia could have been caused by 'normal' sex, to the end of her testimony." (CT 476.) This request indicates that the jury was closely considering whether or not the sexual relations between appellant and Jane Doe had been consensual. Even if a jury eventually convicts the defendant, its requests for additional instructions or the readback of testimony may establish that the case was a close one. (*People v. Pearch* (1991) 229 Cal.App.3d 1282, 1295; "[j]uror questions and requests to have testimony reread are indications the deliberations were close.

40

[Citations.]"; *People v. Williams* (1971) 22 Cal.App.3d 34, 38-40;
request for readback of critical testimony.)

 Moreover, the jurors in this case reported on the fourth day
that they were deadlocked, also indicating a close case. The court
inquired whether they had reached verdicts on any of the counts, and
the presiding juror wrote that they had, but only on one count. (CT
478.) The court decided to have the jurors put the written verdict
form that related to the count they had decided into a sealed envelope
for the court's safekeeping. (RT 925-926.) Since the two rape and
the sexual penetration charges were all interconnected, it is unlikely
that before it reported it was deadlocked the jury had decided any of
those counts.[6] It was only after the court interviewed the jury and
found out from the jurors that several believed additional instruction
would be helpful and then reread certain of the instructions and
ordered them back into the jury room for further deliberations that the
jury resolved its deadlock and returned verdicts on all counts.
Requests for additional instruction is another indication of a close
case and points to prejudice in the failure to give the requested
instruction. (*People v. Filson* (1994) 22 Cal.App.4th 1841, 1852.)

 The jury was obviously troubled by the case. This court is
required to take heed. (*Sullivan v. Louisiana* (1993) 508 U.S. 275,
279; harmless error analysis requires an appellate court to look at the
impact of an error on the jury.)

 The jury had trouble with coming to a verdict even in the

---

6

 Since the jury had sent a specific note about the count five robbery,
asking whether if they found appellant not guilty on robbery they had to
make a decision as to both of the lesser counts (CT 474), and since the jury
ultimately found appellant not guilty of robbery, but guilty of both lesser
crimes (CT 503-505), it is likely that the verdict they reached before they
reported they were deadlocked was on count five.

face of a very sympathetic young blind victim. But the ambiguous conduct of Jane Doe made it entirely reasonable for appellant to have believed that she wished to have sex with him. Thus, there is certainly a substantial possibility that the jury would have accepted the defense of reasonable good faith belief in consent had an appropriate instruction been given. (*College Hospital, Inc. v. Superior Court, supra,* 8 Cal.4th 704, 715.)

As has been shown above, the trial court prejudicially erred by failing to instruct the jury on the defense theory of reasonably good faith belief in Jane Doe's consent, which was supported by substantial evidence. Such being the case, the judgment on counts one, two and three must be reversed.

**II.    SINCE THE COURT FAILED TO INSTRUCT THE JURY REGARDING ESSENTIAL ELEMENTS RELATING TO THE APPLICABILITY OF SECTION 667.61, APPELLANT'S "ONE STRIKE" LIFE SENTENCE MUST BE STRICKEN**

**A.    Facts/Introduction**

Appellant was sentenced to an indeterminate term of 25 years to life for the count one conviction of forcible rape (section 261, subdivision (a)(2)) of Jane Doe under the so-called "One Strike Law." (CT 566-567; *People* v. *Rayford* (1994) 9 Cal.4th 1, 8 [section 667.61 is commonly known as the "One Strike" law].) Appellant contends that the 25-years-to-life sentence imposed must be stricken, because the jury was inadequately instructed regarding crucial elements of this penalty statute, thereby abridging his right to trial by jury. (See, *Apprendi* v. *New Jersey* (2000) 530 U.S. 466.)

The One Strike law imposes life imprisonment upon conviction for certain sex crimes committed under specified

42

conditions, even if the offender has no prior convictions. Section 667.61, subdivision (a) provides that a person convicted of particular offenses detailed in subdivision (c), including forcible rape and forcible sexual penetration, under at least one circumstance detailed in subdivision (d) is to be imprisoned for life and not be eligible for parole for 25 years, with good time credits of no more than 15 percent. (Section 667.61, subdivisions (a), (c) and (j).) Among the circumstances detailed in subdivision (d) are that "the defendant kidnapped the victim of the present offense and the movement of the victim substantially increased the risk of harm to the victim over and above that level of risk necessarily inherent in the underlying offense in subdivision (c)." (Section 667.61, subdivision (d).)

The One Strike law requires that for its penalty provisions to apply, "the existence of any fact required under subdivision (d) or (e) shall be alleged in the accusatory pleading and either admitted by the defendant in open court or found to be true by the trier of fact." (Section 667.61, subdivision (i).) In the instant case the information alleged "pursuant to subdivisions (a) and (d) of Penal Code section 667.61, that in the commission of each and/or all of the above offenses the Defendant, Jermaine Lavarius McCord, kidnapped Jane Doe and the movement of Jane Doe substantially increased the risk of harm to Jane Doe, over and above the level of risk necessarily inherent in each and/or all of the above offenses."[7] (CT 72.)

The jury was instructed regarding its obligation to make a finding relative to the section 667.61 allegation as follows:

---

[7]

This allegation, though worded to apply to all five counts, clearly was not applicable to the count four kidnaping and the count five robbery, since they are not sex offenses enumerated in section 667.61, subdivision (b). However, this error was rectified by not submitting to the jury the applicability of 667.61 to these counts. (CT 368, 491-505.)

43

"It is further alleged that at the time of the commission of the crimes charged in Counts One Two and Three, that the defendant committed a kidnapping that substantially increased the risk of harm to the victim.

If you find defendant guilty of the crimes charged in Counts One, Two and Three, you must determine whether or not the truth of this allegation has been proved. The People have the burden of proving the truth of this allegation.

If you have a reasonable doubt that it is true, you must find it to be not true. Include a special finding of that question, using a form that will be supplied to you." (CT 368; RT 800.)

Appellant contends that this inadequate instruction – particularly its first paragraph – omitted key elements of the One Strike sentencing scheme. Section 667.61, subdivision (d)(2) requires that a kidnapping be "of the victim of the present offense." It further requires that "the movement of the victim" be what substantially increases the risk of harm to the victim. Further, the rather vague term "risk of harm to the victim" is qualified as being that which is "over and above that level of risk necessarily inherent in the underlying offenses," which in this case were the two rape counts and the charge alleging digital penetration.

Thus, the instruction regarding section 667.61 given in this case did not specify that the jury should examine what had been specifically alleged in the information, nor did it lay out all of the considerations that the jury had to decide . The instruction did not specify that it had to be the actual movement of Jane Doe that

substantially increased the risk of harm to her. And it did not specify that the definition of the risk of harm was not just any risk, but that risk of harm which was over and above the normal risk which is necessarily inherent in the offenses of rape and/or sexual penetration without the movement.

A proper instruction on the One Strike allegation would have included the following italicized wording which should have been added by the court to the first paragraph of the above instruction that was actually read to the jury:

It is further alleged that at the time of the commission of the crimes charged in Counts One, Two and Three, that the defendant committed a kidnapping [*of Jane Doe and that the movement of Jane Doe by defendant*] substantially increased the risk of harm to [*Jane Doe over and above that level of risk necessarily inherent in the underlying offense of rape charged in Counts One and Three and/or the underlying offense of forcible sexual penetration charged in Count Two.*]

**B.    The Court Had The Sua Sponte Obligation To Instruct the Jury on the One Strike (Section 667.61) Principles of Law**

"Even in the absence of a request, a trial court must instruct on general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case. [Citation.]" (*People v. Mayfield* (1997) 14 Cal.4th 668, 773.) More specifically, there is a *sua sponte* duty to instruct on the elements of the One Strike circumstances. (*People v. Jones* (58 Cal.App.4th 693, 709; *People v. Estrada* (1997)

45

57 Cal.App.4th 1270, 1275.)

A defendant has a constitutional right to have the jury determine every material issue presented by the evidence, and a denial of that right constitutes a miscarriage of justice regardless of the strength of the prosecution's case. (*People* v. *Reynolds* (1988) 205 Cal.App.3d 776, 779 (citations omitted.).) The trial court must ensure that the instructions adequately state the law and adequately assist the jury in resolving the issues addressed by the instructions. (*People* v. *Kay* (1984) 153 Cal.App.3d 888, 898.) This is true regardless of whether the instruction pertains to a crime, a defense, an enhancement, or a "penalty provision." In this regard, the United States Supreme Court has written:

> The question whether Apprendi had a constitutional right to have a jury find such [racial] bias [which will increase his sentence for the crime charged] on the basis of proof beyond a reasonable doubt is starkly presented. [¶¶] Our answer to that question was foreshadowed by our opinion in *Jones* v. *United States*, 526 U.S. 227 (1999), construing a federal statute. We there noted that "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Id.*, at 243, n. 6. The Fourteenth Amendment commands the same answer in this case involving a state statute...
> Merely using the label "sentence enhancement" to describe the latter surely does not provide a principled basis for treating them differently. [¶¶] At stake in this case are constitutional protections of surpassing importance: the proscription of any deprivation of liberty without "due process of law," Amdt. 14, and the guarantee that "[i]n all criminal prosecutions, the accused shall enjoy the right to a

46

speedy and public trial, by an impartial jury,"
Amdt. 6.[fn. omitted] Taken together, these rights
indisputably entitle a criminal defendant to "a jury
determination that [he] is guilty of every element
of the crime with which he is charged, beyond a
reasonable doubt." *United States v. Gaudin*, 515
U.S. 506, 510 (1995); see also *Sullivan* v.
*Louisiana*, 508 U.S. 275, 278 (1993); (*In re
Winship* (1970) 397 U.S. 358, 364 ("[T]he Due
Process Clause protects the accused against
conviction except upon proof beyond a reasonable
doubt of every fact necessary to constitute the
crime with which he is charged."). (*Apprendi v.
New Jersey, supra*, 530 U.S. at pp. 475-477.). . .
     If a defendant faces punishment beyond that
provided by statute when an offense is committed
under certain circumstances but not others, it is
obvious that both the loss of liberty and the stigma
attaching to the offense are heightened; it
necessarily follows that the defendant should not--
at the moment the State is put to proof of those
circumstances--be deprived of protections that
have, until that point, unquestionably attached.
(*Apprendi* v. *New Jersey, supra*, 540 U.S. at pp. 483-484.)

     Under the unequivocal language of *Apprendi*, a jury

instruction was required in appellant's trial on not just whether or not

at the time of the commission of the sex crimes charged he committed

a kidnapping that substantially increased the risk of harm to a victim,

but also whether or not the kidnapping resulted in movement to Jane

Doe and the movement itself caused a substantial increase in the risk

of harm to her over and above the risk of harm that would otherwise

necessarily have been suffered by her in a rape or sexual penetration

that would have occurred without the movement.  Since the

legislature has defined the penalty by resort to these specific factors,

under the *Apprendi* analysis, these issues must be submitted to the

jury.  The instruction actually given failed to do this and therefore

was erroneous.

**C.    Reversal Of Appellant's Conviction Is Required Because The Prosecution Cannot Prove Beyond A Reasonable Doubt That The Error Did Not Contribute To the Result Obtained**

"[E]xcept for sentence enhancement provisions that are based on a defendant's prior conviction, the federal Constitution requires a jury to find, beyond a reasonable doubt, the existence of every element of a sentence enhancement that increases the penalty for a crime beyond the "prescribed statutory maximum" punishment for that crime. (*Apprendi v. New Jersey, supra,* 530 U.S. at p. 490.) Therefore, a trial court's failure to instruct the jury on an element of a sentence enhancement provision (other than one based on a prior conviction), is federal constitutional error if the provision "increases the penalty for [the underlying] crime beyond the prescribed statutory maximum." (*Ibid.*)  Such error is reversible under *Chapman* v. *California* (1967) 386 U.S. 18, 24, unless it can be shown "beyond a reasonable doubt" that the error did not contribute to the jury's verdict." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 326.)  The burden is on the beneficiary of the error "either to prove that there was no injury or to suffer a reversal of his erroneously obtained judgement." (*Chapman v. California* (1967) 386 U.S. 18, 23-24.)

"The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279, emphasis in the original.)  "The *Chapman* test is whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'  "To say

48

that an error did not contribute to the verdict is ... to find that error unimportant in relation to everything else the jury considered on the issue in question...." (*Yates v. Evatt* (1991) 500 U.S. 391, 402-403; accord, *Sullivan v. Louisiana, supra*, 508 U.S. 275, 279.)

In the present case, the prosecution is unable to meet the *Chapman* burden. The question of whether Jane Doe was in fact kidnapped and the extent of any movement were key issues that were contested in the trial. In her recorded interview with the investigating detective, Jane did not talk about being held or forced or dragged or kidnapped, a fact emphasized by appellant's trial counsel in his argument to the jury. (Exhibit E1; RT 866.) At other times Jane characterized the amount of force that allegedly was used by appellant variously as being "grabbed" or "held" or "directed." In her direct testimony she at first indicated that as soon as appellant contacted her after she had alighted from the taxicab at 23rd and San Pablo, and before they walked anywhere, she screamed and he covered her mouth and they fell to the gourd where he banged her head against the ground. (RT 98.) In her cross-examination, however, she changed her story and admitted that it was only after they had arrived at the college campus that she and appellant fell to the ground and she hit her head and that it was only then that she started screaming. (RT 309-314.) Defense counsel argued that partly because of her contradictory statements and partly because of her motivation to make up a story in order not to get in trouble with her Living Skills program, Jane Doe was possibly lying and was at least an unreliable and not credible witness. (RT 858-860.)

The testimony was that the incident occurred late at night. Jane Doe testified that when she and appellant were walking toward the college campus she did not hear any other pedestrians and heard

49

only a few automobiles. (RT 99.) There was no evidence about the lighting conditions at the intersection of 23rd and San Pablo, where Jane and appellant got out of the taxi. There was evidence that the athletic field where the custodian found Jane later in the night was fairly dark, but also that every other light was still on at the field. There were lights on in some of the adjoining parking lots and street lights along El Portal Drive next to the athletic field. (RT 73-76.) Whether it was darker in the athletic field than on the street where the pair got out of the taxicab was not clear. There was no testimony from the investigating officer comparing these locations.

A correctly-given jury instruction would have focused the jury on the critical issue of the alleged movement of Jane Doe and whether any such movement by appellant substantially increased the risk to her over and above what it would have been had she been raped right after she got out of the taxi. "[T]he 'risk of harm' element focuses on the movement of the victim during the kidnapping, and the resulting risk of harm. The jury is to consider 'such factors as the decreased likelihood of detection, the danger inherent in a victim's foreseeable attempts to escape, and the attacker's enhanced opportunity to commit additional crimes. (See, e.g., *People v. Lara* [(1974)] 12 Cal.3d [903,] 908 & fn. 4 [examples of such risk of harm 'include not only desperate attempts by the victim to extricate himself but also unforeseen intervention by third parties']; *In re Earley* [(1975)] 14 Cal.3d [122,] 132 ["asportation gave rise to dangers, not inherent in robbery, that an auto accident might occur or that the victim might attempt to escape from the moving car or be pushed therefrom by [defendant]"); cf. *People v. Caudillo* (1978) 21 Cal.3d 562, 574 ... [aggravated kidnapping includes review of such factors as 'the defendant's motivation to escape detection' and 'the possible

enhancement of danger to the victim resulting from the movement.'].)' (*People v. Rayford* (1994) 9 Cal.4th 1, 13-14.)" (*People v. Jones, supra,* 58 Cal.App.4th at p. 713.)

The risk of harm accompanying the crime of rape is high in itself. To prove the One Strike elements of kidnapping and movement and the "required substantial increase in that risk, the risk of harm must therefore be very high indeed. In most cases to establish such an increase in risk the prosecution must prove that the perpetrator removed the victim to a secluded 'secondary location' where privacy affords the perpetrator great control and the victim very little." (*People v. Rayford* (1994) 9 Cal.4th 1, 24, Mosk, J., dissenting.) The jury should have been focused by the jury instructions on whether the movement involved in any kidnapping that occurred substantially raised the risk of harm over and above that which would have been inherent in a rape at the original location.

The jury obviously struggled with its decision about the kidnapping and the sexual crimes, reporting on the fourth day of deliberations before the court re-instructed them that they were hopelessly deadlocked on all except one count. (RT 478; See fn. 6 *infra* for an analysis showing that the deadlock was on the kidnapping and sex crimes counts.) A properly instructed jury would have been able to determine that there was significant risk of harm in any rape or sexual penetration in the first instance and that, though appellant should be fund guilty of the sex crimes, the actual movement of Jane Doe in any kidnapping did not substantially increase the necessarily inherent risk of harm in rape and sexual penetration. But because of the faulty instruction on the One Strike charge, the jury was denied the opportunity to make that determination.

The jury should have been given the chance to decide

51

whether any movement of Jane Doe by appellant substantially increased the risk of harm to her over and above the level of risk necessarily inherent in the underlying offenses of rape or sexual penetration. The error was not harmless beyond a reasonable doubt. It cannot be demonstrated beyond a reasonable doubt that an acquittal or at least a hung jury would not have resulted if the jury had been fully instructed with all the elements of the statute that the prosecution had to prove. That is, it cannot be shown that a properly instructed jury would not have come to a different conclusion about appellant's culpability under the One Strike law. (*Chapman v. California, supra*, 386 U.S. at p. 24.)

**III.     THE ONE STRIKE SENTENCING FINDINGS UNDER PENAL CODE SECTION 667.61 SHOULD BE STRICKEN, SINCE THERE WAS INSUFFICIENT EVIDENCE THAT ANY MOVEMENT FROM THE KIDNAPPING SUBSTANTIALLY INCREASED THE RISK OF HARM TO JANE DOE**

The determination by the jury that the One Strike sentencing provision of section 667.61 was true in relation to the rape and sexual penetration charges rest on insufficient evidence. The statute at issue, section 667.61, subdivision (d)(2), reads in pertinent part as follows: "The defendant kidnapped the victim of the present offense and the movement of the victim substantially increased the risk of harm to the victim over and above that level of risk necessarily inherent in the underlying offense ...." The plain wording of this sentencing scheme required the jury to find two elements: (1) a kidnapping; and (2) movement of the victim that results in a substantial increase in the risk of harm over and above that which is necessarily inherent in the crimes of rape and sexual penetration.

To determine a claim of insufficient evidence, an appellate court must ascertain whether, on the entire record, there is substantial evidence from which a reasonable trier of fact could have found the elements of the crimes charged beyond a reasonable doubt. (*People v. Miranda* (1987) 44 Cal.3d 57, 86; *People v. Johnson* (1980) 26 Cal.3d 557, 576-578.) In making this determination, the reviewing court "'must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [citations]" (*People v. Johnson, supra*, 26 Cal.3d at p. 576.) The task is twofold: first, to resolve the issue in the light of the whole record; second, to judge whether the evidence of each of the essential elements of the charged offense is substantial. (*Id.*, at p. 577.)

Evidence is substantial if it is "of ponderable legal significance...reasonable in nature, credible of solid value. [citations]" (*Id.*, at 576.) The evidence must consist of more than a mere possibility that something happened to be considered substantial. (*People v. Houts* (1978) 86 Cal.App.3d 1012, 1019.)

"[K]idnapping within the meaning of section 667.61, subdivision (d)(2) requires movement of the victim that is more than incidental to the underlying sex offense." (*People v. Diaz* (2000) 78 Cal.App.4th 243, 246.) However, the California Supreme Court has observed that there is no minimum distance a defendant must move a victim. The Court has held that the question of whether the movement was incidental to the commission of the underlying crime is to be considered in the whole context of the environment in which the movement occurred. (*People v. Rayford, supra*, 9 Cal.4th at p. 12.)

In the instant case, the evidence shows that appellant rode

with Jane Doe in the taxicab to 23rd and San Pablo. He paid for the cab as Jane left it and began walking home and talking on her cell phone. Appellant then came up to her as she walked and talked. He engaged her in conversation about her phone. He took the phone from her and she acquiesced. He took hold of her and apparently made her walk with him. They walked approximately 10 minutes to an athletic field on the edge of the college campus. There was some vehicle traffic along the way, but Jane did not notice any pedestrian traffic. If the jury thought that the kidnapping began on the street near 23rd and San Pablo, given that environment and the place where appellant ended up with Jane, there does not appear to be sufficient evidence that the movement of Jane itself substantially increased the risk of harm to her.

Regarding the element of a risk of harm beyond that inherent in the underlying sexual offenses: "The 'risk of harm' test is satisfied when the victim is forced to travel a substantial distance under threat of imminent injury by a deadly weapon. [Citation.]" (*In re Earley, supra,* 14 Cal.3d at p. 131, fn. omitted.) In the present case there was no threat by a weapon. After riding in the taxi with Jane, appellant approached her after they got out of the taxi and inquired about her conversation with her friend in Anaheim. He took the phone from her hand. He placed one hand around her middle and the other hand on her shoulder and moved with her about 10 minutes toward the college campus. (RT 309.) Jane did not verbally protest as they walked. She asked where they were going and appellant replied that he was taking her to a bus stop. (RT 311.) There was never any evidence presented of a verbal threat or threat with a weapon during the movement from the initial location to the college athletic field. (Cf., *People v. Jones, supra,* 58 Cal.App.4th at p. 718;

sufficient evidence of one strike circumstance where defendant used gun to kidnap and then do sex crimes to victim.)

There was not substantial evidence in the instant case about the different lighting in the location where appellant first took hold of Jane Doe at the intersection of 23rd and San Pablo and the location of the purported sexual assaults. The athletic field at the community college had approximately half its lights on at that time of night and parking lots and streets in the areas apparently were lighted. The lighting question affects the sufficiency of evidence of increased risk of harm as well. This is not like the case of *People v. Diaz, supra,* 78 Cal.App.4th at p. 249, where the court found substantial evidence of increased risk of harm where the victim was accosted at night at a well-lighted intersection and then forcibly taken to an area that was completely dark. In *Diaz,* the court opined that "[c]learly, the risk to the victim in the dark and isolated location of the attack increased significantly as compared to the lighted sidewalk near the bus stop where the incident began." (*Ibid.*)

Even though it is not clear that this is what occurred in the present case, it should be noted that acts of removing a victim from public view do not in themselves substantially increase risk of harm to the victim, though such acts are a circumstance to be considered in determining whether the risk of harm substantially increased. (*In re Earley, supra,* 14 Cal.3d at 133.)

In the instant case, the evidence of the essential elements of the One Strike allegations were not of solid enough value to support the jury finding that the movement of Jane Doe in any kidnapping substantially increased the risk of harm to her over and above the level of risk necessarily inherent in the underlying crimes of rape and sexual penetration. Accordingly, the jury finding of the truth of these allegations must be stricken.

55

IV.    **APPELLANT'S 25-YEARS-TO-LIFE SENTENCE UNDER THE "ONE STRIKE" SENTENCING SCHEME VIOLATES FEDERAL AND STATE CONSTITUTIONAL PROHIBITIONS AGAINST CRUEL AND/OR UNUSUAL PUNISHMENT AND SHOULD THEREFORE BE REDUCED**

I.        **The Applicable Standards**

        **1. Federal Standard**

        The Eighth Amendment to the United States Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted." A punishment is excessive in violation of the Eighth Amendment if it is "grossly out of proportion to the severity of the crime." (*Gregg v. Georgia* (1976) 428 U.S. 153, 173.)

        The cruel and unusual punishment clause of the Eighth Amendment prohibits the imposition of a penalty that is disproportionate to the defendant's "personal responsibility and moral guilt." (*Enmund v. Florida* (1982) 458 U.S. 782, 801.) In *Solem v. Helm* (1983) 463 U.S. 277, the United States Supreme Court found the imposition of a life sentence without the possibility of parole for a seventh nonviolent felony to be unconstitutional under the Eighth Amendment. A majority of the Supreme Court held: "[A] court's proportionality analysis under the Eighth Amendment should be guided by objective criteria, including (i) the gravity of the offenses and the harshness of the penalty; (ii) the sentence imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for the commission of the same crime in other jurisdictions." (*Id.*, 463 U.S. at p. 292.)

        A few years later, the Supreme Court decided *Harmelin v. Michigan* (1991) 501 U.S. 957 and upheld the imposition of a life sentence without possibility of parole for a defendant who possessed over one and a half pounds of cocaine. Harmelin produced five

56

separate opinions. While seven justices supported a proportionality review under the Eighth Amendment, only four favored application of all three factors cited in *Solem*. In *Harmelin*, Justice Scalia, joined by Chief Justice Rehnquist, concluded *Solem* was wrongly decided and that the Eighth Amendment contained no proportionality guarantee. (*Harmelin v. Michigan, supra*, 501 U.S. at p. 1001.) Justice Kennedy, joined by Justices Souter and O'Connor, found that the Eighth amendment encompasses "a narrow proportionality principle" (*Id.*, 501 at p. 997) and "does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime." (*Id.*, 501 U.S. at p. 1001.)

Utilizing this restrictive analysis, Justices Souter, O'Connor and Kennedy determined that Harmelin's sentence was not grossly disproportionate to his crime. (*Id.*, 501 U.S. at 1004-1005.) Noting that the defendant possessed a large quantity of cocaine with a potential yield of between 32,500 and 65,000 doses, and the "[p]ossession, use and distribution of illegal drugs represent ''one of the greatest problems affecting the health and welfare of our population,'' these justices also concluded that "petitioner's crime threatened to cause grave harm to society." (*Id.*, 501 U.S. at p. 1002.)

The United States Supreme Court again used the "grossly disproportionate test" in deciding whether a forfeiture was an excessive fine under the Eighth Amendment. In *United States v. Bajakajian* (1998) 524 U.S. 321, customs inspectors found that Bajakajian was preparing to board an international flight without reporting, as required by federal law, that he was transporting more than $10,000. In fact, Bajakajian attempted to leave the country with $357,144, which the government sought to seize as an instrumentality of the crime. (*Id.*, 524 U.S. at pp. 324-325.)

To analyze the situation in *Bajakajian*, the Supreme Court

looked to its past interpretations of the Eighth Amendment, relying on the precedents set forth in *Solem v. Helm, supra*, 463 U.S. 277, and *Rummel v. Estelle* (1980) 445 U.S. 263, 271. The Court held that a forfeiture is unconstitutional if it is grossly disproportionate to the gravity of the defendant's offense. (*United States v. Bajakajian, supra*, 524 U.S. 321.) Applying this test, the *Bajakajian* court found that the forfeiture of $357,144 was grossly disproportionate to petitioner's crime of failing to report currency. (Id., 524 U.S. at pp. 339-340.)

Thus, in determining whether a defendant's sentence is cruel and unusual under the Eighth Amendment, one must only consider the first factor enumerated in *Solem* and again in *Bajakajian*–the gravity of the offense and the harshness of the penalty. Nonetheless, comparative analyses of sentences may be considered "to validate an initial judgment that a sentence is grossly disproportionate to the crime." (*Harmelin v. Michigan, supra*, 501 U.S. at p. 1005.)

### 2. California Standard

The Eighth Amendment's ban on cruel and unusual punishment is made obligatory on the states through the Fourteenth Amendment. (*Robinson v. California* (1962) 370 U.S. 660.) Article I, section 17 of the California Constitution separately and independently sets out a prohibition similar to the Eighth Amendment. (*People v. Dillon* (1983) 34 Cal.3d 441, 478.)

Analysis of whether a sentence imposes cruel or unusual punishment begins with a recognition that "in our tripartite system of government it is the function of the legislative branch to define crimes and prescribe punishments, and that such questions are in the first instance for the judgment of the Legislature alone." (*In re Lynch* (1972) 8 Cal.3d 410, 414; citations omitted.) Although the Legislature is accorded "the broadest discretion possible in enacting

58

penal statutes and in specifying punishment for crime, . . . the final judgment as to whether the punishment it decrees exceeds constitutional limits is a judicial function." (*People v. Anderson* (1972) 6 Cal.3d 628, 640.)

A punishment may violate Article I, section 17 of the Constitution "not only if it is inflicted by a cruel or unusual method, but also if it is grossly disproportionate to the offense for which it is imposed." (*People v. Dillon, supra*, 34 Cal.3d at p. 478.) A sentence may be deemed to be grossly disproportionate in two ways: the sentence in the abstract may constitute cruel or unusual punishment or the sentence as applied to a particular defendant might be cruel or unusual. Even if the imposition of the sentence might not be cruel or unusual in every case in which it is imposed, imposition of that sentence might be cruel or unusual as applied a particular defendant. (*People v. Superior Court (Beasley)* (1984) 159 Cal.App.3d 131, 134-135.) As explained below, the application of section 667.61 in the present case constitutes cruel and/or unusual punishment.

**B.**    **Appellant's Sentence Constitutes Cruel And/Or Unusual Punishment**

In the present case appellant received a total sentence of 26-years-to-life imprisonment. Twenty five years of this draconian sentence resulted from the application of section 667.61, the One Strike law.  At sentencing, appellant moved to modify the verdict on the basis that the sentence mandated by section 667.61 violated the state and federal prohibitions against cruel and unusual punishment. (CT 527-533; RT 993ff.)  As set forth below, appellant asserts that section 667.61 is unconstitutional on its face and as applied to him in this case.

59

### 1. Section 667.61 Is Facially Unconstitutional

Section 667.61, subdivision (a) provides for a mandatory consecutive term of 25-years-to-life whenever a defendant is convicted of a serious sexual offense enumerated in subdivision (c) and the prosecution establishes one or more of the circumstances set forth in subdivision (d). For purposes of section 667.61, appellant was found guilty of section 261, subdivision (a)(2) and section 289, subdivision (a)--both of which are listed in section 667.61, subdivision (c)--and the prosecution established the enhancing circumstances of aggravated kidnaping (section 667.61, subdivision (d)(2)). Given the interplay of the underlying convictions and the One Strike penalty findings, appellant received a 25-years-to-life term pursuant to subdivision (a) of section 667.61. Added on to this sentence was the enhancement pursuant to section 667.9, subdivision (a), because of the victim being blind.

By mandating a term of 25-years-to-life whenever a defendant commits an enumerated offense and meets the enhancing criteria, section 667.61 constitutes cruel and/or unusual punishment on its face. The statute is constitutionally defective because it does not recognize significant gradations of culpability depending on the severity of the current offense and it fails to take mitigating factors into consideration. (*In re Grant* (1976) 18 Cal.3d 1, 11-13; *In re Foss* (1974) 10 Cal.3d 910, 923.)

In addressing the question of whether the application of section 667.61 amounted to cruel and unusual punishment in the case before it, the Second District Court of Appeal (Division Seven) in *People v. Estrada* (1997) 57 Cal.App.4th 1270 found only two states which provided comparable sentences for aggravated rape: Louisiana (LWOP) and Washington (minimum 20 years). (*Id.* at p. 1282; see also the Sixth District case of *People v. Alvarado* (2001) 87

Cal.App.4th 178, 200; appellant acknowledges these contrary authorities.)

Even if there are several other states with measures as draconian as California's section 667.61, it would not save the California statute. "[I]f the challenged penalty is found to exceed the punishments decreed for the offense in a significant number of those jurisdictions, the disparity is a further measure of its excessiveness." (*In re Lynch, supra*, 8 Cal.3d at p. 427.)

Appellant would be in a position to challenge the constitutionality of the statutory scheme even if the particular unfairness described may not have occurred in his case. (*In re Grant, supra*, 18 Cal.3d at pp. 11-12, 18; *In re Lynch, supra*, 8 Cal.3d at p. 439; see *United States v. Cheely* (9th Cir. 1994) 36 F.3d 1439, 1444 & fn. 11.)

Thus, section 667.61 is unconstitutional on its face.

### 2. Section 667.61 Is Unconstitutionally Applied in this Case

Appellant's probation report indicates that he was just short of 20 years old at the time of the crimes for which he was found guilty in this case. His prior criminal record consisted of only minor misdemeanor conduct, with one conviction for receiving stolen property (section 496d-- receiving a stolen vehicle). (CT 535-555.)

Appellant was abandoned by both his parents at an early age and was mainly raised by his grandmother in Mississippi, until his mother came back into his life and then moved with him to California. He then bounced back and forth between his mother and father, spending some longer time with his father, who is an air traffic controller, staying with him for a time when he was transferred to Texas. (CT 543-548.) As trial counsel noted from this background, "we can only suspect what kind of psychological trauma this [history]

inflicted on him." (CT 530.)

Despite the troubled upbringing, appellant was an honest and hardworking person, according to his mother. At the time of the incident he was working as a stock clerk for Nike Town in San Francisco. He had previously worked for UPS as a package handler. While in jail, appellant earned his high school equivalency degree and began college correspondence courses, with an eye to obtaining a bachelor's degree. He was not married, but had a daughter with his girlfriend. (CT 530, 542-545.)

Appellant's trial counsel noted that appellant's mother loves and cares for him deeply, having attended almost every day of his trial. His step father, a pastor at a local church, wrote a letter in his support to the probation officer, detailing appellant's positive qualities, but also his need for help. (CT 526, 530, 558.) At his sentencing hearing, his step father spoke eloquently on appellant's behalf with the conviction that appellant, with the network of support he has, was a changed young man. Also speaking for appellant was a chaplain from the San Francisco Sheriff's Department who attested to the resources that he would help apply to assisting appellant's way back into society. (RT 989-992.)

Appellant wrote a letter to the court before his sentencing in which he basically asked for the court's mercy, saying he had matured during his time in custody and no longer did the same thing that criminals do. He acknowledged making a lot of mistakes in his life and being very terrified by his trial. He said that he had evaluated his former lifestyle and used the time in jail to better himself. He expressed that his incarceration had actually helped him in his life. (CT 523-525.) The court acknowledged the letter and said it expressed appropriate sentiments and that appellant demonstrated that he knows the wrongfulness of his acts. (RT 992.)

The crimes for which appellant was sentenced in this case, while serious and reprehensible, do not warrant the punishment of the 25-years-to-life One Strike law sentence. An individual who commits a cold-blooded premeditated murder is subject to a 25-years-to-life sentence (section 190, subdivision (a)), while a defendant who commits a second degree murder in California receives a sentence of 15-years-to-life (section 190, subdivision (a)), much less than the sentence imposed upon appellant for his present offenses. By starker contrast, a defendant who is found to have engaged in continuous repetitive sexual molestation of a child he resides with is exposed to a maximum determinate sentence of only 16 years in California, pursuant to section 288.5.

While the two counts of rape and the sexual penetration of Jane Doe after kidnapping her–should they survive this appeal–certainly deserve significant punishment, no principled analysis can view appellant as a greater danger and menace to society than a murderer or a molesting pedophile. His culpability is more in line with a forcible rape offender, who is subject to an eight year aggravated term of imprisonment (Section 264, subdivision (a)), which together with the enhancement because of the victim in this case being blind (Section 667.9, subdivision (a)) would be a 9 year sentence, plus whatever other determinate terms that might be required to punish him for the other offenses he was convicted of. As stated in *Dillon*, "a comparison of the challenged penalty with those proscribed in the same jurisdiction for more-serious crimes . . . is particularly striking when a more serious crime is punished less severely than the offense in question . . . " (*People v. Dillon, supra,* 34 Cal.3d at p. 487, fn. 38.)

**C.**        **Appellant's Sentence Should Be Reduced**

The 26-years-to-life sentence imposed in this case is grossly disproportionate to appellant's crimes and personal circumstances and therefore constitutes unconstitutional cruel and/or unusual punishment.  Therefore, appellant's sentence should be reduced by this Court to a determinate term calculated to impose reasonable punishment that takes into account appellant's conduct and individuality and that complies with federal and state constitutional provisions prohibiting cruel and unusual punishment.

**V.      APPELLANT'S CONVICTION FOR FORCIBLE
         SEXUAL PENETRATION MUST BE REVERSED,
         SINCE THERE WAS INSUFFICIENT EVIDENCE OF
         DIGITAL PENETRATION OR THE REQUISITE
         SPECIFIC INTENT**

Appellant was convicted of one count of forcible sexual penetration. But in actuality, there was insufficient evidence to sustain this allegation.

Section 289, subdivision (a)(1) prohibits any "act of sexual penetration when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person..." Subdivision (k)(1) describes sexual penetration as "the act of causing the penetration, however slight, of the genital or anal opening of any person or causing another person to so penetrate the defendant's or another person's genital or anal opening for the purpose of sexual arousal, gratification, or abuse by any foreign object, substance, instrument, or device, or by any unknown object." "'Foreign object, substance, instrument, or device' shall include any part of the body, except a sexual organ." (Section 289, subdivision (k)(2).) Penetration, however slight, does not require proof of vaginal penetration. It includes contact with the victim's hymen, clitoris, and other genitalia inside the exterior of the labia majora. (*People v. Quintana* (2001) 89 Cal.App.4th 1362, 1372.)

Thus, as part of the jury instructions given to the jury regarding the crime of forcible sexual penetration, the jury was correctly told, pursuant to CALJIC No. 10. that "In order to prove this crime, each of the following elements must be proved: [¶] One, a person committed an act of sexual penetration upon another person. [¶] Two, the sexual penetration was against the will of the alleged victim. [¶] Three, the sexual penetration was accomplished by...the

65

use of force, violence, duress, menace or fear of immediate and
unlawful bodily injury on the alleged victim or any other person
...threatening to retaliate in the future against the alleged victim or
any other person, and there was a reasonable possibility that the
perpetrator would execute the threat. [¶] And four, the penetration
was done with the purpose and specific intent to cause sexual arousal,
gratification or abuse." (RT 794-795.)

When Jane testified she said that during the first rape
incident her assailant stuck his finger into her vagina and then put his
penis in for about 5 minutes. She said it did not hurt when he did
this, but it felt uncomfortable. (RT 105-106, 315.)

The SART Nurse testified in this case that when she
examined Jane Doe, Jane told her that her assailant had penetrated her
vagina with his finger two times and that both times he was putting
his finger in at the same time as his penis. (RT 332-333.) When
Detective Sharp interviewed her the same night as the incident he had
asked her whether of not her assailant's penis was erect or soft when
he inserted it into her. She specifically told the detective that it was
soft. (RT 531.) But she said that the assailant had kept pushing
against her and insider her really hard, though there was no
clarification about whether his penis remained soft during this entire
time of pushing. (RT 582-583.) In Detective Sharp's audio taped
interview of Jane about a week after the incident, he asked whether
her assailant had, besides his penis, also put a finger in her. She said
that he had, but only the first time, not the second time. And she said
that he was doing it at the same time as he was putting his penis in
her. (Exhibit E1, p. 14.)

As is apparent by the above evidence, there is nothing that
indicated that appellant, in putting his finger into Jane Doe's vagina,
had the purpose and specific intent of causing sexual arousal,

66

gratification or abuse.  It is clear that appellant was using his finger to guide his soft penis into Jane Doe's vagina, but the intent in so doing was not to abuse Jane or for his own arousal or gratification.  The sexual penetration was thus incidental to the rape and was not a separate crime.

The prosecutor confused the issued when she argued the following to the jury: "[There's two theories for the digital asexual penetration.  [¶] At one point she said he stuck it in twice.  At one point, it's once.  All 12 have to decide is [*sic.*] at least there was one, one where he inserted his finger into her vagina.  You have to agree, all 12 of you, even if his hand – stuck his finger to guide his penis.  [¶] What's not required for rape is his penis didn't have to be erect.  His penis did not have to go all the way in.  The fact that he stuck his finger is a separate crime.  [¶] All you have to decide is – and agree, all 12 of you – is that he did it at least once.  You don't have to agree that it was the first time or the second time, only that he did it once.  He's only charged with one count."  (RT 887-888.)

One problem with this formulation is that it left out the requirement that the digital penetration had to have been with the purpose or specific intent of abuse, arousal or gratification.  This was precisely the area in which the evidence was insufficient.

Because on the record in this case there is no substantial evidence from which a reasonable trier of fact could have found the elements of digital penetration beyond a reasonable doubt, appellant's conviction for this crime must be reversed.  (*People v. Johnson, supra,* 26 Cal.3d at pp. 576-578.)

## VI.    WHEN VIEWED CUMULATIVELY, THE NUMEROUS ERRORS REQUIRE REVERSAL

As has been established above, a series of errors occurred at appellant's trial.  Appellant's requested instruction on the defense of a reasonable good faith belief in Jane Doe's consent was denied by the court.  The jury was misinstructed regarding the essential elements on the One Strike law that resulted in his 25 years to life sentence.  The evidence was insufficient concerning the One Strike allegation and the digital penetration charge.  In addition, the indeterminate 25-years-to-life sentence under the One Strike law violates constitutional prohibitions against cruel and unusual punishment.  Given the sheer number of errors, a finding of cumulative and reversible prejudice is required.  (*People v. Hill* (1998) 17 Cal.4th 800, 844; a number of errors, though independently harmless, will require reversal when the totality of the record shows that the defendant was denied a fair trial.)

In seeking reversal, appellant must once again emphasize that this was a close case.  Appellant offered the substantial factual defense that Jane Doe consented to have sex with him.  As a result, the jury evidenced its discomfiture by asking questions, seeking further instruction, and by deliberating for thirteen hours. Given these objective indications that the case was a close one, reversal is mandated.  (*People v. Holt* (1984) 37 Cal.3d 436, 458-459; the "cumulative effect" of evidentiary errors and prosecutorial misconduct compelled reversal.)

68

## CONCLUSION

For the reasons set forth in the arguments above, appellant Lavarius Jermaine McCord respectfully requests that the judgment of conviction be reversed with directions to dismiss the sexual penetration charge and the One Strike sentencing allegation. Assuming there is no reversal, appellant's sentence should be reduced as set forth herein.

Date: August 28, 2005

Respectfully submitted,

H. STANLEY DEWEY
Attorney for Appellant

By Appointment of the Court
of Appeal Under the First
District Appellate Project's
Independent Case System

## <u>Certification of Length of Brief</u>

I, H. Stanley Dewey, attorney for appellant herein, certify

pursuant to Rule 33(b) that, according to the word processing program used

to create this brief, the brief contains 20,656 words.

H. STANLEY DEWEY
Attorney for Appellant

## CERTIFICATE OF SERVICE BY MAIL

I, H. Stanley Dewey, declare:

I am an active member of the State Bar of California.  I am not a party to the within action.  My business address is 3150 Hilltop Mall Road, Richmond, California 94806.  On the date subscribed below, I deposited in the United States Mail at Richmond the following attached document(s):

APPELLANT'S OPENING BRIEF

Before I deposited the above-described document(s) in the U.S. Mail, I placed them in sealed envelope(s) with postage fully prepaid thereon, addressed as follows:

Bill Lockyer
Attorney General of California
455 Golden Gate Avenue, Suite 1100
San Francisco, CA  94102-3664

District Attorney, Contra Costa County
P.O. Box 670
Martinez, CA 94553

First District Appellate Project
730 Harrison Street, #201
San Francisco, CA  94107

Clerk, Contra Costa County
For Delivery to: Judge Harlan Grossmn
P.O. Box 911
Martinez, CA  94553

Lavarius Jermain McCord, V-62318
San Quentin State Prison
San Quentin, CA 94974

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 8/29/05

H. STANLEY DEWEY
Attorney at Law

71

# EXHIBIT B

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT, DIVISION FIVE

**THE PEOPLE OF THE STATE OF CALIFORNIA,**

Plaintiff and Respondent,

v.

**LAVARIUS JERMAINE McCORD,**

Defendant and Appellant.

A108457

Contra Costa County Superior Court No. 050320282
The Honorable Harlan G. Grossman, Judge

ATTORNEY GENERAL-
OFFICE COPY
**FILED**
Court of Appeal-First App. Dist.

NOV 1 8 2005

DIANA HERBERT

**RESPONDENT'S BRIEF**

BILL LOCKYER BY ——————
Attorney General of the State of California DEPUTY

ROBERT R. ANDERSON
Chief Assistant Attorney General

GERALD A. ENGLER
Senior Assistant Attorney General

MOONA NANDI
Supervising Deputy Attorney General

JOAN KILLEEN
Deputy Attorney General

State Bar No. 111679

    455 Golden Gate Avenue, Suite 11000
    San Francisco, CA 94102-7004
    Telephone: (415) 703-5968
    Fax: (415) 703-1234

**Attorneys for Respondent**

8/30/2005 ROBF

**DOCKETED**
**SAN FRANCISCO**

NOV 2 3 2005

By: L. MACARAEG
No. 9F2005 0A-0092

# TABLE OF CONTENTS

Page

STATEMENT OF THE CASE                                              1

STATEMENT OF FACTS                                                2

ARGUMENT                                                         11

    I.    THE TRIAL COURT PROPERLY FOUND THAT THERE WAS INSUFFICIENT EVIDENCE TO WARRANT INSTRUCTION ON REASONABLE GOOD FAITH BELIEF IN CONSENT                                     11

    II.    THE TRIAL COURT PROPERLY INSTRUCTED THE JURY ON THE ELEMENTS OF THE SECTION 667.61 KIDNAPPING ALLEGATION                                17

    III.    SUFFICIENT EVIDENCE SUPPORTS THE JURY'S FINDING ON THE KIDNAPPING SPECIAL ALLEGATION                                         21

    IV.    APPELLANT'S ONE STRIKE SENTENCE DOES NOT CONSTITUTE CRUEL AND UNUSUAL PUNISHMENT                                      25

    V.    SUFFICIENT EVIDENCE SUPPORTS APPELLANT'S CONVICTION FOR SEXUAL PENETRATION                                            31

CONCLUSION                                                      33

i

# TABLE OF AUTHORITIES

Page

**Cases**

*People v. Aguilar*
(2004) 120 Cal.App.4th 1044                                    22

*People v. Alvarado*
(2001) 87 Cal.App.4th 178                            26, 27, 30

*People v. Bloyd*
(1987) 43 Cal.3d 333                                           21

*People v. Campbell*
(2000) 82 Cal.App.4th 71                                       19

*People v. Diaz*
(2000) 78 Cal.App.4th 243                                      23

*People v. Estrada*
(1997) 57 Cal.App.4th 1270                       26, 27, 29, 30

*People v. Jackson*
(1998) 66 Cal.App.4th 182                                      29

*People v. Johnson*
(1993) 6 Cal.4th 1                                             21

*People v. Jones*
(1997) 58 Cal.App.4th 693                             19, 20, 22

*People v. Kraft*
(2000) 23 Cal.4th 978                                          21

*People v. Mayberry*
(1975) 15 Cal.3d 143                                           14

*People v. Redmond*
(1969) 71 Cal.2d 745                                           21

## TABLE OF AUTHORITIES  (continued)

                                                                        Page

*People v. Rhodes*
(2005) 126 Cal.App.4th 1374                                            27, 29

*People v. Rodriguez*
(1999) 20 Cal.4th 1                                                        21

*People v. Salazar*
(1995) 33 Cal.App.4th 341                                                  23

*People v. Shadden*
(2001) 93 Cal.App.4th 164                                                  22

*People v. Smith*
(1995) 33 Cal.App.4th 1586                                                 23

*People v. Stitely*
(2005) 35 Cal.4th 514                                                  12, 15

*People v. Towler*
(1982) 31 Cal.3d 105                                                       21

*People v. White*
(1986) 179 Cal.App.3d 193                                                 32

*People v. Williams*
(1992) 4 Cal.4th 354                                                      12

*People v. Wutzke*
(2002) 28 Cal.4th 923                                                  29, 30

**TABLE OF AUTHORITIES  (continued)**

Page

**Statutes**

Penal Code
  § 207, subd. (a)                                             1
  § 209, subd. (b)(1)                                          19
  § 211                                                        1
  § 212.5, subd. (c)                                           1
  § 261, subd. (a)(2)                                          1
  § 289, subd. (a)(1)                                          1
  § 667.61, subds. (a) and (d)                                 17
  § 667.61, subd. (d)                                          29
  § 667.61, subd. (d)(2)                               19, 20, 22
  § 667.9, subd. (a)                                           1


**Other Authorities**

California Jury Instructions, Criminal
  No. 9.52.1                                                   18
  No. 9.54                                                     19
  No. 9.56                                                     15
  No. 9.58                                                     15
  No. 10.65                                           11, 12, 14, 15
  No. 17.24.1                                                  18

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT, DIVISION FIVE

| | |
|---|---|
| **THE PEOPLE OF THE STATE OF CALIFORNIA,**<br><br>Plaintiff and Respondent,<br><br>v.<br><br>**LAVARIUS JERMAINE McCORD,**<br><br>Defendant and Appellant. | A108457 |

## STATEMENT OF THE CASE

On October 17, 2003, the Contra Costa County District Attorney filed an information charging appellant with forcible rape (Pen. Code, § 261, subd. (a)(2), counts one, three),[1] forcible sexual penetration (§ 289, subd. (a)(1), count two), kidnapping (§ 207, subd. (a), count four), and second degree robbery (§§ 211/212.5, subd. (c), count five). The information further alleged that the victim was blind and that appellant knew or reasonably should have known of the disability (§ 667.9, subd. (a)), and that in the commission of the offenses, appellant kidnapped the victim, thereby substantially increasing the risk of harm over and above the risk inherent in the underlying offenses. (CT 70-72.)

On July 14, 2004, a jury found appellant guilty on counts one through four and guilty of the lesser included offense of grand theft on count five. (CT 491-505; RT 949-966.) On October 6, 2004, the trial court sentenced appellant to a total term of 26 years to life in state prison. (CT 562-567; RT 996-1002.)

On November 10, 2004, appellant filed a notice of appeal. (CT 568.)

---

1. All other unspecified statutory references are to the Penal Code.

1

## STATEMENT OF FACTS

Will Robertson, a custodian on the graveyard shift at Contra Costa College, was working in the early morning hours of January 16, 2003, when he saw a blind woman feeling her way along the fence and out the gate of a dark football field. (RT 49-51, 70, 73.) The woman, who was frightened, asked Robertson if he could help her. She said she had been raped and that the person took her cell phone and cane. Robertson took her to the custodian's office and contacted the campus police. (RT 52-53.)

The victim, referred to as Jane Doe in the reporter's transcript, was 22 years old at the time of trial and had been blind since birth. She lived at California School for the Blind in Fremont while she was growing up. (RT 78.) On January 15, 2003, she was at the school for a meeting, which ran late. (RT 79, 119, 321.) When she was ready to leave that evening, she called Para Transit to take her to her apartment in San Pablo. When Para Transit failed to arrive at the school, she decided to take BART home. (RT 79-81.) She had never taken BART or the bus home by herself before that night. (RT 92-93.)

Jane Doe left the school about 10:00 p.m. (RT 82.) While she was riding BART, she asked a passenger to tell her when they got to El Cerrito Del Norte station. When they reached that station, she asked the passenger to take her to the number 72 bus stop. (RT 82-84.) The first bus driver told Jane Doe that she was not going to Contra Costa College or to 23rd and San Pablo, where Jane Doe wanted to go. A second bus driver also said she was not going to Jane Doe's destination. (RT 85-86.) While she was speaking to the second driver, a man came up to Jane Doe and asked if she needed help. Jane Doe asked him to take her to the cab stand. (RT 87-88.)

The man walked with Jane Doe to the cab stand at the BART station. She held onto his arm with one hand and used her other hand to feel with her cane. (RT 88-89.) Jane Doe asked the cab driver to take her to 23rd and San

Pablo. The man who had walked her to the cab stand asked if she wanted him to go with her. She said no, but thought she said it too softly, because he got in the cab with her. (RT 89-90.)[2/] The man told the cab driver he wanted to take his girlfriend home. Jane Doe had never met the man before. She did not say anything to him because she was "really afraid." She could smell alcohol and thought he was drunk; she was afraid that if she said anything, "he might get violent." (RT 90.) She told the cab driver she was not the man's girlfriend, but he did not respond. She did not say anything else because she was afraid. (RT 303, 316-317.)

During the cab ride, there was no further conversation, but the man put his hand on Jane Doe's thigh. After she moved away from him, he did not touch her. (RT 92.) When the cab stopped, Jane Doe got out and walked away. The man, who paid the cab driver with his own money, got out about two minutes after she did. As she continued to walk, Jane Doe called a friend on her cell phone to tell her that she was not home yet. While she was talking on the phone, the man from the cab came up and asked for her phone. He said he wanted to ask her friend if she could meet Jane Doe. When Jane Doe said "no," he grabbed the phone away from her and refused to return it. After Jane Doe walked away, the man grabbed her from behind with both hands. (RT 93-97.)

The man "dragged [her] to the college," about ten minutes away. (RT 99, 309.) When she asked him to stop, he told her to "shut the F up." (RT 100.) She heard cars pass by, but did not hear anyone. She was screaming as the man dragged her on the sidewalk. (RT 101, 309.) At some point, Jane Doe felt gravel under her feet. She could tell they went around a fence or wall and over to some wooden bleachers. She continued to scream, and the man

---

2.  Jane Doe did not ask the cab driver to take her to her apartment because she did not want the man to know where she lived. (RT 317.)

3

continued to tell her to shut up. (RT 101-102.)[3/] The man told her to sit down or he would knock her out. When she tried to get away from him, they both fell to the ground. The man covered her mouth, then started choking her. He also banged her head on the ground. (RT 98-99, 103, 309, 314.) Jane Doe kicked the man in the stomach, and he hit her on her shoulder. He told her she had "skinned up his knees," and she said he had skinned hers as well. He said, "Get up, bitch, right now." (RT 103.)

The man lifted Jane Doe up from the ground and said he would leave her alone if she did what he asked. He said, "Lift up your shirt before I fucking kill you." (RT 104; see RT 320.) After Jane Doe lifted her shirt, the man laid her on the ground and pulled down her underwear and pants. (RT 104-105.) The man put his finger in her vagina, then inserted his erect penis for about five minutes. (RT 105, 315.) When Jane Doe asked him to stop, he told her "to shut the F up." He told her he would stop when he was finished. (RT 105.) It hurt "a little bit" when he had his penis inside her, "but most of the time it felt really uncomfortable." (RT 106.) After he was finished, Jane Doe asked the man which way she should go. He told her to go straight and she would find her way home, then left her there. (RT 106-107.)

After the man left, someone came up to Jane Doe and asked if she needed help. She said she had been raped and needed to go to the police station. The man pretended to phone the police. When Jane Doe felt his sweatshirt, however, she realized it was the same man who had just raped her. (RT 107-108.) The man said, "You are in trouble. Now I am going to do it again." (RT 108.) He dragged her to the bleachers where he pulled down her pants and took off one of her shoes and socks. (RT 109-110.) He put his penis

---

3.   Jane Doe later said she started screaming when they got to the bleachers. She had asked the man where they were going, and he said they were going to the bus stop. (RT 312.)

4

in her vagina for about two minutes. While the man was raping her, Jane Doe said she was going to get pregnant. He said he would take care of the baby. (RT 110.) When the man took his penis out the second time, he told Jane Doe he was not "raping" her. He also said he was watching her. He said he had to get his things and would be right back. He left, but did not return. He took her phone and white cane with him. (RT 111.)[4]

Jane Doe walked around for several minutes, but had no idea where she was. When a custodian found her, he took her to call the police. After the police arrived, she went to the hospital. (RT 111-114.) Jane Doe had never had sex before that night. (RT 117-118.) She did not willingly have sex with the man. (RT 117.)

Dechanti Williams was on the BART train on the night of January 15, 2003. When she exited at the Del Norte station, she saw a blind woman ask a man for directions to the bus stop. (RT 180-181.) As Williams walked to the same bus stop, appellant approached her and tried to pick her up. Williams told him he was too young for her. (RT 181-183.) After she boarded the bus, appellant continued to tap on the window and tried to persuade her to exit the bus. Williams "just looked at him and shook [her] head." (RT 183.) Appellant then got on the bus and told Williams to get off. She told him she did not know him and that she was not getting off the bus. (RT 184.) While appellant was trying to persuade Williams to go with him, the blind woman was asking the bus driver how to get to a location in San Pablo. (RT 183-185.) After appellant got off the bus, he stood next to the blind woman and listened to her talk to the bus driver, who recommended that she get a cab to take her home. (RT 185.) When the bus driver tried to direct the blind woman to the cab area,

---

4. Jane Doe's cell phone bills showed that several calls were made on her phone in the hours following her attack. (RT 486-488.)

appellant offered to take her over there. As the bus pulled out, Williams saw appellant grab the woman's elbow and guide her to the cabs. (RT 186, 199.)

A day or two later, Williams saw appellant when she was leaving a store at Hilltop Mall, but did not talk to him. She had earlier telephoned the police because she saw a news story about an incident involving a blind woman and thought it was the same woman she had seen at the BART station. When she spoke to the police officer, she provided a description of the man she last saw with the blind woman that night. (RT 187-190, 200.) She later selected appellant's photograph from a lineup. (RT 193-194, 462.) Williams had no doubt that appellant was the man she saw with the blind woman on January 15, 2003. (RT 196.)

Araminta Harris, an AC transit bus driver, saw appellant at the Del Norte bus stop on the night of January 15, 2003. He had ridden her bus a couple of times. That night, he asked when she was leaving. When a blind woman approached Harris's bus, appellant was still "bouncing" and "flirting" around. (RT 386-388.) The blind woman wanted to go to 23rd and San Pablo, but Harris told her she did not go to that location. Harris was going to show the woman where to catch a cab, but before she could do so, appellant took the woman's arm and walked her to the cab area. (RT 389-390, 398.) Harris then saw the woman leave in a cab. There was another person "kind of crouched down" in the cab, but she could not see who it was. (RT 393.) Harris was "devastated" when she read an article about the blind woman in the next day's paper. (RT 398.) She contacted the police and provided a description of appellant. (RT 398-400.)

Harris subsequently saw appellant at the same bus stop, where he was taking the braids out of his hair. Harris went to the BART station booth and asked them to call the police. (RT 405-406.) After the police arrived and stopped appellant, Harris identified him as the man she had seen with the blind

6

woman the night of the assault. (RT 407-409, 424.) Harris told the officers she had no doubt of her identification. (RT 425.) She also identified him in a photo lineup. (RT 462.)

Nancy Phinnesse taught independent living skills to visually impaired students so they could live in the community. (RT 133-134.) Jane Doe, who had been living in an apartment at the living skills center in San Pablo since December 2002, was one of her students. (RT 134.) In the early morning hours of January 16, 2003, Phinnesse received a call informing her of what had happened to Jane Doe. Phinnesse went to Contra Costa College, where Jane Doe was waiting with two custodians. (RT 135.) Jane Doe was "[t]raumatized. She was very quiet. She was—to me, she was almost in shock, but she wanted to talk about it a lot, and I just let her talk. But she was clearly upset." (RT 136.) Phinnesse said that Jane Doe was "very naive and very sheltered." (RT 145.) She was generally "very calm," "very mild, very soft-spoken." (RT 150.)

It was against the center's policy for students to travel independently after dark. If they had to travel after dark, they were told to do so in groups. (RT 148.) After she had been raped, Jane Doe was afraid that Phinnesse would be angry with her for traveling alone. She blamed herself for her rape because she was out alone late at night. (RT 149.) She was very depressed after the incident and had difficulty learning, so her stay at the center was extended. (RT 150.)

On the morning of January 16, 2003, police officers found Jane Doe's white cane near the baseball field of Contra Costa College. (RT 158.) Upon appellant's February 22, 2003, arrest, police officers collected a cell phone. (RT 216, 225, 464, 466, 469.) They also collected oral swabs and blood from appellant. (RT 217-220, 289-291, 468-469.) Jane Doe's cell phone was not recovered. (RT 493.)

Louise Jones conducted a sexual assault examination of Jane Doe on January 16, 2003. (RT 239-240.) Jane Doe had a scratch on her neck, scrapes on her knees, one of which was bleeding, and disheveled hair. (RT 241-242, 343.) When Jones conducted the genital examination, Jane Doe was crying and said she was in pain. Jones observed multiple blood clots, a laceration, bruising, and petechiae, indicating broken capillaries, in her external genital area, which was very red. (RT 247-249, 263-267, 355-356.) Jones had difficulty examining Jane Doe's vaginal area because she was in so much pain, but she did observe some abrasions on the right side of the vagina. (RT 252-253.) Jones collected a standard blood draw, swabs from Jane Doe's mouth and vagina, and fingernail scrapings from both hands. (RT 253-255, 274-276.) She also removed loose matted pubic hair from Jane Doe's pubic area. (RT 272.) When Sergeant Thomas Sharp later removed Jane Doe's panties from the rape kit, they were "still wet and rather bloody." (RT 439.)

When describing the assault, Jane Doe said her attacker put his finger in her vagina twice, each time he raped her. (RT 332-333.) Jones's examination was consistent with the history that Jane Doe had provided. (RT 334-335, 360.)

Sergeant Sharp first spoke to Jane Doe in the emergency room at the hospital, which was not conducive to a good interview. In his report, Sharp summarized the information Jane Doe had given him, rather than record specific questions and answers. Also, she had previously been interviewed by another officer. (RT 437, 572, 576-580, 583-585.) Jane Doe was "very shaken, scared and definitely traumatized." (RT 438.) As she was relating the incident, Jane Doe became more withdrawn and quiet and was "actually burrowing behind Nancy Phinnesse." (RT 585.)

Jane Doe told Sergeant Sharp that her abductor held her and forced her to walk from San Pablo Avenue to the Contra Costa College, which took

8

about 10 minutes. (RT 444-446.) Sharp later walked three different routes from San Pablo to the football field at the college. Two of the routes took 10 to 15 minutes at a slow paced walk and were between one half and three quarters of a mile in length. (RT 496-501, 509.)

Sergeant Sharp conducted a second, taped interviewed of Jane Doe on January 22, 2003, which was played for the jury. (RT 532, 539, 541.) In the interview, Jane Doe said that the man came up from behind her and grabbed her as she was walking away after exiting the cab. He walked with her for ten minutes until they came to some bleachers, where he told her to sit down or he would knock her out. (Defense Exh. E1 at p. 3.)

Sergeant Sharp conducted a videotaped interview of appellant on February 22, 2003. (RT 599-602.) A redacted version of the tape was played for the jury. (RT 605; see People's Exh. 44.) In the interview, appellant denied any involvement with the blind girl and denied any knowledge of what had happened to her. (People's Exh. 44a at pp. 7-17.)[5]

Criminalist David Stockwell took a portion of a reference blood sample for Jane Doe and conducted DNA analysis to determine its genetic type. (RT 682-683.) He also determined appellant's genetic type from his oral swab. (RT 697-699.) He analyzed the evidence from Jane Doe's sexual assault kit, and saw sperm on two of the slides. (RT 683-688.)[6] After comparing genetic types from the sperm fraction of the vaginal swab and the reference samples for Jane Doe and appellant, Stockwell found that the sperm fraction was from a single male source whose genetic profile matched that of appellant at the 13 loci tested. (RT 703, 711, 715.) Stockwell estimated that the genetic profile would

---

5. The exhibit does not have the page numbers printed on it.

6. One of the slides was from a rectal smear. Because the number of sperm (four) was so low, Stockwell thought its presence resulted from a process called vaginal drainage rather than penetration of the rectum. (RT 701-703.)

be randomly observed one time in 59 quintillion African-Americans, 3.4 sextillion Caucasians, or 11 sextillion Hispanics. (RT 704.) The chance that the genetic profile belonged to a sibling of the donor were one in a million African-Americans, one in 1.2 million Caucasians, and one in 1.2 million Hispanics. (RT 705.)

In September 2003, at appellant's counsel's request, Sergeant Sharp retrieved the evidence from the sexual assault kit and the blood and oral swab extraction samples and delivered them to a private laboratory, Serological Institute, that engaged in DNA testing. (RT 597-599.) The items were later returned to evidence storage. (RT 599.)

## ARGUMENT

## I.

## THE TRIAL COURT PROPERLY FOUND THAT THERE WAS INSUFFICIENT EVIDENCE TO WARRANT INSTRUCTION ON REASONABLE GOOD FAITH BELIEF IN CONSENT

Appellant did not present any defense evidence, but, through counsel's closing argument, he presented a defense of consent, coupled with an argument that the discrepancies in Jane Doe's various statements showed that she was not credible. The trial court instructed on the meaning of consent in the context of the rape and sexual penetration charges. (CT 313; RT 782.) However, the court refused appellant's request that it give CALJIC No. 10.65, which states that a defendant lacks criminal intent and has a defense to the charge if he had a reasonable and good faith belief that the person voluntarily consented to the sex acts at issue. The trial court properly rejected appellant's request.

The court explained its refusal to give CALJIC No. 10.65 as follows:

Also [defense counsel] had requested CALJIC No. 10.65, which is titled belief as to consent, forcible rape, unlawful oral copulation, sodomy or penetration by foreign object.

I reviewed that instruction and the CALJIC comment and use note last night. Pointed this out to the attorneys this morning that based on—I think it's the *Williams* case—based on the case of *People v. Williams*, 4 Cal.4th 354, 1992, California Supreme Court case, found in the comment to CALJIC No. 10.65, bottom of page 697 in the January 2004 Edition, the softback edition of CALJIC, it seems to me that there was not substantial evidence of the equivocal conduct that would have led a defendant to reasonably and in good faith believe consent existed where it did not.

So on that basis, I did not give the instruction. [Defense counsel] requested the instruction. I've noted on the instruction that it was refused by the Court and that the defendant objects.

(RT 910-911.)

Appellant contends on appeal that "Jane Doe's actions at the BART station and in the taxi cab and after she and appellant got out of the cab were such that appellant could have reasonably and mistakenly believed Jane was consenting to having sex with him when she traveled in the taxicab with him, when she got out of the cab and went with him and had intercourse with him on the college grounds." (AOB 27.) His claim is without merit.

> The mistake of fact defense reflected in CALJIC No. 10.65 has two components. First, the defendant must have "honestly and in good faith, albeit mistakenly, believed that the victim consented to sexual intercourse." [Citation.] This subjective component involves evidence of "equivocal conduct" by the victim that the defendant mistook for consent. [Citation.] Second, an objective component asks whether the defendant's mistaken belief regarding consent was "reasonable under the circumstances." [Citation.] In order to give such an instruction upon request, the trial court must find substantial evidence supporting each feature of the defense. [Citations.]

(*People v. Stitely* (2005) 35 Cal.4th 514, 553-554; see *People v. Williams* (1992) 4 Cal.4th 354, 360-361.)

Here, the trial court did not find substantial evidence to support giving CALJIC No. 10.65. The trial court's ruling was correct because, as the record shows, no evidence supported the instruction, let alone substantial evidence.

As to the first component, appellant did not testify and so presented no direct evidence on the subjective component of the defense, i.e., that he honestly and in good faith believed that Jane Doe consented to have sexual intercourse. Instead, appellant, through cross-examination of witnesses and defense counsel's closing argument, focused on Jane Doe, a young, naive, traumatized blind woman, whose statements to the police officers and at trial varied on details such as who guided her to the bus stop and the precise sequence of events that unfolded before she was attacked. Jane Doe consistently testified, however, that a man got into the cab with her, that she did not want him in the cab, that she tried to convey that to the cabdriver, who

12

ignored her, and that she indicated her dislike for the man's attentions when he was inside the cab. Nothing in that testimony, or in her testimony that she accepted the offer of a stranger to guide her to the cab, suggested equivocal conduct that could be mistaken for consent to have sexual relations. Jane Doe further testified that after she exited the cab, she walked away while talking to a friend on the phone. Appellant came up behind her, took her phone against her will, grabbed her, and physically forced her to walk with him for ten minutes. Again, nothing in her testimony suggested equivocal conduct that could be mistaken for consent to have sex. Jane Doe testified that once they reached the football field, appellant threatened her, struggled with her, and banged her head on the ground. When she tried to scream, he covered her mouth and choked her. He forcibly removed her clothing, penetrated her vagina with his finger, and then raped her. Nothing in Jane Doe's account of the attack suggested equivocal conduct on her part that could be mistaken for consent.

Appellant nevertheless contends that Jane Doe's behavior was equivocal because she did not vigorously protest his presence in the cab, call 911 once she exited the cab, or take other action that would have more forcefully demonstrated her desire to get away from him. His contentions are based on a misreading of the record as a whole. More importantly, nothing cited by appellant remotely suggests equivocal conduct with respect to whether Jane Doe *wanted to have sex* with appellant. Even if she had acceded to his presence in the cab, as appellant claims, or failed to vigorously protest his continuing presence, her actions could not be construed as indicating a desire for sex with a complete stranger in the middle of the night in a remote football field. At best, her actions could have indicated no more than resigned acceptance of appellant's insistence that he accompany her as she tried to make her way home, not a desire for sex, as he conceitedly claims.

13

For the same reasons, appellant fails to show that substantial evidence supported the second component, which asks whether the defendant's mistaken belief regarding consent was reasonable under the circumstances. As already explained, even if appellant thought that Jane Doe's behavior was equivocal with respect to whether she wanted him to leave her alone, any belief on his part that her behavior equated with a desire for sex was manifestly unreasonable. As our Supreme Court explained in *People v. Williams, supra,* "regardless of how strongly a defendant may subjectively believe a person has consented to sexual intercourse, that belief must be formed under circumstances society will tolerate as reasonable in order for the defendant to have adduced substantial evidence giving rise to a *Mayberry*[7] instruction." (4 Cal.4th at p. 361.) Society will not tolerate as reasonable a claim made by a defendant that a woman's equivocal conduct, assuming it exists, with respect to her toleration of his existence in her presence translates to equivocal conduct with respect to her desire to engage in sex with him. In the circumstances here, appellant's alleged mistaken belief in consent was not objectively reasonable.

In *Williams,* the victim, a homeless woman, willingly accompanied the defendant to a hotel room where she thought they were going to watch television. Instead, the defendant attacked the woman and forced her to have sex. The defendant testified that he did not want sex, but that the victim initiated sex with him and he complied. (4 Cal.4th at pp. 357-359.) The court found the evidence did not support instruction with CALJIC No. 10.65. The defendant's testimony, if believed, established actual consent. The victim's testimony, if believed, would preclude any reasonable belief in consent. "These wholly divergent accounts create no middle ground from which [the defendant] could argue he reasonably misinterpreted [the victim's] conduct." (4 Cal.4th at p. 362.)

---

7. *People v. Mayberry* (1975) 15 Cal.3d 143.

14

As in *Williams*, no middle ground exists here. Jane Doe testified she did not want appellant to accompany her and that he forcibly dragged her to the college where he raped her. Appellant did not testify, but he implied that she consented to his presence and that she lied about various aspects of the case, thus impugning her credibility with respect to the sexual assault charges. As appellant's counsel argued, "this was a consensual encounter." (RT 856.) No instruction with CALJIC No. 10.65 was warranted in the circumstances.

Moreover, even if appellant could have shown that the trial court erred by failing to give the requested instruction, appellant could not show prejudice. As he acknowledges, the trial court gave CALJIC No. 9.58, which instructed, as to the kidnapping charge, that a defendant who entertained a reasonable and good faith belief that the person allegedly kidnapped voluntarily consented to accompany the defendant would lack criminal intent. (CT 351; RT 788.)[8] Since appellant primarily focuses on the evidence preceding the rape to argue that he mistakenly believed Jane Doe consented to his conduct, the instruction given necessarily encompassed that conduct. That is, the instruction told the jury that appellant would not be guilty of kidnapping if he reasonably and in good faith believed that Jane Doe willingly accompanied him to the football field. The jurors rejected that defense and found appellant guilty of kidnapping. Accordingly, appellant cannot show prejudice based on the trial court's refusal to give CALJIC No. 10.65. (Cf. *People v. Stitely, supra,* 35 Cal.4th at p. 554 [since jury rejected mistake of fact defense to unlawful sodomy, defendant could not show prejudice based on absence of mistake of fact instruction with respect to rape].) Since the jury found that Jane Doe did not consent to accompany appellant to the football field, it is entirely unreasonable to suggest the jury would have found that Jane Doe consented to have sex after appellant

---

8.  The court also instructed on actual consent with respect to the kidnapping charge. (RT 787-788; see CT 350 [CALJIC No. 9.56].)

threatened to kill her, hit her, choked her, and forcibly removed her clothing, while she screamed and fought against his attack. The fact that appellant took Jane Doe's sight cane and left her to wander alone among the athletic fields until a custodian found her further negates any possibility the jury would have accepted a reasonable mistake of fact defense. On this record, appellant's claim is wholly without merit.

Appellant persists in his claim by citing to the length of jury deliberations as evidence of the closeness of the case. The record does not support his contention. After the jury had been "deliberating two full days," the jurors sent out a note stating that they had not been able to reach a unanimous verdict on all counts. The jury foreperson also sent out a note stating that she had a concern that one of the jurors was not following the court's instructions. (RT 921; see CT 466.) After a discussion with the parties and the jurors, the court repeated a series of instructions. (RT 932-943.) Less than half an hour after the court gave the instructions, the jury reached a verdict. (RT 943, 948.) The record thus shows that a single juror who was having difficulty with the instructions (or with following them) was able to agree on the verdicts after the court repeated the instructions.

Appellant also points to the jury's requests for readback of testimony and for exhibits. The jury's requests do not establish that the case was close, but rather that the jury carefully considered the evidence presented in light of the instructions and closing arguments. Contrary to appellant's claim, he cannot establish prejudice on this record.

## II.

## THE TRIAL COURT PROPERLY INSTRUCTED THE JURY ON THE ELEMENTS OF THE SECTION 667.61 KIDNAPPING ALLEGATION

The prosecution alleged that appellant kidnapped Jane Doe and that the movement substantially increased the risk of harm over and above the level of risk necessarily inherent in the underlying offenses within the meaning of section 667.61, subdivisions (a) and (d), part of the "one strike" statute. (CT 72.) Appellant contends the trial court's instructions on this special allegation were inadequate. His contention is without merit.

The trial court instructed the jury on the special allegation as follows:

It is further alleged that at the time of the commission of the crimes charged in Counts One, Two and Three, that the defendant committed a kidnapping that substantially increased the risk of harm to the victim.

If you find the defendant guilty of the crimes charged in Counts One, Two and Three, you must determine whether or not the truth of this allegation has been proved. The People have the burden of proving the truth of this allegation.

If you have a reasonable doubt that it is true, you may find it to be not true. Include a special finding on that question using a form that will be supplied to you.

Kidnapping for the purpose of this allegation is the unlawful movement by physical force of a person without the person's consent for a substantial distance where the movement is not merely incidental to the commission of the rape and/or forcible sexual penetration and where the movement substantially increases the risk of harm to the person moved over and above that necessarily present in the crime of rape and/or forcible sexual penetration itself.

In this allegation, the risk of harm requirement refers to the risk of either physical or mental harm.

Kidnapping is also the unlawful compulsion of another person without the person's consent and because of a reasonable apprehension of harm to move—to move for a substantial distance where such movement is not merely incidental to the commission of the rape and/or forcible sexual penetration and where the movement substantially increases the risk of harm to the person moved over and

17

above that necessarily present in the crime of rape and/or forcible sexual penetration itself.

Brief movement to facilitate the crimes of rape or forcible sexual penetration are incidental to the commission of the rape and/or forcible sexual penetration.

On the other hand, movements to facilitate the rape and/or forcible sexual penetration that are for a substantial distance rather than brief are not incidental to the commission of the rape and/or forcible sexual penetration.

In order to prove this allegation, each of the following elements must be proved:

One, a person was unlawfully moved by the use of physical force, or a person was unlawfully compelled to move because of a reasonable apprehension of harm.

Two, the movement of the person was without that person's consent.

Three, the movement of the person was for a substantial distance, that is a distance more than slight, brief or trivial.

And four, the movement substantially increased the risk of harm to the person moved over and above that necessarily present in the crime of rape and/or forcible sexual penetration itself.

(RT 800-802; see CT 368, 382-383.)

After the instructions had been given, the court noted that defense counsel had argued that specific intent should have been included as an element of the special allegation. The court stated the allegation did not contain a specific intent requirement. (RT 911-912.) Appellant did not otherwise object to the instructions.

Appellant quotes CALJIC No. 17.24.1, which refers to the special allegation, but omits the instruction on the elements of the allegation. (AOB 44.) His contention that the instructions failed to adequately inform the jury of the required findings with respect to the special allegation is thus without merit. A full reading of the instructions shows that each of the required findings was explained to the jury.

The trial court's instruction (see CT 382-383) was based on CALJIC No. 9.52.1 [Kidnapping to Commit Certain Sex Crimes]. The instruction was

18

substantially similar to CALJIC No. 9.54 [Kidnapping to Commit Robbery and/or Certain Sex Crimes]. Both instructions reference section 209, subdivision (b)(1). However, the instructions also correctly informed the jury of the elements of aggravated kidnapping under section 667.61, subdivision (d)(2). (See *People v. Jones* (1997) 58 Cal.App.4th 693, 712-713.)

As the *Jones* court explained,

> For purposes of both kidnapping for robbery and the aggravated kidnapping circumstance, the risk of harm element focuses on the movement of the victim during the kidnapping, and the resulting risk of harm. The jury is to consider such factors as the decreased likelihood of detection, the danger inherent in a victim's foreseeable attempts to escape, and the attacker's enhanced opportunity to commit additional crimes. [Citations.] ¶ [A]ny substantial asportation which involves forcible control of the . . . victim will satisfy the risk of harm test. [Citations.] Accordingly, [t]he risk of harm test is satisfied when the victim is forced to travel a substantial distance under the threat of imminent injury by a deadly weapon. [Citation.] [Citations.] On the other hand, when a defendant does no more than move his victim around inside the premises in which he finds him, the movement generally will be deemed insufficient. [Citation.]

(*Id.* at pp. 713-714 (internal quotation marks omitted).) The court found there was "no significant distinction in inherent risk as between robbery and the enumerated sexual offenses." (*Id.* at p. 714.) Accordingly, when determining whether there was a substantially increased risk of harm, the analysis is the same, whether the underlying crime is robbery or a sexual offense. (See *ibid.*) "[T]he [increased] risk is to be compared, on the one hand, to the risk inherent in a 'standstill' robbery, and on the other, to the risk inherent in a 'standstill' sexual offense. Nevertheless, we are not speaking of some *particular* robbery or sexual offense, but rather of a *hypothetical, typical* robbery or sexual offense." (*Id.* at p. 714 (original italics).) The prosecution need not show that the perpetrator had the specific intent to substantially increase the risk of harm. (See *People v. Campbell* (2000) 82 Cal.App.4th 71, 78 ["[W]hile Campbell

argues that his intention was to prevent his identification rather than to render his victim more vulnerable, the statute does not refer at all to the attacker's objective in performing prohibited acts, and any such particular intention cannot be controlling."]; *People v. Jones, supra,* 58 Cal.App.4th at pp. 713-714, 716-717 [finding no specific intent requirement from requirement that movement must substantially increase risk of harm].)

The instruction given here informed the jury of the elements of the section 667.61, subdivision (d)(2) allegation. Appellant cites no relevant authority to support his contention that the instructions were inadequate or erroneous. Indeed, he fails to acknowledge the pertinent instruction actually given. Accordingly, his claim of instructional error should be rejected.

## III.

## SUFFICIENT EVIDENCE SUPPORTS THE JURY'S FINDING ON THE KIDNAPPING SPECIAL ALLEGATION

Appellant contends there was insufficient evidence that the movement of Jane Doe from San Pablo Avenue to Contra Costa College substantially increased the risk of harm over and above that necessarily inherent in the underlying sex offenses. The record does not support his claim.

The applicable standard of review is well established.

> To determine sufficiency of the evidence, we must inquire whether a rational trier of fact could find defendant guilty beyond a reasonable doubt. In this process we must view the evidence in the light most favorable to the judgment and presume in favor of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. To be sufficient, evidence of each of the essential elements of the crime must be substantial and we must resolve the question of sufficiency in light of the record as a whole.

(*People v. Johnson* (1993) 6 Cal.4th 1, 38.) Substantial evidence is evidence that is reasonable, credible, and of solid value, upon which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053; *People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) The standard of review is the same in cases where the People rely primarily on circumstantial evidence. (*People v. Bloyd* (1987) 43 Cal.3d 333, 346.) Even if the reviewing court believes that the evidence might also reasonably be reconciled with the innocence of the defendant, this view "does not warrant interference with the determination of the trier of fact." (*People v. Towler* (1982) 31 Cal.3d 105, 118.) Before a judgment of conviction can be set aside for insufficiency of the evidence to support the trier of fact's verdict, it must clearly appear that upon no hypothesis whatever is there sufficient evidence to support it. (*People v. Redmond* (1969) 71 Cal.2d 745, 755.)

As noted above, section 667.61, subdivision (d)(2) does not require proof that the perpetrator had the specific intent to substantially increase the risk of harm when he kidnapped his victim. (*People v. Jones, supra,* 58 Cal.App.4th at pp. 713-714, 717.) The risk of harm element focuses on the increased vulnerability of the victim through circumstances such as the decreased likelihood of detection, the danger inherent in the victim's attempts to escape, and the attacker's enhanced opportunity to commit additional crimes. (*Ibid.*)

In *People v. Aguilar* (2004) 120 Cal.App.4th 1044, the court stated, "'Where movement changes the victim's environment, it does not have to be great in distance to be substantial.'" (*Id.* at p. 1048, quoting *People v. Shadden* (2001) 93 Cal.App.4th 164, 169.) In *Aguilar*, the defendant dragged the victim 133 feet down a sidewalk at night, moving from an illuminated area to an "extremely dark" area. The movement significantly increased the risk to the victim, decreased the likelihood of detection, and gave the defendant the opportunity to commit additional crimes. (120 Cal.App.4th at pp. 1049-1050.) That the area was still open to the public was not dispositive. "Courts have held that moving a victim to a more isolated open area which is less visible to public view is sufficient." (*Id.* at p. 1049.)

In *People v. Shadden, supra,* 93 Cal.App.4th at pp. 168-169, the court found that movement of the victim only nine feet constituted sufficient movement to constitute aggravated kidnapping. First, there is no minimum number of feet required to show an aggravated kidnapping. (*Id.* at p. 168.) "Where a defendant drags a victim to another place, and then attempts a rape, the jury may reasonably infer that the movement was neither part of nor necessary to the rape." (*Id.* at p. 169.) In that case, the defendant dragged the victim from the front of a store into the back room and shut the door. "Where movement changes the victim's environment, it does not have to be great in

distance to be substantial." (*Ibid.*) As to the risk of harm, the court stated that "where a defendant moves a victim from a public area to a place out of public view, the risk of harm is increased even if the distance is short." (*Ibid.*; see *People v. Diaz* (2000) 78 Cal.App.4th 243, 248-249 [defendant moved victim from a lighted sidewalk to a darkened area behind a recreation center]; *People v. Salazar* (1995) 33 Cal.App.4th 341, 348 [defendant moved victim 29 feet from an outside walkway to a motel bathroom]; see also *People v. Smith* (1995) 33 Cal.App.4th 1586, 1594 [defendant moved victim 40 to 50 feet from a driveway open to public view into a camper].)

Here, Jane Doe took a cab to 23rd and San Pablo Avenue, accompanied by appellant against her wishes. After she exited the cab, she attempted to walk away from him, while telling a friend on the phone that she was not yet at home. Appellant approached from behind and asked for her phone. When Jane Doe did not willingly give it to him, he took it from her. After she walked off, he again approached from behind and grabbed her with both hands. He then "dragged" her to the college, between one half and three-quarters of a mile away, by forcing her to walk with him from a sidewalk on a main street to a darkened football field surrounded by fences and out of public view. Jane Doe was unable to flee because appellant held onto her and because she was blind and did not know where she was. Once at the football field, appellant hit, choked, and threatened Jane Doe, thus further preventing her escape. He was able to carry out his sexual assault in the relative privacy of a remote field. When he finished his assault, he left Jane Doe to wander alone, without even the assistance of her cane, as he easily escaped.

Ignoring the pertinent facts, appellant claims there was insufficient evidence of the darkness of the field or of its remoteness. He ignores the numerous exhibits presented to the jury that showed the location of the field

and its distance from the surrounding city streets. He also ignores the exhibits and testimony that showed the surrounding fences and lighting conditions.

Contrary to appellant's contention, there is no requirement of a threat of imminent injury. A threat of injury is one way in which the kidnapping can be accomplished, but it may also be accomplished by physical force, as the jury was instructed. (See RT 800-801.) Here, appellant first forcibly moved Jane Doe from the sidewalk to the football field by holding onto her and forcing her to walk with him. Once at the field, he prevented her escape by threatening to kill her and by hitting her. The evidence thus overwhelmingly established the forcible asportation. Moreover, although Jane Doe testified that she did not want to go with appellant and that she screamed as he forced her to walk to the football field, there is no requirement that the victim put up a struggle or violently resist in order to establish the forcible asportation, contrary to appellant's suggestion.

The evidence as a whole shows that Jane Doe was forcibly taken from the sidewalk to a place far from public view, that she was prevented from escaping, that appellant was able to avoid detection of the sexual assault more easily than if he had remained on the sidewalk, and that he had a greater opportunity to commit additional crimes. Accordingly, the evidence was more than sufficient to support the jury's finding on the kidnapping allegation.

## IV.

### APPELLANT'S ONE STRIKE SENTENCE DOES NOT CONSTITUTE CRUEL AND UNUSUAL PUNISHMENT

Appellant contends his one strike sentence of 25 years to life violates the state and federal prohibition against cruel and unusual punishment. His contention is without merit.

Appellant raised this claim in a written motion before sentencing. (CT 515-521, 527-533; RT 981.) At the sentencing hearing, the trial court stated,

> I certainly understand the cruel and unusual punishment argument. [The prosecutor] called in a cite to a case of *People v. Estrada*, E-s-t-r-a-d-a, 1997 case, 57 Cal.App.4th 1270. It basically held that the sentencing scheme pursuant to 667.61, which is the one strike section offense statutes is not cruel and unusual and it's—counsel are aware, you know, that sentencing provision actually imposes or mandates a sentence of 25 years to life. It makes it an indeterminate term with 25 to life, 25 year determinate term for the life sentence.

(RT 982.) In rejecting appellant's claim, the court later stated,

> With respect to this particular offense, I am not going to find that sentencing Mr. McCord pursuant to 667.61(a)(d)(2) is cruel and unusual. I am going to impose for Count 1 the sentence of 25 years to life. I believe that despite Mr. McCord's youth, that it is a crime. The crimes he committed, warrants the 25 years to life sentence.
>
> For an individual to, if you will, prey upon this young woman who was blind, it was obvious that she was blind, you know, and Mr. McCord made a lot of choices that day, that evening. It would appear that he—what—he was there, that he was, you know, just trying to occupy some time in the evening at the BART station, maybe meet some woman, he came upon the victim. He took unfair advantage of this woman, I think, in every sense of the term. And he engaged in truly reprehensible behavior. He had many, many, many opportunities to not do what he did.
>
> You know, first appearance, assisting her to the cab, that would be commendable. And if he found her attractive and wished to pursue a relationship with her, he had the means and opportunity to do that.

25

He could have exchanged names. He could have given a phone number. He could have asked permission to assist her further.

He jumped into the cab. He got out of the cab with her. He did not let her go where she wanted to go. And he took her to the campus, which I do believe substantially increased the risk of harm to her. He engaged in multiple sexual acts with her against her will, and then he left her there.

I think the evidence supports that not only did he leave her there, he took the cane from her and put her sight cane somewhere where she would have difficulty finding it. And I think it is sad.

I go back to the taped interview of Mr. McCord when the detective was speaking to him and trying to explain to Mr. McCord why Mr. McCord had been arrested and why they wanted to talk to Mr. McCord, and, you know, as I recall the statement, the detective said, it is about a blind woman that was picked up in a BART station and taken to the college campus and raped. Mr. McCord said, Oh, that is sad. Somebody raped a blind woman. Oh, that is really sad. It is truly, truly sad.

I truly wish, Mr. McCord, for your sake and your family's sake that you had thought about that and experienced that emotion before you did what you did. Because you have—in making the choices that you made and taking the actions that you took, you have committed a crime that is going to have a lifetime affect [*sic*] on the victim, on Jane Doe.

This—evidence was received that this was her first sexual encounter I am sure it is one that she wished had never occurred, and it occurred under circumstances that even if she had been fully sighted would have been terrifying and tragic. I think the fact that she is blind makes it more difficult in—has a greater impact.

(RT 996-997.)

Appellant maintains that, notwithstanding his reprehensible conduct, his one strike sentence constitutes cruel and unusual punishment. As the trial court noted, however, the statutory scheme has been upheld against similar claims. (*People v. Alvarado* (2001) 87 Cal.App.4th 178, 199-201; *People v. Estrada* (1997) 57 Cal.App.4th 1270, 1277-1282.)

"A punishment is excessive under the Eighth Amendment if it involves the 'unnecessary and wanton infliction of pain' or if it is 'grossly out

of proportion to the severity of the crime.' [Citation.]" (*People v. Alvarado, supra,* 87 Cal.App.4th at p. 199.)  A punishment may violate the state constitution if "'it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.' [Citation.] In determining whether a particular punishment is cruel and/or unusual, courts examine the nature of the particular offense and offender, the penalty imposed in the same jurisdiction for other offenses, and the punishment imposed in other jurisdictions for the same offense. [Citations.]" (*Ibid.*; see *People v. Rhodes* (2005) 126 Cal.App.4th 1374, 1389-1390; *People v. Estrada, supra,* 57 Cal.App.4th at p. 1278.)  "'Whether a punishment is cruel or unusual is a question of law for the appellate court, but the underlying disputed facts must be viewed in the light most favorable to the judgment.' [Citation.]" (*People v. Rhodes, supra,* 126 Cal.App.4th at p. 1390.)

Appellant first argues that section 667.61 is unconstitutional on its face.  He contends that 25 years to life is excessive punishment for an aggravated sexual offense.  He acknowledges that the courts in *People v. Estrada, supra,* 57 Cal.App.4th at pp. 1277-1282, and *People v. Alvarado, supra,* 87 Cal.App.4th at pp. 199-200, rejected such claims.  Other than arguing that few jurisdictions impose similar punishment, appellant presents no basis for finding the one strike scheme facially unconstitutional, nor does he contest the reasoning set forth in *Estrada* and *Alvarado*.  Accordingly, his claim should be rejected.

Appellant also argues the statute is unconstitutional as applied.  He cites his early childhood, claiming he was abandoned by both of his parents, but then acknowledges that he had the love and support of both parents at the time of trial and for several years previously.  He had a job, a girlfriend by whom he fathered a child, and a support network, yet that did not stop him from taking

advantage of a young, naive, blind woman who sought only to make her way home late one night.

Appellant had been hanging around the BART station, as was his habit, in search of female companionship. When he could not persuade Dechanti Williams to go with him, despite his persistent efforts, he latched onto Jane Doe. Her blindness and obvious unfamiliarity with her surroundings made her an easy target. Appellant took full advantage of the situation. He accompanied Jane Doe in the cab against her wishes, followed her after exiting the cab, stole her cell phone, from which she might have been able to call for help, physically overpowered her, and dragged her to a remote and darkened football field. There he threatened her life, hit and choked her, and forced her to the ground, where he brutally raped her. Not satisfied with his brutal assault, appellant returned and pretended to offer help to Jane Doe. When she realized who he was, he raped her a second time. He claimed he was watching her and left again, taking her cane and phone, thus preventing her from finding her way or calling for help. Appellant's callous and brutal behavior belie his claims of remorse and pleas for mercy, made only after his conviction, and in the face of severe punishment.

Appellant claims he has only a minimal prior record. He ignores the pending robbery charge that had been trailing this case throughout the proceedings. (Contra Costa County No. 05-021367-8; see CT 509, 536; RT 981.) In addition, while appellant was awaiting trial in the instant case, he engaged in repeated sexual assaults at the Martinez Detention Facility against another inmate who had altered his appearance to look like a woman. Appellant called the man a "gay faggot" and a "bitch," and threatened to "take care of" the man if he reported the assaults. (CT 183-184.) Although the trial court declined to admit the conduct as other crimes evidence on grounds that it was more prejudicial than probative (RT 2-4), this Court may consider the

28

evidence in light of appellant's claim that his record is minimal and that he had changed while in custody and "no longer did the same thing that criminals do" and had "used the time in jail to better himself." (AOB 62.)

Appellant's attempt to minimize his conduct in relation to other crimes also fails. "[S]ection 667.61 ensures serious sexual offenders receive long prison sentences whether or not they have any prior convictions." (*People v. Wutzke* (2002) 28 Cal.4th 923, 929.) "[T]he targeted group preys on women and children, cannot be cured of its aberrant impulses, and must be separated from society to prevent reoffense." (*Id.* at pp. 929-930.) "The sex crimes qualifying for One Strike treatment appear in section 667.61, subdivision (c). Almost all of the enumerated crimes involve the use of force or fear. . . ." (*Id.* at p. 930.) "Conviction of an enumerated offense alone does not trigger the One Strike law. The People also must plead and prove at least one aggravating circumstance specified in section 667.61, subdivision (d) or (e). [Citations.] Many of these circumstances reflect the use of violent or predatory means that increase the victim's 'vulnerability.'" (*Wutzke, supra,* at p. 930.) "The court cannot strike any finding duly made under section 667.61, subdivision (d) or (e)." (*Ibid.*; see *People v. Jackson* (1998) 66 Cal.App.4th 182, 193; *People v. Estrada, supra,* 57 Cal.App.4th at p. 1277.)

"[T]he definition of crime and the determination of punishment" are "matters which are uniquely in the domain of the Legislature." (*People v. Rhodes, supra,* 126 Cal.App.4th at p. 1390.) "While these intrinsically legislative functions" are circumscribed by constitutional limits, "the validity of enactments will not be questioned unless their unconstitutionality clearly, positively, and unmistakably appears." (*Ibid.* [internal quotation marks omitted].)

Since a finding under section 667.61, subdivision (d) cannot be stricken, the 25 year to life sentence imposed on appellant is mandatory.

29

(*People v. Wutzke, supra,* 28 Cal.4th at p. 930; *People v. Estrada, supra,* 57 Cal.App.4th at p. 1277.)   And, as previously demonstrated, the evidence supporting the special allegation was overwhelming.  Appellant's request that his sentence be reduced to an unspecified "determinate term" has no support under applicable law or the facts of this case.

Appellant fails to demonstrate that his sentence is cruel or unusual under either the state or federal constitutions.  (Cf. *People v. Alvarado, supra,* 87 Cal.App.4th at pp. 199-200; *People v. Estrada, supra,* 57 Cal.App.4th at pp. 1277-1282.)  Accordingly, his claim should be rejected.

## V.

## SUFFICIENT EVIDENCE SUPPORTS APPELLANT'S CONVICTION FOR SEXUAL PENETRATION

Appellant contends there was insufficient evidence of forcible sexual penetration. The record does not support his claim.

The jury was instructed on the required findings for forcible sexual penetration. (CT 355-356; RT 792-795.) Among the required findings was that "the penetration was done with the purpose and specific intent to cause sexual arousal, gratification, or abuse." (CT 356; RT 795.) Appellant claims there was insufficient evidence of the required specific intent. "It is clear that appellant was using his finger to guide his soft penis into Jane Doe's vagina, but the intent in so doing was not to abuse Jane or for his own arousal or gratification. The sexual penetration was thus incidental to the rape and was not a separate crime." (AOB 67.)

In her recorded interview, Jane Doe told Sergeant Sharp that appellant put his finger in her at the time of the first rape, but not the second. She said she could feel the difference, and that appellant's penis hurt her the most. He also put his mouth on her right breast. (Defense Exh. E1 at pp. 14-15.) At trial, Jane Doe testified that appellant's penis was hard when he penetrated her. (RT 315.) She said that appellant put his finger in first, then his penis. He did not put them in at the same time. (RT 105, 314-315.) Jane Doe did not recall telling Sergeant Sharp that appellant's penis was soft. (RT 315.) Sergeant Sharp testified that Jane Doe told him it was soft when he first interviewed her at the hospital. (RT 531.)

Appellant claims this evidence shows that he did not have the specific intent required for sexual penetration, and that he was merely guiding his penis with his finger, not committing a separate crime. He made the same contention in closing argument (RT 874-875), which the jury rejected.

In *People v. White* (1986) 179 Cal.App.3d 193, 203, the defendant claimed that he may have put his finger in the young victim's anus when cleaning her and changing her diaper, but that he lacked the specific intent required by the statute. In rejecting that claim the court concluded, "it is the nature of the act that renders the abuse 'sexual' and not the motivations of the perpetrator." (*Id.* at pp. 205-206.)

Here, whether appellant's conduct was for sexual arousal of himself or Jane Doe, sexual gratification of himself or Jane Doe, or sexual abuse, the statutory requirement was met. (See *id.* at pp. 204-206.) That is, even if appellant did not intend his own or Jane Doe's sexual arousal or gratification, his act of forcibly putting his finger in Jane Doe's vagina in the course of a sexual assault constituted sexual abuse. (See *ibid.*) Moreover, the evidence also shows, contrary to appellant's claim, that he inserted his finger into Jane Doe's vagina for his own sexual arousal or gratification. Jane Doe testified that, in addition to the digital penetration and rape, appellant also put his mouth on her breast. Appellant's actions as a whole show that he sexually assaulted Jane Doe for his own gratification. His contention that no rational jury could have found the statutory elements met on this record is without merit.

Appellant contends in Argument VI that even if a single alleged error does not require reversal, the cumulative effect of the errors does. Since appellant fails to show the existence of any error, his cumulative error claim also fails.

## CONCLUSION

Accordingly, respondent respectfully requests that the judgment be affirmed.

Dated:  November 18, 2005

Respectfully submitted,

BILL LOCKYER
Attorney General of the State of California

ROBERT R. ANDERSON
Chief Assistant Attorney General

GERALD A. ENGLER
Senior Assistant Attorney General

MOONA NANDI
Supervising Deputy Attorney General

*Joan Killeen*

JOAN KILLEEN
Deputy Attorney General

Attorneys for Respondent

JK/jk/lls
SF2005DA0092
40069895.wpd

## CERTIFICATE OF COMPLIANCE

I certify that the attached RESPONDENT'S BRIEF uses a 13 point Times New Roman font and contains 9924 words.

Dated:  November 18, 2005

Respectfully submitted,

BILL LOCKYER
Attorney General of the State of
California

JOAN KILLEEN
Deputy Attorney General

Attorneys for Respondent

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:  **P. v. Lavarius Jermaine McCord**                    No.:**A108457**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age and older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On **November 18, 2005**, I served the attached **RESPONDENT'S BRIEF** by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, Suite 11000, San Francisco, CA 94102-7004, addressed as follows:

H. Stanley Dewey
Attorney at Law
3150 Hilltop Mall Road
Richmond, CA 94806

Clerk of the Superior Court
P.O. Box 911
Martinez, CA 94553

First District Appellate Project
730 Harrison St., Room 201
San Francisco, CA 94107

Honorable Robert J. Kochly
District Attorney
P.O. Box 670
Martinez, CA 94553

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on **November 18, 2005**, at San Francisco, California.

| L. SORENSEN | *L. Sorensen* |
|---|---|
| Declarant | Signature |

40070827.wpd

# EXHIBIT C

*J. Killeen*

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT, DIVISION FIVE

**THE PEOPLE OF THE STATE OF CALIFORNIA,**

Plaintiff and Respondent,                    **A108457**

v.

**LAVARIUS JERMAINE McCORD,**

Defendant and Appellant.

---

## APPELLANT'S REPLY BRIEF

Appeal from the Judgment of the Superior Court of California
County of Contra Costa, Case Number 032028-3

HONORABLE HARLAN G. GROSSMAN, JUDGE

---

H. STANLEY DEWEY
Attorney at Law
State Bar Number 107619

3150 Hilltop Mall Road
Richmond, California 94806
Telephone: (510) 970-7616

Attorney for Appellant
LAVARIUS JERMAINE McCORD

By Appointment of the Court of
Appeal Under the First
District Appellate Project's
Independent Case System

DOCKETED
SAN FRANCISCO

DEC 09 2005

By    D. VELASCO
No. SF 2005-DA 2092

## TOPICAL INDEX

**Page**

TABLE OF AUTHORITIES                                                          ii

ARGUMENT

I.       THE FAILURE TO GIVE THE REQUESTED JURY
         INSTRUCTION ON REASONABLE GOOD FAITH
         BELIEF IN CONSENT DENIED APPELLANT HIS
         CONSTITUTIONAL RIGHTS TO DUE PROCESS                                 2

II.      THE JURY WAS NOT PROPERLY INSTRUCTED ON
         THE SECTION 667.61 "ONE STRIKE" SENTENCING
         ALLEGATIONS                                                          5

III.     THERE WAS INSUFFICIENT EVIDENCE THAT ANY
         MOVEMENT FROM THE ALLEGED KIDNAPPING
         SUBSTANTIALLY INCREASED THE RISK OF HARM
         TO JANE DOE                                                          8

IV.      APPELLANT'S 25-TO-LIFE SENTENCE CONSTITUTES
         CRUEL AND UNUSUAL PUNISHMENT IN THIS CASE                           10

V.       SINCE THERE WAS INSUFFICIENT EVIDENCE THAT
         ANY DIGITAL PENETRATION DONE WITH THE
         SPECIFIC INTENT TO CAUSE SEXUAL AROUSAL,
         GRATIFICATION OR ABUSE, APPELLANT'S
         CONVICTION FOR FORCIBLE SEXUAL
         PENETRATION MUST BE REVERSED                                        11

CONCLUSION                                                                   12

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Apprendi v. New Jersey*
  (2000) 530 U.S. 466 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Sullivan v. Louisiana*
  (1993) 508 U.S. 275 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

## STATE CASES

*People v. Daniels*
  (1969) 71 Cal.2d 1119 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*People v. Mayberry*
  (1975) 15 Cal.3d 143 ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*People v. Aguilar*
  (2004) 120 Cal.App.4th 1044 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*People v. Barton*
  (1995) 12 Cal.4th 186 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*People v. Burnham*
  (1986) 176 Cal.App.3d 1134 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*People v. Flannel*
  (1979) 25 Cal.3d 668 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*People v. Hoard*
  (2002) 103 Cal.App.4th 599 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*People v. Modesto*
  (1963) 59 Cal.2d 722 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*People v. Salazar*
  (1995) 33 Cal.App.4th 431 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*People v. Shadden*
  (2001) 93 Cal.App.4th 164 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*People v. Wickersham*
  (1982) 32 Cal.3d 307 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*People v. Williams*
  (1992) 4 Cal.4th 354 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## STATE STATUTES

Cal. Const., art. I, §§. 7(a), 15, 16, 24 and 29 ................................. 7

## MISCELLANEOUS

CALJIC No. 10 ...................................................... 11

CALJIC No. 10.65 .................................................. 2, 3, 4

CALJIC No. 9.58 ..................................................... 4

A108457

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT, DIVISION FIVE

---

**THE PEOPLE OF THE STATE OF CALIFORNIA,**

Plaintiff and Respondent,

v.

**LAVARIUS JERMAINE McCORD,**

Defendant and Appellant.

---

### APPELLANT'S REPLY BRIEF

Appellant's Reply Brief is limited to rebuttal of certain points raised in Respondent's Brief. This limitation does not constitute a waiver of any issues addressed in Appellant's Opening Brief. Appellant submits that the points in Respondent's Brief to which no reply has been made in this brief have been fully covered in his Opening Brief; only those points requiring additional comments are considered in this Reply Brief.

# I.

## THE FAILURE TO GIVE THE REQUESTED JURY INSTRUCTION ON REASONABLE GOOD FAITH BELIEF IN CONSENT DENIED APPELLANT HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS

Appellant was denied the right to a fair trial by the trial court's refusal to give the requested CALJIC No. 10.65 instruction to the jury. Respondent fails to address the violation of appellant's federal constitutional rights as outlined in the opening brief.

Respondent basically attacks the credibility of any assertion by appellant that the reasonably thought the intercourse with Jane Doe was consensual. However, there should be no weighing of the evidence in deciding to give the reasonable good faith belief in consent instruction. If the defense requests an instruction on a particular defense, an instruction must be given so long as there is substantial evidence in support of the defense. (*People v. Wickersham* (1982) 32 Cal.3d 307, 324, overruled on another point in *People v. Barton* (1995) 12 Cal.4th 186, 200.) There is no weighing involved. Doubt as to the sufficiency of the evidence must be resolved in favor of the defendant. (*People v. Flannel* (1979) 25 Cal.3d 668, 684-685.) And even if the court feels evidence in support of the instruction is "incredible," the reviewing court must proceed on the hypothesis that it is entirely true. (*People v. Burnham* (1986) 176 Cal.App.3d 1134, 1143, relying on *People v. Modesto* (1963) 59 Cal.2d 722, 729.)

Respondent's main focus is the assertion that there was no equivocal conduct on Jane Doe's part that indicated she "wanted to

have sex" with appellant. (RB, p. 13.) However, this mistake-of-fact *Mayberry* (*People v. Mayberry* (1975) 15 Cal.3d 143) defense does not require that there was conduct that indicated a desire for sexual relations. What it requires is some evidence of equivocal conduct that appellant could underline mistake for consent and which would negate criminal intent to commit rape or sexual penetration.

Perhaps, as Respondent asserts, Jane Doe's actions indicated no more than a resigned acceptance at appellant's insistence that she accompany him when they got out of the taxi. But this was a question that should have been left to jury: was it begrudging, forced acceptance, or was it conduct that could have been a basis for appellant's reasonable and good faith belief that she was consenting, even though, in fact, she was not consenting? It was for the jury to decide whether or not Jane Doe's equivocal conduct was the result of physical force or of fear, in which case the mistake-of-fact defense should be found untrue, or whether Jane Doe's conduct warranted acquittal on the rape and sexual penetration counts. (*People v. Williams* (1992) 4 Cal.4th 354, 364; CALJIC No. 10.65.)

Respondent argues that even if there was error in failing to give the *Mayberry* instruction requested by appellant, there would be no prejudice because the court gave a mistake-of-fact instruction on the kidnapping charge. The fact that the trial court gave the instruction relating to kidnapping but failed to give a similar instruction relating to the rape and sexual penetration counts does not make logical sense. In

3

any case, instruction the jury what they could consider about kidnapping could not slop over onto the sex crime charges; there is no indication that he jury could have or would have applied the one instruction to the separate sex crime scenarios. The error was not cured by the giving of CALJIC No. 9.58. In fact, the giving of that instruction makes the refusal to give CALJIC No. 10.65 even more inexplicable.

Respondent distorts appellant's arguments about prejudice. The jury deliberations were relatively long: 13 hours over four days. The record shows that in the readbacks requested by the jury, they were concerned about the question of consent. For instance, one bit of testimony read back was the cross-examination of the SART nurse concerning whether the small injuries to Jane Doe's genitalia could have been caused by consensual sexual relations as well as non-consensual. (CT 476.)

Appellant's request for an instruction to the jury on the defense theory that appellant reasonably and in good faith believed that Jane Doe had consented to sexual relations was supported by substantial evidence. It was prejudicial error of the trial court to refuse this crucial instruction. The judgment on counts one, two and three should be reversed.

## II.

## THE JURY WAS NOT PROPERLY INSTRUCTED ON THE SECTION 667.61 "ONE STRIKE" SENTENCING ALLEGATIONS

Appellant continues to assert that the trial court failed to properly instruct the jury regarding the essential elements relating to the so-called "one strike" aggravated kidnapping allegations of section 667.61. However, respondent has correctly pointed out that the opening brief does not fully set forth the instruction that was given. This was done through inadvertence by appellate counsel, who apparently cited only part of the clerk's transcript, rather than the reporter's transcript. The instruction given, as correctly quoted by respondent, was the following:

It is further alleged that at the time of the commission of the crimes charged in Counts One, Two and Three, that the defendant committed a kidnapping that substantially increased the risk of harm to the victim.

If you find the defendant guilty of the crimes charged in Counts One, Two and Three, you must determine whether or not the truth of this allegation has been proved. The People have the burden of proving the truth of this allegation.

If you have a reasonable doubt that it is true, you may find it to be not true. Include a special finding on that question using a form that will be supplied to you.

Kidnapping for the purpose of this allegation is the unlawful movement by physical force of a person without the person's consent for a substantial distance where the movement is not merely incidental to the commission of the rape and/or forcible sexual penetration and where the movement substantially increases the risk of harm to the person moved over and above that necessarily present in the crime of rape and/or forcible sexual penetration itself.

In this allegation, the risk of harm requirement refers to the risk of either physical or mental harm.

Kidnapping is also the unlawful compulsion of another person without that person's consent and because of a reasonable apprehension of harm to move–to move for a

substantial distance where such movement is not merely incidental to the commission of the rape and/or forcible sexual penetration and where the movement substantially increases the risk of harm to the person moved over and above that necessarily present in the crime of rape and/or forcible sexual penetration itself.

Brief movement to facilitate the crimes of rape or forcible sexual penetration are incidental to the commission of the rape and/or forcible sexual penetration.

On the other hand, movements to facilitate the rape and/or forcible sexual penetration that are for a substantial distance rather than brief are not incidental to the commission of the rape and/or forcible sexual penetration.

In order to prove this allegation, each of the following elements must be proved:

One, a person was unlawfully moved by the use of physical force, or a person was unlawfully compelled to move because of a reasonable apprehension of harm.

Two, the movement of the person was without that person's consent.

Three, the movement of the person was for a substantial distance, that is a distance more than slight, brief or trivial.

And four, the movement substantially increased the risk of harm to the person moved over and above that necessarily present in the crime of rape and/or forcible sexual penetration itself.
(RT 800-802.)

It should be noted that in the third paragraph of this instruction actually given to the jury, the court erroneously said that if jurors had a reasonable doubt as to the truth of the aggravated kidnapping allegation, "you <u>may</u> find it to be not true." By the use of the permissive "may," this instruction prejudicially allowed the jury to return a verdict of guilty, even if the allegation was not proved beyond a reasonable doubt. It was, of course, an incorrect statement of the law. The jurors should have been told that if they had a reasonable doubt that the allegation was true, they <u>must</u> have found the allegation not true. As given, the instruction watered down the prosecution's

burden of proof, thereby denying appellant's rights to due process of law and an impartial jury under both the federal and state constitutions. (U.S. Const., 5th, 6th & 14th Amends.; Cal. Const., art. I, §§. 7(a), 15, 16, 24 and 29; *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490.)

A constitutionally improper definition of the prosecution's burden of proof beyond a reasonable doubt, such as occurred in this instruction, is reversible error per se. As Justice Scalia wrote for the High Court in *Sullivan v. Louisiana* (1993) 508 U.S. 275, any error in defining "reasonable doubt" for a jury cannot be deemed harmless because the error goes to the very heart of our system of criminal trials and deprives the defendant of his right to be convicted only upon a finding by the jury of guilt beyond a reasonable doubt as correctly defined.

The instruction concerning the section 667.61 allegations was defective for the reasons stated in the opening brief and, as noted here, on the basis that it fundamentally misstated how the jury was to apply the reasonable doubt standard. The errors were of constitutional proportions and were not harmless by any standard. This court should therefore strike the jury's findings that the allegations were true.

## III.

## THERE WAS INSUFFICIENT EVIDENCE THAT ANY MOVEMENT FROM THE ALLEGED KIDNAPPING SUBSTANTIALLY INCREASED THE RISK OF HARM TO JANE DOE

Appellant reaffirms his argument as set forth in the opening brief that the findings pursuant to the one strike provisions of section 667.61 rested on insubstantial evidence.

The evidence is insufficient that any movement of Jane Doe was more than merely incidental to the accomplishment of the rape. Several cases relied upon by respondent, *People v. Shadden* (2001) 93 Cal.App.4th 164, and *People v. Salazar* (1995) 33 Cal.App.4th 431, have been criticized for confusing the concept of "incidental" in the statute with the concept of "necessary." In holding that there was insufficient evidence of movement that was more than incidental to a robbery, and therefore not sufficient to justify a finding of aggravated kidnapping for robbery, the court in *People v. Hoard* (2002) 103 Cal.App.4th 599 wrote the following:

> [T]he lower courts have continued to grapple with the meaning of "merely incidental." Two recent cases involving kidnapping to commit rape confuse "incidental" with "necessary." In *People v. Salazar* [citation] a rapist dragged his victim 29 feet from a motel hallway into a motel bathroom. *Salazar* reasoned the rape could have been attempted in the motel hallway. Because movement was not necessary for the rape, it was not incidental. [citation.] Stated affirmatively, according to *Salazar*, necessary movement is incidental movement. But that equation is contrary to the accepted definitions of incidental as secondary, minor, subordinate, or nonessential. [citation.]
>
> *Salazar* acknowledged there are many cases involving alleged kidnapping to commit robbery in which the California

Supreme Court has followed [*People v.*] *Daniels* [(1969) 71 Cal.2d 1119] and found movement was incidental. [citation.] In a footnote, *Salazar* tried to distinguish those cases, focusing on a perceived difference between robbery and rape: "Whereas the commission of a robbery may frequently require that a victim be moved to the property which is the object of the robbery, a rape involves solely an attack on the person and does not necessarily require movement to complete the crime." [citation.] This sentence does not make sense. Certainly, rape is more easily, if not necessarily, accomplished out of plain view than in a public hallway. It could be said rape may frequently require movement. It could also be correctly said a robbery does not necessarily require movement. More accurately, some robberies and rapes require movement and some do not. *Salazar's* effort to distinguish between rape and robbery is not persuasive.

In *People v. Shadden*, [citation.] defendant attempted to rape a video store owner after dragging her nine feet into a small back room of the store. The court adopted *Salazar's* reasoning that rape does not necessarily require movement and therefore movement was more than incidental. [citation.] Like *Salazar*, *Shadden* equates the meaning of "incidental" with "necessary:" "The jury could reasonably infer that the movement was not incidental to the attempted rape because Shadden only began the sexual attack after he moved her." [citation.] Then, in seeming contradiction, the *Shadden* court also observes that "when [defendant] closed the door, he enhanced his opportunity to rape and injure [the victim.]" [citation.] In other words, moving the victim to the back room facilitated the rape and thus, under *Daniels*, could properly be regarded as incidental to the main crime. [citation.]

In our view, incidental and necessary do not mean the same thing. The courts in *Shadden* and *Salazar* seem to have committed the error of *ipse dixit*, as when Humpty Dumpty told Alice, " 'When I use a word' ... 'it means just what I choose it to mean-neither more nor less.' " [citation.] But we agree with Alice a word should mean what it says: "This prosaic notion is based on our abiding conviction that communication suffers when language says what it does not mean." [citation.]
(*People v. Hoard* (2003) 103 Cal.App.4th 599, 605-606.)[1]

---

[1]

  *People v. Hoard, supra*, 103 Cal.App. 4th 599, was itself criticized concerning the definition of "incidental" movement by the
(continued...)

The evidence of the essential elements of the one strike allegations were not of solid enough value to support the jury finding that any movement of Jane Doe in the alleged kidnapping was more than incidental to the commission of the alleged rapes and sexual penetration or that the movement substantially increased the risk of harm inherent in the underlying crimes.

## IV.

## APPELLANT'S 25-TO-LIFE SENTENCE CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT IN THIS CASE

Appellant feels that his argument on this issue was adequately put forward in his opening brief and has not been sufficiently rebutted by respondent. Therefore this court should find his sentence of 25-years-to-life to be unconstitutionally cruel and unusual and should impose a punishment that complies with federal and state constitutional provisions.

---

[1](...continued)
*Shadden* court in the case of *People v. Aguilar* (2004) 120 Cal.App.4th 1044, 1151-1152, which concluded that there was "a clear and coherent standard" under which "[t]he interpretation of 'incidental' depends on the facts of the particular case." (*Id.*, at p. 1152.) However, appellant fails to see how a coherent rule of law can be predicated on a term that changes its meaning depending on the evidence.

V.

## SINCE THERE WAS INSUFFICIENT EVIDENCE THAT ANY DIGITAL PENETRATION DONE WITH THE SPECIFIC INTENT TO CAUSE SEXUAL AROUSAL, GRATIFICATION OR ABUSE, APPELLANT'S CONVICTION FOR FORCIBLE SEXUAL PENETRATION MUST BE REVERSED

Section 289, subdivision (k)(1) requires that if a sexual penetration is going to be found under that statute, it must have been done with the purpose and specific intent of sexual arousal, gratification or abuse. (See, CALJIC No. 10, as correctly given in this case.) Respondent argues that even if appellant did not intend his own or Jane Doe's sexual arousal or gratification, his act of putting his finger in Jane Doe's vagina was sexual abuse. Respondent appears to impermissibly meld the act of penetration with the required specific intent.

Here there is no evidence of the purpose or specific intent of sexual abuse. It is apparent in this case that any penetration of Jane Doe's vaginal opening that appellant did was merely incidental to facilitating the insertion of his penis, and there was no substantial evidence that the act was done for the purpose of his or Jane Doe's sexual gratification or arousal or for the purpose of sexually abusing her.

Because of the lack of sufficient evidence of specific intent on the sexual penetration count, it should be reversed.

ll

## **CONCLUSION**

For the foregoing reasons, as well as those more fully set forth in Appellant's Opening Brief on all argued points, appellant Lavarius Jermaine McCord respectfully requests that the judgment in this case be reversed, with directions to dismiss the sexual penetration charge and the One Strike sentencing allegation. If the court does not reverse, appellant's sentence should nevertheless be reduced, as set forth in argument IV.

Date:  December 8, 2005

Respectfully submitted,

H. STANLEY DEWEY
Attorney for Appellant

By Appointment of the Court of
Appeal Under the First District
Appellate Project's Independent
Case System

## CERTIFICATE OF SERVICE BY MAIL

I, H. Stanley Dewey, declare:

I am an active member of the State Bar of California. I am not a party to the within action. My business address is 3150 Hilltop Mall Road, Richmond, California 94806. On the date subscribed below, I deposited in the United States Mail at Richmond the following attached document(s):

APPELLANT'S REPLY BRIEF

Before I deposited the above-described document(s) in the U.S. Mail, I placed them in sealed envelope(s) with postage fully prepaid thereon, addressed as follows:

Bill Lockyer
Attorney General of California
455 Golden Gate Avenue, Suite 1100
San Francisco, CA 94102-3664

District Attorney, Contra Costa County
P.O. Box 670
Martinez, CA 94553

First District Appellate Project
730 Harrison Street, #201
San Francisco, CA 94107

Clerk, Contra Costa County
For Delivery to: Judge Harlan Grossmn
P.O. Box 911
Martinez, CA 94553

Lavarius Jermain McCord, V-62318
Calipatria State Prison
PO Box 5002
Calipatria, CA 92233

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.
Date: 12/8/05

H. STANLEY DEWEY
Attorney at Law

13

MAILROOM
SAN FRANCISCO
CA. DEPT. OF JUSTICE

2005 DEC -9  A 10: 07

ATTORNEY GENERAL
RECEIVED