# EXHIBIT D

COPY

Filed 04/27/06

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b). This opinion has not been certified for publication or ordered published for purposes of rule 977.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION FIVE

FILED

APR 2 7 2006

Court of Appeal - First App. Dist.
DIANA HERBERT

By_____

| | |
|---|---|
| **THE PEOPLE,** | |
| **Plaintiff and Respondent,** | A108457 |
| v. | |
| **LAVARIUS JERMAINE McCORD,** | **(Contra Costa County** |
| **Defendant and Appellant.** | **Super. Ct. No. 050320283)** |

Defendant Lavarius Jermaine McCord was charged with two counts of forcible rape (Pen. Code, § 261, subd. (a)(2))[1] (counts 1 & 3), one count of forcible sexual penetration (§ 289, subd. (a)(1)) (count 2), one count of kidnapping (§ 207, subd. (a)) (count 4), and one count of second degree robbery (§§ 211, 212.5, subd. (c)) (count 5), all alleged to have been committed against the same victim. The information further alleged as to each count that the victim was blind and defendant knew or reasonably should have known of her disability (§ 667.9, subd. (a)). Finally, pursuant to section 667.61, subdivisions (a) and (d), it was alleged in each of the counts that defendant kidnapped the victim, and moving her substantially increased the risk of harm to her over and above that inherent in the underlying offenses.

_____

[1]  All undesignated section references are to the Penal Code.

1

The jury found defendant guilty on counts 1 through 4 and guilty of the lesser included offense of grand theft on count 5. The jury found true as to counts 1 through 4 that the victim was blind and defendant knew or reasonably should have known of this disability. Further, the jury found true the allegation pursuant to section 667.61 as to counts 1 through 3.

On appeal, defendant argues: (1) the trial court erred in failing to instruct the jury on defendant's reasonable good faith belief in consent; (2) the court inadequately instructed the jury on the applicability of section 667.61; (3) insufficient evidence supported the findings of kidnapping under section 667.61; (4) defendant's sentence under section 667.61 violates federal and state constitutional prohibitions against cruel and unusual punishment; (5) there was insufficient evidence to support defendant's conviction for forcible penetration (count 2); and (6) the cumulative effect of the alleged errors requires reversal. We reject these contentions and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

*Facts*

At the time the offenses were committed, the victim was 20 years old and blind. She lived alone in an apartment that was part of the Living Skill Center, a program for blind and visually impaired students, and attended the California School for the Blind in Fremont. On January 15, 2003, she was at the school for a meeting that ran late. When she was ready to leave, she called Para Transit, a transportation service used by visually impaired and disabled passengers, to take her to her apartment. When Para Transit did not arrive, she took a bus to the Fremont BART (Bay Area Rapid Transit) station and boarded the train. She had never taken BART or the bus home by herself before that night.

While riding BART, she asked a male passenger to tell her when they reached the El Cerrito Del Norte station. Upon arriving, she asked the passenger to take her to the number 72 bus stop. At the stop, the bus driver told her that the bus did not go by Contra Costa College, where the victim had said she wanted to go. A second bus driver also said the bus was not going to the victim's destination. While she was speaking to the second

2

bus driver, a man who sounded African-American, approached her and asked if she needed help. The victim asked him to take her to the cab stand. She held onto his arm with one hand and used her other hand to feel with her cane. When the two arrived at the taxi, the man asked her if she wanted him to come with her. She said no, but thought she said it too softly because he entered the cab with her.

While inside the cab, the victim told the driver she wanted to go to 23d and San Pablo Avenues. She did not tell the driver to take her to her apartment, because she did not want the man who had accompanied her to know where she lived. The man told the driver that he wanted to take his girlfriend home. She told the driver that she was not the man's girlfriend, but she did not say more because she was "really afraid," could smell alcohol, and thought the man "might get violent" if she were to say more. She did not communicate her concern to the driver. During the drive the man put his hand on her thigh, but did not continue to touch her after she moved away.

When the cab stopped, the victim exited the cab and walked away. The man paid the driver and left the cab a few minutes after she did. As she walked, the victim used her cell phone to call a friend to tell her she was not home yet. As the victim continued to talk on the phone and walk away from the cab, the man who had accompanied her came up and asked for her phone. He said he wanted to ask her friend if she could meet the victim. When the victim said "no," he grabbed the phone and refused to return it. She said, "Okay. That's it. Fine." Then she walked away. She heard the phone being clicked shut. Several seconds later, the man grabbed her from behind. She screamed, demanding that he "let [her] go right now." He then dragged her along the sidewalk for about 10 minutes. She did not hear anyone walking past them.

As the man continued to drag her, the victim felt the surface change from sidewalk to gravel. They stopped at wooden bleachers on the Contra Costa Community College campus. She screamed and the man told her to "shut the f . . . up" and to sit down before he knocked her out. When she tried to get away from him, they both fell to the ground. She kicked him in the stomach and he hit her on the shoulder. When she screamed, he

3

covered her mouth, choked her, and banged her head against the ground. They both skinned their knees in the struggle.

The man then said, "Get up, bitch, right now," and told her if she did what he asked, he would leave her alone. He said, "Lift up your shirt before I fucking kill you." After she lifted her shirt, he laid her on the ground and pulled down her underwear and pants. He put his finger in her vagina and then inserted his penis for about five minutes. When the victim asked him to stop, he again told her to "shut the f . . . up," and that he would stop when he was finished. When he had his penis inside her, it hurt "a little bit, but most of the time it felt really uncomfortable." She did not know if the man had ejaculated. After he finished, the victim asked him to indicate which way to go. He told her to go straight and she would find her way home.

The man then pretended to leave. Later, he came back,[2] acted as though he were someone else and asked, "Do you need help?" The victim told him she had been raped and wanted to go to the police station to make a report. He then pretended to call the police. She heard the clicking sound on the phone and heard him saying someone had been raped. About this time, she felt his sweatshirt and realized it was the man who had just raped her.

After he stopped pretending to talk on the phone, he said, "Okay. You are in trouble. Now I am going to do it again." He pulled the victim's hand around his arm and walked her a few minutes away to nearby bleachers. There he laid her on one of the bleachers, unbuttoned her trousers and pulled them and her underwear down to her ankles. He removed one of her shoes and a sock. He again inserted his penis in her vagina for about two minutes. As he did so, the victim said, "I am going to get pregnant," to which the man replied, "I will take care of the baby."

---

[2]  The victim does not recall how much time elapsed between the man's departure and his return.

After he removed his penis, he told her he was not raping her. He then told her he was watching her and would "be right back," but he did not return, taking her phone and cane with him.

The victim wandered around for several minutes without any idea of her location. Between 1:00 a.m. and 2:00 a.m. on January 16, 2003, Will Robertson, a custodian at Contra Costa College, found the victim feeling her way along an athletic field fence. After she told him she had been raped, he took her to the custodian's office and called the police. The police arrived, took a report, and then took the victim to the hospital. She had never had sex before the instant attacks.

Nancy Phinnesse, the victim's teacher and case manager at the Living Skill Center, was called to the Contra Costa College campus in the early morning hours on January 16. When she arrived, the victim appeared "[t]raumatized . . . very quiet . . . almost in shock, but she wanted to talk . . . ."

Louise Jones was the sexual assault response team nurse for Contra Costa County who examined the victim on January 16, 2003. The victim had a scratch on her neck, scrapes on her knees, and messy hair. When Jones conducted the genital examination, the victim cried and said she was in pain. Jones observed multiple blood clots, a laceration, bruising, and petechiae, indicating broken capillaries, in the victim's external genital area, which was very red.[3] Although Jones had difficulty examining the victim's vaginal area because of the pain, Jones did observe some abrasions on the right side of the vagina. Jones drew the victim's blood, took swabs from her mouth and vagina and took fingernail scrapings from both hands. She also removed loose matted pubic hair from the victim's pubic area.

---

[3]  Jones testified that a woman can have vaginal bleeding when she has sexual intercourse for the first time, because the woman's hymen could be broken by intercourse. She also indicated that vaginal injury could occur in normal intercourse between two consenting adults.

The victim told Jones that her assailant had hit her head on a wall, held her shoulder down to the ground with one hand, and twice penetrated her vagina with his finger, inserting his finger at the same time as his penis.

Detective Sharp interviewed the victim at the county hospital on the morning of January 16. He did not record that interview, but summarized the information the victim had given him.[4] The victim was "very shaken, scared and definitely traumatized." As she communicated the details of the incident, she became more withdrawn and "actually burrow[ed] behind . . . Phinnesse." The victim told Sharp that the assailant held her and forced her to walk from San Pablo Avenue to the Contra Costa College, which took about 10 minutes.

On January 22, 2003, Sharp made an audiotape of his second interview with the victim, which was played for the jury. In the interview, the victim said that the man came up from behind her and, as she walked away from the cab, he grabbed her. He walked with her for 10 minutes until they came to some bleachers, where he told her to sit down or he would knock her out.

Dechanti Williams testified that on the evening of January 15, 2003, she was a passenger on BART and, while exiting at the Del Norte station, saw a blind woman ask a man, later identified as defendant, for directions to the bus stop. As Williams walked to the same bus stop, defendant began flirting with Williams. Williams told defendant he was too young for her. After she boarded the bus, defendant continued to tap on the

---

[4]    During this initial interview with Detective Sharp, the victim made statements inconsistent with her trial testimony. She told Sharp that: the BART station agent assisted her with hailing a cab and helped her get into the cab; the cab driver sounded Filipino; she gave the driver her address and he had informed her that the fare would be $10; she paid the driver $10 herself; at that point a male got into her cab; she told the driver she wanted him out of the cab; the driver told the male to leave but he refused to do so; the male said, "All right baby, I'll take you home"; from the 23d and San Pablo intersection, the cab driver told her it would be an extra $10 to take her to her apartment; and she and the male both got out of the cab at 23d and San Pablo. She did not mention talking with her friend or that the phone had been taken from her hand, and she did not mention being afraid during the cab ride.

window, urging her to exit the bus. Defendant then boarded the bus and told her to get off. After he finally understood she was not going to exit, he left the bus.

At about the same time, the blind woman Williams had seen earlier was standing at the door of the bus talking to the driver. Defendant stood next to the blind woman. The bus driver recommended that the woman take a cab home. Williams heard defendant offer to take the blind woman to a cab and saw him guide her by the elbow toward the taxi stand.

Later, Williams saw newspaper and television reports about the rape of a blind woman. She contacted the police because she thought the descriptions sounded like the blind woman she had seen at the BART station. When she spoke to a police officer, she provided a description[5] of the man she saw with the victim that night and later selected defendant's photograph from a lineup. She had no doubt that defendant was the man she saw with the blind woman on January 15.

Araminta Harris, an Alameda County Transit bus driver, saw defendant at the Del Norte BART bus stop on the night of January 15th. He had ridden her bus before. That night, he asked when the bus was leaving. When a blind woman approached Harris's bus, defendant was still "bouncing" and "flirting" around. The blind woman wanted to go to the 23d and San Pablo intersection but Harris told her she did not drive to that location and advised her to go to the taxi stand around the corner. Defendant took the woman's arm and walked her to the cab area. Harris saw the woman leave in a cab and another person "kind of crouched down" in the cab but she could not clearly see the second passenger. When Harris read an article about the blind woman in the next day's newspaper, she contacted the police and provided a description of defendant: dark brown skin, age 20 to 25 with a distinctive, newly done twisted hair style.

About a week after the incident, Harris drove her bus into the Del Norte BART station and saw defendant sitting in the station, taking the braids out of his hair. She went

---

[5]    Williams gave Detective Sharp the following description:  a Black male, six feet tall, slender, with a light mustache, wearing a blue velour sweat suit.

to the station booth and asked them to call the police. After the police arrived and stopped defendant, Harris identified him as the man she had seen with the blind woman the night of the rapes. She told officers she had no doubt about the accuracy of her identification. She later identified him in a photo lineup.[6]

Detective Sharp conducted a videotaped interview of defendant. A redacted version of the tape was played for the jury. In the interview, defendant denied any involvement with the victim and any knowledge of what had happened to her.

Criminalist David Stockwell took a portion of a reference blood sample from the victim and conducted DNA analysis to determine its genetic type. He also determined defendant's genetic type from his oral swab. After comparing genetic types from the sperm fraction of the vaginal swab and the reference samples from the victim and defendant, Stockwell found that the sperm fraction was from a single male source whose genetic profile matched that of defendant at the 13 loci tested. Stockwell estimated that the genetic profile would be randomly observed one time in 59 quintillion African-Americans, 3.4 sextillion Caucasions, or 11 sextillion Hispanics.

Following the jury's verdict, the trial court sentenced defendant to 26 years to life in state prison. Defendant filed a timely appeal.

DISCUSSION

I. *The Trial Court Properly Found That There Was Insufficient Evidence to Justify a Jury Instruction on Reasonable and Good Faith Belief in Consent*

The defense requested an instruction, CALJIC No. 10.65, which states that a reasonable, good faith belief in consent may negate criminal intent and thus afford a defense to a charge of rape. We disagree with defendant's contention that the denial of this instruction request violated his due process rights under the federal Constitution.

---

[6]    Sharp confirmed he had shown a number of photographic lineups to Williams and Harris before defendant was arrested and that they did not pick anyone out of those lineups. However, they both selected defendant out of the photo lineups prepared after defendant was arrested.

Often referred to as a *Mayberry* instruction, CALJIC No. 10.65 reflects the principle that "[i]f a defendant entertains a reasonable and bona fide belief that [the accuser] voluntarily consented to . . . engage in sexual intercourse, it is apparent he does not possess the wrongful intent that is a prerequisite under Penal Code section 20 to a conviction of . . . rape by means of force or threat. . . ." (*People v. Mayberry* (1975) 15 Cal.3d 143, 155.) The rationale is that a defendant who reasonably and in good faith believes the victim has consented is acting under a "mistake of fact" which precludes a finding of criminal intent. (*People v. Williams* (1992) 4 Cal.4th 354, 360.)

"The mistake-of-fact defense reflected in CALJIC No. 10.65 has two components. First, the defendant must have 'honestly and in good faith, albeit mistakenly, believed that the victim consented to sexual intercourse.' [Citation.] This subjective component involves evidence of 'equivocal conduct' by the victim that the defendant mistook for consent. [Citation.] Second, . . . the defendant's mistaken belief regarding consent was 'reasonable under the circumstances.' [Citation.] In order to give such an instruction upon request, the trial court must find substantial evidence supporting each feature of the defense. [Citations.]" (*People v. Stitely* (2005) 35 Cal.4th 514, 553-554.)

Such an instruction is proper "only when the defense is supported by 'substantial evidence,' that is, evidence sufficient to 'deserve consideration by the jury,' not 'whenever *any* evidence is presented, no matter how weak.' Thus, in determining whether the *Mayberry* instruction should be given, the trial court must examine whether there is substantial evidence that the defendant honestly and reasonably, but mistakenly, believed that the victim consented to sexual intercourse." (*People v. Williams, supra,* 4 Cal.4th at p. 361.)

We agree with the trial court's finding that there was not substantial evidence that defendant possessed an honest and reasonable belief that the victim consented to have sex with him. First, defendant presented no evidence that he believed, reasonably or unreasonably, that the victim had consented to have sex. He did not testify about his version of the encounter and, thus, provided no direct evidence on the subjective component of the defense.

Further, there was no circumstantial evidence supporting an inference that defendant believed the victim had consented. The evidence established that the first time defendant forcibly sexually penetrated the victim, he did so only after dragging her away from the road, striking, choking, and threatening her.[7] None of this conduct can be rationally viewed as that of a man who has, or believes he has, his partner's consent to engage in sex.

Defendant nevertheless contends that the victim's behavior was equivocal because she took defendant's arm and allowed him to lead her to the cab station; she did not protest his presence in the cab with a sufficiently loud voice; she did not call the police once she exited the cab; she allowed him to pay the $10 cab fare; and she did not call the police after exiting the cab.

None of this constitutes equivocal conduct that could be mistaken for consent to engage in sexual intercourse with defendant. Even assuming the victim allowed defendant to enter the cab and pay the $10 fare, such actions cannot be construed as indicating a desire to have sex with a stranger in a remote area of an athletic field. Moreover, her subsequent screaming, physical struggle, and pleas for him to stop clearly undermined any basis for defendant to have believed her conduct indicated consent to intercourse.

Even if the defendant believed the victim consented, such a belief would not be reasonable. At no time prior to the two acts of forcible sexual penetration did the victim act in a way that should have been construed by defendant as consent. (See *People v. Mayberry, supra*, 15 Cal.3d at pp. 148, 156.) The uncontroverted evidence established that the victim rebuffed defendant's hand on her thigh and, prior to intercourse, she screamed and violently struggled. When she asked him to stop, he told her to "[S]hut the f . . . up." Prior to raping her a second time, he said, "You are in trouble. Now I am

---

7    Defendant made the following threatening remarks: "Shut the f . . . up, sit down before I knock you out"; "Get up, bitch, right now"; "Lift up your shirt before I fucking kill you"; and "I will leave you alone if you do what I ask."

going to do it again." He then dragged her to the bleachers and pulled down her pants and underwear. During the second rape, she told him she might get pregnant, to which he replied, "I will take care of the baby." Such clear indications of resistance make defendant's alleged mistaken belief of consent wholly unreasonable.

II. *The Trial Court Properly Instructed the Jury on the Elements of the Section 667.61 Kidnapping Allegation*

Defendant was sentenced to an indeterminate term of 25 years to life[8] for the count 1 conviction of forcible rape (§ 261, subd. (a)(2)) under section 667.61, the so-called "one strike" law. (*People v. Rayford* (1994) 9 Cal.4th 1, 8 [§ 667.61 is commonly known as the one strike law].) He argues that the sentence imposed under section 667.61 must be stricken, because the jury was inadequately instructed on the aggravated kidnapping allegations of this statute, thereby abridging his right to trial by jury.[9]

---

[8]  Defendant also received one additional year to run consecutive to count 1 pursuant to the jury's findings under section 667.9, subdivision (a) that the victim was blind at the time of the offense and defendant knew or reasonably should have known of the disability.

[9]  Defendant also argues that in reading the instructions regarding the essential elements of the one strike allegations, the court mistakenly stated that if jurors had a reasonable doubt as to the truth of the aggravated kidnapping allegation, "[the jury] *may* find it to be not true," thereby allowing the jury to return a guilty verdict even if the allegation was not proved beyond a reasonable doubt. We decline to decide this issue because defendant first raised it in his reply brief. It is a well-established rule that points raised for the first time on appeal in a reply brief will not be considered in the absence of a showing of a good reason for the failure to present them before. (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764-765; *Kaichen's Metal Mart, Inc. v. Ferro Cast Co.* (1995) 33 Cal.App.4th 8, 17 ["Points raised in a reply brief for the first time generally will not be considered"]; *Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8 [points raised for the first time in the reply brief will not be considered unless good reason is shown for the failure to present them before].) Even if good cause exists for failure to present this issue earlier, a letter from the court reporter filed January 24, 2006 indicates that the court correctly stated the prosecution's burden of proof: "Upon review of my stenographic notes, on page 800, line 16, the word 'may' should be changed to 'must.' " This letter was sent to defendant's counsel on January 24, 2006. Absent a response from counsel, we presume the court correctly stated the prosecution's burden.

11

Section 667.61, subdivision (a) says that a person convicted for an offense detailed in subdivision (c), including forcible rape and forcible sexual penetration, under at least one circumstance detailed in subdivision (d) is to be imprisoned for life and not eligible for parole for 25 years, with good time credits of not more than 15 percent. (§ 667.61, subds. (a), (c) and (j).) Among the circumstances detailed in subdivision (d) are that "the defendant kidnapped the victim of the present offense and the movement of the victim substantially increased the risk of harm to the victim over and above that level of risk necessarily inherent in the underlying offense in subdivision (c)." (§ 667.61, subd. (d).) The existence of any fact required under subdivision (d) must have been alleged in the accusatory pleading and either admitted by defendant in open court or found to be true by the trier of fact. (§ 667.61, subd. (i).)

The jury was instructed as follows:

"It is further alleged that at the time of the commission of the crimes charged in counts [1, 2 and 3], that the defendant committed a kidnapping that substantially increased the risk of harm to the victim.

"If you find the defendant guilty of the crimes charged in counts [1, 2 and 3], you must determine whether or not the truth of this allegation has been proved. The People have the burden of proving the truth of this allegation.

"If you have a reasonable doubt that it is true, you [must] find it to be not true. Include a special finding on that question using a form that will be supplied to you.

"Kidnapping for the purpose of this allegation is the unlawful movement by physical force of a person without the person's consent for a substantial distance *where the movement is not merely incidental to the commission of the rape and/or forcible sexual penetration* and where *the movement substantially increases the risk of harm* to the person moved *over and above that necessarily present in the crime of rape and/or forcible sexual penetration itself.*

---

The written instructions delivered to the jury included the word "must," confirming this presumption.

"In this allegation, *the risk of harm requirement refers to the risk of either physical or mental harm.*

"Kidnapping is also the unlawful compulsion of another person without that person's consent and because of a reasonable apprehension of harm to move . . . for a substantial distance where such movement is not merely incidental to the commission of the rape and/or forcible sexual penetration and where the movement substantially increases the risk of harm to the person moved over and above that necessarily present in the crime of rape and/or forcible sexual penetration itself.

"Brief movement to facilitate the crimes of rape or forcible sexual penetration are incidental to the commission of the rape and/or forcible sexual penetration.

"On the other hand, movements to facilitate the rape and/or forcible sexual penetration that are for a substantial distance rather than brief are not incidental to the commission of the rape and/or forcible sexual penetration.

"In order to prove this allegation, each of the following elements must be proved:

"One, a person was unlawfully moved by the use of physical force, or a person was unlawfully compelled to move because of a reasonable apprehension of harm.

"Two, the movement of the person was without that person's consent.

"Three, the movement of the person was for a substantial distance, that is a distance more than slight, brief or trivial.

"And four, the movement substantially increased the risk of harm to the person moved over and above that necessarily present in the crime of rape and/or forcible sexual penetration itself." (Italics added.)

The court's reading of the instructions shows that each of the required findings was explained to the jury. Defendant argues that the instruction (1) did not specify that the kidnapping be of the victim of the present offense; (2) did not indicate that the movement of the victim must have substantially increased the risk of harm; and, (3) did not define the term "risk of harm." The italicized portions of this instruction demonstrate that appellant is wrong.

III. *Sufficient Evidence Supports the Jury's Finding on the Kidnapping Special Allegation*

Defendant contends that insufficient evidence supported the jury's finding on the kidnapping special allegation pursuant to section 667.61 because defendant's movement of the victim did not substantially increase the risk of harm to her. This claim is meritless.

To determine a claim of insufficient evidence, we determine whether, on the entire record, there is substantial evidence from which a reasonable trier of fact could have found the elements of the crimes charged beyond a reasonable doubt. (*People v. Miranda* (1987) 44 Cal.3d 57, 86.) Evidence is substantial if it is " 'of ponderable legal significance . . . reasonable in nature, credible, and of solid value. [Citations.]' " (*People v. Johnson* (1980) 26 Cal.3d 557, 576.) In making this determination, we "view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citations]" (*Ibid.*)

The risk of harm element of section 667.61, subdivision (d)(2) "focuses on the movement of the victim during the kidnapping, and the resulting risk of harm. The jury is to consider 'such factors as the decreased likelihood of detection, the danger inherent in a victim's foreseeable attempts to escape, and the attacker's enhanced opportunity to commit additional crimes [citations].' " (*People v. Jones* (1997) 58 Cal.App.4th 693, 713.)

Particularly given the victim's disability, any movement from a familiar path made detection less likely, escape more dangerous, and enhanced defendant's opportunity to exploit her confusion.[10] Here, the victim was dragged from a sidewalk that bordered a public road and forced to walk 10 minutes to a darkened athletic field, away from street

---

[10] Robertson's testimony supports the inference that defendant's movement of the victim led to such confusion. At around 1:00 a.m., the morning of January 16, he found her "holding onto the fence, moving oddly" with her "arm full out, hands with palms facing forward" trying to "feel her way out" of the field, but unable to get out of a corner.

traffic, surrounded by fences. Such factors provide more than sufficient evidence to support the jury's finding that defendant's movement of the victim substantially increased her risk of harm within the meaning of section 667.61, subdivision (d).

IV. *The One Strike Sentence Does Not Constitute Cruel and Unusual Punishment*

Defendant contends that the 25-years-to-life sentence imposed under section 667.61's one strike sentencing scheme violated federal and state constitutional prohibitions against cruel and unusual punishment. Defendant is wrong.

Under federal law, a sentence is tested under the Eighth Amendment by whether it is " 'grossly disproportionate' " to the crime. (*Harmelin v. Michigan* (1991) 501 U.S. 957, 1001.) In *Harmelin*, the United States Supreme Court found that the defendant's sentence of life without possibility of parole for a nonviolent offense, possession of a large quantity of cocaine, was not cruel and unusual punishment under the federal Constitution. (*Harmelin*, at pp. 965, 994-995.) Here, defendant's crimes involved multiple violent felonies against a particularly vulnerable victim. Thus, under *Harmelin*, defendant's sentence was not " 'grossly disproportionate.' " (*People v. Crooks* (1997) 55 Cal.App.4th 797, 805-806.)[11]

When assessing a claim of cruel and unusual punishment under the California Constitution, we look at " 'the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society. A look at the nature of the offense includes a look at the totality of the circumstances, including motive, the way the crime was committed, the extent of the defendant's involvement, and the consequences of defendant's acts. A look at the nature of the offender includes an inquiry into whether "the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of

---

[11] In *Crooks*, the Court of Appeal noted that the defendant in *Harmelin* was sentenced to life without parole for the nonviolent offense of drug possession, whereas the *Crooks* defendant, a burglar and a forcible rapist, received a lesser sentence. Thus, *Crooks* held that the defendant's sentence did not constitute cruel and unusual punishment under the federal standard. (*People v. Crooks, supra,* 55 Cal.App.4th, at pp. 805-806.)

mind." [Citation.] Next, we compare the challenged punishment with the punishment prescribed for more serious crimes in the same jurisdiction. And finally, the challenged punishment is compared with punishment for the same offense in other jurisdictions.' " (*People v. Romero* (2002) 99 Cal.App.4th 1418, 1431-1432.)

Only if, after conducting this detailed analysis, the court determines that defendant's sentence is "so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity," is it precluded under our state Constitution. (*In re Lynch* (1972) 8 Cal.3d 410, 424.) " 'Whether a punishment is cruel or unusual is a question of law for the appellate court, but the underlying disputed facts must be viewed in the light most favorable to the judgment.' [Citation.]" (*People v. Rhodes* (2005) 126 Cal.App.4th 1374, 1390.)

Defendant contends section 667.61 is unconstitutional on its face, arguing that a 25-years-to-life sentence is excessive punishment for an aggravated sexual offense. However, as defendant acknowledges, this sentencing scheme has been upheld in *People v. Estrada* (1997) 57 Cal.App.4th 1270, 1277-1283 and *People v. Alvarado* (2001) 87 Cal.App.4th 178, 199-201. As the *Estrada* court noted, "punishment under the one strike law is precisely tailored to fit crimes bearing certain clearly defined characteristics. For the 25-year minimum term to apply, the predicate offense must be a crime of sexual violence *and* it must be committed under circumstances which increase the risk of injury or death to the victim such as kidnapping, burglary, or infliction of mayhem or torture [citation] or be committed by one previously convicted of a violent sex offense [citation]. Thus . . . the defendant . . . cannot claim he is the victim of an indiscriminate sentencing scheme which metes out the same punishment for a broadly defined offense regardless of the circumstances surrounding the commission of the offense. [Citation.]" (*Estrada*, at p. 1280.)

Forcible rape and kidnapping fit within the meaning of this punishment scheme. They are serious crimes that the Legislature has reasonably concluded warrant imposition of a lengthy sentence because, in addition to the harm inflicted by the commission of the

sex offense itself, the accompanying crime of kidnapping places the victim in a position of elevated vulnerability.

Defendant also argues that the statute is unconstitutional as applied, noting defendant's age, minimal prior record, and family history. None of these factors reduces his culpability. At the time of the crimes defendant was nearly 20 years old and of legal age. As the trial court noted, he "made a lot of choices that day." He preyed on a blind woman, threatened her, hit her, raped her twice, and then left her in an unfamiliar setting in the middle of the night, after having taken her cane and cell phone. Given the many steps he took to commit these offenses, youthful rashness does not minimize his behavior.

Similarly, defendant's minimal prior record, though worthy of consideration, does not diminish his culpability. Finally, defendant's assertion that his family inflicted psychological trauma on him are undermined by his acknowledgement that his mother, stepfather, girlfriend, and daughter create a "network of support" that has rendered him a "changed young man." We conclude that the length of the sentence, when considered in light of the severity of the offense, and appellant's culpability does not give rise to an inference of gross disproportionality.

Nor does the intrajurisdictional comparison of punishments required by the California Constitution provide any additional basis for finding the sentence to be so disproportionate that it "shocks the conscience." (*People v. Dillon* (1983) 34 Cal.3d 441, 477-478.) Defendant suggests that his sentence is disproportionate because a defendant who commits a second degree murder receives a sentence of 15 years to life. It is no doubt true that the finality of murder makes it categorically different, but not necessarily more serious than the offense of forcible rape and kidnapping. The victim of such a crime is not only subjected to the sexual offense, but also the increased risk of harm kidnapping poses. In *Alvarado*, the court held a sentence of 15 years to life pursuant to the one strike law for the commission of a rape during a burglary did not constitute cruel and unusual punishment. The court acknowledged that the sentence was the same as the sentence for second-degree murder. Nevertheless, it explained that the lengthy sentences

specified by the one strike law reflect the Legislature's determination that the aggravating circumstances specified in section 667.61 place the victim in a position of elevated vulnerability, and that a lengthy prison sentence should be imposed upon a first conviction to protect society from serious and dangerous sex offenders. (*People v. Alvarado, supra,* 87 Cal.App.4th at p. 186.) In light of these legislative findings and the seriousness of the offense, the court concluded that it could not "say that punishing such conduct as severely as second degree murder is either shocking or outrageous." (*Id.* at p. 200; *People v. Estrada, supra,* 57 Cal.App.4th at pp. 1278-1283.) We agree.

We conclude that defendant's sentence does not constitute cruel or unusual punishment under either the state or federal Constitutions.

V. *Sufficient Evidence Supports Defendant's Conviction for Forcible Sexual Penetration*

Defendant argues his conviction for forcible sexual penetration must be reversed because there is insufficient evidence of such penetration or the requisite specific intent. Applying the substantial evidence standard of review explained in part III, *ante,* we disagree with defendant's contention.

First, defendant argues there is insufficient evidence that he inserted his finger separately from his penis. Defendant is wrong. In her recorded interview with Detective Sharp, the victim stated that defendant put his finger in her at the time of the first rape, but not the second. She said she could feel the difference and that defendant's penis hurt her most. At trial, the victim testified that defendant's penis was hard when he penetrated her. She stated that he put his finger in first and then his penis. She did not remember telling Sharp that his penis was soft although Sharp testified that she had made such a statement. Viewing the evidence in the light most favorable to the People, the jury could have reasonably believed the victim's testimony over Sharp's recollection of statements given shortly after a traumatic event and concluded that the defendant inserted his finger before inserting his penis in the victim.

Sufficient evidence also supports the determination that, at the time of such penetration, the defendant had the requisite lewd intent. The trial court instructed the jury on the required findings for forcible sexual penetration, including the requirement that

18

"penetration was done with the purpose and specific intent to cause sexual arousal, gratification or abuse." Defendant contends that he used his finger to guide his soft penis into the victim's vagina and, thus, forcible penetration was incidental to the rape and lacking in the requisite intent. Defense counsel presented this argument to the jury during his summation, but the jury rejected it and we find it meritless. In the course of a lengthy sexual assault of the victim, defendant inserted his finger into her vagina. This context provides substantial evidence of his lewd intent in doing so.

Since none of defendant's claims of error require reversal, his cumulative error claim also fails.

DISPOSITION

The judgment is affirmed.

_____
SIMONS, J.

We concur.

_____
JONES, P.J.

_____
REARDON, J.*

(A108457)

_____

\*    Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

# EXHIBIT E

IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

**THE PEOPLE OF THE STATE OF CALIFORNIA,**

Plaintiff and Respondent,

No._____

v.

**LAVARIUS JERMAINE McCORD,**

Defendant and Appellant.

Contra Costa County Superior Court, Case Number 050320283
HONORABLE HARLAN G. GROSSMAN, JUDGE

Court of Appeal Number A108457

## APPELLANT'S PETITION FOR REVIEW

FOLLOWING THE UNPUBLISHED DECISION OF THE
COURT OF APPEAL, FIRST APPELLATE DISTRICT, DIVISION FIVE,
AFFIRMING THE CONVICTION

H. STANLEY DEWEY
Attorney at Law
State Bar Number 107619

3150 Hilltop Mall Road
Richmond, California 94806
Telephone: (510) 970-7616

Attorney for Appellant
LAVARIUS JERMAINE McCORD

By Appointment of the Court of
Appeal Under the First
District Appellate Project's
Independent Case System



DOCKETED
SAN FRANCISCO

JUN _ 8 2006

By L. CARAMANZANA
No. SF 2005DA0092

## **TOPICAL INDEX**

**Page**

TABLE OF AUTHORITIES                                              ii

PETITION FOR REVIEW                                              1

NECESSITY FOR REVIEW                                            2

STATEMENT OF THE CASE                                          3

STATEMENT OF FACTS                                              5

ARGUMENTS OF LAW

I.   THE COURT OF APPEAL MISAPPLIED THE STANDARD FOR
     DETERMINING IF THERE WAS SUFFICIENT EVIDENCE TO
     WARRANT APPELLANT'S REQUESTED INSTRUCTIONS ON HIS
     DEFENSE OF REASONABLE GOOD FAITH BELIEF IN
     CONSENT, THUS FAILING TO PROTECT APPELLANT'S
     CONSTITUTIONAL RIGHTS TO DUE PROCESS                       12

II.  THIS COURT SHOULD OVERRULE THE COURT OF APPEAL
     AND FIND THAT APPELLANT'S 25-YEARS-TO-LIFE SENTENCE
     UNDER THE "ONE STRIKE" SENTENCING SCHEME VIOLATES
     FEDERAL AND STATE CONSTITUTIONAL PROHIBITIONS
     AGAINST CRUEL AND/OR UNUSUAL PUNISHMENT                   21

CONCLUSION                                                     25

## NECESSITY FOR REVIEW

This Court has said that when a criminal defendant requests jury instructions that a reasonable, good faith belief in consent may negate criminal intent and thus afford a defense to rape, a trial court should give the instructions if there is substantial evidence supporting both (1) that the defendant had a good fath, albeit mistaken, belief that the victim consented to sexual intercourse based on "equivocal conduct" by the victim which the defendant could mistake for consent, and (2) that the defendant's mistaken belief was reasonable under the circumstances. (*People v. Stitely* (2005) 35 Cal.4th 514, 553-554.) Division Five of the Court of Appeal, First Appellate District, has shrunk the definition of what can be considered sufficient evidence to warrant such a defense requested instruction beyond any meaning, thus taking matters from the determination of the jury. Appellant requested a *Mayberry* instruction (*People v. Mayberry* (1975) 15 Cal.3d 143) which was denied by the trial court and which the Court of Appeal incorrectly held lacked the substantial evidence to be given. This Court should revisit the measure of the evidence needed to require an instruction on this mistake-of-fact defense theory, since this is an area of the law that allows unbridled discretion to courts.

This Court should make a definitive finding that the "one strike" sentencing scheme of Penal Code section 667.61 violates the prohibitions against cruel and unusual punishment, both on its face and as applied to appellant, who received a 25-year to life term under this draconian provision.

This Court should disavow the Court of Appeal's decision in order to settle important questions of law (California Rules of Court, rule 28 (b) (1) and to do justice.

# STATEMENT OF THE CASE

Appellant was charged with two counts of forcible rape (Penal Code[1] section 261, subdivision (a)(2)), one count of forcible sexual penetration (section 289, subdivision (a)(1)), one count of kidnapping (section 207, subdivision (a)), and one count of second degree robbery (sections 211 and 212.5, subdivision (c)), all alleged to have been committed against a victim designated as "Jane Doe." An enhancement was also alleged as to each count: that the victim was blind and appellant knew or should have known of this disability. (section 667.9, subsection (a).) Finally, it was charged pursuant to section 667.61, subdivisions (a) and (d) in each count that appellant kidnapped Jane Doe and that moving her substantially increased the risk of harm to her over and above the risk inherent in the particular crimes charged. (CT 70-72.)

The jury found appellant guilty on counts one though four and guilty of the lesser offenses of grand theft and petty theft on count five. The jury found true as counts one through four that Jane Doe was blind and that appellant knew or should have known of this disability. Further, the jury found true the allegation pursuant to section 667.61 as to each of these counts. (CT 243-244; RT 950-966.)

The court imposed a total prison sentence of 26 years to life: for the count one rape, the court imposed 25 years to life, pursuant to the One Strike sexual offense sentencing requirements of section 667.61, subdivisions (a) and (d)(2). For the blind victim enhancements the court imposed a one year consecutive sentence on count one and stayed application to the other counts. For the counts two and three the court imposed a concurrent mid-term of six years. Sentence on count four was stayed pursuant to section 654. As to the count five grand theft offense,

---

[1]

All subsequent references to statutes are to the Penal Code, unless otherwise noted.

-3-

the court imposed a concurrent two years and set aside the petty theft verdict. (CT 566-567; RT 996-1001.)

Appellant filed a timely notice of appeal on November 10, 2004. (CT 568-569.) On April 27, 2006, Division Five of the First District Court of Appeal filed its unpublished opinion affirming the judgment. This Petition for Review is taken from that decision.

## STATEMENT OF FACTS

Jane Doe is a blind African American woman who was 21 years old at the time of these events. (RT 78; CT 155.) She lived alone in part of a group of apartments leased in San Pablo by a program for blind and visually impaired students. (RT 78-79, 133-134.) She attended the California School for the Blind in Fremont. (RT 78.)

In the evening of January 15, 2003, Jane was in Fremont at the School for the Blind for a meeting. (RT 78, 321.) At 10:00 p.m. she took the BART train and got off at the Del Norte Station in El Cerrito. (RT 79-81.) At the station, she asked a white male passenger to take her to the number 72 bus. There a bus driver told Jane that her bus did not go by Contra Costa College, where Jane said she wanted to go. A second bus the driver also said her bus did not stop by the college. While she talked to the second driver, a male who sounded Black to Jane, asked if she needed help. Jane said yes, and asked if he would take her to a taxi. As she walked to the taxi stand at the BART station, Jane held onto the man's arm and used her sight cane with the other hand. The man told her that there was a Yellow Cab at the stop. At the taxi, the man asked her, "Do you want me to come with you?" She responded, "no," but probably did not say it loud enough for him to hear her, since she tends not to speak up. This man got in the cab with her. (RT 80, 85-90, 125, 316.)

Inside the cab, she told the driver she wanted to go to 23rd Street and San Pablo Avenue. She did not tell the driver to take her to her apartment, because she did not want the man who walked with her to know where she lived. The driver told her the fare would be $10. The man who had gotten inside with her told the driver, "I want to take my girlfriend home." (RT 90, 316-317.) Jane responded that she was not the man's girlfriend, but she did not say more because she was afraid that the man would become violent. She thought the man was drunk, since his breath smelled of alcohol. She did not say anything else to the cab driver; she did not communicate to him in any way that she was concerned that there was someone in the cab with her. During the drive, the male who had gotten in

-5-

with her put his hand on her thigh, but he moved it off quickly when she asked him to, and she moved away from him. There was no other conversation. (RT 90-92, 303, 305.)

The taxi stopped at 23rd and San Pablo Avenue. The man paid the cab driver with his own money, and Jane heard him get out after she did. She did not wait at the cab, but started walking. (RT 92-94, 306.)

As she walked, she used her flip cell phone to check her phone messages and to telephone a friend to tell her she was not home yet. Jane spoke to her friend for about 5 minutes while she walked. As she walked and talked, the man who had been in the cab with her came up and asked for her phone, saying he wanted to ask her friend if she could meet Jane. When Jane refused, he grabbed the phone away from her. She said, "Okay. That's it. Fine." Then she walked away. She heard the phone being clicked shut. (RT 96-97, 313.)

Moments later the man grabbed her from behind, putting his right arm around her waist and his left hand on her shoulder. She asked him to let her go. He forced her to walk along the sidewalk. The man held her like this as they walked for about 10 minutes. She asked the man where they were going, and he said he was taking her to the bus stop. She never agreed to walk with this man. (RT 95, 99, 101-102, 309, 311, 319.)

As they walked, Jane felt the surface change from sidewalk to gravel. They stopped walking at some wooden bleachers on the Contra Costa Community College campus. She started screaming and demanded, "Let me go right now." The man told her to "shut the F... up" and to sit down before he knocked her out. Jane tried to slip away from him, but she fell to the ground, and he fell next to her. She then kicked him in the stomach. He hit her on the shoulder. She skinned her knees in the fall. He told her he had also skinned his knees. (RT 100, 102-103, 312.)

The man ordered her, "Get up, bitch, right now." Jane was afraid. She got up. The man banged her head against a wall they were next to. The man said he would leave her alone if she did what he asked her to do. He said, "lift up your shirt before I fucking kill you." He laid her on the ground and pulled her pants and underwear down. He lay on top of her,

stuck his finger in her vagina and inserted his penis. She asked him to please stop. He told her to shut up, that he would stop when he was finished. This lasted for about five minutes. It felt very uncomfortable, but hurt only a little bit. She did not know if the man ejaculated. (RT 103-106, 112.)

After he stopped, Jane asked the man to show her which way to go. He told her that she should go straight and she would find her way home. Then he pretended to leave. She stood up and put her clothes back on. Moments later he came back, acted as though he were someone else and asked, "Do you need help?" She said she had been raped and wanted to make a police report. The man pretended to call the police. She heard the clicking sound of a phone and heard him saying someone had been raped. Then she felt his sweatshirt and realized it was the man who had just raped her. (RT 106-108.)

After he stopped pretending, the man said, "Okay, you are in trouble. Now I am going to do it again." He pulled Jane's hand around his arm and walked her a few minutes away to some bleachers. There he laid her on a bleacher and pulled her trousers and underwear down to her ankles. He inserted his penis in her vagina for about two minutes. Jane exclaimed, "I am going to get pregnant." The man's response was, "I will take care of the baby." After he removed his penis he said, "I wasn't raping you." He told her he was watching her and would come "right back," but he did not return. He took Jane's cell phone and her white cane. (RT 107-111.) Before these events, Jane had never had sex with anyone. (RT 118.)

Jane put her clothes and shoes on and wandered around for several minutes with no idea where she was. Will Robertson, a custodian at the college, found her feeling her way along a fence of a fairly dark athletic field between 1:00 and 2:00 AM. She told him she had been raped. He took her to the custodians' office and called the police. The police came, took a report and then took Jane to the hospital. (RT 49-52, 73-74, 111-113.)

Contra Costa Community College Detective Thomas Sharp interviewed Jane Doe at the hospital in the morning of January 16, 2003, and interviewed her again on January 22, 2003. (RT 435, 440.)

-7-

There were some inconsistencies from Jane's testimony in both interviews. Jane told Sharp that it was the BART station agent who had assisted her with hailing a cab and helped her get into the cab. She told Sharp she had given the driver her address and he had informed her that the fare would be $10. She claimed to have paid the $10 to the driver herself. (RT 523-524, 526.)

Jane told Sharp that it was at that point that a male got into the back of the cab with her. She announced to the cab driver that she did not know this person and wanted him out of the cab. The cab driver told the male to leave, but he refused to do so. The man said, "All right, baby. I'll take you home." At 23rd and San Pablo the cab stopped and the driver told her it would be an extra $10 to drive to her apartment. She and the male both got out of the cab at 23rd and San Pablo. (RT 524-526.) Jane did not mention that she had checked her messages on her cell phone after she got out of the cab, nor that she been talking to a friend on the phone, nor that the phone had been taken from her hand. (RT 530-531.) She also did not mention being afraid during the cab ride. (RT 572.) She said that when the man inserted his penis it was soft. (RT 531, 583.)

Jane told Sharp that after the assault the man told her his name was Riece from Pinole and that he had asked Jane her name. She told the man her name was Lauren and that she was age 30. She told Sharp that the man had said, "If you don't do it, I will kill you." She also recounted that the man had grabbed her by the neck and covered her mouth with his other hand to prevent her from screaming and had said, "Shut up, bitch." However, nothing was said about any threats the man made to her as he left, such as that he was watching her. (RT 573-574, 585.)

Jane told Sharp that when the man put his penis in her vagina the first time, he was at the same time putting a finger in her. Both the penis and the finger hurt her. His finger did not go all the way in, and it was his penis that was hurting her the most. (Exhibit E1, pp 14-15.)

Louise Jones was the Sexual Assault Response Team (SART) nurse who examined Jane at the county hospital. (RT 232-237.) She observed a scratch on Jane's neck, scrapes on both knees, and messy hair. Jane's

demeanor was calm and cooperative during the examination. (RT 240-243, 273 341, 366.)

During the genital examination, Jane cried and said she was in pain. Jones observed abrasions on the right side of Jane's vaginal wall and a laceration to the labia minora. There was redness and soreness on the outer portions of Jane's vaginal wall. She saw petechia, indicating broken capillaries. She also observed two blood clots. (RT 247, 249-253, 264-270, 346, 353, 356.) Jones collected four swabs from matter inside Jane's vagina. (RT 252-260.)

Jones testified that a woman can have vaginal bleeding when she has sexual intercourse for the first time, and that vaginal injury can occur in normal intercourse between two consenting adults. (RT 352-353.)

Nancy Phinnesse, Jane Doe's case manager at the Living Skill Center was called to the college campus in the early morning hours of January 16. When she arrived, Jane appeared traumatized and was very quiet, but wanted to talk about what had occurred. (RT 133-136, 144.)

Phinnesse noted it is against policy at the Living Skill Center for students to travel alone after dark; they are supposed to go in groups. Jane knew these rules. Jane blamed herself for being raped because she was out alone after dark. Jane was usually a very mild, calm, soft-spoken person; she was also very naive and sheltered. (RT 145, 148-150.)

Police processed the crime scene at Contra Costa College. One officer collected a white sight cane on the ground of the athletic fields. (RT 156-172.)

Dechanti Williams was on the BART train on the night of January 15, 2003, and observed a blind woman exit at the Del Norte Station as she did. Williams saw the blind woman being directed to a bus by a white male in the BART station. (RT 180, 196.)

On her way to a bus, Williams encountered appellant, who began flirting with her. She told him he was too young for her. After she got on the bus, appellant boarded and tried to get Williams to come off the bus with him. When he finally understood that Williams was not going to exit, he left the bus. (RT 181-185.)

At about the same time, the blind woman Williams had seen moments before was standing at the door of the bus talking to the driver. Appellant stood next to her and offered to take the blind woman to a cab. Williams saw appellant guiding the woman by the elbow toward the taxi area. (RT 181, 185-186, 199.)

Williams later saw media reports about the rape of a blind girl, and the descriptions sounded to her like the blind woman she had seen at the BART station. She contacted the police and gave a description of appellant to Detective Sharp. (RT 187-188, 590.) Sharp later showed her a photo lineup that included appellant's photograph, and Williams picked out his photo as the man she had seen on the night of January 15, 2003. (RT 188-194, 447, 455-462.)

Araminta Harris was an AC Transit bus driver on the night of January 15, 2003. A blind woman using a cane came up to her bus and asked if she was driving to the college. Harris told the woman that the bus went there, but not to 23rd Street, where the woman wanted to go. The woman said she would catch a cab. Harris directed her to a taxi stand on the other side of the BART station. (RT 380-389.)

As Harris was talking with the blind woman, appellant came up to her bus and asked what time it was leaving. Appellant had ridden her bus before. After Harris told the blind woman about the taxicab area, she saw appellant take the woman's right arm with his left--like a gentleman--and walk her toward the taxi area. (RT 387-391.)

Moments later, Harris saw a taxicab pull away from the BART station with the blind woman, but she could not clearly see the second passenger. (RT 391-397.)

When Harris read in the next day's newspaper about the blind woman, she contacted the police and gave a description of appellant, particularly mentioning his newly done, distinctive twisted hair style. (RT 398-403.) On February 21, 2003 at about 8:00 p.m., Harris drove her bus into the Del Norte Station and saw appellant sitting there undoing his braided hair. She immediately informed the BART station agent who called

the police. After police detained appellant, she confirmed that it was the man she had seen that night with the blind woman. (RT 404-410, 412.)

Detective Sharp interviewed appellant in custody after his arrest at the Del Norte BART station. Appellant denied any involvement with the blind girl and any knowledge of what happened to her. (Exhibit 44a.) Sharp took photographs of appellant and took swabs from inside appellant's mouth for DNA testing. (RT 468-469.)

David Stockwell from the Contra Costa County Sheriff's Department Crime Lab Stockwell examined the sample from the vaginal swabs taken from Jane by the SART nurse, and he extracted the DNA content of the sperm material from it. (RT 636ff, 691, 694-696.) Next, he analyzed the DNA from the swab taken from appellant's mouth. (RT 697-698.) He concluded that the DNA profile from the sperm matched appellant's DNA. Stockwell estimated that the profile he observed would be randomly observed once in 59 quintillion African-Americans, 3.4 septillion Caucasians, or 11 septillion Hispanics. (RT 703-704, 715.)

## ARGUMENTS OF LAW

I.    **THE COURT OF APPEAL MISAPPLIED THE STANDARD FOR DETERMINING IF THERE WAS SUFFICIENT EVIDENCE TO WARRANT APPELLANT'S REQUESTED INSTRUCTIONS ON HIS DEFENSE OF REASONABLE GOOD FAITH BELIEF IN CONSENT, THUS FAILING TO PROTECT APPELLANT'S CONSTITUTIONAL RIGHTS TO DUE PROCESS**

Appellant requested a jury instruction about his reasonable, good-faith belief that Jane Doe consented to have sexual intercourse with him. The instruction was rejected by the trial court.[2] The Court of Appeal decided there was no need for such instruction because "there was not substantial evidence that defendant possessed an honest and reasonable belief that the victim consented to have sex with him." (*Slip Opn.*, p. 9.) In so holding, the Court of Appeal has raised the bar for substantial evidence to an impossible height.

Division Five of the First District Court of Appeal seems to have ignored the facts in this case, as well as the test of when there is evidence

---

[2]

The wording requested by appellant was set forth in a CALJIC No. 10.65 form: "In the crime of unlawful forcible rape oral copulation by force and threats forcible sodomy penetration of the genital or anal opening by a foreign object, substance, instrument or device by force, violence fear or threats to retaliate, criminal intent must exist at the time of the commission of the ___(crime charged)___. [¶] There is no criminal intent if the defendant had a reasonable and good faith belief that the other person voluntarily consented to engage in sexual intercourse oral copulation sodomy or penetration of the genital anal opening by a foreign object, substance, instrument, or device. Therefore, a reasonable and good faith belief that there was voluntary consent is a defense to such a charge, unless the defendant thereafter became aware or reasonably should have been aware that the other person no longer consented to the sexual activity. [¶] However, a belief that is based upon ambiguous conduct by an alleged victim that is the product of conduct by the defendant that amounts to force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person of the alleged victim or another is not a reasonable and good faith belief. [¶] If after a consideration of all the evidence you have a reasonable doubt that the defendant had criminal intent at the time of the accused sexual activity, you must find him/her guilty of the crime." (CT 302.) The jury instruction form would obviously have been changed by the court to specify the particular offenses involved in this case, had the court not refused to give the instruction.

-12-

sufficient to warrant a defense instruction. "It is well established that a criminal defendant is entitled to adequate instructions on the defense theory of the case." (*Conde v. Henry* (9th Cir. 2000) 198 F.3d 734, 739.) Due process requires that the jury must be instructed on the defendant's theory of the case. (*People v. Modesto* (1963) 59 Cal.2d 722, 730.)

The trial court instructed the jury on the definition of actual consent as a defense to the rape charge (CT 394, RT 782), but failed to instruct the jury on reasonable belief in consent, also known as a mistake-of-fact, or the *Mayberry* defense, even though appellant requested that the court give CALJIC No. 10.65.[3]   (CT 294, 302.)  Trial counsel presented an argument to the jury about consent.  (RT 856-880.)  But because the requested instruction was not given, he was unable to argue that appellant had a reasonable belief that Jane's actions or lack of action indicated she was consenting to his advances and to having sexual relations with him.

If the defense requests an instruction on a particular defense or a lesser included offense, an instruction must be given so long as there is sufficient evidence in support of the defense or lesser included crime. (*People v. Wickersham* (1982) 32 Cal.3d 307, 324, overruled on another point in *People v. Barton* (1995) 12 Cal.4th 186, 200.)  Importantly, doubt as to the sufficiency of the evidence must be resolved in favor of the defendant.  (*People v. Flannel* (1979) 25 Cal.3d 668, 684-685.)  Moreover, even if the evidence in support of the instruction is "incredible," the reviewing court must proceed on the hypothesis that it is entirely true. (*People v. Burnham* (1986) 176 Cal.App.3d 1134, 1143, relying on *People v. Modesto* (1963) 59 Cal.2d 722, 729.)

A natural corollary of the theory of actual consent is a defendant's reasonable and good faith belief in consent. (See *People v. Giardino* (2000) 82 Cal.App.4th 454, 471.)  A trial court is obliged sua sponte to instruct on this alternative theory if the theory is supported by substantial

---

[3]    In *Mayberry*, as here, the defendant *requested* the instruction on reasonable belief in consent. (*People v. Mayberry, supra*, 15 Cal.3d at p. 153.)

evidence that the defendant actually believed the sex act was consensual and the alleged victim engaged in conduct that was sufficiently equivocal in regard to consent that the defendant reasonably believed there was consent. (*People* v. *Mayberry, supra,* 15 Cal.3d at pp. 153-158; accord *People* v. *Williams* (1992) 4 Cal.4th 354, 361, 364.)

While rejecting the *Mayberry* instruction in that particular case, this court in *Williams* held, for the guidance of lower courts in the future, that the instruction must be given where there is substantial evidence of the alleged victim's "equivocal conduct" constituting a possible middle ground, and even though such equivocal conduct follows the defendant's exercise or threat of force, violence or fear. (*People v. Williams, supra,* 4 Cal.4th at p. 362.) *This case is such a middle-ground case.*

The record demonstrates that Jane Doe's conduct was equivocal about whether she might be agreeing to have sex with appellant. To begin with, she took appellant's arm and allowed him to lead her to the taxicab at the BART Station. When they arrived at the cab, appellant asked if Jane wanted him to come with her. Though she testified she said no in response, she admitted that it was probably not loud enough for appellant to hear. After appellant entered the cab with Jane, he told the driver he wanted to take his girlfriend home, referring to Jane. Jane testified ambiguously, stating both that she said nothing in response to this either to appellant or the cab driver and that she told the driver she was not appellant's girlfriend. (RT 85-90, 317.) She did not tell the cab driver that she did not know the man with her or that she did not want him to go with her. After she and appellant got into the cab, Jane told the taxi driver that she wanted to go to 23rd and San Pablo. That she did not tell the driver to take her directly to her apartment could reasonably have been interpreted by appellant that she wanted to stay with appellant. (RT 316-317.)

During the ride in the taxi Jane made no protest to the cab driver about appellant's presence. She did not communicate in any way that she was concerned with appellant being in the taxi. She and appellant rode in silence, except that when appellant put his hand on her thigh, she asked

-14-

that he move his hand, which appellant did. Jane had a cell phone, but did not use it in the taxi. (RT 90-92, 303, 305.)

When Jane exited the taxicab at 23rd and San Pablo she let appellant pay the $10 cab fare with his own money. (RT 93.) She herself began walking and talking on the telephone to her friend. She talked for about 10 minutes. (RT 93-94, 486.) She did not call 911 nor is there evidence that she expressed any reservations about her situation to her friend on the phone.

Appellant walked up to Jane and asked to see her cell phone so he could talk to her friend and ask if she could meet Jane. When Jane refused this request, appellant took the phone. Jane's response was to make the ambiguous statement, "Okay. That's it. Fine." Then she simply walked away from appellant. (RT 96-97.) At that point appellant took hold of her from behind and made her walk with him for about 10 minutes. During the walk, the only thing Jane said was to ask appellant where they were going. She did not scream nor try to signal the cars she heard traveling along the street where they walked. (RT 101, 311-312.)

It was only on the college athletic field that Jane demanded that appellant let her go and started screaming and struggling with appellant. In the struggle she and appellant fell to the ground. (RT 100-103, 112, 312, 342-343.) He told her to get up and she did. He said he would leave her alone if she did what he asked her to do, which was to have sex with him. He proceeded to have intercourse with Jane, during which she asked him to please stop. (RT 103-106.)

After the first intercourse and after Jane had gotten dressed, appellant came back and said he was going to do it again. He put Jane's arm around his, similar to how he had done it back at the BART Station, and lead her to some bleachers, where he again had intercourse with her. Jane followed and did not protest. She told appellant that she was afraid she would have a baby, to which appellant replied that he would take care of any baby. Jane asked appellant his name (he said it was "Riece") and she told him hers was "Lauren." (RT 107-111, 574.)

Jane Doe's behavior during these events was "equivocal." She appeared to voluntarily accompany appellant in the cab to a location in San Pablo. She gave no noticeable protest to appellant coming with her or toward his initial verbal advances. She did not use her phone to call the police or seek help from her friend either during the cab ride or after she got out of the cab. She acted ambiguously, by her behavior giving conflicting suggestions as to whether she wished to have sex with appellant. Even after appellant took hold of her and walked with her toward the college, Jane's actions were less than certain about whether she was consenting to be with appellant. However, in the field at the college campus Jane became less equivocal. The jury clearly did not believe that Jane consented to have sex with appellant. Nevertheless, because of what preceded the actions on the field appellant could reasonably have believed that Jane had consented. On these facts, jurors could certainly find that there was "equivocal" conduct which supported the defense of a reasonable good faith belief that consent had been given.

The court's analysis of the facts in *People v. Anderson* (1983) 144 Cal.App.3d 55 supports this conclusion. In reversing the conviction the court held the failure to give the *Mayberry* instruction was prejudicial error. "While the jury decided the issue of actual consent adversely to appellant, that determination does not necessarily decide the issue of whether appellant reasonably believed the victims consented. The two defenses are separate." (*Id.*, at p. 63.)

The *Anderson* court pointed out that it was not necessary for a defendant to have testified about consent. Since a defendant's state of mind is often shown through circumstantial evidence rather than his direct testimony, a defendant can establish sufficient circumstantial evidence other than by his testimony to require an instruction of his reasonable good faith belief on the question of consent. (*Ibid.*; *People v. DeLeon* (1992) 10 Cal.App.4th 815, 824.) Evidence of equivocal conduct on the part of a victim can come solely from the defendant's mouth, solely from the victim's mouth, or from a third party. (*People v. May* (1989) 213 Cal.App.3d 118, 125.) In the instant case, appellant did not testify, but the direct and cross-

-16-

examination of Jane Doe as well as other circumstantial evidence was sufficient to establish appellant's state of mind of a reasonable good faith belief.

Like the woman in *People v. May, supra,* 213 Cal.App.3d 118, Jane Doe gave indications she willingly traveled with appellant. However, after the taxi ride and particularly at the college campus, she signaled that she did not want to have sex (i.e. she started screaming that appellant should let her go and she struggled with appellant). Like the woman in *May,* however, she arguably put aside her initial reluctance and voluntarily submitted to having intercourse. And after the initial sexual contact, during the second intercourse she did not resist or protest. Though this pattern of conduct was not sufficient to convince the jury that there had been consent, it was certainly "equivocal" enough to require the court to instruct with CALJIC No. 10.65. (*People v. May, supra,* 213 Cal.App.3d at pp. 125-126.)

It was for the jury to decide whether or not Jane Doe's equivocal conduct was "the product of" the physical force or violence or of fear, such that the mistake-of-fact defense should be disallowed, or whether it warranted acquittal on the rape count. The jury is "permitted to credit some portions of a witness's testimony, and not credit others." (*People v. Williams, supra,* 4 Cal.4th at p. 364.) The jury could believe that all Jane's actions were the result of force and violence and fear engendered by appellant, or could believe the circumstantial evidence of her vague, ambiguous or equivocal behavior indicated consent to appellant that he reasonably and mistakenly believed was consent to the sexual intercourse.

The requested CALJIC No. 10.65 would have provided an opportunity for the jurors to make that finding. As it was, under the instructions given the only option the jury had to acquit was to find actual consent. The court should have given the jury a middle ground by giving the requested *Mayberry* instruction.

The trial court's failure to give the mistake-of-fact defense instruction requires per se reversal. The controlling rule is that the omission to instruct on an affirmative defense constitutes reversible error unless "'the factual

question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions.' [Citation.]" (*People v. Stewart* (1976) 16 Cal.3d 133, 141; accord, *People v. Lee* (1987) 43 Cal.3d 666, 675, fn. 1.)

In the instant case, the jury was not given any instruction on the subject of reasonable good faith belief in consent. Thus, reversal is compelled on both counts of rape and the forcible sexual penetration count. (*People v. May, supra*, 213 Cal.App.3d 118, 128-129; "[a]lthough the jury resolved the issue of <u>actual</u> consent against May, that determination says nothing about how they would have resolved the issue of <u>reasonable belief</u> in consent, since they were never asked to consider it. [Citations.]," emphasis in original.)

Aside from California law, per se reversal is required under the due process clause of the federal Constitution. (*United States v. Escobar De Bright* (9th Cir. 1984) 742 F.2d 1196, 1201-1202.)

The United States Supreme court has indicated that per se reversal is required when an error "vitiates <u>all</u> the jury's findings." (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 281, emphasis in original.) Or, stated otherwise, per se reversal is compelled when the consequences of an error "are necessarily unquantifiable . . . ." (*Id.*, at p. 282; accord, *Neder v. United States* (1999) 527 U.S. 1 [144 L.E.2d 35, 48].) Since it is impossible to know whether a jury would have accepted a defense which it never had occasion to consider, the conclusion is inescapable that the effect of the instructional omission in this case is "necessarily unquantifiable." (See *Conde v. Henry, supra,* 198 F.3d 734, 740-741; structural error found where the defense was precluded from presenting its "theory of the case;" *United States v. Sarno* (9th Cir. 1995) 73 F.3d 1470, 1485; "failure to instruct a jury upon a legally and factually cognizable defense is not subject to harmless error analysis. [Citations.]")

Assuming arguendo that this court should find that error occurred solely under state law and is not entitled to per se reversal, the question is whether there is a reasonable probability that an acquittal would have been returned absent the error. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

Under *Watson*, a reasonable probability "does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility. [Citations.]" (*College Hospital, Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715, emphasis in original; see also *People v. Blakely* (2000) 23 Cal.4th 82, 93.)

It is manifest that prejudice must be found in this case. The case was factually fairly simple, with the actual presentation of evidence lasting four days (including two half days). (RT 217-226, 231-234.) Yet the jury deliberated for a total of approximately thirteen hours over four days. (CT 234-243.) Given this objective indication that the case was close, reversal is mandated. (*People v. Cardenas, supra*, 31 Cal.3d 897, 907; six hours of deliberations is evidence of a close case.)

Even if a jury eventually convicts the defendant, its requests for additional instructions or the readback of testimony may establish that the case was a close one. (See, e.g., *People v. Pearch* (1991) 229 Cal.App.3d 1282, 1295.) On the first day of deliberations the jury requested copies of Jane Doe's interview with Detective Sharp and asked to examine all other evidence. (CT 468.) On the third day of deliberations the jury requested a readback of all of Jane Doe's testimony. (CT 473.) Crucially, the jury requested a readback of part of the cross examination of the SART nurse, "starting with the cross-examination by the Defense Attorney of Louise Jones regarding whether or not the injuries sustained on [Jane Doe's] genitalia could have been caused by 'normal' sex, to the end of her testimony." (CT 476.) This request indicates that the jury was closely considering whether or not the sexual relations between appellant and Jane Doe had been consensual.

Moreover, the jurors in this case reported on the fourth day that they were deadlocked, also indicating a close case. The court inquired whether they had reached verdicts on any of the counts, and the presiding juror wrote that they had, but only on one count. (CT 478.) Since the two rape and the sexual penetration charges were all interconnected, it is unlikely that before it reported it was deadlocked the jury had decided any of those

counts.[4]  It was only after the court interviewed the jurors and found that several believed additional instruction would be helpful and then reread certain of the instructions and ordered them back into the jury room for further deliberations that the jury resolved its deadlock and returned verdicts on all counts.  Requests for additional instruction is another indication of a close case and points to prejudice in the failure to give the requested instruction.  (*People v. Filson* (1994) 22 Cal.App.4th 1841, 1852.)

The jury was obviously troubled by the case.  This court is required to take heed.  (*Sullivan v. Louisiana, supra,* 508 U.S. at p. 279; harmless error analysis requires an appellate court to look at the impact of an error on the jury.)

The jury had trouble with coming to a verdict even in the face of a very sympathetic young blind victim.  The equivocal conduct of Jane Doe made it reasonable for appellant to have believed that she wished to have sex with him.  Thus, there is certainly a reasonable chance that the jury would have accepted the defense of reasonable good faith belief in consent had an appropriate instruction been given.  (*College Hospital, Inc. v. Superior Court, supra,* 8 Cal.4th 704, 715.)

The error was prejudicial and the judgment on counts one, two and three must be reversed.

---

[4]

    Since the jury had sent a note about count five, asking whether if they found appellant not guilty on robbery they had to make a decision as to both of the lesser counts (CT 474), and since the jury ultimately found appellant not guilty of robbery, but guilty of both lesser crimes (CT 503-505), it is likely that the verdict they reached before they reported they were deadlocked was on count five.

II.    **THIS COURT SHOULD OVERRULE THE COURT OF APPEAL AND FIND THAT APPELLANT'S 25-YEARS-TO-LIFE SENTENCE UNDER THE "ONE STRIKE" SENTENCING SCHEME VIOLATES FEDERAL AND STATE CONSTITUTIONAL PROHIBITIONS AGAINST CRUEL AND/OR UNUSUAL PUNISHMENT**

Relying on *People v. Estrada* (1997) 57 Cal.App.4th 1270, 1277-1283, and *People v. Alvarado* (2001) 87 Cal.App.4th 178, 199-201, Division Five of the First District Court of Appeal rejected appellant's contention that the section 667.61 "one strike" sentence of 25-years-to-life imposed on him violates the constitutional prohibitions against cruel and unusual punishment both on its face and as imposed on appellant. (*Slip Opn.*, pp. 15-18.) This court should instruct the Courts of Appeal how to correctly apply the cruel and unusual standards and should hold appellant's sentence to be violative of these standards.

Under federal law, a punishment is excessive in violation of the Eighth Amendment if it is "grossly out of proportion to the severity of the crime." (*Gregg v. Georgia* (1976) 428 U.S. 153, 173; *Harmelin v. Michigan* (1991) 501 U.S. 957, 1001.) Appellant received a total sentence of 26-years-to-life imprisonment; 25 years of this draconian sentence resulted from the application of section 667.61. At sentencing, appellant moved to modify the verdict on the basis that the sentence mandated by section 667.61 violated the state and federal prohibitions against cruel and unusual punishment. (CT 527-533; RT 993ff.)

Article I, section 17 of the California Constitution separately and independently sets out a prohibition similar to the Eighth Amendment. (*People v. Dillon* (1983) 34 Cal.3d 441, 478.) Under California law, analysis of whether a sentence imposes cruel or unusual punishment begins with a recognition that "in our tripartite system of government it is the function of the legislative branch to define crimes and prescribe punishments, and that such questions are in the first instance for the judgment of the Legislature alone." (*In re Lynch* (1972) 8 Cal.3d 410, 414; citations omitted.) Although the Legislature is accorded "the broadest discretion possible in enacting penal statutes and in specifying punishment

-21-

for crime, . . . the final judgment as to whether the punishment it decrees exceeds constitutional limits is a judicial function." (*People v. Anderson* (1972) 6 Cal.3d 628, 640.)

A punishment may violate Article I, section 17 of the Constitution "not only if it is inflicted by a cruel or unusual method, but also if it is grossly disproportionate to the offense for which it is imposed." (*People v. Dillon, supra,* 34 Cal.3d at p. 478.) A sentence may be deemed to be grossly disproportionate in two ways: the sentence in the abstract may constitute cruel or unusual punishment or the sentence as applied to a particular defendant might be cruel or unusual. Even if the imposition of the sentence might not be cruel or unusual in every case in which it is imposed, imposition of that sentence might be cruel or unusual as applied a particular defendant. (*People v. Superior Court (Beasley)* (1984) 159 Cal.App.3d 131, 134-135.)

By mandating a term of 25-years-to-life whenever a defendant commits an enumerated offense and meets the enhancing criteria, section 667.61 constitutes cruel and/or unusual punishment on its face. The statute is constitutionally defective because it does not recognize significant gradations of culpability depending on the severity of the current offense and it fails to take mitigating factors into consideration. (*In re Grant* (1976) 18 Cal.3d 1, 11-13; *In re Foss* (1974) 10 Cal.3d 910, 923.)

In addressing the question of whether the application of section 667.61 amounted to cruel and unusual punishment in the case before it, the Second District Court of Appeal (Division Seven) in *People v. Estrada* (1997) 57 Cal.App.4th 1270 found only two states which provided comparable sentences for aggravated rape: Louisiana (LWOP) and Washington (minimum 20 years). (*Id.* at p. 1282; see also the Sixth District case of *People v. Alvarado* (2001) 87 Cal.App.4th 178, 200; appellant acknowledges these contrary authorities.)

Even if there are several other states with measures as draconian as California's section 667.61, it would not save the California statute. "[I]f the challenged penalty is found to exceed the punishments decreed for the offense in a significant number of those jurisdictions, the disparity is a

further measure of its excessiveness." (*In re Lynch, supra,* 8 Cal.3d at p. 427.)

Appellant would be in a position to challenge the constitutionality of the statutory scheme even if the particular unfairness described may not have occurred in his case. (*In re Grant, supra,* 18 Cal.3d at pp. 11-12, 18; *In re Lynch, supra,* 8 Cal.3d at p. 439; see *United States v. Cheely* (9th Cir. 1994) 36 F.3d 1439, 1444 & fn. 11.)

Thus, section 667.61 is unconstitutional on its face.

But section 667.61 was also unconstitutionally applied in appellant's case. Appellant was just short of 20 years old at the time of the crimes herein. His prior criminal record consisted of only one minor misdemeanor conviction. (CT 535-555.)

Appellant was abandoned by both his parents at an early age and was mainly raised by his grandmother in Mississippi, until his mother came back into his life and then moved with him to California. He then bounced back and forth between his mother and father, spending some longer time with his father, who is an air traffic controller, staying with him for a time when he was transferred to Texas. (CT 543-548.) As trial counsel noted from this background, "we can only suspect what kind of psychological trauma this [history] inflicted on him." (CT 530.)

Despite the troubled upbringing, appellant was an honest and hardworking person, according to his mother. At the time of the incident he was working as a stock clerk for Nike Town in San Francisco. He had previously worked for UPS as a package handler. While in jail, appellant earned his high school equivalency degree and began college correspondence courses, with an eye to obtaining a bachelor's degree. He was not married, but had a daughter with his girlfriend. (CT 530, 542-545.)

Appellant's trial counsel noted that appellant's mother loves and cares for him deeply, having attended almost every day of his trial. His step father, a pastor at a local church, wrote a letter in his support to the probation officer, detailing appellant's positive qualities, but also his need for help. (CT 526, 530, 558.) At his sentencing hearing, his step father spoke eloquently on appellant's behalf with the conviction that appellant,

with the network of support he has, was a changed young man. Also speaking for appellant was a chaplain from the San Francisco Sheriff's Department who attested to the resources that he would help apply to assisting appellant's way back into society. (RT 989-992.)

Appellant wrote a letter to the court before his sentencing in which he asked for the court's mercy, saying he had matured during his time in custody and no longer did the same thing that criminals do. He acknowledged making a lot of mistakes in his life. He said that he had evaluated his former lifestyle and used the time in jail to better himself. (CT 523-525.) The court acknowledged that the letter expressed appropriate sentiments. (RT 992.)

The crimes for which appellant was sentenced in this case, while serious and reprehensible, do not warrant the punishment of the 25-years-to-life One Strike law sentence. An individual who commits a cold-blooded premeditated murder is subject to a 25-years-to-life sentence (section 190, subdivision (a)), while a defendant who commits a second degree murder in California receives a sentence of 15-years-to-life (section 190, subdivision (a)), much less than the sentence imposed upon appellant for his present offenses. By starker contrast, a defendant who is found to have engaged in repetitive sexual molestation of a child he resides with is exposed to a maximum determinate sentence of only 16 years in California. (section 288.5.)

While the two counts of rape and the sexual penetration of Jane Doe after kidnapping her certainly deserve significant punishment, no principled analysis can view appellant as a greater danger and menace to society than a murderer or a molesting pedophile. His culpability is more in line with a forcible rape offender, who is subject to an eight year aggravated term of imprisonment (Section 264, subdivision (a)), which together with the enhancement because of the victim in this case being blind (Section 667.9, subdivision (a)) would be a 9 year sentence, plus whatever other determinate terms that might be required to punish him for the other offenses he was convicted of. As stated in *Dillon*, "a comparison of the challenged penalty with those proscribed in the same jurisdiction for more-

serious crimes . . . is particularly striking when a more serious crime is punished less severely than the offense in question . . . " (*People v. Dillon, supra*, 34 Cal.3d at p. 487, fn. 38.)

This court should instruct the lower courts by finding appellant's sentence to be cruel and unusual.

### CONCLUSION

For the foregoing reasons, this petition for review should be granted.

Date: June 5, 2006

Respectfully submitted,

H. STANLEY DEWEY
Attorney for Appellant

## Certification of Length of Brief

I, H. Stanley Dewey, attorney for appellant herein, certify pursuant to Rule 28.1(d) that, according to the word processing program used to create this brief, the brief contains 8214 words.

Date: June 5, 2006

H. STANLEY DEWEY
Attorney for Appellant

Filed 04/27/06

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b). This opinion has not been certified for publication or ordered published for purposes of rule 977.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION FIVE

FILED

APR 2 7 2006

Court of Appeal - First App. Dist.
DIANA HERBERT

By

|  |  |
|---|---|
| **THE PEOPLE,** | |
| **Plaintiff and Respondent,** | **A108457** |
| **v.** | |
| **LAVARIUS JERMAINE McCORD,** | **(Contra Costa County** |
| **Defendant and Appellant.** | **Super. Ct. No. 050320283)** |

Defendant Lavarius Jermaine McCord was charged with two counts of forcible rape (Pen. Code, § 261, subd. (a)(2))[1] (counts 1 & 3), one count of forcible sexual penetration (§ 289, subd. (a)(1)) (count 2), one count of kidnapping (§ 207, subd. (a)) (count 4), and one count of second degree robbery (§§ 211, 212.5, subd. (c)) (count 5), all alleged to have been committed against the same victim. The information further alleged as to each count that the victim was blind and defendant knew or reasonably should have known of her disability (§ 667.9, subd. (a)). Finally, pursuant to section 667.61, subdivisions (a) and (d), it was alleged in each of the counts that defendant kidnapped the victim, and moving her substantially increased the risk of harm to her over and above that inherent in the underlying offenses.

---

[1]   All undesignated section references are to the Penal Code.

1



The jury found defendant guilty on counts 1 through 4 and guilty of the lesser included offense of grand theft on count 5. The jury found true as to counts 1 through 4 that the victim was blind and defendant knew or reasonably should have known of this disability. Further, the jury found true the allegation pursuant to section 667.61 as to counts 1 through 3.

On appeal, defendant argues: (1) the trial court erred in failing to instruct the jury on defendant's reasonable good faith belief in consent; (2) the court inadequately instructed the jury on the applicability of section 667.61; (3) insufficient evidence supported the findings of kidnapping under section 667.61; (4) defendant's sentence under section 667.61 violates federal and state constitutional prohibitions against cruel and unusual punishment; (5) there was insufficient evidence to support defendant's conviction for forcible penetration (count 2); and (6) the cumulative effect of the alleged errors requires reversal. We reject these contentions and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

*Facts*

At the time the offenses were committed, the victim was 20 years old and blind. She lived alone in an apartment that was part of the Living Skill Center, a program for blind and visually impaired students, and attended the California School for the Blind in Fremont. On January 15, 2003, she was at the school for a meeting that ran late. When she was ready to leave, she called Para Transit, a transportation service used by visually impaired and disabled passengers, to take her to her apartment. When Para Transit did not arrive, she took a bus to the Fremont BART (Bay Area Rapid Transit) station and boarded the train. She had never taken BART or the bus home by herself before that night.

While riding BART, she asked a male passenger to tell her when they reached the El Cerrito Del Norte station. Upon arriving, she asked the passenger to take her to the number 72 bus stop. At the stop, the bus driver told her that the bus did not go by Contra Costa College, where the victim had said she wanted to go. A second bus driver also said the bus was not going to the victim's destination. While she was speaking to the second

2

bus driver, a man who sounded African-American, approached her and asked if she needed help. The victim asked him to take her to the cab stand. She held onto his arm with one hand and used her other hand to feel with her cane. When the two arrived at the taxi, the man asked her if she wanted him to come with her. She said no, but thought she said it too softly because he entered the cab with her.

While inside the cab, the victim told the driver she wanted to go to 23d and San Pablo Avenues. She did not tell the driver to take her to her apartment, because she did not want the man who had accompanied her to know where she lived. The man told the driver that he wanted to take his girlfriend home. She told the driver that she was not the man's girlfriend, but she did not say more because she was "really afraid," could smell alcohol, and thought the man "might get violent" if she were to say more. She did not communicate her concern to the driver. During the drive the man put his hand on her thigh, but did not continue to touch her after she moved away.

When the cab stopped, the victim exited the cab and walked away. The man paid the driver and left the cab a few minutes after she did. As she walked, the victim used her cell phone to call a friend to tell her she was not home yet. As the victim continued to talk on the phone and walk away from the cab, the man who had accompanied her came up and asked for her phone. He said he wanted to ask her friend if she could meet the victim. When the victim said "no," he grabbed the phone and refused to return it. She said, "Okay. That's it. Fine." Then she walked away. She heard the phone being clicked shut. Several seconds later, the man grabbed her from behind. She screamed, demanding that he "let [her] go right now." He then dragged her along the sidewalk for about 10 minutes. She did not hear anyone walking past them.

As the man continued to drag her, the victim felt the surface change from sidewalk to gravel. They stopped at wooden bleachers on the Contra Costa Community College campus. She screamed and the man told her to "shut the f . . . up" and to sit down before he knocked her out. When she tried to get away from him, they both fell to the ground. She kicked him in the stomach and he hit her on the shoulder. When she screamed, he

covered her mouth, choked her, and banged her head against the ground. They both skinned their knees in the struggle.

The man then said, "Get up, bitch, right now," and told her if she did what he asked, he would leave her alone. He said, "Lift up your shirt before I fucking kill you." After she lifted her shirt, he laid her on the ground and pulled down her underwear and pants. He put his finger in her vagina and then inserted his penis for about five minutes. When the victim asked him to stop, he again told her to "shut the f . . . up," and that he would stop when he was finished. When he had his penis inside her, it hurt "a little bit, but most of the time it felt really uncomfortable." She did not know if the man had ejaculated. After he finished, the victim asked him to indicate which way to go. He told her to go straight and she would find her way home.

The man then pretended to leave. Later, he came back,[2] acted as though he were someone else and asked, "Do you need help?" The victim told him she had been raped and wanted to go to the police station to make a report. He then pretended to call the police. She heard the clicking sound on the phone and heard him saying someone had been raped. About this time, she felt his sweatshirt and realized it was the man who had just raped her.

After he stopped pretending to talk on the phone, he said, "Okay. You are in trouble. Now I am going to do it again." He pulled the victim's hand around his arm and walked her a few minutes away to nearby bleachers. There he laid her on one of the bleachers, unbuttoned her trousers and pulled them and her underwear down to her ankles. He removed one of her shoes and a sock. He again inserted his penis in her vagina for about two minutes. As he did so, the victim said, "I am going to get pregnant," to which the man replied, "I will take care of the baby."

---

[2]    The victim does not recall how much time elapsed between the man's departure and his return.

4

After he removed his penis, he told her he was not raping her. He then told her he was watching her and would "be right back," but he did not return, taking her phone and cane with him.

The victim wandered around for several minutes without any idea of her location. Between 1:00 a.m. and 2:00 a.m. on January 16, 2003, Will Robertson, a custodian at Contra Costa College, found the victim feeling her way along an athletic field fence. After she told him she had been raped, he took her to the custodian's office and called the police. The police arrived, took a report, and then took the victim to the hospital. She had never had sex before the instant attacks.

Nancy Phinnesse, the victim's teacher and case manager at the Living Skill Center, was called to the Contra Costa College campus in the early morning hours on January 16. When she arrived, the victim appeared "[t]raumatized . . . very quiet . . . almost in shock, but she wanted to talk . . . ."

Louise Jones was the sexual assault response team nurse for Contra Costa County who examined the victim on January 16, 2003. The victim had a scratch on her neck, scrapes on her knees, and messy hair. When Jones conducted the genital examination, the victim cried and said she was in pain. Jones observed multiple blood clots, a laceration, bruising, and petechiae, indicating broken capillaries, in the victim's external genital area, which was very red.[3] Although Jones had difficulty examining the victim's vaginal area because of the pain, Jones did observe some abrasions on the right side of the vagina. Jones drew the victim's blood, took swabs from her mouth and vagina and took fingernail scrapings from both hands. She also removed loose matted pubic hair from the victim's pubic area.

---

[3]    Jones testified that a woman can have vaginal bleeding when she has sexual intercourse for the first time, because the woman's hymen could be broken by intercourse. She also indicated that vaginal injury could occur in normal intercourse between two consenting adults.

The victim told Jones that her assailant had hit her head on a wall, held her shoulder down to the ground with one hand, and twice penetrated her vagina with his finger, inserting his finger at the same time as his penis.

Detective Sharp interviewed the victim at the county hospital on the morning of January 16. He did not record that interview, but summarized the information the victim had given him.[4] The victim was "very shaken, scared and definitely traumatized." As she communicated the details of the incident, she became more withdrawn and "actually burrow[ed] behind . . . Phinnesse." The victim told Sharp that the assailant held her and forced her to walk from San Pablo Avenue to the Contra Costa College, which took about 10 minutes.

On January 22, 2003, Sharp made an audiotape of his second interview with the victim, which was played for the jury. In the interview, the victim said that the man came up from behind her and, as she walked away from the cab, he grabbed her. He walked with her for 10 minutes until they came to some bleachers, where he told her to sit down or he would knock her out.

Dechanti Williams testified that on the evening of January 15, 2003, she was a passenger on BART and, while exiting at the Del Norte station, saw a blind woman ask a man, later identified as defendant, for directions to the bus stop. As Williams walked to the same bus stop, defendant began flirting with Williams. Williams told defendant he was too young for her. After she boarded the bus, defendant continued to tap on the

---

4    During this initial interview with Detective Sharp, the victim made statements inconsistent with her trial testimony. She told Sharp that: the BART station agent assisted her with hailing a cab and helped her get into the cab; the cab driver sounded Filipino; she gave the driver her address and he had informed her that the fare would be $10; she paid the driver $10 herself; at that point a male got into her cab; she told the driver she wanted him out of the cab; the driver told the male to leave but he refused to do so; the male said, "All right baby, I'll take you home"; from the 23d and San Pablo intersection, the cab driver told her it would be an extra $10 to take her to her apartment; and she and the male both got out of the cab at 23d and San Pablo. She did not mention talking with her friend or that the phone had been taken from her hand, and she did not mention being afraid during the cab ride.

6

window, urging her to exit the bus. Defendant then boarded the bus and told her to get off. After he finally understood she was not going to exit, he left the bus.

At about the same time, the blind woman Williams had seen earlier was standing at the door of the bus talking to the driver. Defendant stood next to the blind woman. The bus driver recommended that the woman take a cab home. Williams heard defendant offer to take the blind woman to a cab and saw him guide her by the elbow toward the taxi stand.

Later, Williams saw newspaper and television reports about the rape of a blind woman. She contacted the police because she thought the descriptions sounded like the blind woman she had seen at the BART station. When she spoke to a police officer, she provided a description[5] of the man she saw with the victim that night and later selected defendant's photograph from a lineup. She had no doubt that defendant was the man she saw with the blind woman on January 15.

Araminta Harris, an Alameda County Transit bus driver, saw defendant at the Del Norte BART bus stop on the night of January 15th. He had ridden her bus before. That night, he asked when the bus was leaving. When a blind woman approached Harris's bus, defendant was still "bouncing" and "flirting" around. The blind woman wanted to go to the 23d and San Pablo intersection but Harris told her she did not drive to that location and advised her to go to the taxi stand around the corner. Defendant took the woman's arm and walked her to the cab area. Harris saw the woman leave in a cab and another person "kind of crouched down" in the cab but she could not clearly see the second passenger. When Harris read an article about the blind woman in the next day's newspaper, she contacted the police and provided a description of defendant: dark brown skin, age 20 to 25 with a distinctive, newly done twisted hair style.

About a week after the incident, Harris drove her bus into the Del Norte BART station and saw defendant sitting in the station, taking the braids out of his hair. She went

---

[5]    Williams gave Detective Sharp the following description: a Black male, six feet tall, slender, with a light mustache, wearing a blue velour sweat suit.

7

to the station booth and asked them to call the police. After the police arrived and stopped defendant, Harris identified him as the man she had seen with the blind woman the night of the rapes. She told officers she had no doubt about the accuracy of her identification. She later identified him in a photo lineup.[6]

Detective Sharp conducted a videotaped interview of defendant. A redacted version of the tape was played for the jury. In the interview, defendant denied any involvement with the victim and any knowledge of what had happened to her.

Criminalist David Stockwell took a portion of a reference blood sample from the victim and conducted DNA analysis to determine its genetic type. He also determined defendant's genetic type from his oral swab. After comparing genetic types from the sperm fraction of the vaginal swab and the reference samples from the victim and defendant, Stockwell found that the sperm fraction was from a single male source whose genetic profile matched that of defendant at the 13 loci tested. Stockwell estimated that the genetic profile would be randomly observed one time in 59 quintillion African-Americans, 3.4 sextillion Caucasions, or 11 sextillion Hispanics.

Following the jury's verdict, the trial court sentenced defendant to 26 years to life in state prison. Defendant filed a timely appeal.

DISCUSSION

I. *The Trial Court Properly Found That There Was Insufficient Evidence to Justify a Jury Instruction on Reasonable and Good Faith Belief in Consent*

The defense requested an instruction, CALJIC No. 10.65, which states that a reasonable, good faith belief in consent may negate criminal intent and thus afford a defense to a charge of rape. We disagree with defendant's contention that the denial of this instruction request violated his due process rights under the federal Constitution.

---

6    Sharp confirmed he had shown a number of photographic lineups to Williams and Harris before defendant was arrested and that they did not pick anyone out of those lineups. However, they both selected defendant out of the photo lineups prepared after defendant was arrested.

8

Often referred to as a *Mayberry* instruction, CALJIC No. 10.65 reflects the principle that "[i]f a defendant entertains a reasonable and bona fide belief that [the accuser] voluntarily consented to . . . engage in sexual intercourse, it is apparent he does not possess the wrongful intent that is a prerequisite under Penal Code section 20 to a conviction of . . . rape by means of force or threat. . . ." (*People v. Mayberry* (1975) 15 Cal.3d 143, 155.) The rationale is that a defendant who reasonably and in good faith believes the victim has consented is acting under a "mistake of fact" which precludes a finding of criminal intent. (*People v. Williams* (1992) 4 Cal.4th 354, 360.)

"The mistake-of-fact defense reflected in CALJIC No. 10.65 has two components. First, the defendant must have 'honestly and in good faith, albeit mistakenly, believed that the victim consented to sexual intercourse.' [Citation.] This subjective component involves evidence of 'equivocal conduct' by the victim that the defendant mistook for consent. [Citation.] Second, . . . the defendant's mistaken belief regarding consent was 'reasonable under the circumstances.' [Citation.] In order to give such an instruction upon request, the trial court must find substantial evidence supporting each feature of the defense. [Citations.]" (*People v. Stitely* (2005) 35 Cal.4th 514, 553-554.)

Such an instruction is proper "only when the defense is supported by 'substantial evidence,' that is, evidence sufficient to 'deserve consideration by the jury,' not 'whenever *any* evidence is presented, no matter how weak.' Thus, in determining whether the *Mayberry* instruction should be given, the trial court must examine whether there is substantial evidence that the defendant honestly and reasonably, but mistakenly, believed that the victim consented to sexual intercourse." (*People v. Williams, supra,* 4 Cal.4th at p. 361.)

We agree with the trial court's finding that there was not substantial evidence that defendant possessed an honest and reasonable belief that the victim consented to have sex with him. First, defendant presented no evidence that he believed, reasonably or unreasonably, that the victim had consented to have sex. He did not testify about his version of the encounter and, thus, provided no direct evidence on the subjective component of the defense.

Further, there was no circumstantial evidence supporting an inference that defendant believed the victim had consented. The evidence established that the first time defendant forcibly sexually penetrated the victim, he did so only after dragging her away from the road, striking, choking, and threatening her.[7] None of this conduct can be rationally viewed as that of a man who has, or believes he has, his partner's consent to engage in sex.

Defendant nevertheless contends that the victim's behavior was equivocal because she took defendant's arm and allowed him to lead her to the cab station; she did not protest his presence in the cab with a sufficiently loud voice; she did not call the police once she exited the cab; she allowed him to pay the $10 cab fare; and she did not call the police after exiting the cab.

None of this constitutes equivocal conduct that could be mistaken for consent to engage in sexual intercourse with defendant. Even assuming the victim allowed defendant to enter the cab and pay the $10 fare, such actions cannot be construed as indicating a desire to have sex with a stranger in a remote area of an athletic field. Moreover, her subsequent screaming, physical struggle, and pleas for him to stop clearly undermined any basis for defendant to have believed her conduct indicated consent to intercourse.

Even if the defendant believed the victim consented, such a belief would not be reasonable. At no time prior to the two acts of forcible sexual penetration did the victim act in a way that should have been construed by defendant as consent. (See *People v. Mayberry, supra*, 15 Cal.3d at pp. 148, 156.) The uncontroverted evidence established that the victim rebuffed defendant's hand on her thigh and, prior to intercourse, she screamed and violently struggled. When she asked him to stop, he told her to "[S]hut the f . . . up." Prior to raping her a second time, he said, "You are in trouble. Now I am

---

7    Defendant made the following threatening remarks: "Shut the f . . . up, sit down before I knock you out"; "Get up, bitch, right now"; "Lift up your shirt before I fucking kill you"; and "I will leave you alone if you do what I ask."

going to do it again." He then dragged her to the bleachers and pulled down her pants and underwear. During the second rape, she told him she might get pregnant, to which he replied, "I will take care of the baby." Such clear indications of resistance make defendant's alleged mistaken belief of consent wholly unreasonable.

II.  *The Trial Court Properly Instructed the Jury on the Elements of the Section 667.61*
    *Kidnapping Allegation*

Defendant was sentenced to an indeterminate term of 25 years to life[8] for the count 1 conviction of forcible rape (§ 261, subd. (a)(2)) under section 667.61, the so-called "one strike" law. (*People v. Rayford* (1994) 9 Cal.4th 1, 8 [§ 667.61 is commonly known as the one strike law].) He argues that the sentence imposed under section 667.61 must be stricken, because the jury was inadequately instructed on the aggravated kidnapping allegations of this statute, thereby abridging his right to trial by jury.[9]

---

[8]  Defendant also received one additional year to run consecutive to count 1 pursuant to the jury's findings under section 667.9, subdivision (a) that the victim was blind at the time of the offense and defendant knew or reasonably should have known of the disability.

[9]  Defendant also argues that in reading the instructions regarding the essential elements of the one strike allegations, the court mistakenly stated that if jurors had a reasonable doubt as to the truth of the aggravated kidnapping allegation, "[the jury] *may* find it to be not true," thereby allowing the jury to return a guilty verdict even if the allegation was not proved beyond a reasonable doubt. We decline to decide this issue because defendant first raised it in his reply brief. It is a well-established rule that points raised for the first time on appeal in a reply brief will not be considered in the absence of a showing of a good reason for the failure to present them before. (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764-765; *Kaichen's Metal Mart, Inc. v. Ferro Cast Co.* (1995) 33 Cal.App.4th 8, 17 ["Points raised in a reply brief for the first time generally will not be considered"]; *Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8 [points raised for the first time in the reply brief will not be considered unless good reason is shown for the failure to present them before].) Even if good cause exists for failure to present this issue earlier, a letter from the court reporter filed January 24, 2006 indicates that the court correctly stated the prosecution's burden of proof: "Upon review of my stenographic notes, on page 800, line 16, the word 'may' should be changed to 'must.' " This letter was sent to defendant's counsel on January 24, 2006. Absent a response from counsel, we presume the court correctly stated the prosecution's burden.

Section 667.61, subdivision (a) says that a person convicted for an offense detailed in subdivision (c), including forcible rape and forcible sexual penetration, under at least one circumstance detailed in subdivision (d) is to be imprisoned for life and not eligible for parole for 25 years, with good time credits of not more than 15 percent. (§ 667.61, subds. (a), (c) and (j).) Among the circumstances detailed in subdivision (d) are that "the defendant kidnapped the victim of the present offense and the movement of the victim substantially increased the risk of harm to the victim over and above that level of risk necessarily inherent in the underlying offense in subdivision (c)." (§ 667.61, subd. (d).) The existence of any fact required under subdivision (d) must have been alleged in the accusatory pleading and either admitted by defendant in open court or found to be true by the trier of fact. (§ 667.61, subd. (i).)

The jury was instructed as follows:

"It is further alleged that at the time of the commission of the crimes charged in counts [1, 2 and 3], that the defendant committed a kidnapping that substantially increased the risk of harm to the victim.

"If you find the defendant guilty of the crimes charged in counts [1, 2 and 3], you must determine whether or not the truth of this allegation has been proved. The People have the burden of proving the truth of this allegation.

"If you have a reasonable doubt that it is true, you [must] find it to be not true. Include a special finding on that question using a form that will be supplied to you.

"Kidnapping for the purpose of this allegation is the unlawful movement by physical force of a person without the person's consent for a substantial distance *where the movement is not merely incidental to the commission of the rape and/or forcible sexual penetration* and where *the movement substantially increases the risk of harm* to the person moved *over and above that necessarily present in the crime of rape and/or forcible sexual penetration itself.*

---

The written instructions delivered to the jury included the word "must," confirming this presumption.

"In this allegation, *the risk of harm requirement refers to the risk of either physical or mental harm.*

"Kidnapping is also the unlawful compulsion of another person without that person's consent and because of a reasonable apprehension of harm to move . . . for a substantial distance where such movement is not merely incidental to the commission of the rape and/or forcible sexual penetration and where the movement substantially increases the risk of harm to the person moved over and above that necessarily present in the crime of rape and/or forcible sexual penetration itself.

"Brief movement to facilitate the crimes of rape or forcible sexual penetration are incidental to the commission of the rape and/or forcible sexual penetration.

"On the other hand, movements to facilitate the rape and/or forcible sexual penetration that are for a substantial distance rather than brief are not incidental to the commission of the rape and/or forcible sexual penetration.

"In order to prove this allegation, each of the following elements must be proved:

"One, a person was unlawfully moved by the use of physical force, or a person was unlawfully compelled to move because of a reasonable apprehension of harm.

"Two, the movement of the person was without that person's consent.

"Three, the movement of the person was for a substantial distance, that is a distance more than slight, brief or trivial.

"And four, the movement substantially increased the risk of harm to the person moved over and above that necessarily present in the crime of rape and/or forcible sexual penetration itself." (Italics added.)

The court's reading of the instructions shows that each of the required findings was explained to the jury. Defendant argues that the instruction (1) did not specify that the kidnapping be of the victim of the present offense; (2) did not indicate that the movement of the victim must have substantially increased the risk of harm; and, (3) did not define the term "risk of harm." The italicized portions of this instruction demonstrate that appellant is wrong.

III. *Sufficient Evidence Supports the Jury's Finding on the Kidnapping Special Allegation*

Defendant contends that insufficient evidence supported the jury's finding on the kidnapping special allegation pursuant to section 667.61 because defendant's movement of the victim did not substantially increase the risk of harm to her. This claim is meritless.

To determine a claim of insufficient evidence, we determine whether, on the entire record, there is substantial evidence from which a reasonable trier of fact could have found the elements of the crimes charged beyond a reasonable doubt. *(People v. Miranda* (1987) 44 Cal.3d 57, 86.) Evidence is substantial if it is " 'of ponderable legal significance . . . reasonable in nature, credible, and of solid value. [Citations.]' " *(People v. Johnson* (1980) 26 Cal.3d 557, 576.) In making this determination, we "view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citations]" *(Ibid.)*

The risk of harm element of section 667.61, subdivision (d)(2) "focuses on the movement of the victim during the kidnapping, and the resulting risk of harm. The jury is to consider 'such factors as the decreased likelihood of detection, the danger inherent in a victim's foreseeable attempts to escape, and the attacker's enhanced opportunity to commit additional crimes [citations].' " *(People v. Jones* (1997) 58 Cal.App.4th 693, 713.)

Particularly given the victim's disability, any movement from a familiar path made detection less likely, escape more dangerous, and enhanced defendant's opportunity to exploit her confusion.[10] Here, the victim was dragged from a sidewalk that bordered a public road and forced to walk 10 minutes to a darkened athletic field, away from street

---

[10] Robertson's testimony supports the inference that defendant's movement of the victim led to such confusion. At around 1:00 a.m., the morning of January 16, he found her "holding onto the fence, moving oddly" with her "arm full out, hands with palms facing forward" trying to "feel her way out" of the field, but unable to get out of a corner.

traffic, surrounded by fences.  Such factors provide more than sufficient evidence to support the jury's finding that defendant's movement of the victim substantially increased her risk of harm within the meaning of section 667.61, subdivision (d).

IV.  *The One Strike Sentence Does Not Constitute Cruel and Unusual Punishment*

Defendant contends that the 25-years-to-life sentence imposed under section 667.61's one strike sentencing scheme violated federal and state constitutional prohibitions against cruel and unusual punishment.  Defendant is wrong.

Under federal law, a sentence is tested under the Eighth Amendment by whether it is " 'grossly disproportionate' " to the crime.  (*Harmelin v. Michigan* (1991) 501 U.S. 957, 1001.)  In *Harmelin*, the United States Supreme Court found that the defendant's sentence of life without possibility of parole for a nonviolent offense, possession of a large quantity of cocaine, was not cruel and unusual punishment under the federal Constitution.  (*Harmelin*, at pp. 965, 994-995.)  Here, defendant's crimes involved multiple violent felonies against a particularly vulnerable victim.  Thus, under *Harmelin*, defendant's sentence was not " 'grossly disproportionate.' "  (*People v. Crooks* (1997) 55 Cal.App.4th 797, 805-806.)[11]

When assessing a claim of cruel and unusual punishment under the California Constitution, we look at " 'the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society.  A look at the nature of the offense includes a look at the totality of the circumstances, including motive, the way the crime was committed, the extent of the defendant's involvement, and the consequences of defendant's acts.  A look at the nature of the offender includes an inquiry into whether "the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of

---

[11]  In *Crooks*, the Court of Appeal noted that the defendant in *Harmelin* was sentenced to life without parole for the nonviolent offense of drug possession, whereas the *Crooks* defendant, a burglar and a forcible rapist, received a lesser sentence.  Thus, *Crooks* held that the defendant's sentence did not constitute cruel and unusual punishment under the federal standard.  (*People v. Crooks, supra,* 55 Cal.App.4th, at pp. 805-806.)

mind." [Citation.] Next, we compare the challenged punishment with the punishment prescribed for more serious crimes in the same jurisdiction. And finally, the challenged punishment is compared with punishment for the same offense in other jurisdictions.' " (*People v. Romero* (2002) 99 Cal.App.4th 1418, 1431-1432.)

Only if, after conducting this detailed analysis, the court determines that defendant's sentence is "so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity," is it precluded under our state Constitution. (*In re Lynch* (1972) 8 Cal.3d 410, 424.) " 'Whether a punishment is cruel or unusual is a question of law for the appellate court, but the underlying disputed facts must be viewed in the light most favorable to the judgment.' [Citation.]" (*People v. Rhodes* (2005) 126 Cal.App.4th 1374, 1390.)

Defendant contends section 667.61 is unconstitutional on its face, arguing that a 25-years-to-life sentence is excessive punishment for an aggravated sexual offense. However, as defendant acknowledges, this sentencing scheme has been upheld in *People v. Estrada* (1997) 57 Cal.App.4th 1270, 1277-1283 and *People v. Alvarado* (2001) 87 Cal.App.4th 178, 199-201. As the *Estrada* court noted, "punishment under the one strike law is precisely tailored to fit crimes bearing certain clearly defined characteristics. For the 25-year minimum term to apply, the predicate offense must be a crime of sexual violence *and* it must be committed under circumstances which increase the risk of injury or death to the victim such as kidnapping, burglary, or infliction of mayhem or torture [citation] or be committed by one previously convicted of a violent sex offense [citation]. Thus . . . the defendant . . . cannot claim he is the victim of an indiscriminate sentencing scheme which metes out the same punishment for a broadly defined offense regardless of the circumstances surrounding the commission of the offense. [Citation.]" (*Estrada*, at p. 1280.)

Forcible rape and kidnapping fit within the meaning of this punishment scheme. They are serious crimes that the Legislature has reasonably concluded warrant imposition of a lengthy sentence because, in addition to the harm inflicted by the commission of the

16

sex offense itself, the accompanying crime of kidnapping places the victim in a position of elevated vulnerability.

Defendant also argues that the statute is unconstitutional as applied, noting defendant's age, minimal prior record, and family history. None of these factors reduces his culpability. At the time of the crimes defendant was nearly 20 years old and of legal age. As the trial court noted, he "made a lot of choices that day." He preyed on a blind woman, threatened her, hit her, raped her twice, and then left her in an unfamiliar setting in the middle of the night, after having taken her cane and cell phone. Given the many steps he took to commit these offenses, youthful rashness does not minimize his behavior.

Similarly, defendant's minimal prior record, though worthy of consideration, does not diminish his culpability. Finally, defendant's assertion that his family inflicted psychological trauma on him are undermined by his acknowledgement that his mother, stepfather, girlfriend, and daughter create a "network of support" that has rendered him a "changed young man." We conclude that the length of the sentence, when considered in light of the severity of the offense, and appellant's culpability does not give rise to an inference of gross disproportionality.

Nor does the intrajurisdictional comparison of punishments required by the California Constitution provide any additional basis for finding the sentence to be so disproportionate that it "shocks the conscience." (*People v. Dillon* (1983) 34 Cal.3d 441, 477-478.) Defendant suggests that his sentence is disproportionate because a defendant who commits a second degree murder receives a sentence of 15 years to life. It is no doubt true that the finality of murder makes it categorically different, but not necessarily more serious than the offense of forcible rape and kidnapping. The victim of such a crime is not only subjected to the sexual offense, but also the increased risk of harm kidnapping poses. In *Alvarado*, the court held a sentence of 15 years to life pursuant to the one strike law for the commission of a rape during a burglary did not constitute cruel and unusual punishment. The court acknowledged that the sentence was the same as the sentence for second-degree murder. Nevertheless, it explained that the lengthy sentences

17

specified by the one strike law reflect the Legislature's determination that the aggravating circumstances specified in section 667.61 place the victim in a position of elevated vulnerability, and that a lengthy prison sentence should be imposed upon a first conviction to protect society from serious and dangerous sex offenders. (*People v. Alvarado, supra,* 87 Cal.App.4th at p. 186.) In light of these legislative findings and the seriousness of the offense, the court concluded that it could not "say that punishing such conduct as severely as second degree murder is either shocking or outrageous." (*Id.* at p. 200; *People v. Estrada, supra,* 57 Cal.App.4th at pp. 1278-1283.) We agree.

We conclude that defendant's sentence does not constitute cruel or unusual punishment under either the state or federal Constitutions.

V. *Sufficient Evidence Supports Defendant's Conviction for Forcible Sexual Penetration*

Defendant argues his conviction for forcible sexual penetration must be reversed because there is insufficient evidence of such penetration or the requisite specific intent. Applying the substantial evidence standard of review explained in part III, *ante,* we disagree with defendant's contention.

First, defendant argues there is insufficient evidence that he inserted his finger separately from his penis. Defendant is wrong. In her recorded interview with Detective Sharp, the victim stated that defendant put his finger in her at the time of the first rape, but not the second. She said she could feel the difference and that defendant's penis hurt her most. At trial, the victim testified that defendant's penis was hard when he penetrated her. She stated that he put his finger in first and then his penis. She did not remember telling Sharp that his penis was soft although Sharp testified that she had made such a statement. Viewing the evidence in the light most favorable to the People, the jury could have reasonably believed the victim's testimony over Sharp's recollection of statements given shortly after a traumatic event and concluded that the defendant inserted his finger before inserting his penis in the victim.

Sufficient evidence also supports the determination that, at the time of such penetration, the defendant had the requisite lewd intent. The trial court instructed the jury on the required findings for forcible sexual penetration, including the requirement that

18

"penetration was done with the purpose and specific intent to cause sexual arousal, gratification or abuse." Defendant contends that he used his finger to guide his soft penis into the victim's vagina and, thus, forcible penetration was incidental to the rape and lacking in the requisite intent. Defense counsel presented this argument to the jury during his summation, but the jury rejected it and we find it meritless. In the course of a lengthy sexual assault of the victim, defendant inserted his finger into her vagina. This context provides substantial evidence of his lewd intent in doing so.

Since none of defendant's claims of error require reversal, his cumulative error claim also fails.

DISPOSITION

The judgment is affirmed.

_____
SIMONS, J.

We concur.

_____
JONES, P.J.

_____
REARDON, J.*

(A108457)

_____
\*   Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant
to article VI, section 6 of the California Constitution.

## CERTIFICATE OF SERVICE BY MAIL

I, H. Stanley Dewey, declare:

I am an active member of the State Bar of California. I am not a party to the within action. My business address is 3150 Hilltop Mall Road, Richmond, California 94806. On the date subscribed below, I deposited in the United States Mail at Richmond the following attached document(s):

APPELLANT'S PETITION FOR REVIEW

Before I deposited the above-described document(s) in the U.S. Mail, I placed them in sealed envelope(s) with postage fully prepaid thereon, addressed as follows:

Bill Lockyer
Attorney General of California
455 Golden Gate Avenue, Suite 1100
San Francisco, CA  94102-3664

First District Appellate Project
730 Harrison Street, #201
San Francisco, CA  94107

Clerk, Contra Costa County
For Delivery to: Judge Harlan Grossmn
P.O. Box 911
Martinez, CA  94553

Lavarius Jermain McCord, V-62318
Calipatria State Prison
PO Box 5002
Calipatria, CA 92233

District Attorney, Contra Costa County
P.O. Box 670
Martinez, CA 94553

Court of Appeal, First Appellate
District
Division Five
350 McAllister Street
San Francisco, CA 94102

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 6/6/06

H. STANLEY DEWEY
Attorney at Law

RECEIVED BY MAILROOM
455 GOLDEN GATE AVENUE
SAN FRANCISCO

'03 JUN -3  11 : 07

CA DEPT. OF JUSTICE
OFFICE OF THE
ATTORNEY GENERAL

# EXHIBIT F

Court of Appeal, First Appellate District, Div. 5 - No. A108457
**S144010**

# IN THE SUPREME COURT OF CALIFORNIA

### En Banc

THE PEOPLE, Plaintiff and Respondent,

v.

LAVARIUS JERMAINE MCCORD, Defendant and Appellant.



DOCKETED
SAN FRANCISCO
JUL 1 3 2006
By: T. OTANES
No. S144010A0092

Petition for review DENIED.

SUPREME COURT
F I L E D

JUL 1 2 2006

Frederick K. Unirich Clerk

DEPUTY

GEORGE

Chief Justice

ATTORNEY GENERAL
OFFICE OF THE
CA DEPT. OF JUSTICE

08 JUL 13 13    05

SAN FRANCISCO
455 GOLDEN GATE AVENUE
RECEIVED IN THE ROOM

# EXHIBIT G

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES                                                    i

STATEMENT                                                              ii

PUNISHMENT IMPOSED                                                     iii

PROCEDURAL HISTORY                                                     iii


**I
HABEAS CORPUS IS A PROPER VEHICLE FOR THE PRESENTATION
OF PETITIONER'S CLAIMS**                                               1


**II
THIS HABEAS CORPUS PETITION IS FILED TO RIPEN CLAIMS THE
APPELLATE COUNSEL FAILED TO RAISE ON FIRST APPEAL, AND
THEREBY DEFAULTED IN THE EXHAUSTION OF STATE REMEDIES
TO ADDRESS THE WRONGFUL CONVICTION**                                   2


**III
THE COURT'S DENIAL OF PETITIONER'S MARSDEN MOTION TO
DISMISS TRIAL COUNSEL VIOLATED PETITIONER'S SIXTH
AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE COUNSEL**                      4


**IV
PETITIONER'S SIXTH AMENDMENT RIGHT TO EFFECTIVE
ASSISTANCE OF COUNSEL WAS VIOLATED BY TRIAL COUNSEL'S
INADEQUATE DEFENSE AGAINST THE CHARGES**                               10


**V
PETITIONER'S RIGHT TO A FAIR TRIAL PROTECTED UNDER THE
DUE PROCESS CLAUSE OF THE 14TH AMENDMENT WAS VIOLATED
WHEN THE COURT QUALIFIED NURSE JONES AS AN EXPERT IN
SART EXAMS AND PROCEDURES AND ALLOWED HEARSAY
TESTIMONY THAT WAS UNLAWFUL**                                          14


**VI
PROSECUTOR'S CLOSING ARGUMENT TO THE JURY IMPROPERLY
VIOLATED PETITIONER'S FIFTH AMENDMENT RIGHT, SIXTH
AMENDMENT RIGHT, AND FOURTEENTH AMENDMENT RIGHT OF
THE LAW WHEN SHE ARGUED NO EVIDENCE OF CONSENT WAS
HEARD**

**VII**
**PROSECUTION PRESENTED FALSE AND MISLEADING EVIDENCE TO
THE JURY IN VIOLATION OF PETITIONER'S RIGHT TO A FAIR TRIAL
GUARANTEED BY THE 14TH AMENDMENT AND FAILED TO REVEAL
EXCULPATORY INFORMATION**                                                  18

CONCLUSION                                                                 21

LEAVE TO AMEND PETITION                                                    22

VERIFICATION                                                               25

# TABLE OF AUTHORITIES CITED

Page

## FEDERAL CASES

Brady v. Maryland   (1963) 373 U.S. 83                          22
Donnelly v. DeChristoforo, ( 1974) 416 U.S. 637                17
Griffin v. California (1965) 380 U.S. 609                       17
In re Hochberg ( 1970) 2 Cal.3d 870
Strickland v. Washington, (1984) 466 U.S. 668                  8

## STATE CASES

People v. Crandell                                             1
        (1988) 46 Cal. 3d 833
People v. Marsden
        (1970) 2 Cal. 3d 118                                  1
People v. Duvall (1995) 9 Cal.4th 464.

## STATUTES

Penal Code
        section 261                                           ii
        section 289                                           ii
        section 207                                           ii
        section 211                                           ii
        section 212.5                                         ii, iii
        section 667.61                                        ii
        section 667.9                                         ii
        sections 1538.5                                       3
        sections 995                                          3

Evidence Code
        section 801 (b)

## CONSTITUTIONS

U.S. Const. amend V                                           4
U.S. Const. amend VI                                          3, 8, 9, 18
U.S. Const. amend XIV                                         3, 14, 22

## MISCELLANEOUS

CALJIC No. 203                                                4
CALJIC No. 10.65                                             18

## STATEMENT

Petitioner presents this writ to exhaust state remedies for federal habeas corpus purposes.  Petitioner was convicted in Contra Costa Superior Court in 2004 of forcible rape (Penal Code section 261, subdivision (a)(2)); one count of forcible sexual penetration (section 289, subdivision (a)(1), one count of kidnaping (section 207, subdivision (a)), and one count of second degree robbery (sections 211 and 212.5, subdivision (c)).

An enhancement was alleged to each count:  that the victim, Jane Doe, was blind and petitioner knew or should have known of the disability, (section 667.9, subsection (a).  In addition, petitioner was charged pursuant to section 667.61, subdivisions (a) and (d) in each count that Jane Doe was kidnaped and the movement substantially increased the risk of harm to her over and above the risks inherent in the particular crimes. (CT 70-72)

Petitioner was convicted without testifying or presenting any witnesses on his behalf.  The state produced several witnesses, four police officers, a DNA lab technician, a registered nurse, a SART nurse, a taxi driver, bus driver, teacher/counselor, a custodian, a passenger witness, and Jane Doe, who was nineteen years on January 16, 2003, when the alleged incidents occurred at Contra Costa Community College in San Pablo, California.  The recall of events are Jane's Doe's version, and Jane Doe's alone.  They are too inconsistent to sort and therefore are provided in Exhibit 12 for the reader to decide the veracity of her statements.

The deadlock jury deliberated for two and one days, ultimately finding petitioner guilty of counts one through four, and guilty of the lesser offenses for

count five.  The jury found true the allegations pursuant to section 667.61 as true to each of the counts.

## PUNISHMENT IMPOSED

Petitioner is presently serving a life sentence in Calipatria State Prison, Calipatria, California.  He was sentenced to a prison term of 26 years, receiving 25 years to life for one count of rape to life  to the One Strike sexual offense sentencing requirement of section 667.61, subdivision (a) and (d)(2).  For the enhancements, the court imposed a one year consecutive sentence on count one. For counts two and three, the court imposed a concurrent mid-term of six years. Sentence on court four was stayed pursuant to section 654.  The imposed for count five for grand theft a sentence of two years to run concurrent, and set aside the petty theft verdict.  (RT 996-1001).

## PROCEDURAL HISTORY

Petitioner filed an appeal of his conviction.  On April 27, 2006, the First District Court of Appeal, Division Five affirmed the judgment.  Petitioner filed for Review before this court on June 6, 2006.  It was denied on July 12, 2006.

## POINTS AND AUTHORITIES
## ARGUMENT

I

## HABEAS CORPUS IS A PROPER VEHICLE FOR THE PRESENTATION OF PETITIONER'S CLAIMS

The claims asserted in this petition is that the petitioner was deprived of his constitutional right to the effective assistance of counsel. This constitutional claim cannot be presented as strongly on appeal as it is herein because its factual basis rests in part on evidence in addition to that contained in the record on appeal. See In re Hochberg ( 1970) 2 Cal.3d 870. Although habeas corpus cannot serve as a second appeal, denial of the right to counsel is a claim recognizable on habeas corpus whether of not it was raised on appeal. Id. Because trial counsel failed to bring evidence or perform adequately at trial some of the merits of the following claims were not developed at trial.

II

## THIS HABEAS CORPUS PETITION IS FILED TO RIPEN CLAIMS THE APPELLATE COUNSEL FAILED TO RAISE ON FIRST APPEAL, AND THEREBY DEFAULTED IN THE EXHAUSTION OF STATE REMEDIES TO ADDRESS THE WRONGFUL CONVICTION

This habeas corpus petition contests the legality of the judgment of conviction and sentencing order entered in People v. McCord. Petitioner has appealed his conviction to those court and petitioner's direct appeal is final. Petitioner is being unlawful imprisoned for the following additional claims.

III

## THE COURT'S DENIAL OF PETITIONER'S MARSDEN MOTION TO DISMISS TRIAL COUNSEL VIOLATED PETITIONER'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE COUNSEL

Petitioner filed a motion requesting removal of his court appointed counsel prior to the trial date of June 21, 2004. The court granted petitioner a hearing on June 16, 2004, to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance in accordance with People v. Marsden, (1970) 2 Cal.3d 118.

Petitioner explained that he and counsel have not discussed details of his case; that counsel had repeatedly delayed the trial; he was unaware of any development in finding witnesses or suppression motions. (Exh 1). The court record shows that counsel had continued the trial two times successfully (Exh 2;CT 76-81; 84-89; 91-99 ). Counsel cited in his declarations to the motions how unprepared he was, his lack of experience with the matter of the case, his need to further investigate.

"A defendant is entitled to relief if the record clearly shows that the appointed attorney is not providing adequate representation or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result. People v. Crandell (1988) 46 Cal.3d 833

After inquiry of counsel regarding his trial experience, and hearing statements of petitioner, the court ruled that petitioner had not met his burden even though the court had heard prior the hearing of the motion that counsel still was not prepared

2

for trial the next week.

The denial of the motion to remove counsel was an abuse of discretion. It was foreseeable that counsel may be successful standing before a judge and jury and argue a case based on trial skills, but to be successful at defending a client, counsel had to have done significant pretrial work to develop an adequate defense. The court had no reason to believe the appointed counsel was ready for trial when it had heard directly from counsel that he was not.

The assessment of how trial counsel would perform was apparent from his motions to continue. (Exh 1)  Trial counsel did file suppression motions under Penal Code sections 1538.5 and 995 on May 11, 2004, one day after filing a third motion to continue in order that the motions could be heard prior trial. It was apparent that counsel was hard pressed for time.   The motions were heard during trial trailing.

Denial of the motion is not an abuse of discretion unless the defendant has shown that a failure to replace the appointed attorney would substantially impair the defendant's right to assistance of counsel. Petitioner listed and stated clearly the reasons he felt his counsel was not performing after six months, and cognizant the he faced a life sentence.

A continuance of the trial briefly for petitioner to retain private counsel that would have far more obligations of due diligence than displayed by his present counsel after six months. The denial was a violation of petitioner's constitutional right to have affective assistance of counsel. This denial prejudiced petitioner at trial and he would have received a more favorable result had the <u>Marsden</u> motion

3

been granted.

The trial record shows counsel was not prepared in defending the charges. There was a failure to call any witnesses to impeach Jane Doe; failure to have his investigating officer appear, failure to retain expert witnesses; failure to establish the chain of custody for physical evidence and seek its exclusion, failure to confront the lab who analyzed the DNA from Jane Doe; his advice to petitioner to remain silent, failure to understand the admissibility of rape trauma testimony, and failure to object to the prosecution's closing arguments on consent.

The court's decision to deny petitioner the right to dismiss trial counsel, aware that counsel was unprepared for trial at such a late date violated petitioner's constitutional right to affective assistance of counsel under the Sixth Amendment of the United States Constitution. The court's abuse of discretion in determining petitioner had not met his burden to remove counsel violated his due process of law under the Fourteenth Amendment because the court failed to determine whether trial counsel would be adequate to defend the case. The court base its decision on prior experience without assessing the present situation. It is apparent that more trial preparation for petitioner would have had a different effect on the deadlock jury.

IV

PETITIONER'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED BY TRIAL COUNSEL'S INADEQUATE DEFENSE AGAINST THE CHARGES

Trial counsel's professional standard was below a reasonable standard in the

4

preparation and defense of petitioner.  Petitioner was prejudiced by the conduct of

trial counsel and if not for such conduct, it is reasonable to believe he would not

have been convicted of the charges.  Trial counsel's ineffective assistance of

counsel is stated below in each instance.  It is not exhaustive of the record.

1.  Trial counsel failed to file a suppression motion regarding the taped

interview of petitioner with Officer Sharp dated February 22, 2003.  Counsel 's

arguments at the hearings to suppress evidence were limited to blood and saliva.

There is no argument regarding the taped interview.  (RT 1-146)

The court admitted the videotape after an evidentiary hearing at trial and

gave CALJIC No. 2.03 instruction to the jury regarding "consciousness of guilt"

because the videotape of petitioner contained inconsistent statements to proof at

trial.  Petitioner should have been afforded the right of a hearing to confront the

voluntariness of the videotape that was a violation of his Fifth Amendment right to

remain silent.  It would have allowed counsel to question Officer Sharp on any

preliminary discussions prior the taping and assess petitioner's ability to testify on

his behalf.

2.  Trial counsel's discovery was limited or inadequate.  The record reflects

no potential witness list filed for the trial.  There apparently were some subpoenas

served, but no witness called.  At one point counsel asked leave of court to have

his investigator Ed Oasa sit through witness testimony.  (RT 284-285) It was

denied because he had not properly noticed the prosecution regarding discovery.  It

is not clear if trial counsel had time to notice any discovery, having less than six

weeks to prepare for trial.

Mr. Oasa was never called to testify regarding his investigations. Counsel did not retain any witness to defeat the evidence gathered by the DNA technicians regarding the evidence introduced at trial, nor confronted the original lab tech on her analysis of the data.

3. Trial counsel did not locate and subpoena potential exculpatory witnesses such as Ed Docto[1], Stan Porter, Officer Skeen, Officer Milano. All are known to have talked with Jane Doe shortly after the incident for several hours at the college campus. Investigation of these individuals would have refuted the claim of "rape trauma" as suggested by Officer Sharp (RT 438:9; RT 611:18-19).[2] and Louise Jones, the SART nurse at trial.

4. A very important witness, Shayla Gustafson was never interviewed by the defense.[3] (Exh 3) It was not evident from the record or file whether the state had given counsel reports that Officer Sharp had located this witness to whom he spoke to personally (RT 588-589). It is apparent that it may have been more exculpatory than revealed. This witness had a ten minute conversation with Jane Doe prior her alleged abduction according to Jane Doe's timing of the events.

---

[1] Ed Docto has given a statement to petitioner's attorney that he assisted Jane Doe by allowing her to use his telephone, gave a stick off a mop so she could walk around, assisted her to the ladies, as well as allowed her to use his cell phone to call her carrier. She showed no signs of pain or emotional distress.

[2] An objection was made but overruled.

[3] Petitioner has send a letter to the last known address on 6/17/07. it has not returned as of yet.

6

5. Trial counsel neither secured independent medical testimony to repute the findings of SART nurse, Louise Jones who alleges the injuries suffered by Jane Doe were from rape, and not menstruation.  Nor did trial counsel subpoena the medical/ hospital records of Jane Doe to determine whether Jane Doe was sutured, released with medications, who the physician that the SART nurse supposedly conferred with regarding the exam.

6. Trial counsel failed to investigate Jane Doe on the night of the incident.

a. No evidence was brought out in trial that she may not have been at the School of the Blind as she states repeatedly that night. Attached is a letter requesting that information. (Exh 4).  It differs from Jane Doe's testimony that she took the BART from the school. (RT 79)

b. On the date of the alleged incidents, Jane Doe was a registered student at Contra Costa Community College. Whether this information was given to the defense, it is not clear from the file or record. Nor was it developed during examination of Nancy Phinnesse, the skills center teacher/ counselor. (Exh 5). This information if it had been presented to the jury could have been mitigating, that in fact she may have even suggested the location for a walk. She may have been familiar with the grounds having walked there for classes. The college is a short distance from her residence.

c. It is noted that Jane Doe had a boyfriend, but no investigation was done whether he was with her on the date of the incidents.

7. Trial counsel failed to develop the time of the incident which was crucial

7

to the charge of kidnap and rape. To travel by BART from Fremont to Del Norte El Cerrito is a 40 to 50 minute ride which would have put Jane Doe exiting the BART at 10:50 p.m. Per testimony that she was checking messages after the cab ride, and per the phone bills entered into evidence at 11:02 p.m. There is a call at 12:15 which Jane Doe makes to her friend, Shayla Gustafson in Southern California. She talks for 10 minutes. Jane is ultimately found by a custodian on the campus after 1:30 a.m.    Development of this information would have defeated a charge of kidnapping.

       8.  Counsel's preparation of a defense was defective in strategy

          a. Client complained of the difficulty in communicating with counsel regarding trial strategy and defense.   Trial counsel wanted to introduce petitioner's prior sexual conduct with girlfriends to argue the possibility of rough sex, or petitioner's physical attributes. Petitioner was rightly uncooperative. (Exh 6) These factors would not have mitigated the injuries. Trial counsel should have retained expert witnesses to support Jane Doe could have been menstruating and objected to the potential altering of the evidence.   Counsel avoided developing the blood evidence.   No one ever asked Jane Doe how she determines when she is menstruating. For many women it is a sight revelation.

          b.   Counsel convinced petitioner that it would not be in his best interest to take the stand because it is more probable that Jane Doe would not be believed due to her inconsistencies about the events, and his prior arrests would be introduced to impeach him as a credible witness.

8

This advice was harmful to petitioner.   Counsel argued that the two had consensual sex to the jury but consent has to be heard.  (Exh 7)

9.  Trial counsel failed to object to the prosecution's closing argument that trial counsel did not present any evidence of consent.  It was reasonable to infer that prosecution was intimating at petitioner's silence.  Counsel failed to object to the reference.   Consent is not a alibi, or witness, or physical evidence.  It is speech by parties involved.

10.  Trial counsel did not request an full evidentiary hearing regarding the admission of the clothing of Jane Doe on the grounds they were potentially altered.  He did object to the admission of the underwear and that there was problem with the chain of custody of the clothing. (RT 738 -739)  However, counsel did not argue that the evidence was not what it purported to be on the night of the crime and should not have been presented to the jury as such.

In analyzing an ineffective assistance of counsel claim, the overriding concern is to determine whether counsel's conduct so undermined the functioning of the adversary process that the trial cannot be relied upon as having produced a just result per Strickland v. Washington, (1984) 466 U.S. 668.

The two prong test is whether counsel was unreasonable unprofessional at trial, and the results prejudiced the defendant.  It is unreasonable to defend against rape without testimony by the accused.

It is unreasonable for counsel not to obtain witnesses, or evidence to defeat the charges, if petitioner was not to testify.  To depend on impeachment of the

state's witnesses alone, failing to object, and waiving or forfeiting opportunities to object is deficient and the result was that petitioner is serving a sentence of 26 years. Petitioner's Sixth Amendment right to affective assistance of counsel was violated by the poor performance of trial counsel. His conviction should be reversed.

## V

## PETITIONER'S RIGHT TO A FAIR TRIAL PROTECTED UNDER THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT WAS VIOLATED WHEN THE COURT QUALIFIED NURSE JONES AS AN EXPERT IN SART EXAMS AND PROCEDURES AND ALLOWED HEARSAY TESTIMONY THAT WAS UNLAWFUL

Petitioner filed a motion in limine to deny certification of Louise Jones to testify as an expert at trial. (CT 203; Exh 8). Petitioner believed she was not qualified to examine Jane Doe without supervision of a physician can could not make medical findings that were essentially stated as medical diagnosis by her.

During the hearing of petitioner's motion, the court was cautious to limit her qualifications as an expert only to

> COURT: I am going to permit, based on what has been stated to the court, to permit Ms. Jones to testify as an expert in the field of conducting of sexual assault exams and procedures to be followed in the conducting of sexual assault exams. (RT 22-26)

Based on speculation that there were other medical personnel at the hospital that Nurse Jones consulted with to comply with the law, the court qualified the nurse as an expert.

> Court: In terms of were there other medical personnel that examined the victim.

10

A: No, I don't believe..she was not working with the requirement, but she did the examination herself. I will see if she has a CV. (RT 14:2-7)

Court...I have no reason to doubt that Ms. Jones as a sexual assault forensic examiner works a the Regional Medical Center in Martinez was consulted by a physician. And I see no basis whatsoever for excluding her testimony. Ms. Santos has said that she doesn't believe that she would be offering Ms. Jones as an expert.

Ms. Santos:...I said I wasn't necessarily going to ask her that specific question of whether or not the injuries that she observed on Jane Doe were consistent with her allegation. ...I do intend to qualify her as an expert to conduct these examinations. (RT 24:26- to 27:17 )

When question who the doctor to whom she consulted, she could not remember the name, but states it may be found in the medical chart (RT 348:15). In fact, the doctor never came into the examination room per the testimony.

Q: Did you also pass this information on to any type of doctors?
A: Yes
Q:... there is a doctor that, in fact, you were working under the auspice of?
A: Yes

Q: Was this  the case with Jane Doe
A: Yes.  The physicians, I communicate directly with them.
(RT    270:1-10)

Petitioner's right to due process was violated when Nurse Jones did in fact

testify beyond the scope of her qualification as a SART nurse who as such was to

inform the jury of the procedures taken to examine a person who alleges sexual

assault.  Nurse Jones then went on to discuss what Jane Doe told her regarding

the alleged assault.

A: .. I wrote..."he hit her head on the wall or my head on the wall."
(RT 332:2-5)

Q: Did Jane Doe describe for you any way in which she as held down.

11

A: Yes, she did
Q: What did she describe for you??
A: ...he held her should down to the grown with one hand.
 (RT332:8-28)


Q: ...consistent with history

OBJECTION

COURT: ...found is qualified to conduct these examination and
qualified to testify as an expert with respect to the conducting of the
exams...not a doctor and cannot diagnose, but I believe ...is qualified
to testify to her finding and whether or not in her opinion they are or
are not consistent. So overruled. (RT 334:8-21)


There is no evidence to support Nurse Jones worked in collaboration with a

physician.   There is no scientific data upon which relied to come to her medical

opinion that Jane Doe had been sexually assaulted.  On cross examination she

admitted that she was not qualified to diagnose (RT 336:20-26); that she only took

one week course in SART examinations; and could not find sperm on the slide

prepared from a sample from Jane Doe's vaginal canal.

There was an issue to the blood that was found in Jane Doe's clothes.

Nurse Jones offered hearsay on the issue of Jane Doe's menstruation.

Q.  Was Jane Doe menstruating
A.  No.  She stated she wasn't.
 (RT 249:16-17)
Counsel Object on Hearsay grounds.  Moves to strike
Court:  Is it being offered for the truth of the matter?
Santos:  Not by that means
Court:  . I will permit that the statement attributed to Jane Doe that she was
not menstruating at the time of the cam may be considered by this witness.
 (RT 249:19-28)

..you may consider it as it enables this witness to---- as it relates to her state

12

of mind or her observation, things of that nature, but not for the truth of the matter. (RT 250:1-5)

Q. Did you have any evidence that she was menstruating
A. No

Counsel: I would object to that. Beyond the scope of this witness' expertise.

Court: Well, int the training you have received conducting these exams, do. they cover the issue of menstruation?

The Witness: It was discussed in class, yes. That—

The Court: It is covered in your—

The Witness: Yes. What to do if they are. (RT 250:14-27)

There is no explanation as to whether she could tell if Jane Doe was menstruating or not. She does not explain what is to be done. She does not emphatically state that Jane Doe was not menstruation. Leaving speculation that she was not. Nor does she qualify whether she ever worked with a patient with blood.

Nurse Jones testimony as an expert on whether her findings supported rape, was a violation of petitioner's due process to a fair trial under the 14th Amendment of the U.S. Constitution. Her taking photos and history of the patient did not qualify her to determine that the blood found in Jane Doe's clothes were the result of physical trauma. Nor could she state that Jane Doe was assaulted as she did. Her testimony was based on hearsay that prejudiced the petitioner.

One juror passed a note to the court requesting the following question: "Did Jane Doe tell nurse the person choked her or strangled her." (RT362:4-28) The

13

answer to such would be hearsay. The answer is well outside what Nurse Jones was qualified to testify at trial.

Petitioner's right to a fair trial was violated when the court allowed cumulative hearsay from Nurse Jones. Nurse Jones did not base her conclusions on scientific medical opinions well grounded in the medical community. Her opinions were anecdotical opinions, based on case by case and personal knowledge and opinions. California Evidence Code section 801(b) allows a potential expert who has special knowledge, skill, experience, or training to rely on things personally known or perceived to form an opinion upon the subject...unless an expert is precluded by law from using such matter as a basis for his opinion.

The testimony was inadmissible and highly prejudicial and contributed to the conviction of petitioner. It was not harmless error to allow such testimony. Prosecution argued in closing that Jane Doe had "internal injuries", and that "...the nurse...said she wasn't on her period. (RT 826: 10-11) This violated petitioner's due process of the Law under the Fourteenth Amendment.

## VI

## PROSECUTOR'S CLOSING ARGUMENT TO THE JURY IMPROPERLY VIOLATED PETITIONER'S FIFTH AMENDMENT RIGHT, SIXTH AMENDMENT RIGHT, AND FOURTEENTH AMENDMENT RIGHT OF THE LAW WHEN SHE ARGUED NO EVIDENCE OF CONSENT WAS HEARD

The prosecutor argues that to prove lack of consent by Jane Doe it had only to be against her will. " She is not required to fight. She is not required to even say "I don't want to do it." If it's against her will, that's what's required for the

14

crime of rape. (RT 813:22-26)

How does one interpret the will of another without some sort of expression. Nonetheless, it is obvious that Jane Doe claimed petitioner had sexual intercourse with her without consent. If she said otherwise the entire trial would not have happened. There would not be a crime.

What is problematic is that consent is an agreement. It is a verbal statement that one assents to the conduct of another. The prosecutor argues to the jury that

"... sexual assault is a very personal crime. It's not the crime of....crime like a robbery where people are on the street and they see it. I don't think I've heard...ever heard when it was somebody's mother or father or daughter or son watching. It is not that the type of a crime." (RT 816: 23-28)

Therefore as a reasonable objective persons on a jury, weighing the evidence and facts before them. They expect to here a verbal exchange to some extent regarding the incident. The prosecutor argues "First of all – and let me remind you, al that testimony is evidence. You've got a lot of things just through someone saying it." (RT 821:11-13)

"But 'Jane' knows, and 'Jane' said she didn't know this man. She didn't agree to have sex with this man. She didn't agree to go to the college campus with this man, and you have no evidence that suggests otherwise. None." (RT 823:27-28;824: 1-3)

The statement emphasizes the fact that only one person is testifying regarding the encounter and she says it was not consent. However, consent is a defense to forcible rape. The burden of persuasion is on the accused by his testimony to prove that he acted with an understanding of agreement to the act of

15

sexual intercourse.

The prosecution's insistence there was no consent testimony repeatedly pointed to the fact that the petitioner did not take the stand to refute Jane Doe's version of the story. "...you don't have evidence that anything else happened to 'Jane' other than what 'Jane" said happened to her." (RT 846: 8-10) This was a violation of petitioner's Fifth Amendment right to remain silent.

The prosecution hides behind the name of defense counsel, though it is obvious she is referring to petitioner. A prosecutor can comment on the accused's lack of alibis or evidence, but in this case, the evidence that was required for consent was testimony. As the prosecutor so stated above, sexual intercourse where others are observant rarely happens. (RT 816:23-28)

She states as follows:

> "One of the things I believe Mr. Ahearn is going to stand up and again argue to you, that this was a consensual encounter even though there's no evidence of that. (RT846 28;847:1-2)

> "Mr. Ahearn is going to stand up and argue to you, I think—unless he changes his defense from opening statement....'She content (sic) to this." (RT:848:21-28;849 1-2)

> "You have nothing in the evidence to suggest that she agreed to anything that took place. " (RT:882:7-8)

> "She did not consent to go for ten minutes. She was not going for a walk. You have no evidence of that. None. Zero." (RT:884: 3-5)[4]

> "There's no evidence to support the suggestion that he did not kidnap

---

[4] An objection was raised by trial counsel that this information was in the audiotape of January 22, 2007 played to the jury.

her, that he did not compel her to go with him against her will. "
(RT: 884:27-28; 885:1)

The prosecutions' reference to that no consent was given inferred he should

have spoken to defeat Jane Doe's claim, otherwise it was an adoptive admission.

Her comments violated petitioner's Fifth Amendment right to remain silent as

stated in Griffin v. California (1965) 380 U.S. 609.

One juror who did not believe Jane Doe's version of the events, or the

testimony of the investigating officer, and who held out with her lone vote against

conviction, changed her decision, because no consensual evidence was presented

to the trial.    A letter regarding her post trial interview states the name of Mr.

Ahearn as not producing consensual evidence.  But who could Mr. Ahearn produce

to prove consent. The petitioner. (Exh 7)

The prosecutor's remarks sufficiently infected the "trial so as to make it

fundamentally unfair, and, therefore, a denial of due process". Donnelly v.

DeChristoforo, ( 1974) 416 U.S. 637.

The prejudice from this error was compounded when the court refused to

instruct on petitioner's jury instruction CALJIC No.10.65 violating petitioner's due

process of law.   Any admonishment or jury instruction by the court regarding

petitioner's silence could not cure the prosecution's violation of petitioner's

constitutional right.

There is no evidence that trial counsel objected to the inferences, and thus

reflects ineffective assistance of counsel as guaranteed by the Sixth Amendment of

17

the U.S. Constitution.   A reversal of the state conviction is required.

## VII

## PROSECUTION PRESENTED FALSE AND MISLEADING EVIDENCE TO THE JURY IN VIOLATION OF PETITIONER'S RIGHT TO A FAIR TRIAL GUARANTEED BY THE 14ᵀᴴ AMENDMENT AND FAILED TO REVEAL EXCULPATORY INFORMATION

The prosecution entered into evidence the clothing that Jane Doe allegedly wore in the early morning hours of January 16, 2003. They were a jacket, a sweater, jeans, shoes, and under bra, and underwear. The prosecution fosters testimony through various witnesses what the chain of custody was for the clothing.   First there is testimony from Nancy Phinnesse, Jane Doe's teacher and counselor who drove Jane to the hospital early that morning.

> A: ...and she bagged each item as Jane Doe took it off, and labeled it.
> Q: Did you watch the nurse as sh gathered this clothing and put in the bags as you just described
> A: Yes, I did.
> (RT:137:4;139:19)

On cross examination, Ms. Phinnesse states "...the emergency room nurse gathered the clothes..., gave her a robe to wear...(RT:141:27-28).   The prosecution questioned Ms. Jones, the SART nurse regarding the clothes, " And in a case of a sexual assault of an adult female, is the female clothing collected. " She answered "It varies. In this case the police took all the clothing." (RT.238:20-22)

The prosecution continues with questions to Officer Sharp, the investigating officer from Contra Costa Community College.

> Q: At some point during your visit to the hospital, did you take possession of any underwear that Jane Doe, "Jane", may have had on?
> A: Yes

18

(RT 438:19 to 440:5)

Prosecution then asks about the contents of the Jane Doe's jacket. Sharp

answers to the bus tickets, "These are the items I removed from the victim's

pocket. (RT511:2; 515:25) Defense objects to the testimony that the transfer

may have dates on them and would be considered hearsay. The court ruled in his

favor which closed the door on impeaching the officer regarding one of the

transfers having a January 19, 2003 date on it. (Exh 9) The prosecution politely

ended its direct. The objection without knowledge of the ticket was a strategic

error on the defense, and implies that the defense had not reviewed the state's

evidence prior trial. This information of a post dated bus transfer should have been

reported to the jury.

Trial counsel, awakened to his mistake gets Officer Sharp to admit that he

got the jacket on January 17, 2003 at 5:20 p.m..   Still this is incorrect because

the bus transfer ticket was dated January 19, 2003. (RT 543-544) Even the jury

was concerned about the chain of custody of the clothing and in one of a series of

notes which the court allowed to be presented to the prosecution or defense during

the trial. The following occurred.

> Court: For the record, Juror No. 12, I did take the note. I took it. I did not
> want you to think that anybody else took it. Before we play the videotape, if
> you wish, you can follow up on ay of the questions presented.
>
> Ms. Santos: Yes
> Q: Detective Sharp, when Jane Doe's clothes were collected at the hospital
> on January 16[th], you testified that you delivered them to the crime lab ten
> days later on the 26[th]. Was there any–what happened to the clothing in the
> interim, sir?
> A: They were stored in our evidence.

19

Q. In your evidence bureau?
A: Yes
Q: Was there any particular reason why it was— well, that the 26th was the day you took the clothes to the crime lab?
A: The only delay was – mostly was I wanted to make sure the panties were completely dried before we — they were repackaged and submitted.
(RT 604-605)

It seems to be of no importance to defense to ask, what did Jane Doe wear home if all her clothes were taken at the hospital.   The post dated ticket implies that the clothing was not collected then,  and may not in fact be the bloody underwear or jeans from that night. The injuries described by Nurse Jones, a small cut, an "abrasion inside the vaginal wall does not reflect the heavy blood stain in the pants. The evidence as presented may have been tainted and their admissibility as the true items that Jane Doe wore that night were at issue.   The court admitted the clothing over defense's objection. (RT 738-739).

Days later, the prosecution argued internal injuries to the jury in closing.  But more revealing was her statement that the clothing was provided to the police by Nancy Phinnesse, Jane Doe's counselor contrary to the testimony previously given by Ms. Phinnesse, the SART nurse and Officer Sharp.  She states "And the clothes were taken to her and given to the police.  And that's the main reason why she (Nancy Phinnesse-skills counselor) testified. (RT 825:24-28;826:1-3); " But for Ms. Phinnesse, you never would have seen the clothes." (827:3-4)

The prosecutor withheld this information from defense and attempts to rectify it in closing by stating how the clothes may have actually been gathered. Prior knowledge of the information would have impeached her witnesses, and made

20

the evidence suspect.  This was critical exculpatory evidence that the clothing may be other than what it purported to be on the night of the alleged incidents.

The bloody underwear and pants were admitted to demonstrate that the blood stains represented physical injuries to Jane Doe, the after marks of trauma. [5] (Exh 10) The chain of command is crucial to the possibility that evidence has been tampered with in this case.[6] The prosecution withholding this information fostered false testimony and mislead the jury.  This was a violation as held in <u>Brady v. Maryland</u> (1963) 373 U.S. 83, and petitioner's 14th Amendment right to have a fair trial.  The introduction of this potentially altered evidence alone necessitates the overturning of petitioner's conviction.

### CONCLUSION

Petitioner was a young man of nineteen when he met Jane Doe.  They were of the same age and similar cultural background.  They had things in common, she lived in a school for the blind most and raised by her grandmother.  He too had

---

[5] Petitioner's attorney observed the blood stain in the pants.  The blood soaked through the dark jeans to the point there is a shading of brown/red coloring.  The stain goes down each pant leg from the crotch approximately 2 inches on each leg side and up the back seam for about 3 to 4 inches.

However the underwear, though there is some deep blood stain, tends to have a water impression to them as if the blood was mixed with another fluid, at first, could it have been semen, but the testimony is there is no ejaculation. little sperm found.  The second thought is that the blood has been rinsed from the underwear to defeat the impression that the woman had her period, and the blood is a result of minor physical injuries.

[6] The probationer's report states " Police recovered the victim's blood soaked panties and found men's clothing, including an "old navy" shirt in a nearby men's bathroom, is also false. (Ct 536:4)

21

been raised by his grandmother. Petitioner is now serving a life sentence, 26 years, based on Jane Doe's interpretation of the events. She states in the probation report, she hoped petitioner goes to prison for the "rest of his life".

Counsel's advice to petitioner to waive his right to speak was poorly given when the strongest defense to rape is consent, that she did give petitioner a reasonable belief that she was attracted to him. Petitioner faced several police officers, lab technicians, a nurse, and other salient witness for a crime committed on a community campus that drew local media. When Jane Doe complained, an arrest conviction had to be made.

His defense to all this—nothing, except an audio tape of Jane Doe. Impeachment of Jane Doe's inconsistency as the only defense was poor advocacy. Petitioner's defense was inadequate because trial counsel was not prepared and knowledgeable of the criminal matter.

It is a matter of justice that petitioner's sentence of with special enhancements be overturned. Petitioner requests that the court acknowledge his trial had fundamental errors, too cumulative to state herein but those that were raised did violate petitioner's constitutional rights to a fair trial. Therefore issuance of a writ of habeas corpus is just.

### LEAVE TO AMEND THE PETITION

Petitioner's counsel has attempted to gather evidence in a very short time period, less than three months. Faced with a imposing deadline to file a brief, it is has been difficult to obtain evidence to support the allegations herein without

22

subpoena power, to obtain may records that petitioner alleges still exist.

Petitioner alleges that the prosecutor knows the whereabouts of Shayla
Gustafson and has other information that was discussed with Jane Doe on the
night of the alleged rape.  Petitioner alleges that Jane Doe was not at the School
for the Blind on January 15, 2003 as she testified.

Petitioner has sought to interview witnesses Dechanti Williams to determine
the time that Jane Doe was seen leaving the BART station and Arminta Harris
regarding the time she departed to establish that the time from the cab ride to the
time Jane Doe was found was significant and supports that Jane Doe provided
false testimony.  The witnesses refuse to cooperate with petitioner's attempt to
provide declarations regarding the allegations herein.   Examination of the physical
evidence and medical testimony as to the findings of Jane Doe should be re-
examined.

Petitioner seeks leave to amend the petition to conform to proof at an
evidentiary hearing after full discovery rights pursuant to People v. Duvall (1995) 9
Cal.4th 464. ("where access to critical information is limited or denied to one party,
where it is unreasonable to expect a party to obtain information at the pleading
stage, or where the proper resolution of a case hinges on the credibility of a
witnesses, the general rule requiring the pleading of facts should not be enforced in
such a draconian fashion so as to defeat the ends of justice".)

23

WHEREFORE, petitioner respectfully prays:

1. That this court take judicial notice of the record on appeal in <u>People v.</u>
<u>McCord</u>, Case No. A108457 and Superior Court of Contra Costa County Case No.
05-32028-3.

2. In the interests of justice, review the testimony and the additional
evidence contained in the Exhibit Appendices filed concurrently in support of this
petition;

3. Grant petitioner leave to amend the declarations submitted should the
court find that excusable grounds for delay in filing the habeas petition have not
been met on any of his claims;

4. Issue an Order to Show Cause to inquire into the legality of petitioner's
claims herein;

5. Set aside petitioner's conviction; or

6. Alternatively, remand to the lower court, and after an evidentiary hearing,
wherein petitioner is allowed to subpoena evidence and witnesses and take
testimony, issue a writ vacating petitioner's judgment of conviction; and;

7. In the interest of justice, grant petitioner such other and further relief as
the Court may deem proper.

Dated: 7/12/07.                     Respectfully Submitted;

                                    Ivy McCray, Attorney for
                                    Petitioner, Lavarius J. McCord

24

**VERIFICATION**

Ivy McCray declares as follows:

I am an attorney admitted to practice law in the state of California. I have been retained by petitioner to prepare this writ of habeas corpus.

I make this verification because petitioner is incarcerated at the California State Prison in Calipatria, California, which is outside the county in which my office is located, and because the matters stated in the petition for writ of habeas corpus are more within my knowledge than his.

I have read the foregoing petition for writ of habeas corpus, and declare that the contents of the petition are true.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 12 day of July at Oakland, California.

Respectfully submitted,

Ivy McCray
Attorney for Lavarious Jermaine McCord

CERTIFICATE OF WORD COUNT

I, Ivy McCray, attorney for petitioner certify the word count for this brief is

approximately 3, 809 words.

Ivy McCray
Attorney at Law

CERTIFICATE OF SERVICE BY MAIL

I, Ivy McCray, declare:

I am an active member of the State Bar of California. I am not a party to the within action. My business address is 829 - 61st Street, Oakland, California 94608. On the date stated below, I deposited in the U.S. mail at Oakland, California, the following document(s):

Petition for Writ of Habeas Corpus

Appendix

I placed the above stated document(s) in a sealed envelop with prepaid postage thereon, and addressed as follows:

Attorney General of California
455 Golden Gate Avenue, Suite 1100
San Francisco, CA 94102-3664

District Attorney,
Contra Costa County
P.O. Box 670
Martinez, CA 94553

Clerk, Contra Costa County
for Delivery to: Judge Harlan Grossman
P.O. Box 911
Martinez, CA 94553

Lavarius J. McCord, CDC -62318
Calipatria State Prison
P.O. Box 5007
Calipatria, CA 92233

I declare under penalty of perjury under the laws of the State of C. that the foregoing is true and correct and executed at Oakland, California. 6 2 2007

Ivy McCray
Attorney at Law

# EXHIBIT H

S154343

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

---

In re LAVARIUS JERMAINE MCCORD on Habeas Corpus

---

The petition for writ of habeas corpus is denied.

Werdegar, J., was absent and did not participate.

SUPREME COURT
FILED

JAN - 3 2008

Frederick K. Ohlrich Clerk

_____
Deputy

GEORGE
_____
Chief Justice